**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| David Phillip Schupmann, | ) | |
| | ) | Case No. 26-05587 |
| Debtor and debtor-in-possession. | ) | |
| | ) | Hon. Jacqueline P. Cox |
| | ) | |

**NOTICE OF MOTION**

TO: See attached list.

PLEASE TAKE NOTICE that on **September 8, 2026 at 1:00 p.m.,** I will appear before the Honorable Jacqueline P. Cox, or any judge sitting in that judge's place, **either** in courtroom 680 of the Everett McKinley Dirksen United States Courthouse, 219 S. Dearborn Street, Chicago, IL 60604, **or** electronically as described below, and present the **Motion to Dismiss Chapter 11 Case & Request to Exceed Page Limitation Under Local Rule 9090-3(F),** a copy of which is attached.

**Important: Only parties and their counsel may appear for presentment of the motion electronically using Zoom for Government. All others must appear in person.**

**To appear by Zoom using the internet,** (1) go to this link: https://www.zoomgov.com/ . (2) Enter the meeting ID 161 273 2896. (3) Enter the passcode 778135.

**To appear by Zoom using a telephone,** (1) call Zoom for Government at 1-669-254-5252 or 1-646-828-7666. (2) Enter the meeting ID 161 273 2896. (3) Enter passcode 778135.

**When prompted identify yourself by stating your full name.**

**To reach Judge Cox's web page** go to www.ilnb.uscourts.gov and click on the tab for Judges.

If **you object to this motion** and want it called on the presentment date above, you may file a Notice of **Objection** no later than two (2) business days before that date. If a Notice of Objection is timely filed, the motion will be called on the presentment date. If no Notice of Objection is timely filed, the court may call the matter regardless.

Date: August 31, 2026

**FW-CO, Inc. d/b/a Fortis**

By: */s/ Jack O'Connor*
One of Its Attorneys

Elizabeth B. Vandesteeg (IL No. 6291426)
Jack R. O'Connor (IL No. 6302674)
Cha'yra C. Eddie-Williams (IL No. 6335826)
Levenfeld Pearlstein LLC
120 S. Riverside Plaza, Ste. 1800
Chicago, Illinois 60606
evandesteeg@lplegal.com
joconnor@lplegal.com
ceddiewilliams@lplegal.com

## CERTIFICATE OF SERVICE

I certify that I served a copy of this notice and the attached **Motion to Dismiss Chapter 11 Case & Request to Exceed Page Limitation Under Local Rule 9090-3(F)** on each entity shown on the attached list at the address shown and by the method indicated on the list on **August 31, 2026.**

By *___/s/ Jack O'Connor___*
Attorney

## SERVICE LIST

***Parties served via electronic notice through CM/ECF:***

***Subchapter V Trustee***
Ira Bodenstein
Attn: Cozen O'Connor
123 N. Wacker Drive, Suite 1800
Chicago, IL 60606
ibodenstein@cozen.com

***U.S. Trustee***
Attn: Adam G. Brief
Office of the U. S. Trustee, Region 11
219 South Dearborn
Room 873
Chicago, IL 60604
Ustpregion11.es.ecf@usdoj.gov

**Counsel for Debtor**
Attn: Ariane Holtschlag
Attn: Jeffrey K Paulsen
Paulsen+Holtschlag LLC
1245 S. Michigan, No. 115
Chicago, IL 60605
aholtschlag@ph-firm.com
jpaulsen@ph-firm.com

Old Second National Bank
Attn: Dana N. O'Brien
McCalla Raymer Leibert Pierce, LLP
333 West Wacker Drive Suite 1820
Chicago, IL 60606
dana.obrien@mccalla.com

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| David Phillip Schupmann, | ) | |
| | ) | Case No. 26-05587 |
| Debtor and debtor-in-possession. | ) | |
| | ) | Hon. Jacqueline P. Cox |
| | ) | |

**MOTION TO DISMISS CHAPTER 11 CASE & REQUEST TO EXCEED PAGE LIMITATION UNDER LOCAL RULE 9090-3(F)**

FW-CO, Inc. d/b/a Fortis ("Fortis"), one of two unsecured creditors scheduled in the above-captioned chapter 11 case (the "Chapter 11 Case," or the "Case") of David Schupmann (the "Debtor," or "Schupmann"), through its undersigned counsel, brings this motion (the "Motion") seeking an order dismissing this Chapter 11 Case under § 1112(b) of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code") and Rules 2002 and 1017(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and requests leave of court to exceed the page limitation under Rule 9090-3(F) of the Local Rules for the United States Bankruptcy Court for the Northern District of Illinois (the "Local Rules"). In support of the Motion, Fortis states:

## PRELIMINARY STATEMENT

This Chapter 11 Case is not a reorganization; it is a naked litigation tactic intended to shield the Debtor from his liability to Fortis. The Debtor filed this Subchapter V Case after fourteen months of contentious litigation with Fortis in the Colorado Action (defined below) (five months of which have been stayed as to Schupmann due to the Chapter 11 Case), where Fortis is pursuing him and others for operating a fraudulent kickback scheme at Fortis's expense, among other claims. This is not a legitimate use of chapter 11. The Debtor has just two unsecured creditors—Fortis and the lawyers defending him in the Colorado Action—and has repeatedly admitted that

he cannot formulate a plan until the Colorado Action develops further. At the same time, his monthly operating reports show continuing losses and no reliable, committed source of plan funding.

Chapter 11 is not a refuge for an individual debtor to pause a two-party dispute, shift venue to bankruptcy court, and delay the very litigation that will determine the creditor body and alleged assets of a debtor's estate. The Debtor filed this Chapter 11 Case in bad faith, and cause exists under Bankruptcy Code § 1112(b) to dismiss it.

## JURISDICTION & VENUE

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b). Venue of this proceeding and the Motion is proper in this District under 28 U.S.C. §§ 1408 and 1409.

2. The statutory bases for the relief sought in this Motion are Bankruptcy Code § 1112(b), Bankruptcy Rules 2002 and 1017(a), and Local Rule 9090-3(F).

## FACTUAL & PROCEDURAL BACKGROUND

3. Fortis is the leader in the roof performance business and is the Debtor's former employer. The Debtor worked for Fortis beginning in 2018 as a Senior Vice President of Sales and Marketing. While employed with Fortis, the Debtor operated in an executive role and managed marketing and operations staff for Fortis, pursuant to the terms of an employment agreement. During his time with Fortis, the Debtor was promoted to serve as Fortis's Chief Operations Officer in October 2021 and later demoted to Enterprise Accounts Director in August 2023 before eventually being terminated in December 2024.

### I. The Debtor's Fraudulent Acts Resulting in the Colorado Action.

4. While employed by Fortis, the Debtor devised and carried out a scheme to personally enrich himself at Fortis's expense, in direct contravention of his fiduciary duty of

loyalty to Fortis and his employment agreement, among other things. As part of the Debtor's scheme, he undertook numerous bad acts, including:

(a) Colluding with another Fortis employee, Charles Schulz ("Schulz") – a co-defendant in the Colorado Action – to run an illicit kickback scheme through which the Debtor would offer contractors guaranteed work in exchange for those contractors inflating their bids (the "Kickback Fees"), and turning over the Kickback Fees directly to the Debtor, Schulz, and/or his affiliated entities after Fortis paid the contractor for its work.

(b) Diverting business away from Fortis to an entity called Trident Solutions of Sugar Grove, LLC ("Trident"), which the Debtor co-owned with Schulz, while both were employees of Fortis.

(c) Using other entities in which the Debtor owned interests, to collect improper "consulting" and "referral" fees from contractors as part of the scheme.

(d) Engaging in self-dealing by personally benefitting from an arrangement in which Fortis made monthly payments for office space that Schupmann did not disclose was actually leased through Top Pick Athletics, Co., an entity in which he held a financial interest.

(e) Violating confidentiality and noncompete provisions of his Fortis employment agreement by accepting a position with Roofing USA, LLC (a direct competitor of Fortis), which has continued through to the present, and by retaining hundreds of pages of confidential Fortis documents after his termination.

*See generally,* (Ex. A).

5. The Debtor's illicit scheme, founded on fraud and perpetuated against Fortis, resulted in significant financial and reputational harm to Fortis. On January 24, 2025, Fortis filed a lawsuit in the United States District Court of Colorado (the "Colorado Court"), pending under case number 1:25-cv-00254-NYW-TPO and captioned *FW-CO, Inc., d/b/a Fortis Warranty v. Schulz, et al*. (the "Colorado Action"). The current operative *Third Amended Complaint & Jury Demand* (the "Amended Complaint") in the Colorado Action alleges, among other things, that the Debtor breached his fiduciary duties to Fortis by engaging in the fraudulent kickback scheme;

breached his employment agreement on numerous grounds;[1] and engaged in civil theft, conversion, and civil conspiracy. A copy of the Amended Complaint is attached here as **Exhibit A**. A copy of the docket for the Colorado Action as of August 31, 2026 is attached here as **Exhibit B**.

## II. <u>The Debtor's Prepetition Efforts to Thwart Fortis in the Colorado Action.</u>

6. Throughout the 20 long months that the Colorado Action has been pending, the Debtor has worked to stall and delay the Colorado Action, withholding information from Fortis, failing to comply with court orders, and, most recently, dissolving Trident in February 2026. *See* (**Exhibit C**) (Illinois Secretary of State record showing termination as of 02-04-2026).

7. On January 24, 2025, Fortis commenced the Colorado Action against Schupmann, Schulz, and Trident, alleging that the two former senior executives had orchestrated a scheme to divert business away from Fortis, demand kickbacks from contractors, and funnel opportunities to Trident, an entity they created and operated in secret while still employed by Fortis. *See* Exs. A, B.[2] Within days after filing the Colorado Action, Fortis learned that Schupmann had begun working for Roofing USA, LLC ("<u>Roofing USA</u>") in violation of his non-compete and non-solicitation covenants. Fortis sought emergency injunctive relief, *see* (Ex. B, Colo. Dkt. 10) and on February 24, 2025, the Colorado Court granted a TRO restraining Schupmann from engaging in managerial, sales, or marketing functions for any competing commercial roofing entity. (Ex. B, Colo. Dkt. 35). The Court ordered expedited discovery to be completed by April 8 and set a

---

[1] As detailed in the Amended Complaint, the Debtor is a repeat offender when it comes to violating employment agreements. In 2014, another one of the Debtor's former employers, Tecta America Corporation, sued the Debtor for engaging in a scheme to violate the restrictive covenants of his employment agreement with Tecta in Illinois state court. *See* (Ex. A ¶ 130); *see also Tecta America Corp. v. Schupmann*, Case No. 2014CH18525 (Cir. Ct. Cook Cty., Ill., Cty. Dep. Chancery Div).

[2] At the Court's request, Fortis will provide copies of the underlying motions and orders from the Colorado Action discussed herein.

preliminary injunction hearing for May 30. (*Id.*). Despite the TRO, Schupmann continued the conduct underlying the TRO, and failed to timely provide the expedited discovery the Colorado Court ordered completed by April 8 until months after the Court-imposed deadline.

8. During expedited discovery, Fortis uncovered evidence that Schupmann had been ghostwriting sales proposals, engaging with clients and prospects, attending sales meetings, and joining in-person sales pitches, all in violation of the TRO. (Ex. B, Colo. Dkt. 62). On April 29, 2025, Fortis filed a *Motion for Contempt* (Ex. B, Colo. Dkt. 62) and a *Motion for Preliminary Injunction* (Ex. B, Colo. Dkt. 61). Fortis was simultaneously forced to seek a court order compelling Schupmann to produce records of his sales activities with Roofing USA, which he had refused to produce voluntarily. (*See* Ex. B, Colo. Dkt. 80).

9. At the hearing on Fortis's preliminary injunction motion, the Debtor disclosed he had retained 850 pages of Fortis's proprietary materials, which he did not return until July 25, 2025. (Ex. B, Colo. Dkt. 105). While the Colorado Court ultimately denied the preliminary injunction, it warned that "even absent a preliminary injunction—[the defendants] may still be bound by [the restrictive] covenants until and unless further Order of the Court, or verdict by the jury." (Ex. B, Colo. Dkt. 99).

10. Discovery in the Colorado Action was defined by the Defendants' persistent obstruction. Following expedited discovery, Fortis served written discovery requests on July 25, 2025, but the Debtor's and Trident's responses, even after receiving a deficiency letter, were grossly deficient. Fortis changed counsel to Senn Fortis LLC in November 2025, and new counsel moved quickly to bring discovery into compliance, and the Colorado Court extended fact discovery to August 31, 2026. (Ex. B, Colo. Dkt. 124). In early 2026, Fortis established an ESI Protocol and requested the parties to re-produce prior documents in accordance with the Protocol.

(Ex. B, Colo. Dkts. 128, 134). Schulz's counsel promptly retained an outside e-discovery vendor and re-served compliant productions. Taft Stettinius & Hollister LLP ("Taft")—counsel for the Debtor and Trident—refused to retain an outside vendor to ensure compliance with the Protocol.

11. On March 25, 2026, the Colorado Court denied Fortis's *Motion for Contempt* on narrow procedural grounds but preserved Fortis's right to renew the motion. (Ex. B, Colo. Dkt. 142). That same day, Fortis served another discovery deficiency letter on the Debtor and Trident for outstanding discovery, which went unanswered.

## III. The Petition, Schedules, & Objective Two-Party Character of the Chapter 11 Case on the Petition Date.

12. Five days after Fortis served another deficiency letter on Schupmann, faced with substantive claims and insurmountable evidence against him, the Debtor filed this Chapter 11 Case on March 30, 2026 (the "Petition Date"), electing to proceed under Subchapter V of chapter 11. (Dkt. 1). On April 1, 2026, Ira Bodenstein was appointed as Subchapter V Trustee in the Chapter 11 Case.

13. The Debtor's petition, bankruptcy schedules, and statement of financial affairs tell a simple story. The Debtor is an individual, with no business enterprise to reorganize, no employee jobs to preserve, and no trade creditor relationships requiring a collective bankruptcy remedy.

14. Instead, the Debtor's petition and schedules disclose that:

(a) The Debtor has just one secured creditor, for a personal mortgage debt related to his residence (which he claims is 100% exempt under Illinois law);

(b) The Debtor has only **two** unsecured creditors, both tracing directly to the Colorado Action: (i) Fortis, whose claim arises out of the Colorado Action and (ii) Taft whose $500,000 scheduled claim (the "Taft Claim")

purportedly arises from the legal defense of the Debtor (and Trident) in the Colorado Action.[3] *See* (Dkt. 1).

(c) The Debtor's purported solvency as of the Petition Date is based solely on a speculative asset: his counterclaims in the Colorado Action, which the Debtor assumes will not only prevail, but will be awarded treble damages to the tune of more than $3.39 million. This claim is contingent, unliquidated, disputed, and remains at the pleading stage. *See* (Dkt. 1 at p. 17).

15. The petition and schedules make clear that the Colorado Action has simply shifted venues. This is compounded by the fact that, in the weeks following the Petition Date, Taft disclosed that Trident had been terminated as an Illinois LLC with no assets, (Ex. B, Colo. Dkt. 145), and Taft attorney Todd Rowden attempted to invoke the automatic stay in favor of nondebtor (and defunct entity) Trident in an attempt to block Fortis from pursuing discovery *even against non-debtors* in the Colorado Action.

16. The timing could not be more telling: the Debtor did not file for bankruptcy when the Colorado Action was first brought, when the TRO was entered, or when he was accused of contempt. Instead, he filed only after the Colorado Court cleared the procedural decks, after his original counsel withdrew,[4] after Fortis's new counsel pressed for long-overdue discovery, and as Fortis was poised to add new defendants and claims exposing the full scope of the conspiracy. This

---

[3] Notably, the Debtor claims that he is solely responsible for the Taft Claim, despite the fact that Taft represented both the Debtor *and* Trident in the Colorado Action. *See* (Ex. B, Colo. Dkts. 11, 77, 94, 135) (appearing on behalf of both the Debtor and Trident). The Illinois Secretary of State's website indicates that Trident's registration as an Illinois LLC terminated in early February, 2026. *See* (Ex. C). On information and belief, Fortis asserts that the Debtor likely terminated Trident to shift a joint debt burden away from Trident to the Debtor to (a) manufacture an unsecured claim other than Fortis's; and (b) manufacture eligibility for Subchapter V purposes.

[4] Taft attorneys Patrick Miller and Emily England each respectively withdrew from representing the Debtor and Trident in the Colorado Action. *See* (Colo. Dkts. 138-39). But, in *Schupmann's Application to Employ Michael Jurasek and Taft Stettinius & Hollister LLP as Special Counsel, Effective as of August 1, 2026*, (the "Taft Application") (Dkt. 85), Ms. England is expressly included in the list of Taft attorneys proposed as special counsel for the Debtor. (Dkt. 85 at p. 4). The Debtor provides no context or explanation as to why Ms. England, who withdrew from representing him less than six months earlier, is now willing and able to represent him (particularly in light of outstanding unpaid accounts receivable of nearly half a million dollars) in this Chapter 11 Case.

filing was not the act of a debtor seeking honest relief – it was the latest maneuver in a pattern of obstruction.

17. The Debtor himself confirmed his reason for filing when sitting for examination under Bankruptcy Rule 2004. A copy of the transcript from that examination is attached here as **Exhibit D**. When discussing his reason for filing, the Debtor admitted:

> [Fortis counsel]: Why did you file your bankruptcy proceeding?
>
> [Debtor]: The cost of the TRO process [in the Colorado Action] were very expensive and hadn't really gotten into the complaint yet, promised to be even more expensive, so, one, seeking relief from the costs and two trying to find an expedited way to settle the [Colorado Action].

*See* (Ex. D, Debtor Exam Tr. 16:4-11).

## IV. <u>The Debtor Repeatedly Ties the Chapter 11 Case & Plan Process to the Outcome of the Colorado Action.</u>

18. Since filing the Chapter 11 Case, the Debtor has continued his pattern of openly delaying the Colorado Action. In *Schupmann's Report Under 11 U.S.C. § 1188(c)*, for example, the Debtor expressly stated that the sole purpose of the Chapter 11 Case was to stall and circumvent the pending Colorado Action: "[t]o foster a more efficient and economic resolution of the parties' dispute, and to provide a mechanism to pay out of his future income his attorneys' fees and any potential damages Fortis may be awarded, Schupmann filed this chapter 11 case." *See* (Dkt. 30 at p. 2); *see also* (Ex. D, Debtor Exam Tr. 16:4-21, 24:15-20). The Debtor also admits that he timed the filing specifically in relation to disrupting the Colorado Action. *See* (Ex. D, Debtor Exam Tr. 24:21-25:19) (stating that the timing of the chapter 11 filing was driven by "a time or break," in the Colorado Action at the time when Fortis engaged substitute counsel in Colorado).

19. On June 29, 2026, the Debtor filed *Schupmann's Motion to Extend the Time to File His Plan* (the "<u>Plan Extension Motion</u>"), asking to be excused from § 1189's mandatory

requirement that a Subchapter V debtor file a plan no later than 90 days into the case. (Dkt. 56); *see also* 11 U.S.C. § 1189(b). In the Plan Extension Motion, the Debtor repeated his reason for filing the Chapter 11 Case: "[t]o foster a more efficient and economic resolution of the parties' dispute [in the Colorado Action], and to provide a mechanism to pay out of his future income his attorneys' fees and any potential damages Fortis may be awarded . . .." (Dkt. 56 at p. 2).

20. The Debtor also identified Fortis and the Colorado Action as the sole reason he asked to double the time period for him to file a plan in the Plan Extension Motion, so that "respective positions [between the Debtor and Fortis in the Colorado Action] can be developed further before he proposes his plan[.]" (Dkt. 56 at p. 3).

21. Another explicit example of how the Debtor is using this Chapter 11 Case as a mere continuation of the Debtor's litigation tactics in the Colorado Action is the Taft Application, (Dkt. 85) through which the Debtor seeks authority to employ *his only other unsecured creditor* as special litigation counsel in the Chapter 11 Case, despite Taft's clear inability to demonstrate that it is a disinterested person in this Case. And even in the Taft Application, the Debtor audaciously asserts that Taft is best positioned to serve as his counsel in this Case so that it can "foster a more efficient resolution of [the Colorado Action]." (Dkt. 85 at p. 1).[5]

22. These admissions are not merely evidence that a lawsuit exists. They show that the Debtor believes that progress in, or resolution of, the Colorado Action, an out-of-bankruptcy two-party dispute, is a condition precedent to proposing a plan.

23. Moreover, and notably, the Debtor has not identified any of the essential terms of any feasible plan, including, for example: (i) the amount of projected disposable income or value

[5] Even the Taft Application treats this Chapter 11 Case as secondary to the Colorado Action, painting his own bankruptcy counsel as subordinate to Taft and engaged merely "to handle the ordinary aspects of Schupmann's chapter 11 case, such as pursuing a chapter 11 plan and the like." (*Id*. at 2.)

of property available to fund creditor distributions; (ii) a committed and enforceable third-party contribution; (iii) the proposed treatment of Fortis's disputed claim; (iv) the proposed treatment of Taft's claim; (v) the treatment, if any, of the residential mortgage; (vi) the value and timing of any litigation recovery available for distribution; or (vii) an alternative funding source if the counterclaims in the Colorado Action fail or remain unresolved.

24. Instead, the Debtor has stated that he is now stuck in an absurd catch-22 of his own making, because: "[t]he uncertainty over the size and scope of Fortis's supposed claim, and whether Fortis owes Schupmann money or vice versa, makes it difficult for Schupmann to propose an effective plan of reorganization." (Dkt. 56 at p. 7); *see also* (Ex. D, Debtor Exam Tr. 252:3-256:9) (testimony from the Debtor that he does not know whether plan formulation is dependent on the outcome of the Colorado Action). If the Debtor cannot formulate a plan until positions in the Colorado Action are further developed, then this Case has no independent reorganization objective or timetable and should be dismissed.

25. The Debtor has also used the Chapter 11 Case as a further means of trying to bog Fortis down the same way he has done in the Colorado Action. For example, the Court has authorized Fortis to examine the Debtor under Bankruptcy Rule 2004. (Dkt. 26). But instead of agreeing to sit for the examination as authorized by the Court, the Debtor has attempted to throw roadblocks in front of Fortis, relitigating issues already addressed in this Case, arguing that he should not be subject to questions about his prepetition conduct, his sources of income pre- and post-petition as they relate to his prepetition conduct, and his ability to propose a Chapter 11 plan in *Schupmann's Motion for a Protective Order Confirming the Limits of Fortis's Rule 2004 Examination* (the "Protective Order Motion"). (Dkt. 83).[6]

---

[6] Conveniently for the Debtor, the Court was unavailable to hear the Protective Order Motion until after Fortis's extended deadline to file a § 523 complaint, which expires on August 31, 2026, *see* (Dkt. 83), again forcing

26. The Debtor's obstructionist postpetition conduct is directly in line with his conduct prepetition, and exhibits a continuation of his efforts to defraud, hinder, and delay Fortis in realizing its claims against him in the Colorado Action.

## V. The Debtor's Monthly Operating Reports Show Continuing Losses & Dependence on Uncommitted Nondebtor Funds.

27. As of the date of this Motion, the Debtor has filed four monthly operating reports (the "MORs" and each an "MOR") showing he loses money on a monthly basis without contributions from his nondebtor spouse, Jennifer Schupmann. Without those contributions (and sometimes even with them) the Debtor is incurring substantial, continuing losses:

| MOR Period (Dkt. No). | Reported net cash flow | | Less nondebtor contributions | | Debtor net cash flow | |
|---|---|---|---|---|---|---|
| April 2026 (Dkt. 40) | $ | 3,760.09 | $ | (9,000.00) | $ | (5,239.91) |
| May 2026 (Dkt. 71) | $ | 4,275.82 | $ | (2,200.00) | $ | 2,075.82 |
| June 2026 (Dkt. 79) | $ | (2,624.65) | $ | (2,300.00) | $ | (4,924.65) |
| July 2026 (Dkt. 81) | $ | (4,327.37) | $ | (0.00) | $ | (4,327.37) |
| **Total:** | **$** | **1,083.89** | **$** | **(13,500.00)** | **$** | **(12,416.11)** |

28. There is no pleading or other disclosure by the Debtor identifying a binding commitment by his nondebtor spouse (or any other nondebtor entity), to make further contributions throughout a plan term. *See* 11 U.S.C. § 1191(d) (adopting a disposable income test and not a current monthly income test). The Debtor confirmed this is the case when examined under Rule 2004, stating multiple times that no third party has agreed to support or fund a plan in this Chapter 11 Case. *See* (Ex. D, Debtor Exam Tr. 250:9-251:13).

29. In total, the picture of this Chapter 11 Case is clear: the Debtor filed in bad faith to frustrate the progress of the Colorado Action, and this Case should be dismissed as a result.

Fortis to consider whether to continue playing the Debtor's game, and incur even more time and expense to avoid being prejudiced in this Chapter 11 Case.

**RELIEF REQUESTED & BASIS FOR SAME**

30. By this Motion, Fortis requests that the Court dismiss the Chapter 11 Case for cause under § 1112(b) of the Bankruptcy Code. The Chapter 11 Case is nothing more than a two-party dispute filed in bad faith by the Debtor and should be dismissed. Put plainly, the Debtor is abusing the Chapter 11 process as a litigation tactic to (a) forestall the Colorado Action; (b) force Fortis to incur additional fees and costs participating in this Chapter 11 Case; and (c) attempt to jettison obviously non-dischargeable debts the Debtor owes to Fortis on account of his fraudulent prepetition misconduct.

## I. Section 1112(b) Requires Dismissal or Conversion Once Cause is Established.

31. Bankruptcy Code § 1112(b) states that:

> [O]n request of a party in interest, and after notice and a hearing, absent unusual circumstances specifically identified by the court that establish that the requested conversion or dismissal is not in the best interests of creditors and the estate, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, if the movant establishes cause.

11 U.S.C. § 1112(b).

32. The party moving to dismiss a case bears the burden of showing cause for dismissal, *In re 15375 Mem'l Corp.*, 386 B.R. 548, 551 (Bankr. D. Del. 2008). Once cause is established, however, dismissal or conversion (whichever is in the best interests of creditors) is mandatory, so long as there are no "unusual circumstances" present. *See In re Dovetail, Inc.*, Case No. 07-B-72820, 2008 WL 5644889 (Bankr. N.D. Ill. Dec. 31, 2008) (citing *In re Gateway Access Solutions, Inc.*, 374 B.R. 556, 560 (Bankr. M.D. Pa. 2007) (noting that "the [BAPCPA] amendments to § 1112 limit the court's discretion to refuse to dismiss or convert a case.")); *In re Reserves Resort, Spa & Country Club LLC*, Case No. 12-13316 (KG), 2013 WL 3523289 at *2 (Bankr. D. Del. July 12, 2013).

33. Bankruptcy Code § 1112(b)(4) sets forth a non-exhaustive list of conditions that constitute "cause," to dismiss a chapter 11 case. *See In re Strug-Division, LLC*, 375 B.R. 445, 448 (Bankr. N.D. Ill. 2007); *In re Irasel Sand*, LLC, 569 B.R. 433, 439 (Bankr. S.D. Tex. 2017). While not specifically enumerated under § 1112(b)(4), it is well established that a chapter 11 petition is subject to dismissal for cause if not filed in good faith. *Matter of Madison Hotel Assoc's,* 749 F.2d 410 (7th Cir. 1984). This is exactly that kind of case.

## II. Cause Exists Because the Debtor Filed & is Using this Case in Bad Faith.

34. Good faith is evaluated objectively under the totality of the circumstances existing on the petition date. *In re Tekena USA, LLC*, 419 B.R. 341, 346 (Bankr. N.D. Ill. 2009). To be clear, bad faith does not require any "bad" conduct (although plenty exists in the Case at hand). Rather, courts look to objective factors to find bad faith.

35. This Court frequently applies the 14-factor analysis articulated in *In re Tekena USA, LLC*, 419 B.R. at 346. *See also, In re Lake Mich. Beach Pottawattamie Resort LLC*, 547 B.R. 899, 905-06 (Bankr. N.D. Ill. 2016); *In re First Premier Funding*, *LLC*, 654 B.R. 142, 153 (Bankr. N.D. Ill. 2023). No single factor is determinative, and courts review the totality of the circumstances as they existed on the petition date. *See First Premier Funding*, 654 B.R. at 154.

### A. The objective facts show a two-party litigation case, not a collective reorganization.

36. As this Court stated in *Tekena*, "[o]ne of the hallmarks of bad faith in filing a petition is pre-petition litigation already pending in [another] court between the parties." 419 B.R. at 346. The Colorado Action has been pending for 14 months and has been a contentious and expensive undertaking both for the Debtor and Fortis.

37. The Debtor's unsecured creditor body is tiny and entirely litigation-derived, consisting only of (1) Fortis's claim, arising out of the Colorado Action, and (2) Taft's claim,

arising out of its defense of Debtor and Trident in the Colorado Action. The one secured claim against him relates to an exempt residence. *See* (Dkt. 1 at pp. 12, 22).

38. The Debtor has repeatedly stated that this Case was filed to resolve the Colorado Action and pay litigation-related fees and potential damages. *See* (Dkt. 30 at p. 2; Dkt. 56 at pp. 2-3, 7). He has also stated that he needed additional time to develop and file a plan, so that the parties could "develop their respective positions" in the Colorado Action (which has, of course, been stayed by the Debtor's filing of this bankruptcy Case). *See* (Dkt. 56 at p. 7).

39. These admissions defeat any potential argument by the Debtor that this Case merely happens to involve a significant lawsuit. The Colorado Action is not simply incidental to this bankruptcy proceeding—it is the *sole stated reason* for the filing, the sole source of the unsecured creditor body, the principal scheduled non-exempt (and contingent) asset, and the sole stated reason why he cannot timely propose a plan.

40. The Debtor cannot be permitted to simultaneously argue that this bankruptcy proceeding provides a proper and efficient restructuring forum, while also arguing that he cannot propose a plan until the stayed Colorado Action develops further. This tortured position confirms that the real dispute belongs in the Colorado Court, and this Chapter 11 Case lacks an independent reorganizational purpose.

**B. There is no enterprise or economic operation to rehabilitate or reorganize**.

41. The Debtor is an individual with no identified business to restore. He has no employees, no business assets producing revenue, and no trade-creditor relationships requiring preservation. There is simply no economic enterprise to be rehabilitated or reorganized. *See* *Tekena*, 419 B.R. at 345-46.

42. While the Debtor may contend that Subchapter V allows an individual debtor to reorganize through projected disposable income (or property of equivalent or greater value), the

record must still show a concrete and credible bankruptcy purpose. *See Tekena* 419 B.R. at 349 (holding that a debtor must show a "legitimate reorganizational objective within the scope of the Bankruptcy Code," and not an improper litigation tactic in filing for bankruptcy relief). Here, the Debtor has supplied no purpose for this Case beyond managing or resolving the Colorado Action and its associated debt.

**C. No concrete plan pathway exists**.

43. The Debtor has not identified the amount, duration, source, or reliability of projected disposable income to confirm a plan. He has not explained how the disputed Fortis claim and undisputed Taft Claim would be treated, whether claim estimation would be required, or how confirmation could proceed while he "awaits development" of the Colorado Action or this chapter 11 proceeding itself. *See Tekena*, 419 B.R. at 349-50 (citing *In re Woodbrook Assocs.,* 19 F.3d 312, 316 (7th Cir. 1994) (holding that chapter 11 cases can be dismissed where court determines it is unreasonable to expect a plan can be confirmed)).

44. As such, there is no reasonable likelihood that the Debtor can propose and confirm any plan in this Case. It should be dismissed.

**D. The individual *Tekena* factors require dismissal, or do not apply here**.

45. Quite simply, the vast majority of the *Tekena* factors require that the Court dismiss the Chapter 11 Case, with the remaining limited factors simply inapplicable:

| ***Tekena* Factor** | **Application Here** |
|---|---|
| Few or no unsecured creditors | The Debtor has just two unsecured creditors: Fortis and Taft. (Dkt. 1). |
| Prior bankruptcy or related entity proceeding | The Debtor wound down and dissolved Trident prepetition, avoiding judicial oversight of its affairs. *See* (Ex. C). |
| Improper prepetition conduct | The Debtor engaged in numerous improper acts with respect to Fortis, as set forth in the Amended Complaint. *See* (Ex. A); *see also supra* at n. 1. |

| ***Tekena* Factor** | **Application Here** |
|---|---|
| Filing used to evade court orders | The Debtor filed the Case to halt the Colorado Action, prevent judgment being entered against him, and stall his existing disclosure obligations in those proceedings. (Dkts. 30, 56); (Ex. D, Debtor Exam Tr. 16:4-11). |
| Few debts to non-moving creditors | The Debtor has just one secured creditor and one unsecured creditor aside from Fortis. (Dkt. 1). |
| Eve-of-foreclosure filing | N/A. The Debtor filed the Chapter 11 Case to halt the Colorado Action, which is still at the initial pleading stage. *See* (Dkts. 30, 56); (Ex. D, Debtor Exam Tr. 16:4-11, 24:21-25:19). |
| Foreclosed property as sole or major asset | N/A. |
| No ongoing business or employees | The Debtor is an individual with no employees or ongoing business to preserve. |
| No possibility of reorganization | The Debtor has no prospect of reorganizing. The MORs disclose the Debtor has no disposable income to commit to a chapter 11 plan, and no third party committed to supporting a plan. (Dkts. 40, 71, 79, 81); *see also* (Ex. D, Debtor Exam Tr. 250:9-251:13). |
| Income insufficient to operate | The MORs disclose the Debtor loses money without support from nondebtor sources. (Dkts. 40, 71, 79, 81). |
| No pressure from non-moving creditors | There is no evidence that any creditor other than Fortis pursued claims against the Debtor prepetition. |
| Two-party dispute | The entire basis for the Debtor's chapter 11 filing revolves around frustrating Fortis's efforts in the Colorado Action. *See* (Dkts. 30, 56); (Ex. D, Debtor Exam Tr. 16:4-11, 24:21-25:19). |
| Corporate debtor formed immediately before filing | N/A. |
| Filing solely to create automatic stay | The entire basis for the Debtor's chapter 11 filing was to halt the Colorado Action and frustrate Fortis's pursuit of the Colorado Action. *See* (Dkts. 30, 56); (Ex. D, Debtor Exam Tr. 16:4-11, 24:21-25:19). |

*Tekena*, 419 B.R. 341. As discussed above, these factors all weigh in Fortis's favor, and support dismissal of the Case as a bad faith filing.

## III. <u>Cause for Dismissal Independently Exists Under § 1112(b)(4)(A).</u>

46. Section 1112(b)(4)'s list of *per se* conditions establishing cause to dismiss or convert a chapter 11 case includes the requirement that a case be dismissed where there is a "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." 11 U.S.C. § 1112(b)(4)(A). To show cause under subsection (b)(4)(A), "the moving party must demonstrate that there is both (1) a substantial or continuing loss to or diminution of the estate and (2) the absence of a reasonable likelihood of rehabilitation." *In re TMT Procurement Corp.*, 534 B.R. 912, 919 (Bankr. S.D. Tex. 2015) (*citing In re Creekside Sr. Apartments, L.P.*, 489 B.R. 51, 61 (B.A.P. 6th Cir. 2013)).

### A. The MORs establish the Debtor's continuing losses & administrative insolvency.

47. To determine whether there is a "continuing loss," a court must "look beyond a debtor's financial statement and make a full evaluation of the present condition of the estate." *Irasel*, 569 B.R. at 441 (quoting *In re Moore Constr., Inc.*, 206 B.R. 436, 437–38 (Bankr. N.D. Tex. 1997)). This can be satisfied by "demonstrating that the debtor is experiencing a negative cash flow or declining asset values following the order for relief." *TMT*, 534 B.R. at 918; *see also Irasel*, 569 B.R. at 440 (citing *TMT*, 534 B.R. at 918); *Loop Corp. v. U.S. Tr.*, 379 F.3d 511, 515-16 (8th Cir. 2004) ("Under the interpretation of § 1112(b)(1) consistently used in bankruptcy courts, this negative cash flow situation alone is sufficient to establish 'continuing loss to or diminution of the estate.'").

48. Cause exists to dismiss the Chapter 11 Case under § 1112(b)(4)(A) because there is a substantial and continuing loss to or diminution of the Debtor's estate, and the Debtor has no hope of rehabilitation. The only reason the Debtor has shown any net income through these proceedings is because of nondebtor contributions from his spouse, and even in those instances, his estate still loses money. *See supra* ¶ 28 (analysis of MORs).

49. Moreover, the Debtor's bankruptcy counsel filed *Jeffrey K. Paulsen's First Interim Application for Compensation and Reimbursement of Expenses* (the "Fee Application") on August 24, 2026. (Dkt. 84). In the Fee Application, counsel discloses that it is holding a retainer of $13,645.00 and seeks approval of fees and expenses on an interim basis totaling $18,409.59 through the end of July 2026.

50. Assuming the Fee Application is granted in full, the Debtor's estate is presently administratively insolvent. Even if counsel applies 100% of the remaining balance of its retainer, the Debtor will still owe approximately $4,764.59 to counsel as of July 31, when his estate realized just $1,083.89 (a difference of $3,680.70) in net cash flow during the same period. On this trajectory, and adding another set of counsel to this Chapter 11 Case, *see* (Dkt. 85, Taft Application), the Debtor's administrative insolvency will only deepen, requiring dismissal.

**B. The Debtor has no reasonable chance of rehabilitation.**

51. As set forth above, the Debtor has not indicated how he intends to fund a chapter 11 plan, and the MORs show that he cannot. He has no business operation to restore, no demonstrated increased earnings, and no binding commitment for future non-debtor contributions. Finally, the main asset of the Debtor's chapter 11 estate is listed as a $3.39 million contingent litigation claim. *See* (Dkt. 1 at p. 6). This is not a present source of rehabilitation. The MORs illustrate that the Debtor is currently unable to live within his means and has no business in chapter 11. The Chapter 11 Case should be dismissed for cause as a result.

**IV. Dismissal—Not Conversion—Is in the Best Interest of Creditors.**

52. Section 1112(b) instructs courts that, once cause is established, the court must consider whether dismissal or conversion to chapter 7 is in the best interests of creditors, 11 U.S.C. § 1112(b)(1), unless the court "specifically identifies unusual circumstances" warranting alternate relief. 11 U.S.C. § 1112(b)(2).

53. In this Case, dismissal is in the best interests of creditors. Fortis is, by the Debtor's admission, his largest creditor, and the Chapter 11 Case was filed to halt the Colorado Action and force Fortis to litigate its claims against him in this Court. Upon dismissal, the Colorado Action can continue, and this two-party dispute will be returned to the appropriate venue. If the Case is converted to a chapter 7 proceeding, however, the Colorado Action will still be stayed as to the Debtor, with no foreseeable benefit to Fortis or Taft, the Debtor's only other unsecured creditor.

54. Moreover, nothing about this Case is unusual. The Debtor, like many before him, filed this Case as a litigation tactic in the hopes of frustrating Fortis's ability to obtain a judgment against him in the Colorado Action. The Debtor should not be rewarded for his pre- and post-petition bad faith conduct, and the Chapter 11 Case should be dismissed for cause.

**REQUEST TO EXCEED PAGE LIMITATION**

55. Local Rule 9090-3(F) limits the page count for motions to fifteen pages, unless the Court approves otherwise, and parties may make a request to exceed this page limit within the motion itself. *See* L.R. 9090-3(F).

56. This Motion exceeds the typical page limit set by the Local Rules to adequately present the factual and legal issues surrounding this Chapter 11 Case and the Debtor's bad faith in filing. Fortis submits that, if the facts and arguments set forth in the Motion are not fully considered due to the procedural limitations imposed by the Local Rules, Fortis will be unfairly prejudiced in these proceedings. As such, Fortis requests that the Court allow it to exceed the fifteen-page limitation and consider the Motion in its entirety.

**NOTICE**

57. Notice of this Motion has been provided to: (a) the Debtor; (b) Debtor's counsel; (c) the Subchapter V Trustee; (d) the Office of the United States Trustee; and (e) all parties who

have requested or receive notice through CM/ECF. Fortis submits that, under the circumstances, no further notice is required.

*Wherefore*, Fortis requests that this Court enter an order: (a) granting Fortis leave to exceed the fifteen-page limitation under Local Rule 9090-3(F); (b) dismissing this Chapter 11 Case for cause under Bankruptcy Code § 1112(b); and (c) granting any other, further relief the Court deems appropriate under the circumstances.

Date: August 31, 2026

**FW-CO, Inc. d/b/a Fortis**

By: */s/ Jack O'Connor*
One of Its Attorneys

Elizabeth B. Vandesteeg (IL No. 6291426)
Jack R. O'Connor (IL No. 6302674)
Cha'yra C. Eddie-Williams (IL No. 6335826)
Levenfeld Pearlstein LLC
120 S. Riverside Plaza, Ste. 1800
Chicago, Illinois 60606
evandesteeg@lplegal.com
joconnor@lplegal.com
ceddiewilliams@lplegal.com

# Exhibit A

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:25-cv-00254-NYW-TPO

FW-CO, INC., d/b/a FORTIS WARRANTY,

Plaintiff and Counter-Defendant,

RICHARD LEWIS,

Counter-Defendant,

v.

CHARLES SCHULZ;
DAVID SCHUPMANN;

Defendants and Counter-Claimants,

TRIDENT SOLUTIONS OF SUGAR GROVE, LLC;
ROOFING USA, LLC; and
INSTALLATION SERVICES LLC d/b/a TOPKEY CONSTRUCTION,

Defendants.

---

**THIRD AMENDED COMPLAINT & JURY DEMAND**

---

Plaintiff FW-CO, Inc., d/b/a Fortis ("**Fortis**" or the "**Company**"), by and through its undersigned counsel, files the following Third Amended Complaint & Jury Demand against Defendants Charles Schulz ("**Schulz**"); David Schupmann ("**Schupmann**"), Trident Solutions of Sugar Grove, LLC ("**Trident**") (together, the "**Trident Defendants**"); as well as Roofing USA, LLC ("**Roofing USA**"); and Installation Services LLC d/b/a TopKey Construction ("**TopKey**") (collectively, "**Defendants**").

## INTRODUCTION

**"I have never been asked to do this in my other 28 years in the business" – Scott Reynolds**

1. This case involves two former employees who, apparently unsatisfied with the significant compensation Fortis provided them, engaged in a massive scheme to enrich themselves at their employer's expense by both demanding kickbacks from contractors and diverting business to an entity that they created and operated.

2. Schulz and Schupmann's actions were in clear violation of their respective duties of loyalty to Fortis, and in breach of the Employment Agreements ("**Agreements**" or individually an "**Agreement**") that Schupmann and Schulz executed as a condition of their employment with Fortis.

3. Schulz and Schupmann's wrongdoing was aided and abetted by Trident, which intentionally interfered with Fortis's employment contracts and business relations with the intent of damaging Fortis for the benefit of Trident Defendants.

4. Schulz and Schupmann's wrongdoing was further aided and abetted by Roofing USA, a competitor to Fortis which sought to steal materials, knowhow, and market share from Fortis, as well as TopKey, a general contractor which knowingly participated in and gave substantial assistance to the kickback scheme by embedding concealed fees into its external pricing and paying those fees to Trident at Schulz and Schupmann's direction.

5. Fortis hired Schupmann on February 27, 2018 as part of its effort to build out the sales and marketing wing of its business.

6. Schupmann's first hire was Schulz, who joined Fortis in June 2018.

7. Fortis eventually promoted Schupmann to COO of Fortis in October 2021.

8. As a member of Fortis's sales and marketing division, Schulz was primarily tasked with identifying and soliciting potential clients for Fortis's Roof Performance Program (the "**Program**"). The Program offers an initial roof reconditioning service, followed by the issuance of a roof warranty, which saves Fortis's customers significant amounts of money compared to a complete roof replacement. Fortis works with outside contractors to provide the labor and materials to complete these projects. In addition to a base salary, Schulz was awarded a 10% commission on his gross sales volume—two to three times more than that of any other Fortis salesperson.

9. Schulz's supervisor was Schupmann, who developed a close relationship with Schulz. Like Schulz, Schupmann earned a large base salary of $400,000 and was eligible to earn significant bonuses based on his performance—Schupmann made over $1.1 million in 2023 alone and averaged over $700,000 in annual compensation during the last three years of his employment.

10. Given that Schulz and Schupmann had the ability to accrue substantial bonuses and commissions through their compensation plans, an ordinary employee in their shoes would have worked hard on Fortis's behalf to maximize their compensation, benefitting themselves and the Company concurrently. If Schulz and Schupmann were concerned that their pay was less than they deserved, they could have resigned and

sought other employment or negotiated new terms with Fortis. Schulz and Schupmann instead chose a third path: to “double dip” from Fortis through demanding kickbacks from Fortis’s contractors and, in other instances, diverting whole projects from Fortis to abscond with all of the revenue generated from that work without Fortis ever knowing of their scheme.

11. To further this plot, Schulz and Schupmann created Trident, which they used both as a receptacle for their kickback payments and as a de facto competitor of Fortis’s that diverted potential Fortis business secretly.

12. Schulz and Schupmann successfully ran this illicit campaign for years, earning untold amounts before it was uncovered by Fortis in late 2024.

13. Nothing about the Trident Defendants’ actions was legal. Schulz and Schupmann usurped business opportunities from Fortis and artificially inflated Fortis’s costs and liabilities in obvious violation of the duty of loyalty and in breach of their contractual obligations to Fortis. These actions were assisted by and greatly benefited Trident, which at all times had knowledge of Fortis’s contracts and prospective business relations.

14. Roofing USA knew that Schulz and Schupmann were parties to employment contracts with Fortis, and that they had duties of loyalty to Fortis, yet it nevertheless willfully exploited and benefited from Schulz and Schupmann’s breaches of their contracts with Fortis—both while Schulz and Schupmann were employed by Fortis, and, for Schupmann, after his employment with Fortis ended.

15. TopKey benefited from the Trident Defendants' wrongful acts through its knowing participation in Schulz and Schupmann's breaches of their contracts and common law duties of loyalty through the kickback and diversion scheme they were a knowing and eager participant in.

16. Defendants' acts have significantly damaged and jeopardized Fortis's business by unfair methods. Defendants have caused Fortis to lose significant revenue and clients due to Schulz and Schupmann's unlawful kickback scheme and diversion of work away from Fortis, which Trident, Roofing USA, and TopKey knowingly and willingly participated in for their own profit. Accordingly, Fortis seeks money damages for its lost profits, contract damages, lost business, lost goodwill, Defendants' unjust enrichment, and disgorgement of all compensation that Fortis paid to Schulz and Schupmann during their periods of disloyalty. Fortis also seeks injunctive relief enjoining the Trident Defendants from continuing to unfairly compete with Fortis and ordering Schupmann and Schulz to comply with the restrictive covenants contained within the Agreements.

## PARTIES AND JURISDICTION

17. Plaintiff Fortis is a privately held Colorado corporation with its principal place of business in Colorado. Fortis is registered to do business in the state of Colorado.

18. Defendant David Schupmann is an individual who, upon information and belief, currently resides at S440 Crego Place, Geneva, IL, 60134.

19. The Court has personal jurisdiction over Schupmann because his Agreement contains a Colorado forum selection clause. The Court also has personal jurisdiction over Schupmann because he was employed by Fortis, a Colorado employer,

because he repeatedly came to Colorado for work, because he repeatedly made false or misleading statements to Fortis personnel located in Colorado, and because some or all of the wrongdoing committed by Schupmann was specifically targeted to harm Fortis in the state of Colorado.

20. Defendant Charles Schulz is an individual who, upon information and belief, currently resides at S31W37307 School Section Lake Rd, Dousman, WI, 53118.

21. The Court has personal jurisdiction over Schulz because his Agreement contains a Colorado forum selection clause. The Court also has personal jurisdiction over Schulz because he was employed by Fortis, a Colorado employer, because he repeatedly came to Colorado for work, because he repeatedly made false or misleading statements to Fortis personnel located in Colorado, and because some or all of the wrongdoing committed by Schulz was specifically targeted to harm Fortis in the state of Colorado. Moreover, Schulz has threatened Fortis with claims pursuant to the Colorado Wage Act, which further illustrates his understanding that he is subject to Colorado law and the jurisdiction of Colorado courts.

22. Defendant Trident Solutions of Sugar Grove, LLC is a limited liability company owned by Defendants Schulz and Schupmann. For purposes of diversity jurisdiction, Trident is a citizen of Wisconsin and Illinois.

23. The Court has specific personal jurisdiction over Trident because Trident intentionally and tortiously interfered with Fortis's employment contracts and prospective business relations in Colorado such that Trident's conduct was specifically aimed at this

state. Additionally, the various wrongful acts performed by Schupmann and Schultz in or directed to persons in Colorado were done as they were officers and owners of Trident.

24. Defendant Roofing USA, LLC is a South Carolina Limited Liability Company with a primary place of business at 349 W. Coleman Blvd, Suite 202, Mount Pleasant SC 29464.

25. This Court has specific personal jurisdiction over Roofing USA because Roofing USA committed intentional, wrongful acts directed at Fortis, a Colorado resident, with the knowledge that the brunt of the injury from its wrongful acts would be felt in Colorado. Roofing USA knew Fortis was a Colorado based company and knew this when it intentionally and tortiously interfered with Fortis's employment contracts, business relations, trade secrets and proprietary information, among other wrongs.

26. Defendant Installation Services LLC; formerly known as Installation Services by HCR, LLC; doing business under the trade name of TopKey Construction ("TopKey"); is a limited liability company with its principal place of business at 14880 Sweitzer Lane, Laurel, Maryland, 20707. For purposes of diversity jurisdiction, TopKey is a citizen of Maryland.

27. This Court has specific personal jurisdiction over TopKey because TopKey purposefully directed conduct at a Colorado resident (Fortis) by coordinating, calculating, and embedding concealed fees into TopKey's external pricing on Fortis-tied opportunities while maintaining direct contractual and confidentiality relationships with Fortis.

28. The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332 because the parties are diverse in citizenship and the matter in controversy exceeds $75,000.

29. Venue is proper in the Court because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

## FACTUAL ALLEGATIONS

### I. Fortis and its Business.

30. Founded in 2003, Fortis is a leader in the roof performance business. Fortis's primary revenue stream is the Program. The Program consists of three phases: (1) a proprietary Fortis Roof Risk Assessment, during which Fortis's Quality Control personnel assess the quality of a roof and relevant building conditions to determine the exact number of years Fortis can guarantee performance, (2) a roof reconditioning, performed by Fortis's contractor network, to bring each roof up to Fortis's standards, and (3) the issuance of a comprehensive warranty backed by Lloyd's of London. If a customer experiences a roofing issue while covered by a Fortis warranty, Fortis sends its Operations team to assess the issue and promptly schedule repairs through its nationwide network of contractor partners.

31. The benefit of the Program to Fortis's customers is clear: rather than potentially spending millions on a roof replacement, customers can instead spend a fraction of the cost on the Program, which guarantees roof performance for a set amount of time.

32. The Program has been highly successful and leads the market as the most reliable, financially advantageous way to extend roof life, avoid the risk of roof performance issues, eliminate unexpected roof maintenance costs, and secure unmatched savings.

33. Due to the success of the Program, Fortis has developed strong relationships with its customers and roofing contractors alike based on confidence in the quality of Fortis's services and Fortis's commitment to providing such services at competitive prices.

34. However, not all roofs are eligible for the Program. If Fortis's initial assessment determines that reconditioning work would be insufficient to bring a roof up to Program standards, then Fortis will advise its client that the roof requires an immediate replacement. Often, clients will request that Fortis manage the roof replacement process due to their trust in Fortis as a reliable partner in the roofing industry. In these instances, Fortis receives a general management fee and works with its contractor network to replace the roof.

35. While Fortis's primary revenue stream comes from the Program, Fortis has received over $1,000,000 in revenue for roof replacement management projects between 2022-2024 and, as it learned, would have earned substantially more if not for Defendants' wrongful acts, including Schulz and Schupmann's diverting roof replacement projects for themselves and their Company, Trident; as well as wrongfully working with Roofing USA to steal trade secrets, proprietary information, and diverting opportunities to Roofing USA.

36. Fortis's decision to engage in such reroofing management projects is subject to the discretion of its executive team working out of its Denver, Colorado headquarters.

37. While Fortis's headquarters are located in Colorado, Fortis's success has allowed it to expand its services to cover buildings in six countries. Fortis's Program protects more than 150 million square feet of property and has helped customers defer over $550 million in costs. Fortis's efforts have allowed it to develop significant goodwill in the roofing industry.

**II. Schupmann and Schulz Are Hired by Fortis.**

38. Schupmann joined Fortis in 2018 as a Senior Vice President of Sales and Marketing. In that role, Schupmann was tasked with building Fortis's sales and marketing operations. From the start of his employment, Schupmann operated in an executive role and managed Fortis's marketing and operations staff.

39. Schupmann's initial base salary was $250,000 and included an options grant of 5% of Fortis's stock that would vest over time. Schupmann was ultimately compensated well in excess of this base salary, as he earned approximately $2.1 million in total compensation from the Company between 2022-2024, including $1.1 million in 2023 alone.

40. In exchange for this executive position with significant access to Fortis's customer relationships, confidential information, and trade secrets, Fortis required that Schupmann sign the Agreement (attached hereto as Exhibit A) on February 27, 2018.

41. The Agreement contains several lawful restrictive covenants in order to protect Fortis and the significant investment it made in Schupmann. For starters, Schupmann agreed that he would "devote substantially all of his business time, attention and skill to the performance of his duties as an employee of the Company." (Ex. A, § 1.1.2.)

42. Schupmann's Agreement includes several confidentiality provisions that provide as follows:

> 5.1.1 Executive acknowledges that, during employment with the Company, Executive will have access to confidential information of and pertaining to the Company and its clients, all of which is hereby agreed to constitute confidential information and trade secrets (as described in 5.1.3 hereof) of the Company. To ensure the continued secrecy and confidentiality of such information and trade secrets, Executive hereby covenants and agrees that Executive shall keep secret and shall not divulge any of the names of, or any other information relative to, the clients and business operations of Company, and any information concerning Company's clients, employees, employment practices, policies, techniques, methods, and any all business associations or activities of Company and its clients and any information or knowledge that Executive acquires during Executive's employment with the Company. Executive also further covenants and agrees that Executive will not keep, <u>or use for his personal advantage</u>, either directly or indirectly, any information documentation (regardless of the manner or form in which such documentation exists) relative to the business of the Company or its clients and, furthermore, will not furnish or make available any such information to any third party.
>
> 5.1.2 Upon leaving employment with the Company, Executive will return and not take with him any confidential information or trade secrets, including without limitation, manuals, programs, documents, computer programs, compilations of technical data, client and prospective client lists, specifications and other records of any nature relating to the Company, its clients or others, or any reproductions thereof. <u>Further, Executive will take no other action inconsistent with his obligations as an employee of the Company</u>.
>
> Executive acknowledges that the Company has certain trade secrets including, but not limited to, certain processes, formulae, data, know-how,

> software programs, improvements, inventions (whether patentable or not), techniques, marketing plans, business plans, strategies, forecasts, computer programs, and other copyrightable material, the compensation and terms of employment of other employees, customers and customer lists, and other information relating to the Company's business which is secret and of value (Information"), which trade secrets the parties agree are and shall remain under the full control of the Company and shall remain of limited availability. In consideration for entering into this Agreement, Executive hereby covenants and agrees that Executive shall not divulge to any third party at any time any information regarding such trade secrets or the substance thereof without the prior written consent of the Company and, furthermore, with respect to such trade secrets, shall comply with all of the provisions of Section 5 hereof. Employee agrees that Company is the only firm offering its type of services in the United States and certain other countries, and further agrees (i) that the Company takes precautions above and beyond normal business precautions to guard secrecy of the Information; having knowledge of the Information is of great value to the holder as against competitors; the Company has expended considerable effort and money in obtaining and developing the Information; and (iv) the amount of time and expense it would take for others to acquire and duplicate the Information is also considerable. Employee acknowledges the confidentiality of the Information and that the Information is protected by this Agreement and by C.R.S. §§ 7-74-101 *et seq.*, the Colorado Uniform Trade Secrets Act, from unauthorized disclosure or use for any competitive purpose.

(Ex. A, § 5.1) (emphasis added).

43. The Agreement also contains an employee and customer non-solicitation clause:

> During the Employment Period and for a period of two (2) years following the termination of such Employment Period, the Executive shall not, either directly or indirectly, on the Executive's own behalf or on behalf of others, approach, solicit, induce, divert or hire, or attempt to approach, solicit, induce, divert or hire, any employee or customer or prospective customer of the Company, whether or not the employment or relationship of any such person or entity is pursuant to a written agreement or for a determined period or at will, to terminate such employment or relationship with the Company. Executive's agreement to not solicit customers shall be limited to the Area defined below in subparagraph 5.3.1.

(Ex. A, § 5.2.)

44. Schupmann also agreed to a limited non-compete covenant:

> During the Employment Period and for a period of two (2) years following the termination of such Employment Period, the Executive shall not (except on behalf of or with the prior written consent of the Company), within the Area, either directly or indirectly, on his own behalf or in the service or on behalf of others, as a manager or consultant, or in any other capacity which involves duties and responsibilities similar to those the Executive has undertaken for the Company, engage in any Competing Business.

(Ex. A, § 5.3.)

45. The Agreement defines the restricted Area for purposes of the non-compete and non-solicitation covenants as “any state or country where the Company engages in business during Executive’s employment with the Company.” (Ex. A, § 5.3.1.)

46. “Competing Business” is defined as any business organization directly engaged in any business which is the same as, or substantially the same as, the business of Fortis. (*See id.*)

47. Upon executing the Agreement, Schupmann agreed that Fortis would be irreparably harmed should Schupmann breach any of the Agreement’s restricted covenants, and that Fortis would be entitled to injunctive relief as a remedy and to its reasonable attorneys’ fees if it were to prevail in any action to enforce the Agreement’s covenants. (Ex. A, § 5.5.)

48. Finally, the Agreement provides that it will be governed by Colorado law, and that sole and exclusive jurisdiction for any action to enforce the Agreement would be in the United States District Court for the District of Colorado or Denver District Court. (Ex. A, § 10.)

49. Fortis included these restrictive covenants to protect Fortis's significant investment in Schupmann, its client relationships, and its trade secrets and confidential information.

50. Schupmann's initial hire for Fortis's sales team was Schulz, who joined Fortis in June 2018. Schulz was hired at a base salary of $150,000 a year and was awarded 10% commission on Fortis's gross sales volume for Schulz's customers. This commission rate was between two to three times more than any other Fortis salesperson. Like Schupmann, Schulz's base salary represented only a fraction of his total compensation, which totaled approximately $1 million between 2022-2024. Both Schupmann and Schulz's total compensation reflected a substantial investment for Fortis, as both individuals informed Fortis that the company was paying them three times more than their former employers did.

51. While Schulz resides in Wisconsin, he often attended certain Fortis board events in Colorado as a guest and traveled to Colorado multiple times a year for internal meetings.

52. Like Schupmann, Schulz's primary duty at Fortis was to identify and solicit potential customers for the Program or Fortis's other services. Schulz was also responsible for developing and maintaining Fortis's goodwill and relationships with its customers on Fortis's behalf. In this role, Fortis exposed Schulz to customers and prospects throughout the country. To perform these functions, Fortis provided Schulz with access to confidential and proprietary information and assisted Schulz with client development. In other words, Fortis paid Schulz to develop and maintain relationships

with Fortis's current and prospective customers and to service those customers at a top level.

53. In exchange for this exposure, as well as significant compensation, Schulz agreed to the terms of an Agreement containing restrictive covenants like Schupmann to protect the Company's confidential information and customer goodwill. (Ex. B.)

**III. Schupmann and Schulz Begin to Operate Their Illicit Scheme.**

54. Fortis promoted Schupmann to become its COO in October 2021. The Company intended for Schupmann to eventually take over the role of Company President. However, Fortis ultimately demoted Schupmann rather than promoting him because of poor job performance.

55. Schulz also displayed job performance issues. Soon after his hiring in June 2018, Fortis discovered that Schulz had abused his Company expense account by booking personal travel and entertainment on his Fortis account. In light of these findings, Fortis temporarily reduced Schulz's commission percentage, though it later returned to 10%.

56. Despite these issues, Schulz and Schupmann formed a close relationship. To avoid suspicion, the two often denied that they interacted outside of work, but on multiple occasions, other Fortis personnel would overhear that the two had made extracurricular plans together.

a. Schulz and Schupmann Receive Improper Kickbacks for Fortis Work.

57. Upon information and belief, Schulz and Schupmann's motivation to hide their close relationship from other Fortis employees and executives was because they

were engaged in a massive kickback scheme through which they profited directly at Fortis's expense.

58. Schulz and Schupmann's strategy was simple: they would offer contractors guaranteed work on Fortis projects if those contractors would promise to inflate their bids by 5-7.5%. Then, after the contractor was paid for its work by Fortis, the contractor would pay that 5-7.5% directly to Schulz and Schupmann.

59. For example, if a contractor's initial estimate for a project was $100,000, Schulz and/or Schupmann would instruct the contractor to submit an inflated bid of $105,000-$107,500. Schulz and Schupmann would then receive between $5,000-$7,500 in kickbacks for ensuring the contractor was awarded the job. In Schulz's own words to a contractor, "we understand we'll be paid after you are paid." (Ex. C, Emails Provided by Scott Reynolds, p. 5.)

60. This plot injured Fortis in multiple ways. First, and most obviously, the kickbacks would result in Schulz and Schupmann being compensated significantly more than they were contractually owed (or that Fortis was aware). As previously stated herein, Schulz already received a commission two to three times higher than his peers for this work, and Schupmann earned an average of $700,000 in annual compensation across his last three years at the Company. These amounts were meant to compensate Schulz and Schupmann for the entirety of their work for Fortis.

61. Second, these inflated contractor fees directly cut into the profit Fortis earned on each project. This also dramatically increased Fortis's business risk. Fortis generates profits when the maintenance that it is required to perform during the warranty

period it issues through the Program costs less than the customer pays for that warranty. By artificially increasing Fortis's front-end reconditioning and subsequent maintenance costs, Schulz and Schupmann decreased the likelihood that Fortis would profit on each warranty the Company issued through the Program.

62. On information and belief, Schulz and Schupmann improperly profited through kickbacks from numerous contractors.

b. The Scheme with TopKey.

63. One of the most significant kickback relationships Fortis has uncovered to date was between Schulz and Schupmann and TopKey.

64. TopKey, formerly known as Installation Services, provides commercial roofing services in multiple states, including Maryland, Virginia, and D.C.

65. At some point or about January 1, 2024, Installation Services, LLC rebranded as TopKey Construction and continued operations under the TopKey name with Dan Schardt as President and Chief Executive Officer.

66. TopKey and Fortis had a direct commercial relationship during the time in question. While also engaging in more informal collaboration, on June 28, 2022, they executed a Mutual Confidentiality and Non-Disclosure Agreement to govern the exchange of proprietary information in connection with potential business dealings, signed by Installation Services' Director of Operations, Construction Services, and Fortis's then-COO, Schupmann.

67. On or about June 21, 2023, Fortis and TopKey again entered a written contract, this time for Fortis's program scope and warranty deliverables on a project

known as "Park Shirlington." Fortis later terminated the Park Shirlington reconditioning contract, citing roof deterioration beyond the contracted scope. Separate from Fortis's reconditioning contract, TopKey later pursued roof replacement scope on the same property through another general contractor, Whiting Turner.

68. Schulz and Schupmann's primary contact at TopKey was Project Manager Scott Reynolds ("**Reynolds**"). Reynolds worked for TopKey from August 2022 to approximately August 2024. Soon after Reynolds commenced work for TopKey, he was contacted by Schulz and Schupmann, who proposed their kickback scheme. Schulz and Schupmann promised Reynolds that they would ensure TopKey was awarded Fortis projects if TopKey would pay Schulz and Schupmann a kickback, or "TPI," in exchange. This acronym became well-known throughout TopKey. (*See* Ex. C, p. 6.)

69. Although Reynolds had never experienced this kickback scheme in his nearly three decades in the industry, he accepted Schulz and Schupmann's demand because it came with guaranteed work for TopKey. During the length of his employment with TopKey, Reynolds worked with Schulz and Schupmann to execute the kickback scheme. While the initial kickback amount was 5% of TopKey's initial cost estimate, the percentage eventually rose all the way to 7.5% because Reynolds knew that Schulz and Schupmann would make sure that TopKey was still awarded the project even if TopKey had not made the most competitive bid.

70. Although Fortis maintains a nationwide network of contractors and typically engages local contractors for its projects, TopKey was assigned projects across the country thanks to Schulz and Schupmann's interference. Reynolds was willing to take on

any job Schulz and Schupmann offered because he knew it was guaranteed work for himself and his team.

71. TopKey and Trident formalized their arrangement through a written agreement (albeit unsigned) under which Trident would receive percentage-based fees on projects steered to TopKey. Defendants confirmed this arrangement in verified interrogatory responses, stating that "Trident referred TopKey to businesses who were in need of roofing services in exchange for a referral fee." The parties then coordinated fee reconciliations on Park Shirlington, Homestead FL, and other projects under this framework. On information and belief, TopKey's payments to Trident were funded out of TopKey's receipts on projects that overlapped with Fortis accounts and opportunities.

72. Schupmann instructed Reynolds to begin paying the kickbacks to Trident, which Schupmann created on September 9, 2022. (*See* Ex. D.) Trident's Operating Agreement lists Schulz and Schupmann as its two managers, and the two each hold a 50% stake in the company at the relevant time. (*See* Ex. E, § 7.2, Exs. A and B.) Reynolds and TopKey complied with this request and began to send the "TPI" payments directly to Trident. (*See* Ex. F.)

73. Reynolds participated in Defendants' kickback scheme with the approval of TopKey's leadership, including TopKey President Dan Schardt. At times, Schardt directly confirmed the kickback percentage and total amount Schulz and Schupmann would receive for a given project. On one instance in June 2024, Schardt requested that Schulz provide TopKey with the correct fees for a certain project. (*See* Ex. D, p. 7.) Schulz confirmed that he would provide a proposal and noted that "the basics" involved a 7.5%

kickback in addition to a flat fee of $7,000 per roof section replaced for the project at issue. Schardt then sought confirmation a total amount of $109,977.33 was correct. (*See id*, p. 8.)

74. All told, TopKey performed an estimated 130 jobs on behalf of Fortis during Reynolds' employment, most or all of which were subject to kickbacks for Schulz and Schupmann. Reynolds estimates that Schulz and Schupmann ultimately received between $350,000-$400,000 in kickback payments from TopKey, although Fortis believes that the number is much higher.

75. At no time was Fortis aware of this illicit relationship until Reynolds informed Counter-Defendant Fortis CEO Richard Lewis ("**Lewis**") of its existence after Reynolds' employment at TopKey ended. Schulz and Schupmann displayed the extent of their disloyalty and a disdain for their own employer to Reynolds and questioned why the Company should be allowed to profit off their efforts as employees.

c. Schulz and Schupmann Divert Work from Fortis.

76. Schulz and Schupmann's request for the kickback payments described above was not their only method of lining their own pockets at Fortis's expense.

77. In addition to their kickback arrangement, Schulz and Schupmann also diverted work from Fortis altogether in order to instead profit themselves and Trident. The Trident Defendants primarily employed this tactic in instances where customers were in need of a roof replacement as opposed to participating in Fortis's Program. When Fortis determines that a roof cannot be reconditioned and instead must be replaced entirely, Fortis often manages the replacement process for a consulting fee. Fortis's customers

can trust Fortis to coordinate with contractors and ensure the job is performed properly through the trust and goodwill Fortis has earned in the roofing industry.

78. In violation of the duties they owed to Fortis, Schulz and Schupmann usurped these opportunities on numerous occasions to compete with Fortis directly and unfairly. In this context, Schulz and Schupmann also frequently collaborated with Reynolds and TopKey to divert roof replacement projects from Fortis. The first project Reynolds worked on with Schulz and Schupmann was SouthPoint Village Apartments (the "**SouthPoint Project**") in Durham, North Carolina. The SouthPoint Project involved a complete roof replacement, which Fortis could have managed. Notably, Schulz emailed the SouthPoint Project's job specifications from his Fortis email to his Trident email, yet Schulz and Schupmann never entered the SouthPoint Project as a potential lead in the Company's database. (*See* Ex. G.) This meant that Fortis never had the opportunity to evaluate the SouthPoint Project to determine if it was worth attempting to undertake. Upon information and belief, Trident Defendants made roughly $100,000 in kickbacks for the SouthPoint Project while concealing the project from Fortis.

79. Schulz and Schupmann's improper relationship with TopKey spanned for multiple years. In May 2024, Reynolds contacted Schulz at Schulz's Trident email address to provide Trident Defendants with a roof replacement proposal for a building located at 1011 Marsh Avenue, Fort Myers, Florida, 33905. (*See* Ex. H.) This was yet another project that Schupmann and Schulz did not present to Fortis and that the Company could have performed if not for Schulz and Schupmann's disloyalty.

80. Trident Defendants' diversion of potential Fortis business expanded far beyond their relationship with TopKey, however. On one instance, on September 24, 2019, Schulz received the following email from a Fortis client at his Fortis email address:

> Afternoon Charlie,
>
> We have some roof issues at our Oklahoma City location and was wondering if you're interested in taking a look. I don't believe this is in the spectrum of a warranty project but more like what Fortis did with our Santa Rosa location and a patch job. I've copied our manager Mr. Shore and if you're interested would you reach out to him and see about an evaluation and quote? Let me know, thank you!

(Ex. I.)

81. Despite the fact that the email specifically provided that Fortis had previously completed the exact type of work the client was seeking, Schulz immediately forwarded the email to Schupmann and stated, "Should be a Trident job. What would you like to do here?" (*Id.*)

82. An hour later, Schulz messaged Schupmann's Fortis email address again to suggest that the Trident Defendants ". . . should just send Kyle Crawford and **have him include a bump for us**." (*Id.*) (Emphasis added).

83. Kyle Crawford works for Exterior Solutions Group, a contractor that is part of Fortis's strategic partner network.

84. Schulz advised Schupmann that Crawford ". . . can just be vague and send me the invoice" and promised "10% for us." (*Id.*) Schupmann responded "10/4" to confirm his approval of the arrangement. (*Id.*)

85. Schupmann and Schulz did not enter the project discussed in Exhibit H into Fortis's database as a potential opportunity nor did Fortis ultimately perform work on that

project. Upon information and belief, Schupmann and Schulz diverted the project away from Fortis and was instead performed by Schulz and Schupmann through Trident.

86. One specific area of Fortis's business from which Schulz and Schupmann were especially aggressive for diverting was Fortis's work relating to the solar energy business. Solar energy clients comprise a significant portion of Fortis's customer base because roofs often need to be reconditioned, repaired, or replaced to be fit for solar panel installation. At times, Fortis and solar energy companies combine to offer their services jointly to a building owner. In other instances, solar energy companies lease roofs from building owners and then engage Fortis for roof reconditioning themselves as Fortis's end-client. In other words, Fortis works extensively with solar companies and generates significant revenue from these relationships.

87. Undeterred by the fact that work with solar companies is directly within Fortis's scope of operations, Schulz and Schupmann continued with their operation to compete with Fortis from within.

88. For instance, on January 30, 2023, Schulz sent a document titled "Aspen-Trident Channel Partnership Agmt [Aspen].docx from his Fortis email address to Schupmann's Trident email address. (Ex. J.) The document contemplates a "channel partnership" between Trident and Aspen Power Partners LLC ("**Aspen**"), through which Trident would identify prospective customers of Aspen's and refer them to Aspen in exchange for $0.01 per watt of electricity generated by Aspen's solar panels on projects identified by Trident. (*See* Ex. J, §§ 2, 4.) The term "channel partnership" was previously used by Schupmann to suggest that Fortis undertake similar agreements.

89. Aspen is a Fortis client, but Fortis's work for Aspen declined in 2023 and 2024. Upon information and belief, this was due to Schulz and Schupmann's usurpation of Fortis's business despite their status as Fortis executives.

90. In February 2023, Schulz emailed an attachment titled "Trident Solar opps 2023.xlsx" that includes eight buildings, each with a "Y" (short for "yes") under the column "RPP Candidate." (Ex. K.) "RPP" refers to the Program, which is a Fortis-specific term and is not industry standard. In other words, Schulz and Schupmann were open about the fact that these were opportunities for Fortis's core service yet failed to present them to Fortis in favor of diverting them to Trident. The buildings in the spreadsheet total over 2.3 million square feet in area; Fortis would generally expect to receive between $5-6 million in revenue from a project of this size. (*See id.*) Instead, Fortis got none of it.

91. Subsequent emails identify one of the prospective clients The Trident Defendants attempted to solicit. On March 14, 2023, Schulz emailed a spreadsheet titled "Trident IL_Lease Summary_3.13.2023.xlsx" with the following message:

> Tom
>
> I've broken out the sf area of the systems here. You could put a valuation on this either on the area the solar system covers itself or the entirety of the footprint.
>
> I'm not sure which way would work for Hiffman the best.
>
> Charlie

(Ex. L.)

92. "Tom" refers to Tom Murphy, Fortis's point of contact at Hiffman National, a major property management company. Even though Fortis had already established

relations with Hiffman National, Schulz did not report this project to Fortis. The attached spreadsheet includes many of the same building addresses as those found in Exhibit K.

93. In another instance, The Trident Defendants worked with TopKey to present a proposal to a different solar company—Citrine Power, LLC—for work on a building located at 210-230 West Parkway, Pompton Plains, New Jersey, 07444 in May 2024. (*See* Ex. M.) Schulz had previously entered Citrine Power, LLC in Fortis's systems as a potential opportunity but designated the opportunity "closed—lost" and "disqualified." Upon information and belief, this was done in order to perform work for Citrine Power, LLC on behalf of Trident rather than Fortis.

94. In addition to Trident, Defendants Schulz and Schupmann used entities associated with Schupmann—Top Pick Athletics, Inc. ("Top Pick Athletics") and Top Pick Investment Group LLC d/b/a Top Pick Investments ("Top Pick Investments")—as vehicles to receive disbursements from contractors in Fortis's customer ecosystem, including Smart Roof Commercial LLC, under the guise of purported "consulting" and "referral" services.

95. Top Pick Athletics is an entity associated with Schupmann, founded in approximately 2010, that he used in communications with Smart Roof for vendor onboarding and transmittal of Top Pick Investments invoices. On information and belief, he began engaging them in 2021.

96. Top Pick Investment Group LLC, which invoiced Smart Roof under the trade name "Top Pick Investments," is another entity associated with Schupmann and has been active since 2017. Top Pick Investments' invoices consistently list its business address

as 769 Heartland Drive, Unit/Suite D, Sugar Grove, Illinois 60554, the same complex where Trident is located.

97. On information and belief, Schupmann converted Top Pick Athletics into Top Pick Investments in or around 2017.

98. According to public filings on the Illinois Secretary of State website, Schupmann is a manager of Top Pick Investments.

99. On information and belief, Top Pick Athletics and Top Pick Investments were used as additional vehicles to receive improper disbursements from contractors in Fortis's customer ecosystem.

100. Beginning in early October 2021, Schupmann transmitted to Smart Roof, from his Top Pick Athletics email account, "TPI Consulting Services" invoices issued by Top Pick Investments for purported consulting work on multiple projects, including facilities for one of Fortis's largest clients, the Coca-Cola Company ("Coca-Cola"). Between October 2021 and late 2022, Top Pick Investments issued and transmitted to Smart Roof more than two dozen "TPI Consulting Services" invoices that included multiple Coca-Cola facilities managed by Fortis—as well as other commercial properties—and items tied to a specific project called "Coca-Cola Charlotte," alongside others. Based on present records, the aggregate amount of these Top Pick invoices exceeded $180,000.

101. Smart Roof continued corresponding with Schupmann at his Top Pick Athletics email address as late as September 29, 2022.

102. Fortis's commercial relationship with Smart Roof dates back to at least October 2020, when Fortis issued a purchase order to Smart Roof for Coca-Cola facility work.

103. On June 2, 2022, Smart Roof transmitted an updated proposal for the Coral Hills Shopping Center to Fortis's then-COO, David Schupmann, at his Fortis email address, detailing the scope and pricing for an installation project. Just a few days earlier, on May 27, 2022, Schupmann had circulated a coordination email to Smart Roof personnel stating that Coral Hills was among the "upcoming projects" with a planned September start, reflecting that Coral Hills was being advanced within Fortis's pipeline and vendor workflow.

104. On July 15, 2022, Smart Roof internally tracked "Coral Hills: $80,000 – Waiting on contract" on the same receivables list as "Charlotte Coca Cola – $16,000 – Waiting on Fortis to pay SmartRoof."

105. Around the same period, Schupmann forwarded an Installation Services' Coral Hills quote externally to a New Columbia Solar contact, asking when "we can secure this and lock down the materials for a September start," further evidencing that the contracting channel for Coral Hills was routed outside of Fortis.

106. In or around February 2023, Schulz, on behalf of Trident Solutions, sent Smart Roof an invoice in the amount of $54,000 for "Coral Hills," which Smart Roof's accounting team received, processed, and paid by check later that month. In order to get the payment, Schulz told Smart Roof that the invoice should be sent to Trident as it was the name they were "now under."

107. The same day the invoice issued, Smart Roof personnel confirmed internally that Schulz "is going to send the final invoice for Coral Hills," asked accounting to "get him paid the next pay cycle," reflecting immediate processing of Trident's Coral Hills billing.

108. Taken together, the record reflects that Coral Hills originated and advanced within Fortis's pipeline and coordination with Smart Roof, yet the project's construction contract and subsequent payments went to Trident. Accordingly, Coral Hills is another lucrative project that the Trident Defendants diverted from Fortis.

109. The work described herein would have resulted in millions of dollars in revenue for Fortis had Schulz and Schupmann loyally performed their job duties on behalf of the Company. At no time did Schulz and Schupmann act to present these job opportunities to Fortis, nor did they inform Fortis of their competing business.

110. In fact, Schulz and Schupmann went even farther to cover their tracks. Schupmann explicitly instructed his direct reports that they were not allowed to communicate with Lewis about many subjects. Upon information and belief, Schupmann did this to prevent Lewis from becoming aware of Schulz and Schupmann's wrongdoing, which Lewis only discovered in 2024.

d. Schulz's Disloyalty is Uncovered by Fortis.

111. Schulz and Schupmann successfully continued their disloyalty undetected for several years. Fortis first learned that Schulz had been engaged in wrongdoing because of a project that occurred in July 2024.

112. Schulz was entrusted with maintaining the Coca-Cola client relationship on behalf of Fortis. In July 2024, Schulz advised Fortis personnel that he was travelling to a Coca-Cola facility in Lexington, Kentucky (the "**Lexington Plant**") to meet one of Fortis's client contacts at Coca-Cola. At the time, the Lexington Plant had an active Fortis warranty for its roof that was not set to expire for several years.

113. On July 30, 2024, Schulz began to call Fortis Director of Growth and Development Dan Kimball ("**Kimball**"), Schupmann's direct supervisor at Fortis after he was demoted from the COO position. Schulz claimed that the Lexington Plant's roof was in dire need of work and reported catastrophic roof damage. Schulz further informed Kimball that one of Fortis's contractors, FPS Roofing ("**FPS**"), happened to be working nearby and that Schulz had already coordinated with FPS President of Sales Michael Fusco ("**Fusco**") to begin immediate work on the Lexington Plant.

114. This was unusual for two reasons: (1) FPS is based near Youngstown, Ohio, nearly six hours from Lexington, while a recognized Fortis service provider is located less than two miles from the Lexington Plant and (2) Fortis salespeople such as Schulz are not responsible for scheduling maintenance work on roofs under warranty because Fortis's Operations team conducts prompt in-person inspections of roofs whenever a claim is filed, determines the proper repairs, and then engages a contractor.

115. Schulz represented to Kimball that the Lexington Plant's roof was in such poor condition that it could not wait for the Operations team to travel to Lexington to inspect it. Schulz attributed the amount of damage to poor contracting work or improper reconditioning when Fortis first issued the warranty. While Schulz claimed that a roof

replacement was necessary, FPS ultimately conducted repairs and did not need to replace the roof.

116. In order to investigate these claims, Kimball contacted Jonathan Lewis ("**Lewis**"), Fortis's head of Operations and Quality Control. Lewis informed Kimball that it was highly unusual that the Lexington Plant's roof would display such damage because (1) Coca-Cola had not filed any warranty claims for the roof and (2) Fortis had spent $50,000 to recondition the roof one year prior. Lewis also informed Kimball that Schulz's assertions that the roof reconditioning had been improperly performed were incorrect because Lewis had personally supervised the work. Tellingly, Schulz refused to speak with Lewis even though these issues fell directly within Lewis's job duties.

117. As a result of the events on July 29, 2024, Lewis traveled to the Lexington Plant to investigate the situation. Upon arrival, Lewis was informed by Coca-Coca facility manager Courtney Hundley that they had been directed by Schulz to not submit any claims to Fortis on the Lexington Plant. Lewis also reached out to Fusco to inquire about the nature of the damage and subsequent repairs conducted by FPS.

118. On August 2, 2024, Fusco contacted Kimball (his former coworker at a previous employer) and expressed concern based on his conversation with Lewis. After his conversation with Lewis, Fusco feared that he had been misled by Schulz regarding the situation at the Lexington Plant. Fusco revealed to Kimball that Schulz had directed FPS to be present at the Lexington Plant on July 29 several days in advance for a roof replacement. This directly contradicted Schulz's representations to Fortis that he had only

discovered the damage to the Lexington Plant on the 29th and that FPS's presence in the area was coincidental.

119. In addition, Fusco informed Kimball that Schulz had requested that FPS "pad" its costs for its work at the Lexington Plant by a total of $40,000 and instructed that this amount be paid to Schulz directly after FPS was paid by Fortis. Fusco also detailed that Schulz had requested a "finder's fee" of $10,000 to be added to work FPS had planned to conduct for Fortis in Toledo, Ohio. At the time, Fusco was under the impression that this was standard practice, but his suspicions were raised by Schulz asking for a significantly higher amount of money with regard to the Lexington Plant. As a longtime partner of Fortis's who had performed a significant amount of work for Fortis, Fusco did not want Schulz's wrongdoing to affect the relationship between Fortis and FPS.

120. Schulz refused to admit any wrongdoing when confronted with this information. Additionally, when Schulz was asked why he had requested FPS perform a roof replacement rather than roof repairs even though the Lexington Plant's roof was under warranty (and thus Fortis would be required to pay for the replacement), Schulz replied that Coca-Cola was not aware that the Lexington Plant was under warranty. Fortis then terminated Schulz's employment for this behavior (among other reasons) on August 9, 2024.

121. When terminating Schulz's employment, Lewis set forth in the August 9, 2024 termination letter that Schulz was required to return all "company documentation … including all 'Confidential Information,' … and all copies in paper or electronic form." In so

doing, Lewis referenced the contractual obligations that Schulz had as set forth in his Agreement.

122. Schulz refused to comply with his obligations set forth in the Agreement and as restated in the August 9, 2024 letter. Instead, he retained 267 pages of Fortis materials, including numerous confidential categories of documents containing non-public, commercially valuable information relating to Fortis's business.

123. Schulz did not disclose his retention of these materials until after preliminary injunction hearing in this case on May 30, 2025. Schulz only returned the documents (through counsel) in late June 2025.

124. Upon information and belief, Schulz misled Coca-Cola to believe they did not have a warranty on the Lexington Plant so that no repairs would be performed on the roof and the roof would need to be replaced. Schulz also created the "emergency" situation to ensure that FPS would perform work on the Lexington Plant's roof without Fortis supervision so that Fortis would not learn of the roof's exact condition. Upon information and belief, Schulz engaged in these various subterfuges so that he could charge $40,000 in kickbacks from FPS after the repairs were completed. In short, Schulz spun this complex web of lies to multiple parties in order to enrich himself at the expense of Fortis, Coca-Cola, and FPS.

e. Schupmann, a Repeat Offender, is Also Terminated.

125. After Schulz's termination, Fortis began to investigate Schupmann's level of involvement in Schulz's disloyal activities. Schupmann initially claimed that Schulz had acted alone. However, as Fortis's investigation continued, Schupmann's lies became

apparent. During the investigation, Schupmann offered contradictory explanations of his level of involvement with Schulz and Trident: (1) admitting that he was aware of Trident's formation but that Schulz had not used it prior to his termination, (2) stating that Trident had only been used to perform a roof replacement project that Fortis had declined two years prior, and finally (3) that he had not performed work for Trident in the last 12 months.

126. In addition to Schupmann's dishonesty, Reynolds revealed the nature of the relationship between TopKey and The Trident Defendants in December 2024. Lewis offered Schupmann the opportunity to travel to Fortis's Denver headquarters to discuss what had happened, but Schupmann refused. Fortis then terminated Schupmann's employment on December 24, 2024.

127. When terminating Schupmann's employment, Lewis set forth in the December 24, 2024 termination letter that Schupmann was required to return all "company documentation … including all 'Confidential Information,' … and all copies in paper or electronic form." In so doing, Lewis referenced the contractual obligations that Schupmann had as set forth in his Agreement.

128. Schupmann refused to comply with his obligations set forth in the Agreement and as restated in the December 24, 2024 letter. Instead, he retained 850 pages of Fortis materials, including business plans, marketing plans, various documents containing financial information, budgets, customer materials, statements of work, and warranty forms.

129. Schupmann did not disclose his retention of these materials until doing so at the preliminary injunction hearing in this case on May 30, 2025. Fortis reiterated its

demand for the return of the materials on June 2, 2025, citing the specific provisions in Schupmann's Agreement requiring the return. Despite numerous promises that he would return the materials. Schupmann only did so (through counsel) on July 25, 2025.

130. Fortis has since learned that this is not the first time Schupmann has violated the fiduciary duties and contractual obligations that he has owed to an employer in the industry. In 2014, Schupmann was sued by his former employer, Tecta America Corporation ("**Tecta**"), where Schupmann had previously served as Vice President of National Accounts. Tecta discovered that Schupmann had been plotting with one of Tecta's subcontractors ("**Saratoga**") to orchestrate a mass raid in which the entire business unit that Schupmann supervised would join Saratoga, all in violation of Schupmann's restrictive covenants with Tecta. Tecta also learned that Schupmann had been providing Saratoga with confidential information regarding Tecta's customers and pricing. A copy of Tecta's Complaint is attached hereto as Exhibit N.

131. All told, Defendants' actions have caused Fortis massive amounts of damage. Fortis has experienced significant lost profits and business opportunities because of Schulz and Schupmann's disloyal acts—act that were frequently, as identified herein, encouraged, supported, aided and/or abetted, intentionally and wrongfully, by the other Defendants. Additionally, Fortis has been irreparably harmed through the loss of its customer goodwill.

132. Further, by signing the Agreements, Schupmann and Schulz expressly agreed not to compete with Fortis for a limited period after the end of their employment. Schupmann is violating his Agreement because he has commenced work for Roofing

USA, a roofing contractor that (like Fortis) provides roofing maintenance, repairs, and replacements. Upon information and belief, Schupmann is working as a management-level employee for Roofing USA.

133. Based on content on its web site, Roofing USA does business in Virginia, North Carolina, South Carolina, Georgia, Florida, Texas, and North Dakota. Fortis does business within the same territory and Schupmann was responsible for that territory when he worked for Fortis.

134. Fortis first learned on January 31, 2025, that Schupmann had started work for Roofing USA, but now knows he was working for them as early as July of 2024—while still employed by Fortis.

135. In a managerial capacity for Roofing USA, Schupmann posed and poses a serious threat of unfair competition in that he can exploit—and has exploited—the relationships that he developed on behalf of Fortis with commercial clients and prospects to sell roofing maintenance, repairs, and replacement.

136. In fact, Roofing USA knowingly exploited and profited from Schupmann and Schulz's breaches and disloyalty, allowing Roofing USA to unfairly compete against Fortis. Indeed, Roofing USA knowingly permitted Schupmann to begin working for Roofing USA while Schupmann was still employed by Fortis in July of 2024. Roofing USA did this even though it knew that Schupmann was employed by Fortis and bound by a non-competition covenant and common law fiduciary duties.

137. Furthermore, Roofing USA knowingly and wrongfully solicited and accepted, from Schupmann and Schulz, Fortis's proprietary materials and work product.

Roofing USA did this knowing that the materials were misappropriated, stolen, and/or used without Fortis's authorization and in breach of Schupmann and Schulz's Agreements with Fortis and duties of loyalty to Fortis.

138. The Program is often directly competitive with the services offered by companies like Roofing USA because a business in need of roofing services can choose to buy the Fortis warranty or have repairs done by a traditional roofing contractor. In this context, through Schupmann and Schulz, a competitor like Roofing USA can potentially use—and has used—the vast amounts of confidential information Schupmann and Schulz they learned at Fortis to their advantage and the Company's detriment, exploiting the strengths and weaknesses of the Program to help Roofing USA tailor pitches to Fortis customers and prospects. These actions by Roofing USA would also be—and have been—to the detriment of Fortis's additional services, including the coordination of roof servicing, roof assessments, and roof management.

139. Additionally, Fortis has received multiple inquiries from Coca-Cola regarding warranty forms and contractual language. Upon information and belief, Coca-Cola has taken such action because Schulz and/or Schupmann have continued to contact Coca-Cola in an effort to interfere with Fortis's contractual relationships and solicit Coca-Cola's business away from Fortis in favor of themselves and in violation of their contractual obligations to Fortis.

140. At all relevant times, Trident, Roofing USA, and, on information and belief, TopKey, were aware of the Agreements as well as Fortis's customer relationships and prospects. Trident, Roofing USA, and TopKey all knowingly and intentionally interfered

with the Agreements, as well as these relationships, with the specific intent to damage Fortis, using wrongful means. Trident, Roofing USA, and Topkey's actions were improper and illegal because they were a wrongful, knowing act of aiding and abetting breach of fiduciary duty and breach of contract. It is clear that Schulz and Schupmann, violated the fiduciary duties they owed to Fortis as Fortis employees, and Roofing USA and TopKey knew that, and profited handsomely from it.

141. The Defendants' actions were done intentionally and willfully, were calculated to cause damage to Fortis's lawful business, were maliciously done with the unlawful purpose to cause such damage and loss, with actual damage and loss resulting, and was accomplished by wrongful conduct through the violation of the duty of loyalty.

142. The harm suffered by Fortis as a result of the Defendants' conduct and their continuing intent to violate the terms of the Agreements is and will be irreparable in nature, and incapable of being measured solely in terms of monetary damages, thereby leaving no adequate remedy at law for said harm to Fortis.

**<u>FIRST CLAIM FOR RELIEF</u>**
**BREACH OF THE FIDUCIARY DUTY OF LOYALTY**
**(Defendants Schulz and Schupmann)**

143. Fortis incorporates all preceding paragraphs as if fully stated herein.

144. At all times relevant, Schulz and Schupmann were employed by Fortis in positions of trust and responsibility as employees of the Company wherein they acted as the face of Fortis to its customers, prospects, and partners. In this capacity, Schulz and Schupmann owed Fortis a duty of loyalty to act in Fortis's best interests at all times and not to engage in activities harmful or detrimental to Fortis.

145. While still employed with Fortis, Schulz and Schupmann willfully and maliciously sought kickback payments and diverted business away from Fortis to Trident and other parties (including Roofing USA and TopKey) in order to benefit Trident, themselves, and/or the third parties at the expense of Fortis.

146. While still employed with Fortis, Schulz and Schupmann also willfully and disloyally provided assistance to a competitor, Roofing USA, by providing Roofing USA with proprietary information, sales advice, trade secrets, and even directly transmitting Fortis work product to to Roofing USA.

147. Schulz and Schupmann's breaches of their duty of loyalty has caused Fortis to suffer irreparable harm and economic damages in an amount to be determined at trial.

148. Fortis is entitled to disgorgement of the compensation paid to Schulz and Schupmann during their period of disloyalty, as well as any lost profits and/or unjust enrichment resulting from their breaches of their fiduciary duties.

149. Fortis is also entitled to punitive damages against Schulz and Schupmann because they have acted with malice in usurping Fortis's business opportunities with the attempt to injure Fortis.

**SECOND CLAIM FOR RELIEF**
**<u>BREACH OF CONTRACT</u>**
**(Defendants Schulz and Schupmann)**

150. Fortis incorporates all preceding paragraphs as if fully stated herein.

151. Schupmann and Schulz entered into valid confidentiality and non-compete covenants in the Agreements for good and valuable consideration, whereby they agreed not to use for their personal advantage Fortis's confidential information (including

information regarding its customers) during or after the end of their employment with Fortis or to provide the same or similar services they provided to Fortis on behalf of a competitor during their employment and for two years following the end of their employment in a limited territory.

152. Upon information and belief, Schupmann's and Schulz's acts in using Fortis's confidential information for their personal gain and on behalf of Trident and Roofing USA constitutes a breach of the confidentiality provision of the Agreements.

153. The Agreements' confidentiality provisions are reasonable under the circumstances to protect Fortis's legitimate interests in its confidential information, client/employee relationships, and goodwill.

154. Upon information and belief, Schupmann is continuing to offer the same or similar services he provided for Fortis on behalf of Roofing USA within the area Fortis engaged in business during Schupmann's employment with Fortis. These actions constitute a breach of the non-competition provision of Schupmann's Agreement.

155. The Agreements' non-competition provisions are reasonable under the circumstance to protect Fortis's legitimate interests in its confidential information and customer goodwill.

156. Additionally, Schupmann and Schulz's work, during their employment, on behalf of themselves, Roofing USA, and Trident violated other provisions, including but not limited to Paragraph 1.1.2 of the Agreements, wherein they promised to devote substantially all of their business time, attention and skill to the performance of their duties as employees of the Company.

157. Schulz and Schupmann both violated Paragraph 5.1 of the Agreements by retaining hundreds of pages of documents after the end of their employment.

158. Schulz and Schupmann retained these documents despite specific demands by Fortis for the return of all materials in August and December 2024, respectively. They finally returned the documents in June and July 2025, respectively.

159. Fortis has complied with the material terms of the Agreements at all times relevant.

160. As a result of Schupmann's and Schulz's actions and breaches of the Agreements, Fortis has suffered and/or will suffer irreparable harm, and should be awarded money damages, together with attorneys' fees, costs, and such other relief as the Court may deem just and proper.

**THIRD CLAIM FOR RELIEF**
**TEMPORARY, PRELIMINARY, AND PERMANENT INJUNCTION**
**(Trident Defendants & Roofing USA)**

161. Fortis incorporates all preceding paragraphs as if fully stated herein.

162. As a condition of their employment with Fortis, and in exchange for valuable consideration, Schupmann and Schulz agreed not to provide the same or similar services they provided for Fortis on behalf of a competitor within the area Fortis engaged in business during their employment with Fortis.

163. Trident and Roofing USA have induced, aided, and abetted Schupmann's and Schulz's violations of the Agreements in order to unfairly compete with Fortis by placing Schupmann and Schulz in a position to unfairly compete with Fortis in violation of the Agreements and through the exploitation of Fortis's confidential information. Trident

and Roofing USA have refused to stop this course of action and will continue to employ and abet Schupmann and Schulz in a manner that violates Fortis's contractual and other legal rights.

164. In the absence of injunctive relief, Fortis will suffer irreparable harm, including, but not limited to, unfair competition, loss of customers and disclosure of customer information to a competitor.

165. Fortis has no adequate remedy at law.

166. The potential harm to Fortis if the Trident Defendants and Roofing USA are not enjoined is far greater than any harm that the Trident Defendants will suffer if injunctive relief is granted.

167. Fortis is likely to succeed on the merits of its causes of action against the Defendants.

168. The public interest weighs in favor of granting injunctive relief.

## FOURTH CLAIM FOR RELIEF
## TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS: EMPLOYMENT AGREEMENTS
## (Defendants Trident & Roofing USA)

169. Fortis incorporates all preceding paragraphs as if fully stated herein.

170. At all relevant times, Fortis had valid and enforceable employment agreements with Schupmann and Schulz.

171. Trident knew of the restrictive covenants in Schupmann's and Schulz's Agreements, including the Agreements' non-competition, loyalty, and confidentiality provisions.

172. Roofing USA knew, when it began working with Schupmann and Schulz in July of 2024, that both were employed by Fortis at the time. Roofing USA also knew that Schupman had an employment agreement with restrictions on competition. In fact, Roofing USA's CEO knew that the Agreements meant that, if they worked with Schupmann, there were "products that we couldn't try to sell" and "customers that we couldn't go after."

173. Upon information and belief, Trident and Roofing USA wrongly and without justification solicited and induced Schupmann and Schulz to breach the Agreements and compete with Fortis on behalf of Trident in violation of the Agreements' non-competition provisions. Schupmann and Schulz conducted such activities while using Fortis's confidential information in violation of the Agreements' confidentiality provision—and Trident and Roofing USA, knowingly used and accepted that confidential and proprietary information of Fortis, damaging Fortis.

174. For example, on July 19, 2024, Schupmann sent Brian Tice, CEO of Roofing USA, a "commercial service brochure" that Schupmann had apparently created for use as a Template, and the brochure included services in direct competition with Fortis—for example, roofing "maintenance" and "centralized" services for "oversight" and "peace of mind." Roofing USA was in the process of changing over from a residential to a commercial roofer.

175. Roofing USA received assistance from both Schupmann and Schulz—as individuals and through their company, Trident, when they were both still employed by Fortis—and received assistance in particular with sales and marketing. Schulz was

leading the way for them when it came to training and managing salespeople, while Schupmann was feeding them Fortis work product and operational insights.

176. For example, on July 22, 2024, Roofing USA's CEO accepted a Powerpoint presentation from Schupmann that was to be used for Roofing USA's sales rep kickoff meeting—a presentation that Schupmann gave the next day.

177. Upon seeing the slides, Schulz commented to Schupmann "Looks familiar with some new pizzazz nice work." He said that because the presentation and slides were identical to a presentation that Schupmann had created for Fortis—the only real difference was Schupmann changed the logo. On information and belief, Schupmann used the stolen work product to train Roofing USA's salespeople to compete against Fortis—at a time period when Roofing USA was well aware that Schupmann was still employed by Fortis.

178. Upon information and belief, Trident and Roofing USA continues to interfere with Fortis's contractual rights by directing, encouraging, and allowing Schupmann and Schulz to violate the non-competition clause of the Agreements and/or inducing their violations of the Agreements by creating economic incentives to improperly compete with Fortis.

179. At all relevant times, Trident and Roofing USA were strangers to the Agreements (the Employment Agreements) with which they improperly interfered because neither Trident nor Roofing USA: (a) was a signatory to the Agreements; (b) was an intended or unintended beneficiary of the Agreements; nor (c) had a direct economic interest in the Agreements.

180. Trident and Roofing USA's actions were intentional and for the improper and wrongful purposes of (a) interfering with Fortis's contractual employee relationships; (b) unlawfully and unfairly competing with Fortis; (d) aiding and abetting breach of fiduciary duty; (c) misappropriation of trade secrets and proprietary information; and (e) unfairly harming Fortis's business. They were also actions done by wrongful means as they involved conversion, conspiracy, misappropriation of trade secrets, and aiding and abetting breach of fiduciary duty.

181. Fortis has suffered injury and damages as a direct and proximate result of the challenged conduct, including but not limited to actual damages, lost profits, mitigation expenses, and loss of value and goodwill of Fortis's impacted client relationships—in an amount to be determined at trial.

182. Trident and Roofing USA's conduct exhibits willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care that would raise the presumption of conscious indifference to consequences, such that Fortis is entitled to punitive damages in an amount to be determined at trial.

## FIFTH CLAIM FOR RELIEF
## TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE
## (Defendants Trident & Roofing USA)

183. Fortis incorporates all preceding paragraphs as if fully stated herein.

184. Upon information and belief, Schulz and Schupmann breached their fiduciary duties of loyalty owed to Fortis in order to unfairly compete with Fortis by usurping Fortis's business opportunities for the benefit of themselves and Trident.

185. At all times relevant, Schulz and Schupmann committed these wrongful actions as managers and agents of Trident.

186. Additionally, Roofing USA knowingly and wrongfully acted through its agents Schupmann and Schulz when interfering with Fortis customer relationships and potential projects to benefit Roofing USA. Beginning in July of 2024, Roofing USA worked with and paid Schulz, Schupmann, and/or Trident for "consulting" services, which consisted of getting insider deals, diversion of opportunities, copies of Fortis proprietary training, marketing, and sales materials direct from the source—Fortis's COO (Schupmann) and Head of Sales (Schulz).

187. For example, on July 22, 2024, Schulz emailed his personal email address from his Fortis email address, sending proprietary and confidential details regarding a Fortis business opportunity with a Fortis's client, Coca-Cola.

188. Schulz then forwarded the details from his personal email to himself and Schupmann at Trident. Ultimately, Schupmann, using his Trident email, then emailed the entire thread—<u>showing, to be clear, the origination of the opportunity at Fortis and thus clearly belonging to Fortis</u>—to Tice at Roofing USA, saying "here are the details. . . we can talk about it more after the call tomorrow."

189. Roofing USA then sent the opportunity around internally in order to win the work, saying: "This is from our new sales consultant Dave [Schulz]. He had Coca Cola as a national account."

190. Of course, Roofing USA knew where Schulz had the Coca Cola account: at Fortis. It knew this because Schulz and Schupmann's contacts, accounts, and diversion

of work was precisely the point: it was why Roofing USA wanted to work with them and paid them as "consultants." But in case there was any uncertainty: it was right there on the bottom of the email thread—Schulz and Schupmann were secretly stealing opportunities from their employer and feeding them to a competitor, Roofing USA, to benefit themselves.

191. Ultimately, Roofing USA hired Schupmann to work for them full time, after things fell apart when Schupmann and Schulz's wrongdoing was finally discovered by Fortis.

192. In other words, from the start Roofing USA knew that Schulz and Schupmann were disloyal, that they were breaching their employment agreements, and that they were stealing and providing Roofing USA with proprietary and confidential insider information and business opportunities that should have belonged to Fortis—and it took full advantage and paid the Trident Defendants for the privilege.

193. Similarly, on July 24, 2024, Schulz emailed Roofing USA's CEO, another top leader at Roofing, and Schupmann from his Trident email asking "which of you would be best to steer opportunities through? I have this potential opportunity in Suffolk . . . There may also be some new construction to get involved with as well if we can win over the client on the existing roof opp."

194. Trident and Roofing USA's interference with Fortis's business advantage was done intentionally and willfully, was calculated to cause damage to Fortis's lawful business, and was maliciously done without right or justifiable cause on part of Trident.

195. Upon information and belief, through inducing Schulz and Schupmann's violation of the duty of loyalty to interfere with Fortis's business prospects, Trident and Roofing USA tortiously interfered with Fortis's prospective business advantage through improper or wrongful means.

196. Trident and Roofing USA's actions have resulted in actual damage and loss to Fortis through the loss of Fortis's actual and potential customers, profits, and customer goodwill.

197. The violation of the duty of loyalty for the purpose of wrongfully diverting business opportunities is independently wrongful and unlawful apart from its effect on Fortis's business relationships.

198. Fortis has suffered injury and damages as a direct and proximate result of the challenged conduct, including but not limited to actual damages, lost profits, mitigation expenses, and loss of value and goodwill of Fortis's impacted client relationships.

199. Trident and Roofing USA's conduct exhibits willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care that would raise the presumption of conscious indifference to consequences, such that Fortis is entitled to punitive damages in an amount to be determined at trial.

**SIXTH CLAIM FOR RELIEF**
**CIVIL THEFT**
**(Trident Defendants)**

200. Fortis incorporates all preceding paragraphs as if fully stated herein.

201. During their respective employments with Fortis, Schulz and Schupmann demanded that Fortis's contractors increase their bids for the work they performed on

behalf of Fortis. After Fortis compensated these contractors, the contractors would pay the excess money directly to Schulz, Schupmann, and/or Trident.

202. The funds Fortis expended on the kickback payments are valuable to Fortis because they contributed to the revenue and overall profit of the business.

203. In violation of C.R.S. § 18-4-405, Schulz and Schupmann knowingly, intentionally, and without authorization deceived Fortis with the intent to permanently deprive Fortis of the monies the Trident Defendants received as a result of the kickback payments.

204. The Trident Defendants obtained, retained, and/or exercised control over these funds and permanently deprived Fortis of the benefits of these funds.

205. Upon information and belief, Trident is now or may become in possession of these stolen funds, to the extent the funds are no longer in possession of Schulz and/or Schupmann.

206. Schulz and Schupmann also retained hundreds of pages of documents that belong to Fortis, all despite specific requests for the return of those materials.

207. As a direct and proximate result of the Trident Defendants' civil theft, Fortis has suffered damages in an amount to be proven at trial.

208. As a direct and proximate result of the Trident Defendants' civil theft, and pursuant to C.R.S. § 18-4-4-5, Fortis is also entitled to treble damages equal to three times the amount of actual damages, as well as an award of costs and attorneys' fees.

**SEVENTH CLAIM FOR RELIEF**
**CONVERSION**
**(Trident Defendants)**

209. Fortis incorporates all preceding paragraphs as if fully stated herein.

210. Fortis had an ownership interest and absolute, unconditional right to the revenues, profits, and funds it has earned, obtained, and maintained as a business.

211. Through their kickback scheme, the Trident Defendants, wrongfully and without authorization, have assumed control, dominion, or ownership of this Fortis's property.

212. Fortis also had an ownership interest and absolute, unconditional right to the business records that it maintains in the course of operating its business.

213. Schulz and Schupmann, wrongfully and without authorization, assumed control, dominion, or ownership of Fortis's business records despite specific demands for the return of those materials.

214. As a direct and proximate result of the Trident Defendants' civil conversion of Fortis's property, Fortis has suffered damages in an amount to be proven at trial equal to at least the fair market value of the converted property.

**EIGHTH CLAIM FOR RELIEF**
**CIVIL CONSPIRACY**
**(All Defendants)**

215. Fortis incorporates all preceding paragraphs as if fully stated herein.

216. The Defendants agreed, by words or conduct, to engage in unlawful conduct to personally enrich themselves, including so that they could unlawfully compete

with Fortis, profit from Fortis's efforts, benefit from Fortis's proprietary information, trade secrets, and work product, and/or cause Fortis other economic harm.

217. To accomplish this goal, the Defendants, acting in concert with each other, engaged in an improper scheme to convert and steal Fortis monies, stole business opportunities that rightfully belonged to Fortis, interfered with Fortis's contracts and prospective business advantage, breached their common law duties of loyalty, and otherwise unjustly enriched themselves at Fortis's expense.

218. Additionally, Roofing USA conspired with the Trident Defendants to wrongfully obtain and use Fortis proprietary information, work product, insider information, know how, and trade secrets, as detailed above.

219. The Defendants committed overt acts as described, including theft of proprietary information, aiding and abetting breach of fiduciary duty/breach of fiduciary duty, as well as other wrongful acts. Defendants formed and operated an unlawful scheme with a common purpose and object to injure Fortis by performing unlawful acts in violation of Fortis's employment practices, property rights, common law duties and obligations, and other applicable law.

220. The Defendants' conduct was without justification or privilege and was taken for their respective personal and economic advantage.

221. As a direct and proximate result of the Defendants' civil conspiracy, Fortis has suffered damages in an amount to be proven at trial.

**<u>NINTH CLAIM FOR RELIEF</u>**
**AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**
**(Defendants Trident, Roofing USA, and TopKey)**

222. Fortis incorporates all preceding paragraphs as if fully stated herein.

223. At all times relevant, Schulz and Schupmann were employed by Fortis in positions of trust and responsibility as employees of the Company wherein they acted as the face of Fortis to its customers, prospects, and partners. In this capacity, Schulz and Schupmann owed Fortis a duty of loyalty to act in Fortis's best interests at all times and not to engage in activities harmful or detrimental to Fortis.

224. Under Colorado law, a plaintiff may seek recovery from a nonfiduciary defendant on a claim for aiding and abetting a breach of fiduciary duty when the nonfiduciary defendant knowingly helps cause a fiduciary's breach of its fiduciary duty.

225. While still employed with Fortis, Schulz and Schupmann breached their fiduciary duties of loyalty in numerous ways, and this included by soliciting and accepting kickbacks from TopKey through Trident, diverting business opportunities from Fortis, and placing their personal financial interests above those of Fortis.

226. TopKey, through its President Dan Schardt and its employee Scott Reynolds, knowingly participated in and gave substantial assistance to Schulz and Schupmann's breach of their fiduciary duties to Fortis.

227. TopKey's knowing participation included calculating and confirming the "Referral Fee @ 7.5%" plus "$7k/roof" formula with Schulz.

228. TopKey's knowing participation further included embedding those concealed payment increments into TopKey's external proposals for Fortis-tied work, paying the invoiced kickback fees to Trident on approximately 130 Fortis-tied projects, and, on information and belief, negotiating and entering into an agreement with Trident

that formalized the percentage-based payment structure through which Schulz and Schupmann received the fruits of their disloyalty.

229. TopKey's employee Scott Reynolds accepted the kickback demands from Schulz and Schupmann because, in Reynolds's own assessment, it came with "guaranteed work" from Fortis.

230. TopKey's leadership, including Schardt and Reynolds, understood that Schulz and Schupmann were Fortis employees and that the kickback payments were made in connection with Fortis's allocation of work to TopKey.

231. Roofing USA knowingly aided and abetted Schulz and Schupmann’s breaches of their fiduciary duties by engaging in the conduct described herein, and in particular, in paragraphs 177-184, and 191-199, *supra*, which are incorporated as if fully set forth herein.

232. TopKey and Roofing USA’s knowing participation in and substantial assistance to Schulz and Schupmann's breach of fiduciary duty is established by the conduct alleged above.

233. As a direct and proximate result of TopKey and Roofing USA’s aiding and abetting of Schulz and Schupmann's breach of their fiduciary duties of loyalty, Fortis has suffered damages, including but not limited to lost profits, the value of diverted business opportunities, and inflated project costs attributable to embedded kickback increments.

234. Fortis has also suffered loss of value and goodwill of Fortis's impacted client relationships as a result of TopKey and Roofing USA’s conduct.

235. Fortis is entitled to damages in an amount to be determined at trial, but which should include disgorgement of any benefits TopKey and Roofing USA obtained as a result of its knowing participation in Schulz and Schupmann's breach of fiduciary duty, as well as any lost profits and unjust enrichment resulting from TopKey and Roofing USA's wrongful actions.

**TENTH CLAIM FOR RELIEF**
**UNJUST ENRICHMENT**
**(Defendant TopKey)**

236. Fortis incorporates all preceding paragraphs as if fully stated herein.

237. Fortis conferred valuable benefits on TopKey through Fortis program opportunities, coordination, and Fortis's commercial relationships that positioned TopKey to receive revenue on Fortis-tied projects. TopKey received project awards and contract revenue on Fortis-tied work that it would not otherwise have obtained but for Schulz and Schupmann's steering of those opportunities to TopKey.

238. TopKey's benefits were conferred at Fortis's expense. Fortis paid or caused to be paid project costs that included concealed uplifts embedded in TopKey's external pricing, and Fortis was deprived of management fees and revenue on projects steered to TopKey through coordination with Schulz and Schupmann.

239. TopKey knowingly received and retained the benefit of those Fortis-tied project awards — including on projects across the country that Fortis would ordinarily have assigned to local contractors — while embedding concealed uplifts into its external pricing and paying Trident under the "TPI" arrangement. TopKey was willing to accept

non-competitive project assignments because the insider arrangement provided TopKey with guaranteed work it would not otherwise have secured.

240. TopKey's retention of the benefits derived from Fortis's opportunities and relationships is unjust because TopKey's gains were facilitated by secret payments to Fortis insiders and concealed pricing uplifts.

241. As a direct and proximate result of TopKey's unjust enrichment, Fortis has suffered damages in an amount to be proven at trial and TopKey should make restitution or disgorge unjust benefits received.

**ELEVENTH CLAIM FOR RELIEF**
**TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE**
**(Defendant TopKey)**

242. Fortis incorporates all preceding paragraphs as if fully stated herein.

243. Fortis had valid prospective business relationships and expectancies in the form of ongoing and prospective projects within the Fortis program and customer ecosystem, including on properties such as Park Shirlington and Homestead FL.

244. At all times relevant, TopKey was aware of Fortis's customer relationships and prospective business opportunities by virtue of TopKey's June 28, 2022 mutual NDA with Fortis, TopKey's direct contract with Fortis on Park Shirlington, and TopKey's ongoing coordination with Schulz and Schupmann on Fortis-tied projects. TopKey knowingly and intentionally interfered with these relationships by calculating and embedding percentage-based fees into TopKey's external proposals on Fortis-tied opportunities and paying those fees to Trident. TopKey's actions were improper because

TopKey's coordination with Schulz and Schupmann facilitated the violation of their fiduciary duties they owed to Fortis as employees.

245. TopKey's interference employed improper means because TopKey embedded concealed uplifts into its external pricing and facilitated Schulz and Schupmann's breaches of their fiduciary duties to Fortis.

246. TopKey's interference was maliciously done without right or justifiable cause and was calculated to damage Fortis's lawful business.

247. The violation of the duty of loyalty for the purpose of wrongfully diverting business opportunities is independently wrongful and unlawful apart from its effect on Fortis's business relationships.

248. Fortis has suffered injury and damages as a direct and proximate result of TopKey's interference, including but not limited to actual damages, lost profits, mitigation expenses, and loss of value and goodwill of Fortis's impacted client relationships—in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, based on the foregoing, Fortis respectfully requests the Court grant the following relief:

A. A temporary restraining order, followed by the issuance of a preliminary injunction against Schupmann, Schulz, Roofing USA, and all others acting in active concert (including Trident) with them prohibiting Schupmann and Schulz from breaching the terms of the Agreements, including any violations of their confidentiality and non-competition covenants;

B. The entry of a judgment for monetary damages for Defendants' wrongful acts alleged herein, including, but not limited to actual damages (including all damages incurred by Fortis as a result of lost customers and profits), pre-litigation attorneys' fees and costs, and Defendants' unjust enrichment as a result of their unlawful acts;

C. Disgorgement of all compensation received by Defendants Schulz and Schupmann during their period of disloyalty;

D. An award of punitive damages for Defendant Schulz and Schupmann's violations of the fiduciary duty of loyalty;

E. An award of punitive damages for Defendant Trident's malicious tortious interference with the Agreements;

F. An award of punitive damages for Defendant Trident's malicious tortious interference with Fortis's prospective business advantage;

G. Treble damages for Defendants' civil theft, as authorized by C.R.S. § 18-4-4-5;

H. The fair market value of the property Defendants have converted;

I. Damages resulting from Defendants' civil conspiracy;

J. All other damages as alleged herein;

K. An award of costs and attorneys' fees; and

L. An award of such other relief that the honorable Court may deem just and proper.

Dated this 7th day of May, 2026.

Respectfully submitted,

SENN FORTIS, LLC

*/s/ Lenora B. Plimpton*
Christine K. Lamb, Atty. Reg. #30326
Lenora B. Plimpton, Atty. Reg. #48194
Megan M. Ratcliffe, Atty. Reg. #56489
Senn Fortis LLC
1700 Lincoln Street, Suite 2100
Denver, CO 80203
Telephone: (303) 298-1122
clamb@sennfortis.com
lplimpton@sennfortis.com
mratcliffe@sennfortis.com
*Attorneys for Plaintiff FW-CO, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 7, 2026, I served the foregoing **THIRD AMENDED COMPLAINT & JURY DEMAND** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Kellie Nelson Fetter
675 Fifteenth Street, Suite 2300
Denver, CO 80202
Telephone: (303) 299-8354
Facsimile: (303) 298-0940
kfetter@taftlaw.com
*Attorney for Defendant David Schuppman*

Todd Rowden
Taft Stettinius & Hollister, LLP
111 East Wacker Suite 2600, Chicago, IL 60601
TRowden@Taftlaw.com
Phone: 312.836.4060
Fax: (312) 527-4011
*Attorneys for Defendants David Schuppman and Trident Solutions of Sugar Grove, LLC*

Denesh Chukkapalli
Dworkin Chambers Williams York Benson & Evans, PC
3900 East Mexico Avenue
Suite 820
Denver, CO 80210
303-584-0990
Fax: 303-584-0995
Email: dchukkapalli@dnvrlaw.com

Gary J. Benson
Dworkin Chambers Williams York Benson & Evans, PC
3900 East Mexico Avenue
Suite 1300
Denver, CO 80210
303-584-0990
Fax: 303-584-0995
Email: gbenson@dnvrlaw.com
*Attorneys for Defendant Charles Schulz*

*/s/Katie Witt*
Katie Witt
SENN FORTIS LLC

# Exhibit B

To order copies of any documents listed below, contact Court Express courtexpress@thomsonreuters.com, 1-877-362-7387 (Additional charges apply)

**This docket is current through 08/31/2026**

Today's Date: 08/31/2026
Source: U.S. District Court, District of Colorado (Denver)

| | |
|---|---|
| **Court:** | U.S. District Court, District of Colorado (Denver) |
| **Case Title:** | FW-CO, Inc. v. Schulz et al |
| **Case:** | 1:25-CV-00254 |
| **Judge:** | Judge Nina Y. Wang |
| **Date Filed:** | 01/24/2025 |
| **Case Status:** | JD1, NDISPO |

## CASE INFORMATION

| | |
|---|---|
| **Case Number:** | 1:25CV00254 |
| **Referred To:** | Magistrate Judge Timothy P O'Hara |
| **Jury Demand:** | Both |
| **Nature of Suit:** | Contract: Other Contract (190) |
| **Jurisdiction:** | Diversity |
| **Cause:** | 28 USC 1332 Diversity-Breach of Contract |

## PARTICIPANT INFORMATION

### FW-CO, Inc.

| | |
|---|---|
| **Party Description:** | Doing Business As Fortis Warranty |
| **Type:** | Plaintiff |
| **Attorney:** | Michael P. Elkon |
| **Status:** | LEAD ATTORNEY |
| **Attorney Terminated:** | 11/19/2025 |
| **Firm Name:** | Fisher & Phillips LLP |
| **Firm Address:** | 1230 Peachtree Street, NE<br>Suite 3300<br>Atlanta, GA 30309 |
| **Firm Phone:** | 404-240-5849 |
| **Firm Fax:** | 404-240-4249 |
| **Email Address:** | melkon@fisherphillips.com |
| **Attorney:** | Christine K. Lamb |
| **Status:** | ATTORNEY TO BE NOTICED |
| **Firm Name:** | Senn Fortis LLC |
| **Firm Address:** | 1700 Lincoln Street<br>Suite 2100<br>Denver, CO 80203 |
| **Firm Phone:** | 303-298-1122 |
| **Email Address:** | clamb@sennfortis.com |
| **Attorney:** | Elizabeth Tillotson Hartsel |
| **Attorney Terminated:** | 02/25/2026 |
| **Firm Name:** | Senn Fortis LLC |
| **Firm Address:** | 1700 Lincoln Street<br>Suite 2100<br>Denver, CO 80203 |

| | |
|---|---|
| **Firm Phone:** | 303-298-1122 |
| **Email Address:** | lhartsel@sennfortis.com |
| **Attorney:** | Francis Alfred Wilson |
| **Attorney Terminated:** | 11/19/2025 |
| **Firm Name:** | Seyfarth Shaw LLP |
| **Firm Address:** | 975 F Street, N.W.<br>Washington, DC 20004 |
| **Firm Phone:** | 202-828-5338 |
| **Firm Fax:** | 202-828-5393 |
| **Email Address:** | fwilson@seyfarth.com |
| **Attorney:** | Lenora B. Plimpton |
| **Attorney Terminated:** | 08/20/2026 |
| **Firm Name:** | Senn Fortis LLC |
| **Firm Address:** | 1700 Lincoln Street<br>Suite 2100<br>Denver, CO 80203 |
| **Firm Phone:** | 303-298-1122 |
| **Email Address:** | lplimpton@sennfortis.com |
| **Attorney:** | Matthew Thomas Sharon |
| **Attorney Terminated:** | 11/19/2025 |
| **Firm Name:** | Fisher Phillips LLP |
| **Firm Address:** | 1230 Peachtree Street NE<br>Suite 3300<br>Atlanta, GA 30309 |
| **Firm Phone:** | 770-377-0487 |
| **Email Address:** | msharon@fisherphillips.com |
| **Attorney:** | Megan Mary Ratcliffe |
| **Status:** | ATTORNEY TO BE NOTICED |
| **Firm Name:** | Senn Fortis LLC |
| **Firm Address:** | 1700 Lincoln Street<br>Suite 2100<br>Denver, CO 80203 |
| **Firm Phone:** | 303-298-1122 |
| **Email Address:** | mratcliffe@sennfortis.com |

## David Schupmann

| | |
|---|---|
| **Type:** | Counter Claimant |
| **Attorney:** | Emily A. England |
| **Attorney Terminated:** | 03/05/2026 |
| **Firm Name:** | Taft Stettinius & Hollister LLP |
| **Firm Address:** | 675 Fifteenth Street<br>Suite 2300<br>Denver, CO 80202 |
| **Firm Phone:** | 303-297-2900 |
| **Email Address:** | eengland@taftlaw.com |
| **Attorney:** | Kellie Nelson Fetter |
| **Status:** | ATTORNEY TO BE NOTICED |
| **Firm Name:** | Taft Stettinius & Hollister LLP |
| **Firm Address:** | 675 Fifteenth Street<br>Suite 2300<br>Denver, CO 80202 |
| **Firm Phone:** | 303-299-8448 |
| **Email Address:** | kfetter@taftlaw.com |
| **Attorney:** | Patrick John Miller |
| **Attorney Terminated:** | 03/05/2026 |

| | |
|---|---|
| **Firm Name:** | Taft Stettinius & Hollister LLP |
| **Firm Address:** | 675 Fifteenth Street<br>Suite 2300<br>Denver, CO 80202 |
| **Firm Phone:** | 303-299-8354 |
| **Firm Fax:** | 303-298-0940 |
| **Email Address:** | pat.miller@shermanhoward.com |
| **Attorney:** | Todd Andrew Rowden |
| **Status:** | ATTORNEY TO BE NOTICED |
| **Firm Name:** | Taft Stettinius & Hollister LLP |
| **Firm Address:** | 111 East Wacker Drive<br>Suite 2600<br>Chicago, IL 60601 |
| **Firm Phone:** | 312-527-4000 |
| **Email Address:** | trowden@taftlaw.com |

## Charles Schulz

| | |
|---|---|
| **Type:** | Counter Claimant |
| **Attorney:** | Denesh Chukkapalli |
| **Status:** | ATTORNEY TO BE NOTICED |
| **Firm Name:** | Dworkin Chambers Williams York Benson & Evans, PC |
| **Firm Address:** | 3900 East Mexico Avenue<br>Suite 820<br>Denver, CO 80210 |
| **Firm Phone:** | 303-584-0990 |
| **Firm Fax:** | 303-584-0995 |
| **Email Address:** | dchukkapalli@dnvrlaw.com |
| **Attorney:** | Gary J. Benson |
| **Status:** | ATTORNEY TO BE NOTICED |
| **Firm Name:** | Dworkin Chambers Williams York Benson & Evans, PC |
| **Firm Address:** | 3900 East Mexico Avenue<br>Suite 1300<br>Denver, CO 80210 |
| **Firm Phone:** | 303-584-0990 |
| **Firm Fax:** | 303-584-0995 |
| **Email Address:** | gbenson@dnvrlaw.com |

## Trident Solutions of Sugar Grove, LLC

| | |
|---|---|
| **Type:** | Counter Claimant |
| **Attorney:** | Trident Solutions of Sugar Grove, LLC |
| **Status:** | PRO SE |
| **Attorney Address:** | c/o David Schupmann<br>0S440 Crego Place<br>Geneva, IL 60134 |
| **Attorney:** | Emily A. England |
| **Attorney Terminated:** | 03/05/2026 |
| **Firm Name:** | Taft Stettinius & Hollister LLP |
| **Firm Address:** | 675 Fifteenth Street<br>Suite 2300<br>Denver, CO 80202 |
| **Firm Phone:** | 303-297-2900 |

| | |
|---|---|
| **Email Address:** | eengland@taftlaw.com |
| **Attorney:** | Kellie Nelson Fetter |
| **Attorney Terminated:** | 05/06/2026 |
| **Firm Name:** | Taft Stettinius & Hollister LLP |
| **Firm Address:** | 675 Fifteenth Street<br>Suite 2300<br>Denver, CO 80202 |
| **Firm Phone:** | 303-299-8448 |
| **Email Address:** | kfetter@taftlaw.com |
| **Attorney:** | Patrick John Miller |
| **Attorney Terminated:** | 03/05/2026 |
| **Firm Name:** | Taft Stettinius & Hollister LLP |
| **Firm Address:** | 675 Fifteenth Street<br>Suite 2300<br>Denver, CO 80202 |
| **Firm Phone:** | 303-299-8354 |
| **Firm Fax:** | 303-298-0940 |
| **Email Address:** | pat.miller@shermanhoward.com |

## Charles Schulz

| | |
|---|---|
| **Type:** | Defendant |
| **Attorney:** | Denesh Chukkapalli |
| **Status:** | ATTORNEY TO BE NOTICED |
| **Firm Name:** | Dworkin Chambers Williams York Benson & Evans, PC |
| **Firm Address:** | 3900 East Mexico Avenue<br>Suite 820<br>Denver, CO 80210 |
| **Firm Phone:** | 303-584-0990 |
| **Firm Fax:** | 303-584-0995 |
| **Email Address:** | dchukkapalli@dnvrlaw.com |
| **Attorney:** | Gary J. Benson |
| **Status:** | ATTORNEY TO BE NOTICED |
| **Firm Name:** | Dworkin Chambers Williams York Benson & Evans, PC |
| **Firm Address:** | 3900 East Mexico Avenue<br>Suite 1300<br>Denver, CO 80210 |
| **Firm Phone:** | 303-584-0990 |
| **Firm Fax:** | 303-584-0995 |
| **Email Address:** | gbenson@dnvrlaw.com |

## David Schupmann

| | |
|---|---|
| **Type:** | Defendant |
| **Attorney:** | Emily A. England |
| **Attorney Terminated:** | 03/05/2026 |
| **Firm Name:** | Taft Stettinius & Hollister LLP |
| **Firm Address:** | 675 Fifteenth Street<br>Suite 2300<br>Denver, CO 80202 |
| **Firm Phone:** | 303-297-2900 |
| **Email Address:** | eengland@taftlaw.com |
| **Attorney:** | Kellie Nelson Fetter |

| | |
|---|---|
| **Status:** | ATTORNEY TO BE NOTICED |
| **Firm Name:** | Taft Stettinius & Hollister LLP |
| **Firm Address:** | 675 Fifteenth Street<br>Suite 2300<br>Denver, CO 80202 |
| **Firm Phone:** | 303-299-8448 |
| **Email Address:** | kfetter@taftlaw.com |
| **Attorney:** | Patrick John Miller |
| **Attorney Terminated:** | 03/05/2026 |
| **Firm Name:** | Taft Stettinius & Hollister LLP |
| **Firm Address:** | 675 Fifteenth Street<br>Suite 2300<br>Denver, CO 80202 |
| **Firm Phone:** | 303-299-8354 |
| **Firm Fax:** | 303-298-0940 |
| **Email Address:** | pat.miller@shermanhoward.com |
| **Attorney:** | Todd Andrew Rowden |
| **Status:** | ATTORNEY TO BE NOTICED |
| **Firm Name:** | Taft Stettinius & Hollister LLP |
| **Firm Address:** | 111 East Wacker Drive<br>Suite 2600<br>Chicago, IL 60601 |
| **Firm Phone:** | 312-527-4000 |
| **Email Address:** | trowden@taftlaw.com |

## Trident Solutions of Sugar Grove, LLC

| | |
|---|---|
| **Type:** | Defendant |
| **Attorney:** | Trident Solutions of Sugar Grove, LLC |
| **Status:** | PRO SE |
| **Attorney Address:** | c/o David Schupmann<br>0S440 Crego Place<br>Geneva, IL 60134 |
| **Attorney:** | Emily A. England |
| **Attorney Terminated:** | 03/05/2026 |
| **Firm Name:** | Taft Stettinius & Hollister LLP |
| **Firm Address:** | 675 Fifteenth Street<br>Suite 2300<br>Denver, CO 80202 |
| **Firm Phone:** | 303-297-2900 |
| **Email Address:** | eengland@taftlaw.com |
| **Attorney:** | Kellie Nelson Fetter |
| **Attorney Terminated:** | 05/06/2026 |
| **Firm Name:** | Taft Stettinius & Hollister LLP |
| **Firm Address:** | 675 Fifteenth Street<br>Suite 2300<br>Denver, CO 80202 |
| **Firm Phone:** | 303-299-8448 |
| **Email Address:** | kfetter@taftlaw.com |
| **Attorney:** | Patrick John Miller |
| **Attorney Terminated:** | 03/05/2026 |
| **Firm Name:** | Taft Stettinius & Hollister LLP |
| **Firm Address:** | 675 Fifteenth Street<br>Suite 2300<br>Denver, CO 80202 |
| **Firm Phone:** | 303-299-8354 |

| | |
|---|---|
| **Firm Fax:** | 303-298-0940 |
| **Email Address:** | pat.miller@shermanhoward.com |

## Roofing USA, LLC

| | |
|---|---|
| **Type:** | Defendant |
| **Attorney:** | Todd Andrew Rowden |
| **Status:** | ATTORNEY TO BE NOTICED |
| **Firm Name:** | Taft Stettinius & Hollister LLP |
| **Firm Address:** | 111 East Wacker Drive<br>Suite 2600<br>Chicago, IL 60601 |
| **Firm Phone:** | 312-527-4000 |
| **Email Address:** | trowden@taftlaw.com |

## Installation Services LLC

| | |
|---|---|
| **Party Description:** | Doing Business As Topkey Construction |
| **Type:** | Defendant |
| **Attorney:** | Gabriel Damian Pinilla |
| **Status:** | ATTORNEY TO BE NOTICED |
| **Firm Name:** | Adams & Reese LLP |
| **Firm Address:** | 1001 17th Street<br>Suite 1000<br>Denver, CO 80202 |
| **Firm Phone:** | 303-970-2156 |
| **Email Address:** | gabriel.pinilla@arlaw.com |
| **Attorney:** | Uriel Martinez |
| **Status:** | ATTORNEY TO BE NOTICED |
| **Firm Name:** | Adams & Reese LLP |
| **Firm Address:** | 1001 17th Street<br>Suite 1000<br>Denver, CO 80202 |
| **Firm Phone:** | 817-659-0196 |
| **Email Address:** | Uriel.Martinez@arlaw.com |

## FW-CO, Inc.

| | |
|---|---|
| **Type:** | Counter Defendant |
| **Attorney:** | Michael P. Elkon |
| **Status:** | LEAD ATTORNEY |
| **Attorney Terminated:** | 11/19/2025 |
| **Firm Name:** | Fisher & Phillips LLP |
| **Firm Address:** | 1230 Peachtree Street, NE<br>Suite 3300<br>Atlanta, GA 30309 |
| **Firm Phone:** | 404-240-5849 |
| **Firm Fax:** | 404-240-4249 |
| **Email Address:** | melkon@fisherphillips.com |
| **Attorney:** | Christine K. Lamb |
| **Status:** | ATTORNEY TO BE NOTICED |

| | |
|---|---|
| **Firm Name:** | Senn Fortis LLC |
| **Firm Address:** | 1700 Lincoln Street<br>Suite 2100<br>Denver, CO 80203 |
| **Firm Phone:** | 303-298-1122 |
| **Email Address:** | clamb@sennfortis.com |
| **Attorney:** | Elizabeth Tillotson Hartsel |
| **Attorney Terminated:** | 02/25/2026 |
| **Firm Name:** | Senn Fortis LLC |
| **Firm Address:** | 1700 Lincoln Street<br>Suite 2100<br>Denver, CO 80203 |
| **Firm Phone:** | 303-298-1122 |
| **Email Address:** | lhartsel@sennfortis.com |
| **Attorney:** | Francis Alfred Wilson |
| **Attorney Terminated:** | 11/19/2025 |
| **Firm Name:** | Seyfarth Shaw LLP |
| **Firm Address:** | 975 F Street, N.W.<br>Washington, DC 20004 |
| **Firm Phone:** | 202-828-5338 |
| **Firm Fax:** | 202-828-5393 |
| **Email Address:** | fwilson@seyfarth.com |
| **Attorney:** | Lenora B. Plimpton |
| **Attorney Terminated:** | 08/20/2026 |
| **Firm Name:** | Senn Fortis LLC |
| **Firm Address:** | 1700 Lincoln Street<br>Suite 2100<br>Denver, CO 80203 |
| **Firm Phone:** | 303-298-1122 |
| **Email Address:** | lplimpton@sennfortis.com |
| **Attorney:** | Matthew Thomas Sharon |
| **Attorney Terminated:** | 11/19/2025 |
| **Firm Name:** | Fisher Phillips LLP |
| **Firm Address:** | 1230 Peachtree Street NE<br>Suite 3300<br>Atlanta, GA 30309 |
| **Firm Phone:** | 770-377-0487 |
| **Email Address:** | msharon@fisherphillips.com |
| **Attorney:** | Megan Mary Ratcliffe |
| **Status:** | ATTORNEY TO BE NOTICED |
| **Firm Name:** | Senn Fortis LLC |
| **Firm Address:** | 1700 Lincoln Street<br>Suite 2100<br>Denver, CO 80203 |
| **Firm Phone:** | 303-298-1122 |
| **Email Address:** | mratcliffe@sennfortis.com |

## Richard M. Lewis

| | |
|---|---|
| **Type:** | Counter Defendant |
| **Attorney:** | Christine K. Lamb |
| **Status:** | ATTORNEY TO BE NOTICED |
| **Firm Name:** | Senn Fortis LLC |
| **Firm Address:** | 1700 Lincoln Street<br>Suite 2100<br>Denver, CO 80203 |

| | |
|---|---|
| **Firm Phone:** | 303-298-1122 |
| **Email Address:** | clamb@sennfortis.com |
| **Attorney:** | Elizabeth Tillotson Hartsel |
| **Attorney Terminated:** | 02/25/2026 |
| **Firm Name:** | Senn Fortis LLC |
| **Firm Address:** | 1700 Lincoln Street<br>Suite 2100<br>Denver, CO 80203 |
| **Firm Phone:** | 303-298-1122 |
| **Email Address:** | lhartsel@sennfortis.com |
| **Attorney:** | Lenora B. Plimpton |
| **Attorney Terminated:** | 08/20/2026 |
| **Firm Name:** | Senn Fortis LLC |
| **Firm Address:** | 1700 Lincoln Street<br>Suite 2100<br>Denver, CO 80203 |
| **Firm Phone:** | 303-298-1122 |
| **Email Address:** | lplimpton@sennfortis.com |
| **Attorney:** | Megan Mary Ratcliffe |
| **Status:** | ATTORNEY TO BE NOTICED |
| **Firm Name:** | Senn Fortis LLC |
| **Firm Address:** | 1700 Lincoln Street<br>Suite 2100<br>Denver, CO 80203 |
| **Firm Phone:** | 303-298-1122 |
| **Email Address:** | mratcliffe@sennfortis.com |

**CALENDAR INFORMATION**

**View Calendar Information**

**DOCKET PROCEEDINGS (208)**

| **Entry #:** | **Date:** | **Description:** | |
|---|---|---|---|
| 208 | 08/20/2026 | MINUTE ORDER: The 207 Motion to Withdraw as Counsel is GRANTED. Lenora B. Plimpton is hereby terminated from representation of FW-CO, Inc. d/b/a Fortis Warranty and Richard Lewis in this matter. By Judge Nina Y. Wang on 8/20/2026. For all non-e-filer pro se parties, a copy of this document has been sent via U.S. Mail to the mailing address of record. Text Only Entry(nywlc10, ) (Entered: 08/20/2026) | Send Runner to Court |
| 207 | 08/20/2026 | MOTION to Withdraw as Attorney by Counter Defendants FW-CO, Inc., Richard M. Lewis, Plaintiff FW-CO, Inc.. (Plimpton, Lenora) (Entered: 08/20/2026) | View Add to request |
| 206 | 08/11/2026 | REPLY to Response to 164 MOTION to Dismiss for Lack of Jurisdiction to Third Amended Complaint filed by Defendant Installation Services LLC. (Attachments: # 1 Exhibit 2- | View Add to request |

| | | | |
|---|---|---|---|
| | | Second Declaration of Daniel Schardt, # 2 Exhibit 2-A to the Second Declaration of Daniel Schardt - Review of Discussion Form, # 3 Exhibit 2-B to the Second Declaration of Daniel Schardt - Reynold's Resignation Email)(Pinilla, Gabriel) (Entered: 08/11/2026) | |
| 205 | 08/10/2026 | MINUTE ORDER: This matter is before the Court on 201 Installation Services d/b/a TopKey Construction's Reply in Support of its Motion to Dismiss Plaintiff's Third Amended Complaint. The 201 Reply is 12 and a half pages long and is therefore STRICKEN for failure to comply with this Court's Practice Standards. See NYW Civ. Practice Standard 10.1(c)(1) ("Replies shall not exceed ten (10) pages."). TopKey Construction may have until August 12, 2026 to refile a compliant Reply. By Judge Nina Y. Wang on 8/10/2026. For all non-e-filer pro se parties, a copy of this document has been sent via U.S. Mail to the mailing address of record. Text Only Entry (nywlc10, ) (Entered: 08/10/2026) | Send Runner to Court |
| 204 | 08/07/2026 | RESPONSE to 167 MOTION to Stay Discovery Reply In Support of Roofing USA's Motion to Stay Discovery filed by Defendant Roofing USA, LLC. (Rowden, Todd) (Entered: 08/07/2026) | View Add to request |
| 203 | 08/07/2026 | RESPONSE to 164 MOTION to Dismiss for Lack of Jurisdiction to Third Amended Complaint Reply in Support of Roofing USA's MTD Dkt. 164 filed by Defendant Roofing USA, LLC. (Rowden, Todd) (Entered: 08/07/2026) | View Add to request |
| 202 | 08/07/2026 | MINUTE ORDER This Court SETS a Status Conference on October 20, 2026 at 3:30 p.m. in Courtroom C-402, on the fourth floor of the Byron G. Rogers United States Courthouse located at 1929 Stout Street, Denver, Colorado, 80294.It is an in-person proceeding. However, counsel who are outside Colorado may appear | View Add to request |

| | | | |
|---|---|---|---|
| | | via video teleconference by using the Cisco Meeting App Instructions provided at ECF 96 . This Court will hear oral argument on the Motion to Stay Discovery [ECF 167] in which Defendant Schulz has joined [ECF 179]. By Magistrate Judge Timothy P O'Hara on 08/07/2026. For all non-e-filer pro se parties, a copy of this document has been sent via U.S. Mail to the mailing address of record. (jrobe, ) (Entered: 08/07/2026) | |
| 201 | 08/07/2026 | STRICKEN - REPLY to Response to 164 MOTION to Dismiss for Lack of Jurisdiction to Third Amended Complaint filed by Defendant Installation Services LLC. (Attachments: # 1 Exhibit Exhibit 2 - Second Declaration of Daniel Schardt, # 2 Exhibit Exhibit 2-A to the Second Declaration of Daniel Schardt - Review of Discussion Form, # 3 Exhibit Exhibit 2-B to the Second Declaration of Daniel Schardt - Reynold's Resignation Email)(Pinilla, Gabriel) Modified on 8/11/2026 to strike per 205 Minute Order. (echa, ). (Entered: 08/07/2026) | View Add to request |
| 200 | 08/05/2026 | REPLY to Response to 167 MOTION to Stay Discovery and Charles Schulz's Joinder in Roofing USA's Motion to Stay Discovery 179 filed by Defendant Charles Schulz, Counter Claimant Charles Schulz. (Benson, Gary) (Entered: 08/05/2026) | View Add to request |
| 199 | 07/23/2026 | ORDER granting 197 Motion for Extension of Time. For good cause shown and noting that it is unopposed, the deadline for Defendant/Counterclaimant Charles Schulz to file his reply in support of his Joinder [ECF 179] to the Motion to Stay Discovery [ECF 167] is extended to August 7, 2026. by Magistrate Judge Timothy P O'Hara on 7/23/2026. For all non-e-filer pro se parties, a copy of this document has been sent via U.S. Mail to the mailing address of record. Text | Send Runner to Court |

| | | | |
|---|---|---|---|
| | | Only Entry(tpolc1, ) (Entered: 07/23/2026) | |
| 198 | 07/22/2026 | MEMORANDUM regarding 197 Unopposed MOTION for Extension of Time to File Response/Reply as to 167 MOTION to Stay Discovery filed by Charles Schulz. Motion referred to Magistrate Judge Timothy P O'Hara. By Judge Nina Y. Wang on 7/22/2026. For all non-e-filer pro se parties, a copy of this document has been sent via U.S. Mail to the mailing address of record. Text Only Entry (nywlc10, ) (Entered: 07/22/2026) | Send Runner to Court |
| 197 | 07/22/2026 | Unopposed MOTION for Extension of Time to File Response/Reply as to 167 MOTION to Stay Discovery by Defendant Charles Schulz, Counter Claimant Charles Schulz. (Benson, Gary) (Entered: 07/22/2026) | View Add to request |
| 196 | 07/21/2026 | ORDER granting 192 Motion for Extension of Time. For good cause shown and noting that it is unopposed, the deadline for Defendant Roofing USA, LLC, to file its Reply in support of its Motion to Stay Discovery [ECF 167] is extended to August 7, 2026. by Magistrate Judge Timothy P O'Hara on 7/21/2026. For all non-e-filer pro se parties, a copy of this document has been sent via U.S. Mail to the mailing address of record. Text Only Entry(tpolc1, ) (Entered: 07/21/2026) | Send Runner to Court |
| 195 | 07/21/2026 | MINUTE ORDER: The 193 Unopposed Motion for Extension of Time to File Reply in Support of Roofing USA's Motion to Dismiss is GRANTED. Defendant Roofing USA may have until August 7, 2026 to file its Reply. By Judge Nina Y. Wang on 7/21/2026. For all non-e-filer pro se parties, a copy of this document has been sent via U.S. Mail to the mailing address of record. Text Only Entry(nywlc10, ) (Entered: 07/21/2026) | Send Runner to Court |
| 194 | 07/21/2026 | MEMORANDUM regarding 192 Unopposed MOTION | Send Runner to Court |

| | | | |
|---|---|---|---|
| | | for Extension of Time to File Response/Reply as to 167 MOTION to Stay Discovery Unopposed Motion for Extension of Time to File Reply ISO of Roofing USA's Motion to Stay Discovery filed by Roofing USA, LLC. Motion referred to Magistrate Judge Timothy P O'Hara. By Judge Nina Y. Wang on 7/21/2026. For all non-e-filer pro se parties, a copy of this document has been sent via U.S. Mail to the mailing address of record. Text Only Entry (nywlc10, ) (Entered: 07/21/2026) | |
| 193 | 07/21/2026 | Unopposed MOTION for Extension of Time to File Response/Reply as to 169 MOTION to Dismiss Plaintiff's Third Amended Complaint and Jury Demand Unopposed Motion for Extension of Time to File Reply ISO of Roofing USA's Motion to Dismiss by Defendant Roofing USA, LLC. (Rowden, Todd) (Entered: 07/21/2026) | View Add to request |
| 192 | 07/21/2026 | Unopposed MOTION for Extension of Time to File Response/Reply as to 167 MOTION to Stay Discovery Unopposed Motion for Extension of Time to File Reply ISO of Roofing USA's Motion to Stay Discovery by Defendant Roofing USA, LLC. (Rowden, Todd) (Entered: 07/21/2026) | View Add to request |
| 191 | 07/16/2026 | MINUTE ORDER: 190 Installation Services d/b/a TopKey Construction's Unopposed Motion for Extension of Time to File a Reply in Support of its Motion to Dismiss Plaintiff's Third Amended Complaint is GRANTED. Defendant TopKey Construction may have until August 7, 2026 to file a Reply to its Motion to Dismiss. By Judge Nina Y. Wang on 7/16/2026. For all non-e-filer pro se parties, a copy of this document has been sent via U.S. Mail to the mailing address of record. Text Only Entry(nywlc10, ) (Entered: 07/16/2026) | Send Runner to Court |

| | | | |
|---|---|---|---|
| 190 | 07/16/2026 | MOTION for Extension of Time to File Response/Reply as to 164 MOTION to Dismiss for Lack of Jurisdiction to Third Amended Complaint by Defendant Installation Services LLC. (Pinilla, Gabriel) (Entered: 07/16/2026) | View Add to request |
| 189 | 07/14/2026 | RESPONSE to 164 MOTION to Dismiss for Lack of Jurisdiction to Third Amended Complaint filed by Plaintiff FW-CO, Inc.. (Attachments: # 1 Affidavit Declaration of Richard Lewis in Support of Fortis Response to TopKey's Motion to Dismiss, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9)(Plimpton, Lenora) (Entered: 07/14/2026) | View Add to request |
| 188 | 07/14/2026 | DECLARATION of Gary Scott Reynolds regarding MOTION to Dismiss for Lack of Jurisdiction to Third Amended Complaint 164 by Plaintiff FW-CO, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O, # 16 Exhibit P, # 17 Exhibit Q) (Plimpton, Lenora) (Entered: 07/14/2026) | View Add to request |

| | | | |
|---|---|---|---|
| 187 | 07/14/2026 | RESPONSE to 169 MOTION to Dismiss Plaintiff's Third Amended Complaint and Jury Demand filed by Plaintiff FW-CO, Inc.. (Attachments: # 1 Affidavit Declaration of Richard Lewis, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9)(Plimpton, Lenora) (Entered: 07/14/2026) | View Add to request |
| 186 | 07/14/2026 | RESPONSE to 167 MOTION to Stay Discovery and Schulz Joinder in the Motion to Stay filed by Plaintiff FW-CO, Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5)(Ratcliffe, Megan) (Entered: 07/14/2026) | View Add to request |
| 185 | 07/10/2026 | NOTICE of Service of Rule 45(g) Motion to Compel by Plaintiff FW-CO, Inc., Counter Defendant FW-CO, Inc. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Ratcliffe, Megan) (Entered: 07/10/2026) | View Add to request |
| 184 | 07/08/2026 | MINUTE ENTRY for Status Conference held on 7/8/2026 before Magistrate Judge Timothy P O'Hara. FTR: C402. (jtorr, ) (Entered: 07/09/2026) | View Add to request |
| 183 | 07/08/2026 | NOTICE of Proof of Delivery of Minute Order to Top Pick Investment Group by Counter Defendant FW-CO, Inc., Plaintiff FW-CO, Inc. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Ratcliffe, Megan) (Entered: 07/08/2026) | View Add to request |
| 182 | 07/01/2026 | MINUTE ORDER. For good cause shown and noting that it is unopposed, the Motion for Leave to Appear Remotely [ECF 180 ] is granted. Gary J. Benson, Esq., may attend the July 8, 2026 Status Conference remotely. To connect to the courtroom via video teleconference, Mr. Benson may use the Cisco Meeting App Instructions attached to ECF 96 . By Magistrate Judge Timothy P. O'Hara on 7/1/2026. For all non-e-filer pro se parties, a copy of this document has been sent via U.S. Mail to the mailing address of record.(ggill, ) (Entered: 07/01/2026) | View Add to request |
| 181 | 07/01/2026 | MEMORANDUM regarding 180 Unopposed MOTION for Leave | Send Runner to Court |

| | | | |
|---|---|---|---|
| | | to Appear Remotely at Status Conference 163 Minute Order,,,, filed by Charles Schulz. Motion referred to Magistrate Judge Timothy P O'Hara. By Judge Nina Y. Wang on 7/1/2026. For all non-e-filer pro se parties, a copy of this document has been sent via U.S. Mail to the mailing address of record. Text Only Entry (nywlc10, ) (Entered: 07/01/2026) | |
| 180 | 07/01/2026 | Unopposed MOTION for Leave to Appear Remotely at Status Conference 163 Minute Order,,,, by Defendant Charles Schulz, Counter Claimant Charles Schulz. (Benson, Gary) (Entered: 07/01/2026) | View Add to request |
| 179 | 06/29/2026 | RESPONSE to 167 MOTION to Stay Discovery filed by Counter Claimant Charles Schulz, Defendant Charles Schulz. (Benson, Gary) (Entered: 06/29/2026) | View Add to request |
| 178 | 06/26/2026 | ORDER granting 176 Motion for Extension of Time for good cause shown and noting that it is unopposed. The deadline for Plaintiff to respond to the Motion to Stay [ECF 167] is extended to July 14, 2026. by Magistrate Judge Timothy P O'Hara on 6/26/2026. For all non-e-filer pro se parties, a copy of this document has been sent via U.S. Mail to the mailing address of record. Text Only Entry(tpolc1, ) (Entered: 06/26/2026) | Send Runner to Court |
| 177 | 06/26/2026 | MEMORANDUM regarding 176 Unopposed MOTION for Extension of Time to File Response/Reply as to 167 MOTION to Stay Discovery filed by FW-CO, Inc.. Motion referred to Magistrate Judge Timothy P O'Hara. By Judge Nina Y. Wang on 6/26/2026. For all non-e-filer pro se parties, a copy of this document has been sent via U.S. Mail to the mailing address of record. Text Only Entry (nywlc10, ) (Entered: 06/26/2026) | Send Runner to Court |
| 176 | 06/26/2026 | Unopposed MOTION for Extension of Time to File Response/Reply as to 167 MOTION to Stay Discovery by Counter Defendant FW-CO, Inc., Plaintiff FW-CO, Inc.. (Ratcliffe, Megan) (Entered: 06/26/2026) | Docket Status View Add to request |

| | | | |
|---|---|---|---|
| 175 | 06/25/2026 | MINUTE ORDER: The 174 Unopposed Motion for Extension of Time to Respond to Motions to Dismiss is GRANTED. Plaintiff/ Counter-Defendant FW-CO, Inc., d/ b/a Fortis Warranty may have until July 14, 2026 for its Responses to the Motions to Dismiss. By Judge Nina Y. Wang on 6/25/2026. For all non-e-filer pro se parties, a copy of this document has been sent via U.S. Mail to the mailing address of record. Text Only Entry(nywlc10, ) (Entered: 06/25/2026) | Send Runner to Court |
| 174 | 06/25/2026 | Unopposed MOTION for Extension of Time to File Response/Reply as to 164 MOTION to Dismiss for Lack of Jurisdiction to Third Amended Complaint, 169 MOTION to Dismiss Plaintiff's Third Amended Complaint and Jury Demand by Counter Defendant FW-CO, Inc., Plaintiff FW-CO, Inc.. (Plimpton, Lenora) (Entered: 06/25/2026) | View Add to request |
| 173 | 06/16/2026 | ANSWER/REPLY to 160 Answer to Amended Complaint,, Counterclaim, by FW-CO, Inc., Richard M. Lewis.(Ratcliffe, Megan) (Entered: 06/16/2026) | View Add to request |
| 172 | 06/12/2026 | CORPORATE DISCLOSURE STATEMENT. (Rowden, Todd) (Entered: 06/12/2026) | View Add to request |
| 171 | 06/10/2026 | CORPORATE DISCLOSURE STATEMENT. (Pinilla, Gabriel) (Entered: 06/10/2026) | View Add to request |
| 170 | 06/09/2026 | DECLARATION of Brian Tice regarding MOTION to Dismiss Plaintiff's Third Amended Complaint and Jury Demand 169 by Defendant Roofing USA, LLC. (Rowden, Todd) (Entered: 06/09/2026) | View Add to request |
| 169 | 06/09/2026 | MOTION to Dismiss Plaintiff's Third Amended Complaint and Jury Demand by Defendant Roofing USA, LLC. (Rowden, Todd) (Entered: 06/09/2026) | View Add to request |
| 168 | 06/09/2026 | MEMORANDUM regarding 167 MOTION to Stay Discovery filed by Roofing USA, LLC. Motion referred to Magistrate Judge Timothy P O'Hara. By Judge Nina Y. Wang on 6/9/2026. For all non-e-filer pro se parties, a copy of this document has been sent via U.S. Mail to the mailing address of record. Text Only Entry (nywlc10, ) (Entered: 06/09/2026) | Send Runner to Court |

| | | | |
|---|---|---|---|
| 167 | 06/09/2026 | MOTION to Stay Discovery by Defendant Roofing USA, LLC. (Rowden, Todd) (Entered: 06/09/2026) | View Add to request |
| 166 | 06/09/2026 | CERTIFICATE Regarding Artificial Intelligence by Defendant Installation Services LLC. (Pinilla, Gabriel) (Entered: 06/09/2026) | View Add to request |
| 165 | 06/04/2026 | This matter is before the Court on 164 Installation Services LLC d/b/a TopKey Construction's Motion to Dismiss Third Amended Complaint. The 164 Motion does not comply with the Court's Standing Order Regarding the Use of Generative Artificial Intelligence ("AI") in Court Filings. On or before 6/9/2026, Defendant TopKey Construction shall file a supplemental AI Certification that complies with the Court's Standing Order. Defendant should not re-file the Motion. The Parties are advised that future failures to include an AI Certification may be stricken. By Judge Nina Y. Wang on 6/4/2026. Text Only Entry (nywlc10, ) (Entered: 06/04/2026) | Send Runner to Court |
| 164 | 06/04/2026 | MOTION to Dismiss for Lack of Jurisdiction to Third Amended Complaint by Defendant Installation Services LLC. (Attachments: # 1 Exhibit Exhibit 1 Declaration of Daniel Schardt in Support of Installation Services LLC d/b/a TopKey Construction's Motion to Dismiss Third Amended Complaint)(Pinilla, Gabriel) (Entered: 06/04/2026) | View Add to request |
| 163 | 06/04/2026 | MINUTE ORDER. This matter comes before this Court upon its own motion. This Court SETS a Status Conference on July 8, 2026 at 1:00 p.m. in Courtroom C-402, on the fourth floor of the Byron G. Rogers United States Courthouse located at 1929 Stout Street, Denver, Colorado, 80294. It is an in-person proceeding. This Court will hear oral argument on Plaintiff's Motion to Compel [ECF 140 ]. Plaintiff shall provide Top Pick Investment Group, LLC, the third party who is subject of the Motion to Compel, with a copy of this Minute Order. The third party shall appear at the Status Conference. In addition, this Court notes that | View Add to request |

FW-CO, Inc. v. Schulz et al, 1:25CV00254 (2025)

| | | | |
|---|---|---|---|
| | | the Third Amended Complaint [ECF 153 ] added litigants to this civil action. Once all Parties have answered the Third Amended Complaint, all Parties shall confer about whether the current pre-trial deadlines need to be adjusted and if so to file a motion to request such relief with the Parties' positions included. By Magistrate Judge Timothy P O'Hara on 6/4/2026. For all non-e-filer pro se parties, a copy of this document has been sent via U.S. Mail to the mailing address of record. (eluce) (Entered: 06/04/2026) | |
| 162 | 05/29/2026 | NOTICE of Entry of Appearance by Uriel Martinez on behalf of Installation Services LLCAttorney Uriel Martinez added to party Installation Services LLC(pty:dft) (Martinez, Uriel) (Entered: 05/29/2026) | View Add to request |
| 161 | 05/29/2026 | NOTICE of Entry of Appearance by Gabriel Damian Pinilla on behalf of Installation Services LLCAttorney Gabriel Damian Pinilla added to party Installation Services LLC(pty:dft) (Pinilla, Gabriel) (Entered: 05/29/2026) | View Add to request |
| 160 | 05/26/2026 | Charles Schulz's ANSWER to 153 Amended Complaint,, , COUNTERCLAIM against FW-CO, Inc., Richard M. Lewis by Charles Schulz. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E)(Benson, Gary) (Entered: 05/26/2026) | View Add to request |
| 159 | 05/20/2026 | SUMMONS Returned Executed by FW-CO, Inc.. Roofing USA, LLC served on 5/19/2026, answer due 6/9/2026. (Plimpton, Lenora) (Entered: 05/20/2026) | View Add to request |
| 158 | 05/15/2026 | SUMMONS Returned Executed by FW-CO, Inc.. Installation Services LLC served on 5/14/2026, answer due 6/4/2026. (Plimpton, Lenora) (Entered: 05/15/2026) | View Add to request |
| 157 | 05/13/2026 | SUMMONS issued by Clerk. (Attachments: # 1 Summons) (ccuen, ) (Entered: 05/13/2026) | View Add to request |
| 156 | 05/12/2026 | SUMMONS REQUEST as to ROOFING USA, LLC by Plaintiff FW-CO, Inc.. (Plimpton, Lenora) (Entered: 05/12/2026) | View Add to request |
| 155 | 05/12/2026 | SUMMONS REQUEST as to INSTALLATION SERVICES LLC d/b/a TOPKEY CONSTRUCTION | View Add to request |

| | | | |
|---|---|---|---|
| | | by Plaintiff FW-CO, Inc.. (Plimpton, Lenora) (Entered: 05/12/2026) | |
| 154 | 05/12/2026 | ADVISORY NOTICE OF NONCOMPLIANCE WITH COURT RULES/PROCEDURES: re: 153 Summons request filed by attorney Lenora B. Plimpton. The case caption is incomplete and will not be issued. Action to Take - REFILE THE DOCUMENT - The summons must list all plaintiffs/defendants; "et al." cannot substitute the listing of all parties named in the case Per Fed Civ. Rule 4. (Text Only Entry) (sphil, ) (Entered: 05/12/2026) | Send Runner to Court |
| 153 | 05/07/2026 | AMENDED COMPLAINT Third Amended Complaint and Jury Demand against Charles Schulz, David Schupmann, Trident Solutions of Sugar Grove, LLC, filed by FW-CO, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Summons to TopKey Construction, # 16 Summons to Roofing USA, LLC)(Plimpton, Lenora) (Entered: 05/07/2026) | View Add to request |
| 152 | 05/06/2026 | MINUTE ORDER. Noting that Trident no longer is an active corporate entity with assets and noting the non-opposition, the Motion [ECF 145 ] is granted. Ms. Fetter's representation of Trident in this case is hereby terminated. (Ms. Fetter remains counsel of record for Defendant Shupmann.) Until such time as Plaintiff dismisses Trident as a named litigant, this Court stays this lawsuit as to Trident. By Magistrate Judge Timothy P. O'Hara on 5/6/2026. [Per Order, requested document was mailed to requested party] (ggill, ) Modified on 5/6/2026 to add language (ggill, ). (Entered: 05/06/2026) | View Add to request |
| 151 | 05/05/2026 | MINUTE ORDER: This matter is before the Court on 144 Plaintiff's Motion for Leave to File Third Amended Complaint & Jury Demand. Federal Rule of Civil Procedure instructs that "a party may amend its pleading only with the opposing party's written | Send Runner to Court |

| | | | |
|---|---|---|---|
| | | consent or the court's leave" and that "[t]he court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). Here, Plaintiff's Motion was timely filed pursuant to the 124 Amended Scheduling Order setting April 3, 2026 as the deadline for joinder of parties and amendment of pleadings. Defendants did not file an opposition to the Motion, and the deadline to do so has passed. Thus, 144 Plaintiff's Motion for Leave to File Third Amended Complaint & Jury Demand is GRANTED. Plaintiff is ORDERED to file a clean copy of the Third Amended Complaint & Jury Demand [Doc. [144-1]] on or before May 8, 2026. By Judge Nina Y. Wang on 5/5/2026. Text Only Entry(nywlc10, ) (Entered: 05/05/2026) | |
| 150 | 05/05/2026 | MINUTE ORDER: In light of the 143 Suggestion of Bankruptcy and Notice of Stay, this matter is automatically stayed as to Defendant David Schupmann. 11 U.S.C. § 362. The case proceeds as to all other Defendants. See Fortier v. Dona Anna Plaza Partners, 747 F.2d 1324, 1330 (10th Cir. 1984) ("Extending the stay to protect solvent co-defendants would not advance either of the purposes underlying the automatic stay. Accordingly, we join the other circuit courts in concluding that 11 U.S.C. § 362 stays litigation only against the debtor, and affords no protection to solvent co-defendants."). By Judge Nina Y. Wang on 5/5/2026. Text Only Entry (nywlc10, ) (Entered: 05/05/2026) | Send Runner to Court |
| 149 | 05/05/2026 | NOTICE re 144 MOTION for Leave to File Third Amended Complaint & Jury Demand by Counter Defendant FW-CO, Inc., Plaintiff FW-CO, Inc. (Lamb, Christine) (Entered: 05/05/2026) | View Add to request |
| 148 | 04/20/2026 | REPLY to Response to 140 MOTION to Compel Third Party Top Pick Investment Group LLC's Compliance with Subpoena or, in the Alternative, for Contempt of Court filed by Counter Defendant FW-CO, Inc., Plaintiff FW-CO, | View Add to request |

| | | | |
|---|---|---|---|
| | | Inc.. (Ratcliffe, Megan) (Entered: 04/20/2026) | |
| 147 | 04/20/2026 | NOTICE re 145 MOTION to Withdraw as Attorney and Written Notification Certificate by Counter Defendants FW-CO, Inc., Richard M. Lewis, Plaintiff FW-CO, Inc. (Ratcliffe, Megan) (Entered: 04/20/2026) | View Add to request |
| 146 | 04/06/2026 | MEMORANDUM regarding 145 MOTION to Withdraw as Attorney and Written Notification Certificate filed by Trident Solutions of Sugar Grove, LLC. Motion referred to Magistrate Judge Timothy P O'Hara. By Judge Nina Y. Wang on 4/6/2026. Text Only Entry (nywlc10, ) (Entered: 04/06/2026) | Send Runner to Court |
| 145 | 04/06/2026 | MOTION to Withdraw as Attorney and Written Notification Certificate by Defendant Trident Solutions of Sugar Grove, LLC, Counter Claimant Trident Solutions of Sugar Grove, LLC. (Attachments: # 1 Proposed Order (PDF Only))(Fetter, Kellie) (Entered: 04/06/2026) | View Add to request |
| 144 | 04/03/2026 | MOTION for Leave to File Third Amended Complaint & Jury Demand by Plaintiff FW-CO, Inc.. (Attachments: # 1 Redline of Plaintiff's Third Amended Complaint, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit H, # 10 Exhibit I, # 11 Exhibit J, # 12 Exhibit K, # 13 Exhibit L, # 14 Exhibit M, # 15 Exhibit N)(Plimpton, Lenora) (Entered: 04/03/2026) | View Add to request |
| 143 | 04/01/2026 | SUGGESTION OF BANKRUPTCY of Suggestion of Bankruptcy and Notice of Stay by Defendant David Schupmann. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Rowden, Todd) (Entered: 04/01/2026) | View Add to request |
| 142 | 03/25/2026 | ORDER on Motion for Contempt. It is ORDERED that: (1) Plaintiff FW-CO, Inc. d/b/a Fortis's Motion for Contempt [Doc. 62 ] is DENIED ; and (2) Defendant David Schupmann's Motion to Strike Plaintiff's Reply in Support of Motion for Contempt [Doc. 88 ] is DENIED. By Judge Nina Y. Wang on 3/25/2026.(ggill, ) (Entered: 03/25/2026) | View Add to request |

| | | | |
|---|---|---|---|
| 141 | 03/25/2026 | MEMORANDUM regarding 140 MOTION to Compel Third Party Top Pick Investment Group LLC's Compliance with Subpoena or, in the Alternative, for Contempt of Court filed by FW-CO, Inc.. Motion referred to Magistrate Judge Timothy P O'Hara. By Judge Nina Y. Wang on 3/25/2026. Text Only Entry (nywlc10, ) (Entered: 03/25/2026) | Send Runner to Court |
| 140 | 03/19/2026 | MOTION to Compel Third Party Top Pick Investment Group LLC's Compliance with Subpoena or, in the Alternative, for Contempt of Court by Counter Defendant FW-CO, Inc., Plaintiff FW-CO, Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9)(Ratcliffe, Megan) (Entered: 03/19/2026) | View Add to request |

| | | | |
|---|---|---|---|
| 139 | 03/05/2026 | MINUTE ORDER: The 138 Motion for Withdrawal is GRANTED. Patrick J. Miller and Emily A. England are hereby TERMINATED from their representation of Defendants David Schuppman and Trident Solutions of Sugar Grove, LLC in this matter. By Judge Nina Y. Wang on 3/5/2026. Text Only Entry(nywlc10, ) Modified on 3/5/2026to correct spelling (ggill, ). (Entered: 03/05/2026) | Send Runner to Court |
| 138 | 03/05/2026 | MOTION to Withdraw as Attorney of Patrick J. Miller and Emily A. England by Defendants David Schupmann, Trident Solutions of Sugar Grove, LLC, Counter Claimants David Schupmann, Trident Solutions of Sugar Grove, LLC. (Miller, Patrick) (Entered: 03/05/2026) | View Add to request |
| 137 | 03/04/2026 | NOTICE of Entry of Appearance of Todd Rowden by Todd Andrew Rowden on behalf of David Schupmann (Rowden, Todd) (Entered: 03/04/2026) | View Add to request |
| 136 | 03/02/2026 | MINUTE ORDER: This matter is before the Court on the 135 Entry of Appearance and Substitution of Counsel, which constitutes an improper withdrawal by Patrick J Miller and Emily A. England as counsel for Defendants David Schupmann and Trident Solutions of Sugar Grove, LLC. The 135 Entry of Appearance and Substitution of Counsel is STRICKEN for failure to comply with D.C.COLO.LAttyR 5(b), which provides that "[a]n attorney who has filed an Entry of Appearance... may seek to withdraw on motion showing good cause. Withdrawal shall be effective only on court order entered after service of the motion to withdraw on all counsel of record, any unrepresented party, and the client of the withdrawing attorney." By Judge Nina Y. Wang on 3/2/2026. Text Only Entry (nywlc10, ) (Entered: 03/02/2026) | Send Runner to Court |
| 135 | 03/02/2026 | NOTICE of Entry of Appearance and Substitution of Counsel by Todd Andrew Rowden on behalf of David SchupmannAttorney Todd Andrew Rowden added to party David Schupmann(pty:dft), Attorney Todd Andrew | View Add to request |

| | | | |
|---|---|---|---|
| | | Rowden added to party David Schupmann(pty:cc) (Rowden, Todd) (Entered: 03/02/2026) | |
| 134 | 02/25/2026 | MINUTE ORDER. The Parties' request for the Court to enter their proposed Order for Protocol Governing Production of Hard Copy and Electronically Stored Information pursuant to the terms of their stipulated agreement [ECF 128 ] is granted. This Court enters the Parties' proposed order separately. By Magistrate Judge Timothy P. O'Hara on 2/25/2026. (ggill, ) (Entered: 02/25/2026) | View Add to request |
| 133 | 02/25/2026 | Stipulated Agreement and ORDER for Protocol Governing Production of Hard Copy and Electronically Stored Information. By Magistrate Judge Timothy P. O'Hara on 2/25/2026. (ggill, ) (Entered: 02/25/2026) | View Add to request |
| 132 | 02/25/2026 | MEMORANDUM regarding 128 MOTION for Order to filed by Richard M. Lewis, FW-CO, Inc.. Motion referred to Magistrate Judge Timothy P O'Hara. By Judge Nina Y. Wang on 2/25/2026. Text Only Entry (nywlc10, ) (Entered: 02/25/2026) | Send Runner to Court |
| 131 | 02/25/2026 | MINUTE ORDER: The 130 Motion to Withdraw as Counsel is GRANTED. Attorney Elizabeth T. Hartsel is hereby terminated from representation of Plaintiff/ Counter-Defendant FW-CO, Inc., d/b/a Fortis Warranty and Counter-Defendant Richard Lewis in this matter. By Judge Nina Y. Wang on 2/25/2026. Text Only Entry(nywlc10, ) (Entered: 02/25/2026) | Send Runner to Court |
| 130 | 02/25/2026 | MOTION to Withdraw as Attorney by Counter Defendants FW-CO, Inc., Richard M. Lewis, Plaintiff FW-CO, Inc.. (Hartsel, Elizabeth) (Entered: 02/25/2026) | View Add to request |
| 129 | 02/24/2026 | NOTICE of Entry of Appearance by Lenora B. Plimpton on behalf of FW-CO, Inc., Richard M. LewisAttorney Lenora B. Plimpton added to party FW-CO, Inc. (pty:cd), Attorney Lenora B. Plimpton added to party FW-CO, Inc.(pty:pla), Attorney Lenora B. Plimpton added to party Richard M. Lewis(pty:cd) (Plimpton, Lenora) (Entered: 02/24/2026) | View Add to request |

| | | | |
|---|---|---|---|
| 128 | 01/14/2026 | STIPULATION [PROPOSED] STIPULATED AGREEMENT AND ORDER FOR PROTOCOL GOVERNING PRODUCTION OF HARD COPY AND ELECTRONICALLY STORED INFORMATION by Counter Defendants FW-CO, Inc., Richard M. Lewis, Plaintiff FW-CO, Inc.. (Ratcliffe, Megan) (Entered: 01/14/2026) | View Add to request |
| 127 | 01/14/2026 | NOTICE of Entry of Appearance by Christine K. Lamb on behalf of Richard M. LewisAttorney Christine K. Lamb added to party Richard M. Lewis(pty:cd) (Lamb, Christine) (Entered: 01/14/2026) | View Add to request |
| 126 | 01/14/2026 | NOTICE of Entry of Appearance by Elizabeth Tillotson Hartsel on behalf of Richard M. LewisAttorney Elizabeth Tillotson Hartsel added to party Richard M. Lewis(pty:cd) (Hartsel, Elizabeth) (Entered: 01/14/2026) | View Add to request |
| 125 | 01/14/2026 | NOTICE of Entry of Appearance by Megan Mary Ratcliffe on behalf of Richard M. LewisAttorney Megan Mary Ratcliffe added to party Richard M. Lewis(pty:cd) (Ratcliffe, Megan) (Entered: 01/14/2026) | View Add to request |
| 124 | 01/09/2026 | AMENDED SCHEDULING ORDER by Magistrate Judge Timothy P O'Hara on 1/9/2026. Deadline for Joinder of Parties and Amendment of Pleadings: April 3, 2026. Discovery Cutoff due by August 31, 2026. Dispositive Motions due by September 30, 2026. (sphil, ) (Entered: 01/09/2026) | Docket Status View Add to request |
| 123 | 01/09/2026 | MINUTE ORDER. For good cause shown and noting that it is unopposed, the Parties' Joint Status Report [ECF 121 ] in which they ask to extend pre-trial deadlines is granted. The Parties' request to enter an Amended Scheduling Order which they include in ECF 121 also is granted. The Parties' proposed Amended Scheduling Order incorporates their agreed-upon new deadlines, and it also incorporates discussion of the added Counter-Defendant Richard Lewis. This Court enters their proposed Amended Scheduling Order separately. By Magistrate Judge | View Add to request |

| | | | |
|---|---|---|---|
| | | Timothy P. O'Hara on 1/9/2026. (ggill, ) (Entered: 01/09/2026) | |
| 122 | 01/07/2026 | MEMORANDUM regarding 121 MOTION for Order to filed by FW-CO, Inc.. Motion referred to Magistrate Judge Timothy P O'Hara. By Judge Nina Y. Wang on 1/7/2026. Text Only Entry (nywlc10, ) (Entered: 01/07/2026) | Send Runner to Court |
| 121 | 01/07/2026 | Joint STATUS REPORT and Motion to Amend Scheduling Order by Counter Defendant FW-CO, Inc., Plaintiff FW-CO, Inc.. (Attachments: # 1 Exhibit A) (Ratcliffe, Megan) Modified on 1/7/2026 to add gavel (ggill, ). (Entered: 01/07/2026) | View Add to request |
| 120 | 11/19/2025 | ORDER granting 119 Motion to Withdraw as Attorney. Attorneys Michael P. Elkon, Francis A. Wilson, and Matthew T. Sharon of Fisher Phillips LLP are hereby terminated from their representations in this case. By Judge Nina Y. Wang on 11/19/2025. Text Only Entry(nywlc10, ) (Entered: 11/19/2025) | Send Runner to Court |
| 119 | 11/19/2025 | MOTION to Withdraw as Attorney and Substitution of Counsel by Counter Defendant FW-CO, Inc., Plaintiff FW-CO, Inc.. (Attachments: # 1 Proposed Order (PDF Only) Proposed Order Granting Motion for Withdrawal and Substitution of Counsel)(Elkon, Michael) (Entered: 11/19/2025) | View Add to request |
| 118 | 11/17/2025 | NOTICE of Entry of Appearance - Megan M. Ratcliffe by Megan Mary Ratcliffe on behalf of FW-CO, Inc.Attorney Megan Mary Ratcliffe added to party FW-CO, Inc.(pty:pla) (Ratcliffe, Megan) (Entered: 11/17/2025) | View Add to request |
| 117 | 11/14/2025 | NOTICE of Entry of Appearance by Elizabeth Tillotson Hartsel on behalf of FW-CO, Inc.Attorney Elizabeth Tillotson Hartsel added to party FW-CO, Inc.(pty:cd), Attorney Elizabeth Tillotson Hartsel added to party FW-CO, Inc.(pty:pla) (Hartsel, Elizabeth) (Entered: 11/14/2025) | View Add to request |
| 116 | 11/14/2025 | NOTICE of Entry of Appearance by Christine K. Lamb on behalf of FW-CO, Inc.Attorney Christine K. Lamb added to party FW-CO, Inc.(pty:cd), Attorney Christine K. Lamb added to party FW-CO, | View Add to request |

| | | | |
|---|---|---|---|
| | | Inc.(pty:pla) (Lamb, Christine) (Entered: 11/14/2025) | |
| 115 | 10/01/2025 | MINUTE ENTRY for Status Conference held on 10/1/2025 before Magistrate Judge Timothy P O'Hara. ORDERED: On or before January 7, 2026, the Parties shall confer and file a joint Status Report outlining the status of discovery and the Parties' positions relating to the prospect of settlement in this case. FTR: C402. (jtorr, ) (Entered: 10/01/2025) | View Add to request |
| 114 | 09/12/2025 | MINUTE ORDER: This matter is before the Court on Plaintiff's Motion to Release TRO Bond ("Motion") 113 in which Plaintiff requests that the Court exonerate the bond paid pursuant to the temporary restraining order the Court previously issued, [Doc. 35 ]. The Motion is unopposed. [Doc. 113 at 1]. Accordingly, the Court ORDERS that the $81,000 bond is EXONERATED and the total amount of the bond plus interest accrued, if any, be RETURNED, via certified mail, to the following: FW-CO, Inc. PO Box 102170 Denver, Colorado 80250-2170 By Judge Nina Y. Wang on 09/12/2025. Text Only Entry(nywlc9, ) (Entered: 09/12/2025) | Send Runner to Court |
| 113 | 09/11/2025 | MOTION for Release of Funds by Plaintiff FW-CO, Inc.. (Elkon, Michael) (Entered: 09/11/2025) | View Add to request |
| 112 | 08/27/2025 | ANSWER/REPLY to 107 Answer to Amended Complaint,, Counterclaim, by FW-CO, Inc.. (Elkon, Michael) (Entered: 08/27/2025) | View Add to request |
| 111 | 08/27/2025 | ANSWER/REPLY to 106 Answer to Amended Complaint,, Counterclaim, by FW-CO, Inc.. (Elkon, Michael) (Entered: 08/27/2025) | View Add to request |
| 110 | 08/18/2025 | REPLY to Response to 108 Unopposed MOTION for Leave to File Reply Brief to Show Cause Response 100 Response, Reply to Response to Order to Show Cause filed by Counter Claimants David Schupmann, David Schupmann, Defendant David Schupmann. (Fetter, Kellie) (Entered: 08/18/2025) | View Add to request |

| | | | |
|---|---|---|---|
| 109 | 08/15/2025 | MINUTE ORDER: The Unopposed Motion for Leave to File Reply Brief to Show Cause Response 108 is GRANTED. Defendant David Schupmann may file a reply of no more than five pages on or before August 19, 2025. By Judge Nina Y. Wang on 08/15/2025. Text Only Entry(nywlc9, ) (Entered: 08/15/2025) | Send Runner to Court |
| 108 | 08/15/2025 | Unopposed MOTION for Leave to File Reply Brief to Show Cause Response 100 Response, by Counter Claimants David Schupmann, David Schupmann, Defendant David Schupmann. (Attachments: # 1 Exhibit A-Schupmann's Reply to Response to Order to Show Cause)(Fetter, Kellie) (Entered: 08/15/2025) | View Add to request |
| 107 | 08/14/2025 | Defendant Charles Schulz's ANSWER to 105 Amended Complaint,,, , Amended COUNTERCLAIM against FW-CO, Inc. by Charles Schulz. (Attachments: # 1 Exhibit A - Schulz Employment Agreement, # 2 Exhibit B - Schulz Demand for Payment of Wages (01-10-2025), # 3 Exhibit C - Schulz Amended Demand for Payment of Wages (03-19-2025), # 4 Exhibit D - 2018 Equity Incentive Plan, # 5 Exhibit E - Schulz Stock Option Agreement)(Benson, Gary) (Entered: 08/14/2025) | View Add to request |
| 106 | 08/13/2025 | Defendants David Schupmann and Trident Solutions of Sugar Grove, LLC's ANSWER to 105 Amended Complaint,,, , Amended COUNTERCLAIM against FW-CO, Inc. by David Schupmann, Trident Solutions of Sugar Grove, LLC. (Attachments: # 1 Exhibit A-Employment Agreement, # 2 Exhibit B-09-09-22 Correspondence, # 3 Exhibit C-Notice of Termination of Employment for Cause, # 4 Exhibit D-02-19-25 Wage Demand Letter)(Miller, Patrick) (Entered: 08/13/2025) | View Add to request |
| 105 | 08/12/2025 | AMENDED COMPLAINT FW-CO, Inc., d/b/a Fortis against Charles Schulz, David Schupmann, Trident Solutions of Sugar Grove, LLC, filed by FW-CO, Inc.. (Attachments: # 1 Exhibit A - Schupmann | View Add to request |

| | | | |
|---|---|---|---|
| | | Agreement, # 2 Exhibit B- Schulz Agreement, # 3 Exhibit C - Emails Provided by Scott Reynolds, # 4 Exhibit D - Trident Business Registration, # 5 Exhibit E - Trident Operating Agreement, # 6 Exhibit F - Trident Invoices, # 7 Exhibit G - SouthPoint Apartments, # 8 Exhibit H - Trident May 2024 FL Job, # 9 Exhibit I - Rew Materials, # 10 Exhibit J - Trident Aspen Partnership Agreement, # 11 Exhibit K - Trident Solar Opps 2023, # 12 Exhibit L - Hiffman National, # 13 Exhibit M - Citrine Power, # 14 Exhibit N - Tecta Complaint)(Elkon, Michael) (Entered: 08/12/2025) | |
| 104 | 08/11/2025 | MINUTE ORDER: This matter is before the Court on the Notice of Amended Counterclaims Filed with Consent ("Mr. Schupmann's Notice") 101 , the Notice of Filing of Second Amended Complaint and Jury Demand ("Plaintiff's Notice") 102 , and the Notice of Filing of Amended Counterclaims and Joinder of Richard M. Lewis ("Mr. Schulz's Notice") 103 . All Parties consent to the filing of the amended pleadings. [Doc. 101 at 1-2; Doc. 102 at 1-2; Doc. 103 at 1-2]. Accordingly, on or before August 13, 2025, Plaintiff SHALL FILE a clean copy of his Second Amended Complaint. Only after the Second Amended Complaint has been filed, then Mr. Schupmann SHALL FILE a clean copy of his Answer to Plaintiff's Verified Amended Complaint, Affirmative Defenses, and Amended Counterclaims;; and Mr. Schulz SHALL FILE a clean copy of his Amended Counterclaims and the Joinder of Richard M. Lewis no later than August 14, 2025. by Judge Nina Y. Wang on 08/11/2025. Text Only Entry (nywlc9, ) (Entered: 08/11/2025) | Send Runner to Court |
| 103 | 08/07/2025 | NOTICE of Filing Amended Pleading Amended Counterclaims and Joinder of Richard Lewis by Defendant Charles Schulz, Counter Claimant Charles Schulz (Attachments: # 1 Exhibit A (Schulz Amended Counterclaims (redlined)), # 2 Exhibit B (Schulz | View Add to request |

| | | | |
|---|---|---|---|
| | | Amended Counterclaims (clean with Exhibits 1-5)))(Benson, Gary) (Entered: 08/07/2025) | |
| 102 | 08/07/2025 | NOTICE of Filing Amended Pleading Second Amended Complaint by Plaintiff FW-CO, Inc. (Attachments: # 1 Exhibit A - Redlined Complaint, # 2 Exhibit B - Second Amended Complaint (clean with exhibits))(Elkon, Michael) (Entered: 08/07/2025) | View Add to request |
| 101 | 08/07/2025 | NOTICE re 40 Answer to Amended Complaint,, Counterclaim, Notice of Amended Counterclaims Filed With Consent by Counter Claimants Trident Solutions of Sugar Grove, LLC, David Schupmann, Defendants David Schupmann, Trident Solutions of Sugar Grove, LLC (Attachments: # 1 Exhibit A - Defendants' Answer and Amended Counterclaims (Clean), # 2 Exhibit B - (Redlined) Defendants' Answer and Amended Counterclaims)(Fetter, Kellie) (Entered: 08/07/2025) | View Add to request |
| 100 | 08/01/2025 | RESPONSE to 99 Order on Motion for Preliminary Injunction,, and Order to Show Cause by Plaintiff FW-CO, Inc.. (Attachments: # 1 Exhibit A - Emails with OC RE Return of Materials, # 2 Exhibit B - Declaration of Richard Lewis)(Elkon, Michael) (Entered: 08/01/2025) | View Add to request |
| 99 | 07/25/2025 | ORDER ON MOTION FOR PRELIMINARY INJUNCTION Plaintiff's Motion for Preliminary Injunction [Doc. 21 ] is DENIED. No later than August 1, 2025, the Clerk of the Court is DIRECTED to EXONERATE the bond of $ 81,000 posted by Defendant David Schupmann [Doc. 38 ]. No later than August 1, 2025, Plaintiff shall SHOW CAUSE as to why the Motion for Contempt [Doc. 62 ] should not be denied given the Court's rulings herein. Failure to respond to the Order to Show Cause may result in the denial of the Motion for Contempt [Doc. 62 ], and the associated Motion to Strike Plaintiff's Reply in Support of Motion for Contempt. [Doc. 88 ]. By Judge Nina Y. Wang on 7/25/2025. (norlin, ) (Entered: 07/25/2025) | Docket Status View Add to request |

| | | | |
|---|---|---|---|
| 98 | 07/11/2025 | TRANSCRIPT of SCHEDULING CONFERENCE held on 06/23/2025 before Magistrate Judge O'Hara. Pages: 1-17. Prepared by: AB LITIGATION SERVICES (cboone@ablitservices.com or bpritchard@ablitservices.com). NOTICE - REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov. Transcript may only be viewed at the court's public terminal or purchased through the Court Reporter/ Transcriber prior to the 90 day deadline for electronic posting on PACER. (AB Court Reporting & Video, Inc., ) (Entered: 07/11/2025) | View Add to request |
| 97 | 06/24/2025 | SCHEDULING ORDER. Discovery Cutoff: February 23, 2026. Dispositive Motion Deadline: March 25, 2026. The parties shall designate all affirmative experts and provide opposing counsel and any pro se parties with all information specified in Fed. R. Civ. P. 26(a)(2) on or before: December 23, 2025. The parties shall designate all rebuttal experts and provide opposing counsel and any pro se party with all information specified in Fed. R. Civ. P. 26(a)(2) on or before: January 23, 2026. The Court will hold a Status Conference on October 1, 2025, at 10:00 a.m. in Courtroom C-402, on the fourth floor of the Byron G. Rogers United States Courthouse located at 1929 Stout Street, Denver, Colorado. By Magistrate Judge Timothy P O'Hara on 6/24/2025. (amona,) (Entered: 06/24/2025) | View Add to request |
| 96 | 06/23/2025 | MINUTE ENTRY for Scheduling Conference held on 6/23/2025 | View Add to request |

| | | | |
|---|---|---|---|
| | | before Magistrate Judge Timothy P O'Hara. A Status Conference is set for October 1, 2025, at 10:00 a.m. before U.S. Magistrate Judge Timothy P. O'Hara in Courtroom C-402, on the fourth floor of the Byron G. Rogers United States Courthouse at 1929 Stout Street, Denver, Colorado. Although this Court prefers in-person appearances, the parties may attend this Status Conference remotely if preferred. To connect to the courtroom, counsel shall utilize the video teleconference instructions attached to these Courtroom Minutes. Should the parties determine that such a hearing is not necessary, the parties may jointly contact chambers to vacate the hearing. FTR: C402. (jtorr, ) (Entered: 06/23/2025) | |
| 95 | 06/17/2025 | Proposed Scheduling Order by Counter Claimants Trident Solutions of Sugar Grove, LLC, David Schupmann, Defendants David Schupmann, Trident Solutions of Sugar Grove, LLC. (Miller, Patrick) (Entered: 06/17/2025) | View Add to request |
| 94 | 06/17/2025 | NOTICE of Entry of Appearance by Kellie Nelson Fetter on behalf of Trident Solutions of Sugar Grove, LLC, David SchupmannAttorney Kellie Nelson Fetter added to party Trident Solutions of Sugar Grove, LLC(pty:cc), Attorney Kellie Nelson Fetter added to party David Schupmann(pty:cc), Attorney Kellie Nelson Fetter added to party David Schupmann(pty:dft), Attorney Kellie Nelson Fetter added to party Trident Solutions of Sugar Grove, LLC(pty:dft) (Fetter, Kellie) (Entered: 06/17/2025) | View Add to request |
| 93 | 06/16/2025 | Proposed Scheduling Order by Counter Claimant David Schupmann, Defendant David Schupmann. (Miller, Patrick) (Entered: 06/16/2025) | View Add to request |
| 92 | 06/16/2025 | TRANSCRIPT of DISCOVERY HEARING held on 05/21/2025 before Magistrate Judge O'Hara. Pages: 1-53. Prepared by: AB LITIGATION SERVICES (cboone@ablitservices.com or bpritchard@ablitservices.com). | View Add to request |

| | | | |
|---|---|---|---|
| | | NOTICE - REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov. Transcript may only be viewed at the court's public terminal or purchased through the Court Reporter/ Transcriber prior to the 90 day deadline for electronic posting on PACER. (AB Court Reporting & Video, Inc., ) (Entered: 06/16/2025) | |
| 91 | 06/12/2025 | RESPONSE to 88 MOTION to Strike 84 Reply to Response to Motion for Contempt filed by Plaintiff FW-CO, Inc.. (Attachments: # 1 Exhibit)(Elkon, Michael) (Entered: 06/12/2025) | View Add to request |
| 90 | 06/11/2025 | TRANSCRIPT of Preliminary Injunction Hearing held on 05/30/25 before Judge Wang. Pages: 1-178. NOTICE - REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov. Transcript may only be viewed at the court's public terminal or purchased through the Court Reporter/ Transcriber prior to the 90 day deadline for electronic posting on PACER. (dmart, ) (Entered: 06/11/2025) | View Add to request |
| 89 | 05/30/2025 | COURTROOM MINUTES for Preliminary Injunction Hearing held before Judge Nina Y. Wang on | View Add to request |

| | | | |
|---|---|---|---|
| | | 5/30/2025. Parties stipulate that the Court can direct the Clerk of the Court to change the spelling of Mr. Schupmann's last name. Plaintiff's Motion for Preliminary Injunction 61 is deemed argued, submitted, and taken under advisement. The Court will issue a written Order in due course as soon as possible. Court Reporter: Darlene Martinez. (Attachments: # 1 Joint Witness List, # 2 Joint Exhibit List) (ebuch) (Entered: 05/30/2025) | |
| 88 | 05/29/2025 | MOTION to Strike 84 Reply to Response to Motion for Contempt by Counter Claimant David Schuppman, Defendant David Schuppman. (Attachments: # 1 Proposed Order (PDF Only))(Miller, Patrick) (Entered: 05/29/2025) | View Add to request |
| 87 | 05/29/2025 | MINUTE ORDER: Pending before the Court is the Emergency Renewed Motion for Leave to Allow Third Party Witness to Appear Remotely 86 . In the Motion, Defendant David Schupmann ("Mr. Schupmann") renews his request to have third party Daniel Kimball ("Mr. Kimball") testify remotely due to his new employer's unwillingness to have him appear and testify in person due to risk of retaliation from Richard Lewis, Chief Executive Officer of Plaintiff FW-CO, Inc. d/b/a Fortis Warranty ("Fortis"). Despite knowing that the Preliminary Injunction hearing was set for May 30, 2025 at 9:00 a.m. since February 24, 2025 35 , Mr. Schupmann first moved the Court to allow the remote appearance of Mr. Kimball, based on the inconvenience to the witness, on May 20, 2025. 78 . Remote testimony is the exception, not the rule, for court proceedings, Fed. R. Civ. P. 43, and leave to appear remotely for an evidentiary hearing is typically not warranted based on mere inconvenience to the witness. See Eller v. Trans Union, LLC, 739 F.3d 467, 478 (10th Cir. 2013) ("As the Advisory Committee Notes to Rule 43(a) explain, the rule is intended to permit remote testimony when a witness's inability to attend trial is the result of "unexpected | Send Runner to Court |

FW-CO, Inc. v. Schulz et al, 1:25CV00254 (2025)

reasons, such as accident or illness," and not when it is merely "inconvenient for the witness to attend the trial." Fed.R.Civ.P. 43(a) advisory committee's note."). Now, without any explanation, Mr. Schupmann avers that there is a risk of retaliation that is present if Mr. Kimball testifies in person, that is not present if Mr. Kimball testifies remotely. 86 . Based on the record before it, this Court is not persuaded that remote testimony is justified. In addition, there is insufficient time to facilitate remote testimony in a manner that the Court could be sufficiently assured of appropriate procedural safeguards. See Eller, 739 F.3d at 478 (discussing procedural safeguards in addition to good cause required to satisfy Rule 43(a)). As stated above, Mr. Schupmann has known about this hearing date for over two months, and this exigency is, at least, in part due to his delayed filing. To the extent that Mr. Kimball was not subject to subpoena, Mr. Schupmann could have proffered Mr. Kimball's testimony through affidavit, Fed. R. Civ. 43(c), or through deposition. Mr. Schupmann has failed to make an adequate showing under Rule 43(a). Accordingly, Defendant's Emergency Renewed Motion for Leave to Allow Third Party Witness to Appear Remotely 86 is respectfully DENIED. By Judge Nina Y. Wang on 05/29/2025. Text Only Entry(nywlc9, ) (Entered: 05/29/2025)

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

| | | | |
|---|---|---|---|
| 86 | 05/29/2025 | Emergency MOTION for Leave to Allow Third Party Witness to Appear Remotely 85 Minute Order, 78 MOTION for Leave to Allow Third Party Witness to Appear Remotely by Counter Claimant David Schuppman, Defendant David Schuppman. (Attachments: # 1 Exhibit A - Text Message)(Miller, Patrick) (Entered: 05/29/2025) | View Add to request |
| 85 | 05/28/2025 | MINUTE ORDER: The 78 Defendant David Schupmann's Motion for Leave to Allow a Third Party Witness to Appear Remotely is DENIED. The Parties will be able to preserve their objections to certain testimony on the record. The Court will make admissibility rulings in the context of issuing its order regarding the pending Motion for Preliminary Injunction. By Judge Nina Y. Wang on 05/28/2025. Text Only Entry (nywlc9, ) (Entered: 05/28/2025) | Send Runner to Court |
| 84 | 05/27/2025 | REPLY to Response to 62 MOTION for Contempt filed by Plaintiff FW-CO, Inc.. (Elkon, Michael) (Entered: 05/27/2025) | View Add to request |
| 83 | 05/23/2025 | RESPONSE to 78 MOTION for Leave to Allow Third Party Witness to Appear Remotely filed by Plaintiff FW-CO, Inc.. (Elkon, Michael) (Entered: 05/23/2025) | View Add to request |
| 82 | 05/23/2025 | Witness List Parties' Joint Witness List by Counter Claimant David Schuppman, Defendant David Schuppman. (Miller, Patrick) (Entered: 05/23/2025) | View Add to request |
| 81 | 05/23/2025 | Exhibit List Parties' Joint Exhibit List by Counter Claimant David Schuppman, Defendant David Schuppman. (Miller, Patrick) (Entered: 05/23/2025) | View Add to request |
| 80 | 05/21/2025 | COURTROOM MINUTES for Discovery Hearing held on 5/21/2025 before Magistrate Judge Timothy P O'Hara. For the reasons stated on the record, it is ORDERED : Plaintiff's request to compel Defendant David Schupmann to produce documents responsive to request nos. 9-10 in its March 10, 2025 expedited requests for production is GRANTED. By noon on May 28, 2025, Defendant Schupmann shall disclose all information responsive to Plaintiff's requests. To the extent | View Add to request |

| | | | |
|---|---|---|---|
| | | counsel for Defendant believes responsive records do not exist, he shall provide Plaintiff with an affidavit stating as such by the same deadline. If Defendants believe this will cause undue burden or expense, they shall file any motion for reconsideration by close of business on May 23, 2025. Defendant Schupmann's request to compel production of complete responses to his written discovery requests is GRANTED. Plaintiff shall disclose information responsive to Defendant's written discovery requests relating to non-warranty, roof-related projects performed by Fortis between February 27, 2018, to December 24, 2024, by noon on May 28, 2025, as discussed on the record. And consistent with what was stated by Plaintiff's counsel during the Hearing, Plaintiff shall provide the specific documents that are responsive to Defendant Schupmann's discovery requests rather than providing a general reference to the materials. If Plaintiff believes this will cause undue burden or expense, it shall file any appropriate pleading indicating as such by close of business on May 23, 2025. FTR: C402. (sjeff) (Entered: 05/22/2025) | |
| 79 | 05/20/2025 | MINUTE ORDER: Plaintiff is ORDERED to respond to the 78 Motion for Leave to Allow a Third Party Witness to Appear Remotely by Friday 05/23/2025. No replies will be accepted absent leave of Court. By Judge Nina Y. Wang on 05/20/2025. Text Only Entry (nywlc9, ) (Entered: 05/20/2025) | Send Runner to Court |
| 78 | 05/20/2025 | MOTION for Leave to Allow Third Party Witness to Appear Remotely by Counter Claimant David Schuppman, Defendant David Schuppman. (Attachments: # 1 Proposed Order (PDF Only))(Miller, Patrick) Modified on 5/29/2025 to terminate motion pursuant to 85 Minute Order (norlin, ). (Entered: 05/20/2025) | View Add to request |
| 77 | 05/19/2025 | NOTICE of Entry of Appearance by Emily A. England on behalf of Trident Solutions of Sugar Grove, LLC, David SchuppmanAttorney | View Add to request |

| | | | |
|---|---|---|---|
| | | Emily A. England added to party Trident Solutions of Sugar Grove, LLC(pty:cc), Attorney Emily A. England added to party David Schuppman(pty:cc), Attorney Emily A. England added to party David Schuppman(pty:dft), Attorney Emily A. England added to party Trident Solutions of Sugar Grove, LLC(pty:dft) (England, Emily) (Entered: 05/19/2025) | |
| 76 | 05/16/2025 | MINUTE ORDER. This matter comes before this Court upon the telephonic request of Patrick Miller, counsel for Defendants David Schuppman and Trident Solutions of Sugar Grove, LLC, to participate at the May 21, 2025 Discovery Conference remotely because of a travel conflict. The request is granted. Mr. Miller may use the video teleconference link and instructions found at page 3 of ECF 72 to connect to the courtroom for the Discovery Conference. By Magistrate Judge Timothy P O'Hara on 5/16/2025. (amona, ) (Entered: 05/16/2025) | View Add to request |
| 75 | 05/14/2025 | CONSENT PRELIMINARY INJUNCTION re: 55 Renewed Joint Motion for Entry of Consent Preliminary Injunction, by Judge Nina Y. Wang on 5/14/2025. (ebuch) (Entered: 05/14/2025) | View Add to request |
| 74 | 05/13/2025 | RESPONSE to 61 MOTION for Preliminary Injunction filed by Counter Claimant David Schuppman, Defendant David Schuppman. (Attachments: # 1 Exhibit A - 02-19-25 Demand Letter, # 2 Exhibit B - 03-05-25 Res, # 3 Exhibit C - Declaration of David Schupmann, # 4 Exhibit D - Excerpts of Rick Lewis Deposition, # 5 Exhibit E - Zuni Payments v. Kosarek)(Miller, Patrick) (Entered: 05/13/2025) | View Add to request |
| 73 | 05/12/2025 | RESPONSE to 62 MOTION for Contempt filed by Counter Claimant David Schuppman, Defendant David Schuppman. (Attachments: # 1 Exhibit A - Declaration of David Schupmann, # 2 Exhibit B - Excerpts of David Schupmann Deposition, # 3 Exhibit C - Excerpts of Brian Tice Deposition)(Miller, Patrick) (Entered: 05/12/2025) | View Add to request |

| | | | |
|---|---|---|---|
| 72 | 05/08/2025 | MINUTE ORDER. At the Parties' emailed request, the Court will hold a Discovery Conference on May 21, 2025 at 3:30 p.m. in Courtroom C-402, on the fourth floor of the Byron G. Rogers United States Courthouse located at 1929 Stout Street, Denver, Colorado. The Joint Statement is due three business days before the Discovery Conference. The Discovery Conference shall be an in-person proceeding. However, the Court gives leave to counsel who are outside of Colorado to appear remotely by way of video conference. Todo so, counsel shall follow the Cisco Meeting App Instructions that are attached to this Minute Order. Should counsel encounter technical difficulties, counsel may connect to the courtroom via its telephone conference line: Toll-Free Number: (571) 353-2301 Access code: 061746309 By Magistrate Judge Timothy P O'Hara on 5/8/2025. (amona,) (Entered: 05/08/2025) | View Add to request |
| 71 | 05/06/2025 | RECEIPT for Bond Payment by Plaintiff FW-CO, Inc. re: 54 Order, (agryan) (Entered: 05/06/2025) | View Add to request |
| 70 | 05/05/2025 | MINUTE ORDER. For good cause shown, the Parties' Joint Motion to Delay the Scheduling Conference [ECF 68 ] is granted. The Scheduling Conference currently set on May 8, 2025 is RESET to June 23, 2025 at 9:30 a.m. (Mountain Time) in Courtroom C-402, on the fourth floor of the Byron G. Rogers United States Courthouse located at 1929 Stout Street, Denver, Colorado. It is set as an in-person proceeding. However, this Court will permit counsel outside Colorado to appear remotely. To do so, counsel shall follow the Cisco Meeting App Instructions that are attached to this Minute Order. No later than seven days before the Scheduling Conference, the Parties shall (1) file their Proposed Scheduling Order onto the case docket sheet and (2) submit the proposed Scheduling Order in Word format by joint email, copying all Parties, to Chambers at o'hara_chambers@cod.uscourts.gov. | View Add to request |

| | | | |
|---|---|---|---|
| | | By Magistrate Judge Timothy P O'Hara on 5/5/2025.(amona,) (Entered: 05/05/2025) | |
| 69 | 05/05/2025 | MEMORANDUM regarding 68 Joint MOTION to Continue /Delay the Scheduling Conference filed by FW-CO, Inc.. Motion referred to Magistrate Judge Timothy P O'Hara By Judge Nina Y. Wang on 05/05/5025. Text Only Entry (nywlc9, ) (Entered: 05/05/2025) | Send Runner to Court |
| 68 | 05/05/2025 | Joint MOTION to Continue /Delay the Scheduling Conference by Plaintiff FW-CO, Inc.. (Attachments: # 1 Proposed Order (PDF Only)) (Elkon, Michael) (Entered: 05/05/2025) | View Add to request |
| 67 | 04/30/2025 | MINUTE ORDER: Pending before the Court is the Parties' third Joint Motion for Entry of Consent Preliminary Injunction. 55 . Upon review of the proposed Consent Preliminary Injunction, this Court finds that the latest version still includes language defining "Competing Business" inconsistently with the definition set forth by the Court in its Order Granting Temporary Restraining Order 35 . The Court has included as the main document of this Minute Order a proposed revision to the Consent Preliminary Injunction that conforms to its prior order. If neither Plaintiff FW-Co, Inc. nor Defendant Charles Schulz object by May 5, 2025, the Court shall enter a clean version of the Consent Preliminary Injunction on that date without any further notice of or consideration by the Court, by Judge Nina Y. Wang on 4/30/2025. (ebuch) (Entered: 04/30/2025) | View Add to request |
| 66 | 04/30/2025 | STIPULATED PROTECTIVE ORDER by Magistrate Judge Timothy P. O'Hara on 04/30/2025. (Attachments: # 1 Attachment A) (ggill, ) (Entered: 04/30/2025) | View Add to request |
| 65 | 04/30/2025 | MINUTE ORDER by Magistrate Judge Timothy P. O'Hara on 04/30/2025. The Parties' Joint Motion for Entry of Stipulated Protective Order [ECF 60 ] is granted. This Court enters the Parties' proposed order separately. (ggill, ) (Entered: 04/30/2025) | View Add to request |
| 64 | 04/30/2025 | MEMORANDUM regarding 60 Joint MOTION for Protective Order | Send Runner to Court |

| | | | |
|---|---|---|---|
| | | Joint Motion for Entry of Stipulated Protective Order filed by FW-CO, Inc.. Motion referred to Magistrate Judge Timothy P O'Hara. By Judge Nina Y. Wang on 04/28/2025. Text Only Entry (nywlc9, ) (Entered: 04/30/2025) | |
| 63 | 04/29/2025 | MINUTE ORDER re: Defendant shall respond to the 62 MOTION for Contempt filed by FW-CO, Inc. on or before 05/12/2025. Any reply shall be filed on or before 05/19/2025. By Judge Nina Y. Wang on 04/28/2025. Text Only Entry (nywlc9, ) Modified on 4/30/2025 to update formatting on request from Chambers (norlin, ). (Entered: 04/29/2025) | Send Runner to Court |
| 62 | 04/29/2025 | MOTION for Contempt by Plaintiff FW-CO, Inc.. (Attachments: # 1 Exhibit A - Schupmann Interrogatory Responses, # 2 Exhibit B - Tice Deposition Transcript, # 3 Exhibit C - E. Martinez Friday Update, # 4 Exhibit D - Backman Edifice Construction, # 5 Exhibit E - Wall Panels, # 6 Exhibit F - Follow Up Items, # 7 Exhibit G - Brian Hofstetter Interview, # 8 Exhibit H - Weekly Sales Meeting, # 9 Exhibit I - Yeamans Hall Club Proposal, # 10 Exhibit J - SCPA Solicitation and SOW, # 11 Exhibit K - SCPA Direct Solicitation, # 12 Exhibit L - Triad MC, # 13 Exhibit M - Edifice Construction)(Elkon, Michael) (Entered: 04/29/2025) | View Add to request |
| 61 | 04/29/2025 | MOTION for Preliminary Injunction by Plaintiff FW-CO, Inc.. (Attachments: # 1 Exhibit A - Schupmann Agreement, # 2 Exhibit B - Schupmann Deposition Transcript, # 3 Exhibit C - Tice Deposition Transcript, # 4 Exhibit D - Schupmann Interrogatory Responses, # 5 Exhibit E - Lewis Deposition Transcript, # 6 Exhibit F - Yeamans Hall Proposal, # 7 Exhibit G - RUSA TRF Graphic, # 8 Exhibit H - RUSA Sales Territory, # 9 Exhibit I - Fortis Invoices, # 10 Exhibit J - Greystar Solicitation)(Elkon, Michael) (Entered: 04/29/2025) | View Add to request |
| 60 | 04/29/2025 | Joint MOTION for Protective Order Joint Motion for Entry of Stipulated Protective Order by | View Add to request |

| | | | |
|---|---|---|---|
| | | Plaintiff FW-CO, Inc.. (Attachments: # 1 Proposed Order (PDF Only) Proposed Protective Order)(Wilson, Francis) (Entered: 04/29/2025) | |
| 59 | 04/25/2025 | TRANSCRIPT of Telephone Status Conference held on April 11, 2025 before Judge Wang. Pages: 1-16. NOTICE - REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov. Transcript may only be viewed at the court's public terminal or purchased through the Court Reporter/ Transcriber prior to the 90 day deadline for electronic posting on PACER. (smitc, ) (Entered: 04/25/2025) | View Add to request |
| 58 | 04/24/2025 | CONSENT to Jurisdiction of Magistrate Judge by Plaintiff FW-CO, Inc. All parties do not consent.. (Elkon, Michael) (Entered: 04/24/2025) | View Add to request |
| 57 | 04/23/2025 | MINUTE ORDER: Plaintiff's unopposed 56 Motion for Leave to Exceed Page Limitations is GRANTED. Plaintiff may file a motion for preliminary injunction of up to 25 pages. By Judge Nina Y. Wang on 4/23/2025. Text Only Entry(nywlc8, ) (Entered: 04/23/2025) | Send Runner to Court |
| 56 | 04/22/2025 | MOTION for Leave to Exceed Page Limitations by Plaintiff FW-CO, Inc.. (Elkon, Michael) (Entered: 04/22/2025) | View Add to request |
| 55 | 04/22/2025 | Joint MOTION for Preliminary Injunction Joint Motion for Entry of Consent Preliminary Injunction by Plaintiff FW-CO, Inc.. (Attachments: # 1 Proposed Order (PDF Only) Proposed Order)(Elkon, Michael) (Entered: 04/22/2025) | View Add to request |
| 54 | 04/22/2025 | ORDER On or before May 6, 2025, Plaintiff FW-CO, Inc., d/b/a Fortis, shall post bond in the amount of | View Add to request |

FW-CO, Inc. v. Schulz et al, 1:25CV00254 (2025)

| | | | |
|---|---|---|---|
| | | $81,000. The payment may be made by certified check or bank check. The bond shall expire upon the Court's ruling on Plaintiff's request for a preliminary injunction against Defendant Schupmann. By Judge Nina Y. Wang on 4/22/2025. (norlin, )[NEF ad hoc'd to Intake Cashiers and Finance Division for reference and transparency] (Entered: 04/22/2025) | |
| 53 | 04/11/2025 | COURTROOM MINUTES/MINUTE ORDER for Telephonic Status Conference held before Judge Nina Y. Wang on 4/11/2025. Parties shall use the Court's suggested edits and resubmit a revised proposed Consent Preliminary Injunction. The Joint Motion for Preliminary Injunction 39 is denied without prejudice. Court Reporter: Sarah Mitchell. (ebuch) (Entered: 04/11/2025) | View Add to request |
| 52 | 04/02/2025 | MINUTE ORDER: A telephonic Status Conference is SET for 4/11/2025 at 01:00 PM to discuss the pending 39 Joint MOTION for Preliminary Injunction. The Parties shall participate using the following dial-in information: 571-353-2301; Access Code: 783456374. Defendant David Schuppman is not required to participate in the telephonic Status Conference. By Judge Nina Y. Wang on 4/2/2025. Text Only Entry (nywlc7, ) (Entered: 04/02/2025) | Send Runner to Court |
| 51 | 04/02/2025 | MINUTE ORDER By Magistrate Judge Timothy P. O'Hara on 04/02/2025. The Joint Motion for Extension of the Discovery Deadline [ECF 47 ] by Plaintiff and Defendant David Schupmann is granted. That deadline is extended to April 15, 2025 for the purpose of taking depositions.(ggill, ) (Entered: 04/02/2025) | View Add to request |
| 50 | 04/02/2025 | MINUTE ORDER By Magistrate Judge Timothy P. O'Hara on 04/02/2025. Before the Court is the Parties' Joint Motion for Entry of Stipulated Protective Order. ECF 45 . The Court denies the Motion [ECF 45 ] because the Parties' proposed Protective Order does not comply with the requirements of the Magistrate Judges' Uniform | View Add to request |

| | | | |
|---|---|---|---|
| | | Civil Practice Standards. (ggill, ) (Entered: 04/02/2025) | |
| 49 | 04/01/2025 | Plaintiff's ANSWER/REPLY to 34 Answer to Complaint,, Counterclaim, , DKT 41 Counterclaim of Defendant Charles Schulz by FW-CO, Inc..(Elkon, Michael) (Entered: 04/01/2025) | View Add to request |
| 48 | 04/01/2025 | MEMORANDUM regarding 47 Joint MOTION for Discovery Deadline Extension. Motion referred to Magistrate Judge Timothy P O'Hara. By Judge Nina Y. Wang on 4/1/2025. Text Only Entry (nywlc7, ) (Entered: 04/01/2025) | Send Runner to Court |
| 47 | 04/01/2025 | Joint MOTION for Discovery Deadline Extension by Plaintiff FW-CO, Inc.. (Attachments: # 1 Proposed Order (PDF Only))(Elkon, Michael) (Entered: 04/01/2025) | View Add to request |
| 46 | 03/27/2025 | MEMORANDUM regarding 45 Joint MOTION for Protective Order. Motion referred to Magistrate Judge Timothy P O'Hara. By Judge Nina Y. Wang on 3/27/2025. Text Only Entry (nywlc7, ) (Entered: 03/27/2025) | Send Runner to Court |
| 45 | 03/26/2025 | Joint MOTION for Protective Order Joint Motion for Entry of Stipulated Protective Order by Plaintiff FW-CO, Inc.. (Attachments: # 1 Proposed Order (PDF Only) PROPOSED STIPULATED PROTECTIVE ORDER)(Wilson, Francis) (Entered: 03/26/2025) | View Add to request |
| 44 | 03/21/2025 | ANSWER/REPLY to 40 Answer to Amended Complaint,, Counterclaim, by FW-CO, Inc.. (Elkon, Michael) (Entered: 03/21/2025) | View Add to request |
| 43 | 03/17/2025 | FW-CO, Inc.'s ANSWER/REPLY to 41 Answer to Amended Complaint,, Counterclaim, by FW-CO, Inc.. (Elkon, Michael) (Entered: 03/17/2025) | View Add to request |
| 42 | 03/14/2025 | TRANSCRIPT of Telephonic Status Conference held on 02/26/2025 before Judge Wang. Pages: 1-8. NOTICE - REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the | View Add to request |

| | | | |
|---|---|---|---|
| | | allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov. Transcript may only be viewed at the court's public terminal or purchased through the Court Reporter/ Transcriber prior to the 90 day deadline for electronic posting on PACER. (dmart, ) (Entered: 03/14/2025) | |
| 41 | 03/11/2025 | Defendant Charles Schulz's ANSWER to 20 Amended Complaint,,, , COUNTERCLAIM against FW-CO, Inc. by Charles Schulz. (Attachments: # 1 Exhibit 1 - Employment Agreement, # 2 Exhibit 2 - Demand for Payment of Wages, # 3 Exhibit 3 - Equity Incentive Plan, # 4 Exhibit 4 - Stock Option Agreement)(Benson, Gary) (Entered: 03/11/2025) | View Add to request |
| 40 | 02/28/2025 | Defendant David Schupmann and Trident Solutions of Sugar Grove, LLC's ANSWER to 20 Amended Complaint,,, , COUNTERCLAIM against FW-CO, Inc. by Trident Solutions of Sugar Grove, LLC, David Schuppman. (Attachments: # 1 Exhibit A - Employment Agreement, # 2 Exhibit B - 09-09-22 Correspondence Re Stock Option Agmt, # 3 Exhibit C - Notice of Termination of Employment for Cause, # 4 Exhibit D - 02-19-25 Wage Demand Letter)(Miller, Patrick) (Entered: 02/28/2025) | View Add to request |
| 39 | 02/28/2025 | Joint MOTION for Preliminary Injunction by Plaintiff FW-CO, Inc.. (Attachments: # 1 Exhibit A - Proposed Consent Preliminary Injunction)(Elkon, Michael) (Entered: 02/28/2025) | View Add to request |
| 38 | 02/28/2025 | STIPULATION Regarding TRO Bond Calculation and Expedited Discovery by Plaintiff FW-CO, Inc.. (Elkon, Michael) (Entered: 02/28/2025) | View Add to request |
| 37 | 02/28/2025 | MINUTE ORDER By Magistrate Judge Timothy P. O'Hara on 02/28/2025. This matter comes before this Court upon District Judge Nina Y. Wang's Order for the creation of an expedited discovery schedule [ECF 27 ] and Order setting April 8, 2025 as the deadline | View Add to request |

| | | | |
|---|---|---|---|
| | | for completing expedited discovery [ECF 35 ]. This Court notes that the Scheduling Conference is set for May 8, 2025. This Court notes that District Judge Nina Y. Wang has set the preliminary injunction hearing for May 30, 2025 (ggill, ) (Entered: 02/28/2025) | |
| 36 | 02/26/2025 | COURTROOM MINUTES/MINUTE ORDER for Telephonic Status Conference held before Judge Nina Y. Wang on 2/26/2025. Parties shall meet and confer and in light of the Court's ruling on Plaintiff's motion for temporary restraining order, submit a revised joint motion and proposed consent preliminary injunction no later than March 3, 2025. Denying as moot 29 Joint Motion for Entry of Consent Preliminary Injunction. Court Reporter: Darlene Martinez. (ebuch) (Entered: 02/26/2025) | View Add to request |

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

| | | | | |
|---|---|---|---|---|
| 35 | 02/24/2025 | ORDER GRANTING TEMPORARY RESTRAINING ORDER by Judge Nina Y. Wang on 24 February 2025. Accordingly, IT IS ORDERED that: Plaintiff's Emergency Motion for Temporary Restraining Order and Preliminary Injunction [Doc. 10 ] is GRANTED. Pursuant to Fed. R. Civ. P. 65, a preliminary injunction hearing is SET for May 30, 2025 at 9:00 a.m. in Courtroom A 902 before Judge Nina Y. Wang, Alfred A. Arraj United States Courthouse, 901 19th Street, Denver, Colorado 80294. The Parties shall submit all proposed exhibits and witness lists no later than May 23, 2025; Any expedited discovery shall be completed by no later than April 8, 2025; Fortis shall FILE its forthcoming Motion for Preliminary Injunction by no later than April 29, 2025; and any response thereto shall be filed by no later than May 13, 2025. No reply shall be permitted absent leave of the Court; and A telephonic Status Conference is SET for February 26, 2025 at 11:00 a.m. before Judge Nina Y. Wang to discuss the pending Joint Motion for Entry of Consent Preliminary Injunction [Doc. 29 ]. The Parties shall participate using the following dial-in information: 571- 353-2301; Access Code: 783456374.(cmadr, ) (Entered: 02/24/2025) | View | Add to request |
| 34 | 02/24/2025 | Defendant Charles Schulz's ANSWER to 1 Complaint,,,, , COUNTERCLAIM against FW-CO, Inc. by Charles Schulz. (Attachments: # 1 Exhibit Exhibit 1 to Defendant Schulz's Counterclaims, # 2 Exhibit Exhibit 2 to Defendant Schulz's Counterclaims, # 3 Exhibit Exhibit 3 to Defendant Schulz's Counterclaims, # 4 Exhibit Exhibit 4 to Defendant Schulz's Counterclaims)(Benson, Gary) (Entered: 02/24/2025) | View | Add to request |
| 33 | 02/21/2025 | NOTICE of Entry of Appearance by Gary J. Benson on behalf of Charles SchulzAttorney Gary J. Benson added to party Charles Schulz(pty:dft) (Benson, Gary) (Entered: 02/21/2025) | View | Add to request |

| | | | |
|---|---|---|---|
| 32 | 02/20/2025 | TRANSCRIPT of Motions Hearing held on 02/13/2025 before Judge Wang. Pages: 1-55. NOTICE - REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov. Transcript may only be viewed at the court's public terminal or purchased through the Court Reporter/ Transcriber prior to the 90 day deadline for electronic posting on PACER. (dmart, ) (Entered: 02/20/2025) | View Add to request |
| 31 | 02/18/2025 | STIPULATION for Extension of Time to Answer or Respond to the Complaint by Defendants Trident Solutions of Sugar Grove, LLC, David Schuppman. Trident Solutions of Sugar Grove, LLC answer due 2/28/2025; David Schuppman answer due 2/28/2025. (Miller, Patrick) (Entered: 02/18/2025) | View Add to request |
| 30 | 02/17/2025 | NOTICE of Entry of Appearance by Francis Alfred Wilson on behalf of FW-CO, Inc.Attorney Francis Alfred Wilson added to party FW-CO, Inc. (pty:pla) (Wilson, Francis) (Entered: 02/17/2025) | View Add to request |
| 29 | 02/14/2025 | Joint MOTION for Preliminary Injunction by Plaintiff FW-CO, Inc.. (Attachments: # 1 Proposed Order (PDF Only) Proposed Preliminary Injunction)(Elkon, Michael) (Entered: 02/14/2025) | View Add to request |
| 28 | 02/13/2025 | NOTICE of Entry of Appearance of Gary J. Benson and Denesh Chukkapalli by Denesh Chukkapalli on behalf of Charles SchulzAttorney Denesh Chukkapalli added to party Charles Schulz(pty:dft) (Chukkapalli, Denesh) (Entered: 02/13/2025) | View Add to request |
| 27 | 02/13/2025 | COURTROOM MINUTES for Hearing on Plaintiff's Emergency Motion for Temporary Restraining | View Add to request |

| | | | |
|---|---|---|---|
| | | Order and Preliminary Injunction held before Judge Nina Y. Wang on 2/13/2025. Plaintiff's Emergency Motion for Temporary Restraining Order and Preliminary Injunction 10 is deemed argued and taken under advisement. The Court will issue a written opinion. The Court refers the Parties to Magistrate Judge O'Hara for a scheduling or status conference. The Parties shall meet and confer with respect to expedited discovery and contact Magistrate Judge O'Hara's chambers no later than February 21, 2025 to set a scheduling or status conference. Court Reporter: Darlene Martinez. (ebuch) (Entered: 02/13/2025) | |
| 26 | 02/12/2025 | MINUTE ORDER: Defendants David Schupmann and Trident Solutions of Sugar Grove LLC's 25 Motion for Leave to Appear Telephonically is GRANTED. Counsel for Defendants Schupmann and Trident Solutions of Sugar Grove LLC shall appear telephonically for the hearing on the Emergency TRO Motion set for February 13, 2025 at 10:00 a.m. By Judge Nina Y. Wang on 2/12/2025. Text Only Entry(nywlc7, ) (Entered: 02/12/2025) | Send Runner to Court |
| 25 | 02/12/2025 | Unopposed MOTION for Leave to Appear by Telephone for Hearing on February 13, 2025 by Defendants David Schuppman, Trident Solutions of Sugar Grove, LLC. (Attachments: # 1 Proposed Order (PDF Only))(Miller, Patrick) (Entered: 02/12/2025) | View Add to request |
| 24 | 02/12/2025 | NOTICE of Entry of Appearance by Matthew Thomas Sharon on behalf of FW-CO, Inc.Attorney Matthew Thomas Sharon added to party FW-CO, Inc.(pty:pla) (Sharon, Matthew) (Entered: 02/12/2025) | View Add to request |
| 23 | 02/11/2025 | MINUTE ORDER Plaintiff's Consent Motion for Entry of Consent Preliminary Injunction [Doc. 16 ] is DENIED without prejudice. By Judge Nina Y. Wang on 2/11/2025. (norlin, ) (Entered: 02/12/2025) | View Add to request |
| 22 | 02/11/2025 | ORDER REFERRING CASE: This case is referred to Magistrate Judge Timothy P. O'Hara for non-dispositive matters. Pursuant to 28 U.S.C. § 636(b)(1)(A) and (B) | Send Runner to Court |

| | | | | |
|---|---|---|---|---|
| | | and Fed. R. Civ. P. 72(a) and (b), this case is referred to the assigned United States Magistrate Judge to (1) convene a scheduling conference under Fed. R. Civ. P. 16(b) and enter a scheduling order meeting the requirements of D.C.COLO.LCivR 16.2, (2) conduct such status conferences and issue such orders necessary for compliance with the scheduling order, including amendments or modifications of the scheduling order upon a showing of good cause, and (3) hear and determine pretrial matters, including discovery and other non-dispositive motions. Court-sponsored alternative dispute resolution is governed by D.C.COLO.LCivR 16.6. On the request of the Parties by motion, this Court may direct the Parties to engage in an early neutral evaluation, a settlement conference, or another alternative dispute resolution proceeding. Alternatively, the Magistrate Judge, at his discretion, may convene such early neutral evaluation and/or settlement conferences and direct related procedures as may facilitate resolution of this case without the necessity of a motion or prior authorization of the undersigned. Counsel for the Parties and all counsel who may later enter an appearance shall review and familiarize themselves with the undersigned's Practice Standards, as well as the Practice Standards of the assigned Magistrate Judge. By Judge Nina Y. Wang on 2/11/2025. Text Only Entry (nywlc7, ) (Entered: 02/11/2025) | | |
| 21 | 02/11/2025 | RESPONSE to 10 Emergency MOTION for Temporary Restraining Order and Emergency MOTION for Preliminary Injunction filed by Defendants David Schuppman, Trident Solutions of Sugar Grove, LLC. (Attachments: # 1 Exhibit A - Declaration of David Schupmann)(Miller, Patrick) (Entered: 02/11/2025) | View | Add to request |
| 20 | 02/11/2025 | AMENDED COMPLAINT Verified against Charles Schulz, David Schuppman, Trident Solutions of Sugar Grove, LLC, filed by FW- | View | Add to request |

| | | | |
|---|---|---|---|
| | | CO, Inc.. (Attachments: # 1 Exhibit A - Schupmann Agreement, # 2 Exhibit B - Schulz Agreement, # 3 Exhibit C - Emails provided by Scott Reynolds, # 4 Exhibit D - Trident Business Registration, # 5 Exhibit E - Trident Operating Agreement, # 6 Exhibit F - Trident Invoices, # 7 Exhibit G - SouthPoint Apartments, # 8 Exhibit H - Trident May 2024 FL Job, # 9 Exhibit I - Rew Materials, # 10 Exhibit J - Trident_Aspen Partnership Agreement, # 11 Exhibit K - Trident Solar Opps 2023, # 12 Exhibit L - Hiffman National, # 13 Exhibit M - Citrine Power, # 14 Exhibit N - Tecta Complaint)(Elkon, Michael) (Entered: 02/11/2025) | |
| 19 | 02/11/2025 | NOTICE re 16 MOTION for Preliminary Injunction Consent Motion for Entry of Consent Preliminary Injunction of Filing Exhibit A to the [Proposed] Consent Preliminary Injunction by Plaintiff FW-CO, Inc. (Elkon, Michael) (Entered: 02/11/2025) | View Add to request |
| 18 | 02/10/2025 | MINUTE ORDER: Upon review of the 16 MOTION for Preliminary Injunction Consent Motion for Entry of Consent Preliminary Injunction and the corresponding proposed Consent Preliminary Injunction [16-1], IT IS ORDERED that Plaintiff shall FILE a copy of the proposed "Exhibit A" to the proposed Consent Preliminary Injunction by no later than February 11, 2025. See [16-1 at 1 ("Consistent with Paragraph 5.1.1 of the Agreement between Fortis on the one hand and Schulz on the other (attached hereto as Exhibit A and referred to hereinafter as the 'Agreement')....")]. By Judge Nina Y. Wang on 2/10/2025. Text Only Entry (nywlc7, ) (Entered: 02/10/2025) | Send Runner to Court |
| 17 | 02/10/2025 | CORPORATE DISCLOSURE STATEMENT. (Miller, Patrick) (Entered: 02/10/2025) | View Add to request |
| 16 | 02/07/2025 | MOTION for Preliminary Injunction Consent Motion for Entry of Consent Preliminary Injunction by Plaintiff FW-CO, Inc.. (Attachments: # 1 Proposed Order (PDF Only) Consent Preliminary Injunction) (Elkon, Michael) (Entered: 02/07/2025) | View Add to request |

| | | | |
|---|---|---|---|
| 15 | 02/07/2025 | MINUTE ORDER: Plaintiff filed this case in federal court pursuant to 28 U.S.C. § 1332(a). See [Doc. 1]. Under Rule 7.1 of the Federal Rules of Civil Procedure, "[i]n an action in which jurisdiction is based on diversity under 28 U.S.C. § 1332(a), a party... must, unless the court orders otherwise, file a disclosure statement. The statement must name and identify the citizenship of every individual or entity whose citizenship is attributed to that party." Fed. R. Civ. P. 7.1(a)(2). This disclosure statement is to be filed "when the action is filed in... federal court," Fed. R. Civ. P. 7.1(a)(2)(A), or at the time of the party's "first appearance, pleading, petition, motion, response, or other request addressed to the court," Fed. R. Civ. P. 7.1(b)(1). Plaintiff has filed its disclosure statement representing that it is a citizen of Colorado. See [Doc. 5]. Defendant Trident has filed a disclosure statement, see [Doc. 13], but this statement does not comply with Rule 7.1 because it does not "name and identify the citizenship of every individual or entity whose citizenship is attributed to [Defendant Trident]." Fed. R. Civ. P. 7.1(a)(2). In addition, Defendant Schuppman has not filed any Rule 7.1 disclosure statement. Accordingly, it is ORDERED that, on or before 2/10/2025, Defendants Schuppman and Trident shall file disclosure statements that comply with Rule 7.1. Defendant Trident is reminded that, in the Tenth Circuit, an LLC takes on the citizenship of all of its members. See Siloam Springs Hotel, LLC v. Century Sur. Co., 781 F.3d 1233, 1237-38 (10th Cir. 2015). By Judge Nina Y. Wang on 02/07/2025. Text Only Entry (nywlc2, ) (Entered: 02/07/2025) | Send Runner to Court |
| 14 | 02/07/2025 | MINUTE ORDER : Pending before this Court is Plaintiff's Emergency Motion for Temporary Restraining Order and Preliminary Injunction ("Emergency TRO Motion") filed on February 6, 2025 10 . Plaintiff seeks a temporary restraining order and preliminary injunction against two Defendants, David Schuppman | Send Runner to Court |

| | | | |
|---|---|---|---|
| | | ("Defendant Schuppman") and Trident Solutions of Sugar Grove, LLC ("Defendant Trident"). From both the conferral statement in the Emergency TRO Motion and the docket in this action, it appears that Defendants Schuppman and Trident have been served with the Summons and Complaint in this action 7 , 9 , and have notice of the instant Emergency TRO Motion. Upon review of the Verified Complaint and the instant Emergency TRO Motion, IT IS ORDERED that Defendants Schuppman and/or Trident shall FILE a single Response to the instant Emergency TRO Motion no later than February 11, 2025. No replies will be permitted absent leave of Court. A hearing on the Emergency TRO Motion is SET for February 13, 2025 at 10:00 a.m. before the Honorable Nina Y. Wang in Courtroom A-902 of the Alfred A. Arraj United States Courthouse, 901 19th Street, Denver, Colorado 80294. The Parties shall submit witness lists and exhibit lists no later than 12:00 p.m. on February 12, 2025. Should any live witness testimony be anticipated, the Parties shall provide one paper copy of all exhibits for witness use and two flash drives of exhibits to the Courtroom Deputy no later than 9:30 a.m. on February 13, 2025. By Judge Nina Y. Wang on 02/07/2025. Text Only Entry (nywlc2, ) (Entered: 02/07/2025) | |
| 13 | 02/07/2025 | CORPORATE DISCLOSURE STATEMENT. (Miller, Patrick) (Entered: 02/07/2025) | View Add to request |
| 11 | 02/07/2025 | NOTICE of Entry of Appearance by Patrick John Miller on behalf of David Schuppman, Trident Solutions of Sugar Grove, LLCAttorney Patrick John Miller added to party David Schuppman(pty:dft), Attorney Patrick John Miller added to party Trident Solutions of Sugar Grove, LLC(pty:dft) (Miller, Patrick) (Entered: 02/07/2025) | View Add to request |
| 12 | 02/06/2025 | MINUTE ORDER By Magistrate Judge Timothy P. O'Hara on 02/06/2025. This case has been directly assigned to me pursuant | View Add to request |

| | | | | |
|---|---|---|---|---|
| | | to D.C.COLO.LCivR 40.1. In light of Plaintiff's Emergency Motion for Temporary Restraining Order and Preliminary Injunction [ECF 10 ], the Court directs the Clerk of Court to reassign this civil action to a District Judge. (Case randomly reassigned to Judge Nina Y. Wang and drawn to Magistrate Judge Timothy P. O'Hara. All future pleadings shall be designated to 25-cv-00254-NYW). (ggill, ) (Entered: 02/07/2025) | | |
| 10 | 02/06/2025 | Emergency MOTION for Temporary Restraining Order and, Emergency MOTION for Preliminary Injunction by Plaintiff FW-CO, Inc.. (Attachments: # 1 Exhibit A - Schupmann Agreement, # 2 Exhibit B - FPS Roofing Email, # 3 Exhibit C - Roofing USA Website)(Elkon, Michael) (Entered: 02/06/2025) | View | Add to request |
| 9 | 01/30/2025 | SUMMONS Returned Executed by FW-CO, Inc.. Trident Solutions of Sugar Grove, LLC served on 1/29/2025, answer due 2/19/2025. (Elkon, Michael) (Entered: 01/30/2025) | View | Add to request |
| 8 | 01/30/2025 | MINUTE ORDER By Magistrate Judge Timothy P. O'Hara on 01/30/2025. The Parties shall complete and file the Magistrate Judge Consent Form [ECF 3 ] on or before April 24, 2025 (two weeks before the Scheduling Conference). The Court will hold the Fed. R. Civ. P. 16(b) Scheduling Conference on May 8, 2025 at 1:30 p.m. in Courtroom C-402, on the fourth floor of the Byron G. Rogers United States Courthouse located at 1929 Stout Street, Denver, Colorado. It will be an in-person proceeding. No later than seven days before the Scheduling Conference, the Parties shall (1) file their Proposed Scheduling Order onto the case docket sheet and (2) submit the proposed Scheduling Order in Word format by joint email, copying all Parties, to Chambers at o'hara_chambers@cod.uscourts.gov. (ggill, ) (Entered: 01/30/2025) | View | Add to request |
| 7 | 01/28/2025 | SUMMONS Returned Executed by FW-CO, Inc.. David Schuppman served on 1/27/2025, answer due 2/18/2025. (Elkon, Michael) (Entered: 01/28/2025) | View | Add to request |

| | | | |
|---|---|---|---|
| 6 | 01/28/2025 | SUMMONS Returned Executed by FW-CO, Inc.. Charles Schulz served on 1/28/2025, answer due 2/18/2025. (Elkon, Michael) (Entered: 01/28/2025) | View Add to request |
| 5 | 01/27/2025 | CERTIFICATE of Interested Persons and Corporate Disclosure Statement by Plaintiff FW-CO, Inc.. (Elkon, Michael) (Entered: 01/27/2025) | View Add to request |
| 4 | 01/24/2025 | SUMMONS issued by Clerk. (Attachments: # 1 Summons, # 2 Summons) (echa, ) (Entered: 01/24/2025) | View Add to request |
| 3 | 01/24/2025 | Magistrate Judge consent form issued pursuant to D.C.COLO.LCivR 40.1, direct assignment of civil actions to full time magistrate judges. (echa, ) (Entered: 01/24/2025) | View Add to request |
| 2 | 01/24/2025 | Case assigned to Magistrate Judge Timothy P O'Hara. Text Only Entry. (echa, ) (Entered: 01/24/2025) | Send Runner to Court |
| 1 | 01/24/2025 | COMPLAINT (Verified) against Charles Schulz, David Schuppman, Trident Solutions of Sugar Grove, LLC (Filing fee $ 405,Receipt Number ACODC-10112573)Attorney Michael P. Elkon added to party FW-CO, Inc., d/b/a Fortis Warranty(pty:pla), filed by FW-CO, Inc., d/b/a Fortis Warranty. (Attachments: # 1 Exhibit A - Schuppman Agreement, # 2 Exhibit B - Emails Provided by Scott Reynolds, # 3 Exhibit C - Trident Business Registration, # 4 Exhibit D - Trident Operating Agreement, # 5 Exhibit E - Trident Invoices, # 6 Exhibit F - SouthPoint Apartments, # 7 Exhibit G - Trident May 2024 FL Job, # 8 Exhibit H - Raw Materials, # 9 Exhibit I - Trident_Aspen Partnership Agreement, # 10 Exhibit J - Trident Solar Opps 2023, # 11 Exhibit K - Hiffman National, # 12 Exhibit L - Citrine Power, # 13 Exhibit M - Tecta Complaint, # 14 Summons Charles Schulz, # 15 Summons David Schuppman, # 16 Summons Trident Solutions of Sugar Grove, LLC, # 17 Civil Cover Sheet)(Elkon, Michael) (Entered: 01/24/2025) | View Add to request |

To order copies of any documents listed above, contact Court Express

courtexpress@thomsonreuters.com, 1-877-362-7387 (Additional charges apply)

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit C

ilsos.gov (https://www.ilsos.gov/) Official Website of the Illinois Secretary of State Here's how you know
English



(https://www.ilsos.gov/)

ILLINOIS SECRETARY of STATE
ALEXI GIANNOULIAS (https://www.ilsos.gov/)

Search Ilsos.gov...
(https://www.ilsos.gov/search/searchgoogle.html)

Driver's Licenses & ID Cards | Vehicles, Plates & Titles | Business Services | More Services

# Business Entity Search

## Entity Information

| | | | |
|---|---|---|---|
| **Entity Name** | TRIDENT SOLUTIONS OF SUGAR GROVE LLC | | |
| **Principal Address** | 769 HEARTLAND DRIVE, SUITE D<br>SUGAR GROVE,IL 605540000 | | |
| **File Number** | 11035795 | **Status** | TERMINATED on 02-04-2026 |
| **Entity Type** | LLC | **Type of LLC** | Domestic |
| **Org. Date/Admission Date** | 09-09-2022 | **Jurisdiction** | IL |
| **Duration** | PERPETUAL | | |
| **Annual Report Filing Date** | 02-03-2026 | **Annual Report Year** | 2025 |
| **Agent Information** | C T CORPORATION SYSTEM<br>208 SO LASALLE ST, SUITE 814<br>CHICAGO, IL 60604-1101 | **Agent Change Date** | 09-09-2022 |

### Services and More Information

Choose a tab below to view services available to this business and more information about this business.

Available Services | Managers | Old LLC Name | Assumed Name | Series Name | File History

No services available for this entity.

# Exhibit D

REALTIME ROUGH DRAFT AND UNCERTIFIED TRANSCRIPT

****

The following file is not an official transcript. It is intended only to aid in case preparation. The final transcript will be different, both in form and substance, from this rough draft translation. You may see errors and omissions during the realtime translation. This is not an unusual process, and these errors and omissions will be corrected on the final transcript. Please do not try to bring these discrepancies to the attention of the reporter during the course of the deposition.

UNOFFICIAL DRAFT TRANSCRIPT

THIS IS AN UNOFFICIAL DRAFT TRANSCRIPT

This transcript has not been checked, proofread or corrected. It is a draft transcript, NOT a certified transcript. As such, it may contain computer-generated mistranslations of stenotype code, resulting in inaccurate or nonsensical word combinations or untranslated stenotype symbols which cannot be deciphered by

DRAFT COPY

non-stenotypists. Corrections will be made in the preparation of the certified transcript, resulting in differences in page and line numbers, punctuation and formatting.

THIS DRAFT TRANSCRIPT IS SUPPLIED TO YOU ON THE CONDITION THAT UPON RECEIPT OF THE CERTIFIED TRANSCRIPT, THIS DRAFT AND ANY COPIES THEREOF (IN CONDENSED FORMAT OR OTHERWISE) WILL BE DESTROYED. THE CERTIFIED TRANSCRIPT IS THE ONLY OFFICIAL TRANSCRIPT WHICH MAY BE RELIED UPON FOR PURPOSES OF VERBATIM CITATION OF TESTIMONY.

****

DRAFT COPY

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

IN RE: )
DAVID PHILLIP SCHUPMANN, )
Debtor. ) No. 26-05587
)

The videotaped deposition of DAVID SCHUPMANN, called for examination pursuant to the Rules of Civil Procedure for the United States Bankruptcy Court pertaining to the taking of depositions, taken before Raelene Stamm, a Certified Shorthand Reporter licensed by the State of Illinois, at 120 South Riverside Plaza, Suite 1800, Chicago, Illinois, on the 27th day of August, 2026, at the hour of 9:30 a.m.

Reported by: RAELENE STAMM, CSR
License No.: 084-004445

DRAFT COPY

APPEARANCES:

DRAFT COPY

VIDEOGRAPHER: Good morning we are now on the record. This is the videotaped deposition of David Schupmann pursuant to Rule 2004 of the bankruptcy rules, Case Number 26-05587. This case is filed in the U.S. Bankruptcy Court, Northern District of Illinois, Eastern Division. This deposition is being taken on August 27, 2026. The time is now approximately 9:42 a.m.

This deposition is being held at 120 South Riverside Plaza, Chicago, Illinois, as well as via Zoom meetings. My name is Scott Ziarko. I'm the videographer representing Enhanced Legal Video. The court reporter today is Raelene Stamm who's with Precise Kruse Reporting.

Will counsel please identify yourselves for the record, and will the court reporter please swear in the witness.

MS. VANDESTEEG: Elizabeth Vandesteeg of Levenfeld Pearlstein.

MS. RATCLIFFE: Megan Ratcliffe, Senn Fortis, LLC.

MS. VANDESTEEG: Also virtually is Christine Lamb of Senn Fortis.

MR. PAULSEN: Can we ask that the other

DRAFT COPY

individuals identify themselves for the record, please.

MS. VANDESTEEG: Also present in the room is Richard Lewis.

MR. PORTER: Also present is Loran Porter virtually.

MR. PAULSEN: My name is Jeffrey Paulsen.

I'm a lawyer for Mr. Schupmann.

MR. MORRELL: Benjamin Morrell, I represent Trident and Top Pick of Taft Law.

(Reporter clarification.)

(WHEREUPON, the witness was duly sworn.)

VIDEOGRAPHER: You may begin.

DAVID SCHUPMANN,

called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MS. VANDESTEEG:

Q. Mr. Schupmann, have you ever been deposed before?

A. Yes.

Q. How many times?

A. I think twice zero.

DRAFT COPY

Q. When was your most recent deposition approximately?
A. Maybe a little over a year ago.
Q. What was the context of that deposition?
A. That was an injunction hearing for this matter.
Q. The Colorado injunction hearing in connection with the Colorado proceeding pending between my clients and you and several other defendants?
A. I believe that's right.
Q. And what was the prior deposition before that when approximately was that?
A. I don't know I'm gonna say 2017, 2016, something like that.
Q. What was the context of that deposition?
A. I was at the company Mallard, and there was an employment matter that I was asked to give a deposition as a part of it.
Q. Were you a fact witness in that deposition to the best of your knowledge?
A. I'm sorry. I don't know what a fact witness is.
Q. Testifying as to certain facts this that

DRAFT COPY

case or were you a party to that case?
A. I was not a party to it.
Q. Mr. Schupmann, you understand that you are under oath today and your testimony carries the same force and weight as if you were testifying in court, correct?
A. Yes.
Q. I'm going to go over a few ground rules today. If you do not understand a question, let me know. I'll try to rephrase it. I'm not trying to play gotcha games with you. If you do answer a question I'm going to assume that you do understand it and you're responding to the question I asked, okay?
A. Okay. Before you start, there was one other deposition I gave in a matter while I was at Tecta. It was in a suit against CentiMark. Again I was a fact witness for that as well.
Q. Thank you for clarifying that.
When approximately was that deposition.
A. I don't recall. Sometime prior to 2014, but I don't know the exact dates.
Q. Going back to our ground rules, in order for us to have arrest clean record and for our

DRAFT COPY

court reporter to take this down, I'm going to ask that you wait until I ask my question even if you know exactly where I'm going before you answer, okay?
A. Yes.
Q. And I need you to make sure that when you do answer that you answer verbally not with shakes of the head or uh-huhs or uh-uhs, okay?
A. Yes.
MS. VANDESTEEG: I am going to hand you what we will mark as Exhibit 1.
(WHEREUPON, David Schupmann Deposition Exhibit No. 1 was marked for identification.)
BY MS. VANDESTEEG:
Q. Mr. Schupmann, Exhibit 1 is the notice of today's deposition. Have you seen this document?
A. I don't recall specifically seeing it.
Q. Do you understand that you are here to testify on your own behalf personally in regards to 2004 bankruptcy rules?
A. Yes.
MS. VANDESTEEG: I'm going to hand you what we'll mark Exhibit 2.

DRAFT COPY

(WHEREUPON, David Schupmann
Deposition Exhibit No. 2 was
marked for identification.)

BY MS. VANDESTEEG:

Q. Mr. Schupmann Exhibit 2 I'll represent is the underlying motion seeking 2004 examination of you personally which is at issue for purposes of today's examination.

Have you seen this motion before? Do you understand that this is why we're here?

A. I understand this is why we're here. I don't recall the exact document again, but I understand the purpose of today.

Q. Okay. Are you taking any medications or substances today that would in any way affect your ability to give truthful testimony?

A. No.

Q. Are there any impairments medical or otherwise that would affect your ability to the testify truthfully?

A. No.

Q. Who is your attorney for purposes of your attorney today?

A. For my personal examination.

DRAFT COPY

Q. Yes?
A. Jeffrey Paulsen.
Q. Is Taft appearing in any way as your attorney for purposes of today for this personal appearance?
A. I don't believe for the personal appearance.
Q. What did you do to prepare for your examination today?
A. Just did a brief call yesterday to go over the format of the day and arrange meeting times, that sort of thing.
Q. Who was your call with?
A. Jeff and Ben.
Q. Ben was on that call too?
A. Yes.
Q. To prepare for your personal examination?
A. No. As I understood it, it was potentially for all three, for myself, Trident Top Pick, so the coordination of those.
Q. You do understand that today is simply 2004 examination for you personally though, okay?
A. I didn't know that.
Q. But you do now?

DRAFT COPY

A. I guess I do.
Q. Did you review any documents in preparation for today's examination?
A. No.
Q. Did you speak with Mr. Schultz about this examination?
A. Just that I was having it.
Q. Was there any substance during that conversation?
A. No, I don't think so.
Q. When was that conversation?
A. This morning.
Q. How long did you two speak?
A. Maybe five minutes.
Q. What did he say to you on that conversation?
A. I don't know. I don't go specific just I guess general encouragement.
Q. Did you call him or did he call you?
A. I called him.
Q. Why did you decide to reach out to him this morning?
A. I don't know.
Q. Were you looking for any specific

DRAFT COPY

information from him?
A. No.
Q. How regular do you guys speak?
A. Maybe weekly.
Q. What do you talk about on a weekly basis?
A. Really personal plans, football, hunting, I guess basic stuff like that.
Q. At any time -- at any time in the last let's call it three months have you and Mr. Schultz talked about the substance of your bankruptcy proceeding?
A. I don't know about the substance of it. I think he just knows I filed bankruptcy. I don't know -- we don't really get into the details about of it.
Q. Do you remember any of the details you remember talking with him about?
A. Other than I filed, I don't -- I don't recall any.
Q. Did you speak with anyone at Roofing USA before today's examination?
A. I let me my boss know I was going to be here for it.
Q. Who is your boss?

DRAFT COPY

A. Brian Tice.
Q. When did you let Brian know you were going to be here today?
A. I think I let him know earlier in the week and then I just reminded him this morning.
Q. Why did you let him know you were going to be in this examination?
A. Just because I was going to be out of the office today.
Q. Did you speak with your wife about this examination?
A. Just that I was coming to it.
Q. Is there anyone else you've spoken with about your examination here today?
A. I don't believe so.
Q. Mr. Schupmann, I understand from some of your filings that you are a gun owner. Do you have an Illinois conceal permit?
A. I do.
Q. Are you armed today?
A. I'm not.
Q. Why did you file your bankruptcy proceeding?
A. The cost of the TRO process were very

DRAFT COPY

expensive and hadn't really gotten into the complaint yet, promised to be even more expensive, so, one, seeking relief from the costs and two trying to find an expedited way to settle the matter.

Q. I heard two reasons there. First, seeking relief from the cost was the Colorado action, two, expedited relief with respect to the Colorado action. Are there any other reasons that you can identify for why you filed the bankruptcy?

A. No. I think it's implied in there but I'll just state it. It just -- I mean, I don't have the money for -- to continue that type of litigation. So it was -- yeah.

Q. When did you first consider filing for bankruptcy?

A. It wasn't too much earlier than I filed. I think I got an invoice and kinds ever a discussion about how much more it was gonna take, and just didn't have the funds for it. So I think it came about relatively quick from -- from that invoice.

Q. Who was the invoice from?

A. Taft.

DRAFT COPY

Q. How much was the invoice for?
A. I don't recall the exact dollar figure. It was around a half million dollars.
Q. Was that the first invoice you had seen from Taft?
A. No.
Q. So why was that invoice the reason area at that time and again I believe you filed on March 30, 2026. Does that date sound correct to you?
A. It sounds about right. I think so.
Q. So had there been prior invoices from Taft that were also problematic from your perspective?
A. Well, they were all problematic. I think it just got to the point where it was gonna be too much and there was no end in sight.
Q. Who first suggested bankruptcy to?
A. I think it was a decision we had with our legal team.
Q. Who was on that legal team?
A. I think it was my attorney Mike Jurasek. I don't remember. I think that was the main discussion. There was someone else, but I don't remember who it was.
Q. Let me ask a different way.

DRAFT COPY

CONFIDENTIAL
UNCERTIFIED ROUGH DRAFT



Were all of the members ever your legal team that you just referenced attorneys at Taft?
A. Were all of -- say that again.
Q. Yes. You mentioned a legal team?
A. Yeah.
Q. That you spoke with who first brought -- who first suggested bankruptcy to you and you mentioned Mike Jurasek. Were all of the other members of that legal team Taft attorneys?
A. I don't recall. So the individual I can't think of. I'm not sure if he was with Taft or not.
Q. What is that individual's name?
A. That's what I said. I don't recall what that person's name was.
Q. Was it just the three of you then, Mike Jurasek, you and one other person who were involved in this meeting in which bankruptcy was first discussed?
A. I believe so.
Q. Was that an in-person meeting?
A. No, I think it was a phone call.
Q. Approximately -- I know you said it was relatively soon before you filed, do you recall was that a week before you filed? A month before you

DRAFT COPY

filed? What approximately -- how much time was there between the decision and the filing?

A. I don't recall the exact time frame. It was -- yeah, I don't recall the exact time frame.

Q. Do you recall whether preparation took a matter of weeks, a matter of days, a matter of months?

A. Like weeks is right.

Q. Did you speak to Mr. Schultz about this bankruptcy filing before you filed it?

A. In what way?

Q. In any way?

A. I don't recall exactly. I don't want to speculate on it.

Q. Well, do you have a vague memory of some sort about a conversation that you had with him about this filing?

A. I may have just said I'm considering filing for bankruptcy.

Q. Do you recall what his response was, generally speaking?

A. No.

Q. Why would you have told Mr. Schultz that you were generally considering a bankruptcy filing?

DRAFT COPY

A. Well, we're both named in the suit, and just wanted to give him an update on kind of where I was at with things.

Q. Do you recall if there was anyone else you spoke with about you considering a bankruptcy filing before you filed aside from Mr. Schultz or your legal team?

A. I don't think so.

Q. Did you consider other alternatives in terms of go forward strategy before you filed for bankruptcy?

A. I'm sure we did, yes. I mean, it wasn't something I wanted to do. Sure.

Q. What else did you consider?

A. I mean, we considered using different savings options. We considered -- I mean, I'm trying to think if -- I think we considered some kind ever payment plan that wasn't gonna work. That's all.

Q. When you use the word we in those sentences, who is the we that you're referencing?

A. Oh, just the team that I was with like the discussion of the different options.

Q. The team that you just referenced, is that

DRAFT COPY

again a legal team?
A. Yes.
Q. And the legal team in that context, who -- what individuals were a part of that legal team?
A. The same group. So it was Mike and -- I don't know if he was a tax attorney or bankruptcy attorney. I'm not sure what the other individual was.
Q. But another Taft attorney to the best of your recollection?
A. I'm not -- I don't know that it was.
Q. You mentioned savings options. What did you mean by savings options as an alternative?
A. Like a who will 1 K like long-term savings option.
Q. How would that be an alternative?
A. What do you mean?
Q. How would a 401(k) savings option be an alternative to filing bankruptcy?
A. I didn't know if I could take funds to help cure the bill in order to move things forward.
Q. Let me make sure I understand.
In that context, was a savings option --

DRAFT COPY

the discussion was what other resources of David Schupmann's might be available to pay the outstanding Taft invoices?

A. Yeah. What things could I do to help pay the invoice and continue to stay in -- stay in the matter.

Q. You mentioned also that you considered a payment plan.

What was that potential payment plan that you considered?

A. There are no details around it. It was just something that we considered.

Q. That is again a discussion between you and Taft?

A. There were no details behind it. I mean, they're not a -- I mean, they're not a -- I mean, that's not something that they typically do.

Q. That's not something that Taft typically does, to your knowledge?

A. Good point. I don't know if they typically do it or not. I don't think it was an option in this case.

Q. Did you and Taft a at any point prior to filing bankruptcy enter into a payment plan on

DRAFT COPY

those outstanding invoices?
A. I was making regular payments to Taft, yeah.
Q. During what period of time were you making regular payments to Taft?
A. I don't recall the exact period.
Q. Do you recall how much you were paying in connection with those regular payments to Taft?
A. I believe there was an initial 10,000 dollar payment and then I think there was another thousand dollars a month.
Q. Would we see records of those payments in your bank statements?
A. I believe so.
Q. Did you consider settling the Colorado option before filing for bankruptcy?
A. Yes.
Q. Why didn't you settle it prior to filing bankruptcy?
A. We reached out to settle. We -- there was an offer on the table given by the plaintiff for mediation. We accepted it and it was taken off the table appeared then I think there was another offer given right before the filing, and it was -- it

DRAFT COPY

was -- there was no discussion on it.
(Reporter clarification.)
BY MS. VANDESTEEG:
Q. Did you consider simply continuing to defend the Colorado action?
A. Yes.
Q. But that was not an option because of the outstanding invoices?
A. And just ongoing costs.
Q. Why didn't you wait until the Colorado action was resolved before filing for bankruptcy?
A. Which action do you mean?
Q. The lawsuit pending in Denver in the federal court.
A. So we had just finished the injunction proceeding and the claim hadn't even started yet.
Q. Rephrasing your answer back to you -- it was a matter of cost to continue to defend?
A. That was.
Q. Is that correct?
A. Correct.
Q. Why didn't you file sooner if litigation calls for the problem why did you wait until March 30, 2036?

DRAFT COPY

A. It was -- it just felt like that was a time or break during the process. I believe Fortis attorney had left the case and new attorneys had been brought on so there was kind of a break in the case. So that's when things were starting to start back up again, and apparently the costs were getting way too high to continue.
Q. Let's walk through the timeline a little bit. So we can make sure we're clear.
Fortis filed the Colorado lawsuit January 24 of 2025, correct?
A. Yes.
Q. Was Taft representing you personally in that Colorado action for the entire duration of the litigation?
A. Yes.
Q. Was Taft representing Trident for the entire duration of that litigation?
A. I don't recall because -- I don't recall.
Q. Do you recall a different attorney was representing Trident at any time during that Colorado litigation?
A. No, I don't believe so.
Q. Okay. So Fortis sought a temporary

DRAFT COPY

restraining order and preliminary injunction, correct?

A. Yes.

Q. And in July of 2025, the court denied the preliminary injunction, correct?

A. I think that's right. Yes.

Q. Thereafter, August 7, 2025, Fortis filed a second amended complaint, correct?

A. I don't recall.

Q. Do you recall that a second amended complaint watts filed at some point during the summer of 2025?

A. It could have been. I don't recall.

Q. Do you recall that there were discovery disputes that were happening throughout late 2025 and early 2026?

A. I was just aware that -- try to phrase what I was aware of -- I was aware that something was going on. I believe that we were producing all of our documents. I believe there was -- I thought I saw something that said there was a hitch in gathering information from the Fortis side and right about that same time is when the counsel for that -- the counsel at that time was no longer on

DRAFT COPY

the case or the matter.
Q. When you said counsel was no longer on the matter, was that counsel representing Fortis or counsel representing the defendants?
A. Was representing Fortis.
Q. In terms of the discovery that was being pulled together in the Colorado action, were you personally asked and were you responsible for pulling together discovery responsive to Fortis's discovery requests?
A. Regularly we were pulling together discovery, yes.
Q. We though -- was that you personally who were pulling together the discovery response -- the discovery merely?
A. Some me, some -- I know Charlie was putting stuff together for Trident. I was working with Brian Tice because everything's from Roofing USA that was asked, so yes.
Q. In early 2026, several Taft attorneys -- Patrick Miller and Emily England -- withdrew from the Colorado case, correct?
A. Yes. I think that's right.
Q. Do you know why?

DRAFT COPY

A. Not specifically. Having said that, I think it was because the matter was in stay for me, so they withdrew, is that right, on the time frame, no? I don't know. I'm just gonna say I don't know.

Q. In March of 2026, Taft sent a 3 million dollar plan to Fortis on your behalf, correct?

A. I don't recall that.

Q. Do you recall directing Taft to sent a settlement demand to Fortis in March of 2026?

A. I know there was a request by -- prior to the bankruptcy, but I don't believe that came from Taft.

Q. Do you recall generally that there was back and forth between the parties with respect to potential settlement in March of 2026?

A. I -- I don't believe so. I just recall what I explained earlier immediately prior to the bankruptcy filing.

Q. Let's go back to the why of this bankruptcy case for a moment.

MS. VANDESTEEG: Let's mark that as Exhibit 3, please.

DRAFT COPY

(WHEREUPON, David Schupmann Deposition Exhibit No. 3 was marked for identification.)

BY MS. VANDESTEEG:

Q. Exhibit 3 is Schupmann's report under 11 USC 1188 C, document filed in the case of docket 30 on June 1, 2026.

Do you recognize this report?

A. Not specifically, but understand the gist of it.

Q. Did you assist in the preparation of this report?

A. Yes. There's information in here that I was -- yeah.

Q. Did you review and approve the filing of this report as it reads?

A. If this in fact came from Jeff, then yes, I did.

Q. I'd like you to turn to Page 2 and take a look at the second paragraph.

A. Okay.

Q. This report the final sentence of that second paragraph which reads, to foster a more efficient and economic resolution of the parties

DRAFT COPY

dispute and to provide a mechanism to pay out of his future income, his attorney's fees and any potential damages Fortis may be awarded Schupmann filed Chapter 11 case.

Did I read that correctly?

A. Yes.

Q. What did you mean by to foster a more efficient and economic resolution of the parties' dispute?

MR. PAULSEN: Objection, foundation.

BY MS. VANDESTEEG:

Q. You can go ahead and answer.

A. It was my understanding that through the bankruptcy process there was an opportunity to accelerate the process. So more efficient and economic resolution is what I was after there.

Q. What do you mean by accelerate the process?

MR. PAULSEN: Objection. Foundation. You can answer.

THE WITNESS: I had -- I mean, we'd been in this lawsuit for well over a year, felt like it hadn't moved at all. And again back to the costs of it, it was getting very very very expensive.

DRAFT COPY

BY MS. VANDESTEEG:
Q. And you believed that have bankruptcy would be an alternative to move the Colorado litigation along more quickly?
A. I hoped that it would based on just the cost aspect of it for sure.
Q. So it was your understanding that the bankruptcy process could also allow for a less expensive resolution of the Colorado action?
A. I honestly wasn't sure.
Q. The statement that the filing was to quote provide a mechanism to pay out of his future income his attorney's fees and any potential damages Fortis might be awarded, how would bankruptcy accomplish that?
MR. PAULSEN: Objection, calls for a legal conclusion.
You can answer.
THE WITNESS: I don't know.
BY MS. VANDESTEEG:
Q. Turning your attention to the final sentence of Exhibit 3 on Page 2 which reads once the proofs 6 claim have been filed Schupmann will be in a position to propose a plan ever

DRAFT COPY

reorganization for creditors review and comment.
Did I read that correctly?
A. Yes.
Q. Have you filed a plan of reorganization to date?
A. I don't believe so.
Q. Did you believe that filing the bankruptcy would act as a deterrent for Fortis to continue to pursue its rights and remedies against you?
A. No.
MS. VANDESTEEG: I'm going to hand you what we'll mark as Exhibit 3 -- excuse me -- Exhibit 4.
(WHEREUPON, David Schupmann Deposition Exhibit No. 4 was marked for identification.)
BY MS. VANDESTEEG:
Q. Exhibit 4 is a notice of motion and Schupmann's motion to extend the time to file his plan filed in the case as docket 56 on June 29, 2026.
Do you recognize this motion to extend the time to file the claim?
A. Again, not specifically, but I recognize some of the information here.

DRAFT COPY

Q. Did you assist your counsel in preparing this document?
A. Not directly.
Q. Did you review and approve this document before it was filed?
A. I would guess so. I don't know specifically.
Q. I'll ask you to turn to Page 6 of 8 of this document. If you see up at the top it has the total number of filing pages, so you can you can follow along at Page 6 of 8. Directing your attention to the second full paragraph this language tracks the same language that we just through in Exhibit 3, correct?
A. Yes.
Q. Going on to the third full paragraph here on Page 6, there is a statement that have, quote, the relationship between Schupmann and Fortis remains uncertain.
What is meant by that?
MR. PAULSEN: Objection, foundation.
You can answer.
THE WITNESS: In Paragraph 3? Oh, I'm sorry. The top one is the paragraph. I don't know what

DRAFT COPY

that means.

BY MS. VANDESTEEG:

Q. Paragraph 3, the third full paragraph I should say, goes on to state that Schupmann intends to object to the proof of claim on several grounds.

To your knowledge, have you objected to Fortis' proof of claim?

A. I don't believe so.

Q. Moving on to the fourth and final full paragraph on that Page 6, it states Schupmann believes that ultimately Fortis's claim will be disallowed and that Fortis will owe Schupmann millions of dollars. Fortis no doubt contends that its claim will survive. Schupmann will owe it millions of dollars and that Schupmann's claim against it will be defeated. Schupmann would -- sorry -- Schupmann would pursue drastically different subchapter five plans under each of these scenarios.

What are those different Subchapter five plans under those two different scenarios?

A. I just take this to read if one side wins, it would be different than if the other side wins.

Q. Do you believe that you are able to

DRAFT COPY

propose and file a Subchapter 5 plan before there is resolution on which one of those two pathways --
MR. PAULSEN: Objection.
BY MS. VANDESTEEG:
Q. Is --
MR. PAULSEN: Sorry. Go ahead.
BY MS. VANDESTEEG:
Q. -- is determined to be the actual final pathway through adjudication?
MR. PAULSEN: Objection, calls for legal conclusion.
You can answer.
THE WITNESS: I don't know.
BY MS. VANDESTEEG:
Q. Have you discussed with counsel what those different plan pathways might look like?
A. Not specifically.
Q. Is it your understanding that there has to be a final resolution of the claims between Fortis and yourself before a plan can be proposed in this bankruptcy proceeding?
A. I believe that's our current position.
Q. You are aware and understand that the filing of the bankruptcy stayed the Colorado

DRAFT COPY

action, correct?
A. Yes.
Q. And that while this bankruptcy is proceeding with the stay in effect, the Colorado action cannot be adjudicated to conclusion, correct?
MR. PAULSEN: Objection, calls for legal conclusion.
THE WITNESS: I don't answer. I don't know.
BY MS. VANDESTEEG:
Q. You state here in Exhibit 4 that you believe ultimately Fortis claim will be disallowed and Fortis will owe you millions of dollars.
If you expect to prevail, why did you need bankruptcy protection?
MR. PAULSEN: Objection, foundation.
You can answer.
THE WITNESS: Because it requires money and time to get to a conclusion.
BY MS. VANDESTEEG:
Q. And you don't have the money at least to get to conclusion in Colorado?
A. I didn't believe so.
Q. Do you believe differently as you sit here

DRAFT COPY

today?
A. No.
MS. VANDESTEEG: I'm going to hand you what we'll mark as Exhibit 5.
(WHEREUPON, David Schupmann Deposition Exhibit No. 5 was marked for identification.)
BY MS. VANDESTEEG:
Q. I'm gonna get into my questions on Exhibit 5 in just a second but before I do I want to put one other housekeeping point out there.
We've been going for not quite an hour. I typically try to break about every 90 minutes or so but if for any reason folks would like to take a break, by all means we can do so we just need to do so. My only requirement is we do not take breaks while there's a question pending. We'll get to the answer and then we can take breaks whenever, okay?
A. Okay. Okay.
Q. Okay Exhibit 5 is your voluntary petition for bankruptcy together with schedules and statement of financial affairs. This is a docket 1 in the case filed on March 30, 2026, correct?
MR. PAULSEN: Objection, foundation. It

DRAFT COPY

appears to have -- it appears to be a 54-page document but there's only 39 pages at least in my copy.

MR. MORRELL: Same.

MS. VANDESTEEG: Well, then we had a copying issue and I will ensure at our first break that we make sure that full copies are provided with those remaining pages. In good news the questions I want to go through only in pages 1 through 39.

MR. PAULSEN: Sure.

MS. VANDESTEEG: But we will make sure that the record is complete. Thank you.

MR. PAULSEN: Sure.

BY MS. VANDESTEEG:

Q. Mr. Schupmann, did you review and approve this document before it was filed?

A. Yes.

Q. And in fact if we take a look at Page 6 of 54, directing your attention to the bottom of the page at part 7, you signed this document under penalty of perjury, correct?

A. Yes. Yes.

Q. Let's continue on through to Page 8 of 54, please.

DRAFT COPY

Starting on Page 8 of 54, there is a section entitled B104 that states in bold letters for individual Chapter 11 cases list of creditors who have the 20 largest unsecured claims against you and are not insiders.

Do you see where I am on the page?

A. Yes.

Q. You have two claims listed as your unsecured claims, correct?

A. Yes.

Q. The first is Fortis. Well, it's FW-CO, Inc., correct?

A. Correct.

Q. And FW-CO, Inc., we're going to refer to as Fortis, okay?

A. Okay.

Q. You have a claim scheduled at $1,250,000, correct?

A. Yes.

Q. And that claim is marked as both unliquidated and undisputed correct?

A. Yes.

Q. What's the bases of that claim?

MR. PAULSEN: Objection, foundation.

DRAFT COPY

You can answer.

THE WITNESS: The basis of the amount or the claim?

BY MS. VANDESTEEG:

Q. Let's start with the basis of the claim itself and then we'll come to the amount.

A. I mean, it refers to the Colorado case is what it's referring to.

Q. The Colorado case that Fortis had filed against you?

A. Correct.

Q. How did you calculate that claim amount?

A. I believe my bankruptcy attorney was given that number by opposing counsel.

Q. Your bankruptcy counsel in that sentence -- are you referring to Mr. Paulsen who is here with you today and his firm?

A. His firm, but not Mr. Paulsen.

Q. And you believe that you were provided that number by opposing counsel. Who do you mean by opposing counsel?

A. I don't -- I don't recall. I don't know who they would have spoken to, but I believe that number was given to Ariane and that's where that

DRAFT COPY

came from.
Q. What's the basis of that belief?
A. I think I was told that's where the number came from.
Q. Just sore I can make sure I understand one more time, it's your understanding that counsel for Fortis informed your bankruptcy counsel that Fortis's claim against you was for $1.25 million?
A. I believe that's correct.
Q. The second unsecured claim that you have scheduled is for Taft at $500,000, correct?
A. Yes.
Q. How is that $500,000 calculated?
A. I think it came from the several-page invoice.
Q. Was Taft your only counsel -- is Taft and is Taft still only your only counsel in the Colorado action?
A. Yes.
Q. Is Taft still presently representing you in the Colorado action?
A. I don't know how the technicals of that work. I don't -- I don't know.
Q. Why don't you know? What do you mean by

DRAFT COPY

the technicals?
A. It's in stay and I know the counsels had withdrawn. I'm not sure of the right language for it. And that's all I know.
Q. Do you know whether all of your Taft attorneys have withdrawn in that action -- the Colorado action?
A. I don't know for sure.
Q. At any point during the Colorado action did Taft represent Schultz?
A. I don't -- I don't recall.
Q. At any point during the Colorado action did Taft represent Trident?
A. I don't recall.
Q. At any point in the Colorado action did Taft represent Top Pick Athletics?
A. In the Colorado matter, I don't believe so.
Q. At any point in the Colorado matter Colorado action, did Taft represent Top Pick Investments?
A. I don't believe so.
Q. At any point in the Colorado action did Taft represent Roofing USA?

DRAFT COPY

A. In the Colorado action?
Q. Uh-huh. Yes.
A. I believe so.
Q. Do you know whether there would be separate engagement letters between Taft and any or all of those entities?
A. For what specifically?
Q. For representation of each of those individual entities?
A. In that matter or something else?
Q. Either in connection with the Colorado action or in connection with something else?
A. Do you want to break it down and ask me individually? I'm not sure I can give you a blanket statement.
Q. Sure.
Are you aware of any engagement letter between Taft and Trident for the Colorado action?
A. For the Colorado action, I don't -- I don't recall. I don't know.
Q. Are you aware of any engagement letter between Taft and Trident for any other matter other than the Colorado action?
A. I don't know.

DRAFT COPY

Q. Are you aware of any engagement letter between Taft and Top Pick Athletics in connection with the Colorado action?
A. No.
Q. Are you aware of any engagement letter between Taft and Top Pick Athletics for any other matter other than the Colorado action?
A. I don't know for sure.
Q. Are you aware of any engagement letter between Taft and Top Pick Investments in connection with the Colorado action?
A. No.
Q. Are you aware of an engagement letter between Taft and Top Pick Investments with respect to any matter other than the Colorado action?
A. I don't know.
Q. Are you aware of any engagement letter between Taft and Roofing USA in connection with the Colorado action?
A. Not specifically, no.
Q. What about generally?
A. I don't know that there's a letter.
Q. Are you aware of any engagement letter between Taft and Roofing USA in any matter other

DRAFT COPY

than the Colorado action?
A. I don't -- I don't know.
Q. Each of you personally, Schultz, Trident, Top Pick Investments and Roofing USA are currently defendants in the Colorado action, correct?
A. I don't believe Top Pick Investments is or Top Pick Athletics is.
Q. Let me state that a different way then.
Each of you personally, Schultz, Trident, Top Pick Athletics and Roofing USA are currently defendants in the Colorado action, correct?
A. I don't think that's correct.
Q. I misspoke.
Each of you personally, Schultz, Trident, Roofing USA and Top Key are defendants in the Colorado action, correct?
A. I believe that's right. I'm not sure what Top Key's involvement is, but --
Q. Are there any joint defense agreements in place with respect to the defendants who are involved in the Colorado action?
A. Like if -- like an official document?
Q. Yes. Is there an official?
A. I don't.

DRAFT COPY

Q. Written defense agreement between the defendants in the Colorado action?

A. I don't know.

Q. Is there a written common interest agreement between the various defendants in the Colorado action?

A. I don't know for sure.

Q. To the extent that Taft is representing multiple defendants in the Colorado action, is there avenue document of any sort that clarifies which party or parties are responsible for Taft's invoices in defending that matter?

MR. PAULSEN: Objection foundation.

You can answer.

THE WITNESS: Please ask me that one more time.

BY MS. VANDESTEEG:

Q. Is there any document that explains which entity or entities that Taft is representing in the Colorado action are responsible for the payment of Taft's fees occurred in defending those -- in representing those defendants in the action?

A. Not.

MR. PAULSEN: Objection, foundation.

THE WITNESS: Not that I'm aware of.

DRAFT COPY

BY MS. VANDESTEEG:
Q. Is it your understanding that each of those defendants that Taft is representing is equally responsible for payment of Taft's invoices?
MR. PAULSEN: Objection calls for legal conclusion.
You can answer.
THE WITNESS: Equally in that all parties are responsible for the invoice.
BY MS. VANDESTEEG:
Q. Yes?
A. That's not my understanding.
Q. What is your understanding of who is responsible?
A. That everyone's responsible for their own invoice.
Q. Do you know whether any of the other parties that Taft is representing have been receiving invoices for legal fees incurred in the Colorado action?
A. Well, actual invoices, I don't know.
Q. Do you know if there have been demands made for payment made to any of those other defendants that have Taft is representing in the

DRAFT COPY

Colorado action?

A. I only know because this just happened -- I just happened to see something the other die when I was at Roofing USA I saw an amount or paid to Taft in one of the accounting ledgers. So as I'm sitting here I know that he information.

Q. What did you see?

A. Just an amount.

Q. What was the amount?

A. I think it was close to $55,000.

Q. Do you know for what time period that was paid?

A. I don't know any other details about it.

Q. Do you know for what purpose that was paid?

A. I do not.

Q. Do you know if that was to pay down fees incurred in the Colorado action?

A. I don't know anything else about it.

Q. Who would know?

A. I would assume the president of our company Brian Tice would know what the invoice was for.

Q. Let's go back to this five hundred

DRAFT COPY

thousand dollar number that's listed on Exhibit 5.
Do you understand that five hundred thousand dollars to be the amount that you owe Taft personally in connection with the legal fees incurred in the Colorado action?
A. Yes, to that point in time. Yes.
Q. So the five hundred thousand dollars here does not include, for example, work or fees incurred on behalf of Trident in connection with the Colorado action?
A. I don't believe so. I believe that's just me personally.
Q. Did you at any point see invoices sent to Trident from Taft in connection with the Colorado action?
A. I don't -- I don't recall.
Q. To the extent invoices were sent to Trident by Taft, who would have received them? What individual would have received them?
A. Well, it was just Charlie and I so it would have probably been one of the two of us.
Q. You personally don't recall seeing any invoices sent to Trident from Taft, correct?
A. That's right.

DRAFT COPY

Q. Did Charlie ever mention to you that he had received invoices from Taft in connection with fees that Trident had incurred?
A. Not that I recall.
Q. So to the best of your knowledge, neither you nor Charlie ever saw any invoices from Taft with respect to Trident's fees in connection with the Colorado action, correct?
A. I can't -- I can't say what Charlie saw or didn't see.
Q. But he never mentioned anything to you?
A. Not that I recall.
Q. And you never saw anything?
A. Not that I recall.
Q. In connection with your conversations with Taft prior to filing the bankruptcy when you were talking build the amounts that you owed, did Taft ever mention to you at that time, hey, Trident also owes us fees?
A. Not that I recall.
Q. The discussions were only around the fees that they said you, David, owed them personally correct?
A. I was only talking about myself, yes.

DRAFT COPY

Q. To your knowledge, has Trident ever paid Taft any legal fees?
A. Yes.
Q. How much do you believe Trident has paid Taft?
A. I don't know. I don't know.
Q. To the extent that you don't recall ever seeing any invoices from Trident, how -- under what basis would Trident have paid Taft fees?
A. Well, maybe I need to make a clarification: I assume when you're asking me about invoices from Taft to Trident, you were -- because at the same time you were talking about the Colorado matter and I don't recall seeing any invoices. Were there invoices previously, yes.
Q. And what were those invoices related to?
A. General business, I guess.
Q. What general business services and representation was Taft providing to Trident?
A. I guess we opened the company and so there was the operating agreement. I don't recall matters beyond that, but I think that was -- that's what I recall.
Q. Who is the we in that sentence?

DRAFT COPY

A. Charlie and I.
Q. Is what I'm hearing that when you and Charlie formed Trident, Taft was representing Trident at that time?
A. I don't know what represent means. Like.
Q. Did Taft prepare the operating agreement that you just referenced?
A. Yes.
Q. Were there other documents at that time that you recall Taft prepared?
A. There was a -- I don't remember whatever kind of -- it was a rep agreement or I don't remember what it was, but it was prepared and we didn't do anything with it, but I remember there was a document that we prepared.
Q. What is a rep agreement?
A. I don't I don't even recall if it was a rep agreement. There -- we turned this over previously in discovery, I believe, as well. So it was a document that basically defined what Trident was and -- I don't know how to describe it -- kind of an agreement of terms or an agreement of doing business or something like that.
Q. When approximately were these documents

DRAFT COPY

drafted?
A. I don't recall.
Q. Who at Taft was responsible for drafting these documents?
A. I don't recall.
Q. Was it Mike Jurasek?
A. I don't believe he -- I don't believe Mike did those.
MS. VANDESTEEG: Now might be a good time to take a quick break.
VIDEOGRAPHER: Time is 10:57 a.m.
We're off the record.
(WHEREUPON, a short recess was taken.)
VIDEOGRAPHER: The time is now 11:13 a.m.
This is the beginning of media 2 we're back on the record.
BY MS. VANDESTEEG:
Q. Mr. Schupmann, you understand that you are still under oath, correct?
A. Yes.
Q. We were talking about Exhibit 5, the petition in this case and specifically then we were talking about the Taft claim listed as your second

DRAFT COPY

CONFIDENTIAL
UNCERTIFIED ROUGH DRAFT



unsecured claim on Page 8 of 54:
Do you know to date how much have you paid Taft?
A. I don't know.
Q. Can you tell me when you permanently were making payments to Taft, where did those funds come from?
A. Checking account.
Q. Is that a joint checking account with you and Jennifer Schupmann?
A. It was at the time.
VIDEOGRAPHER: You've got to make sure your voice is up.
MS. VANDESTEEG:
THE WITNESS: Yes.
BY MS. VANDESTEEG:
Q. To your knowledge, were any of your personal Taft fees ever paid out of the Trident account?
MR. PAULSEN: Objection, foundation.
You can answer.
THE WITNESS: I don't -- I don't recall.
BY MS. VANDESTEEG:
Q. To your knowledge, were any of your

DRAFT COPY

personal fees owed to Taft paid out of any Top Pick account?
A. I don't recall.
Q. Do you recall when you personally last made a payment to Taft?
A. It would have been February or March this year prior to the bankruptcy.
Q. I'm sorry. Prior to the bankruptcy?
A. Uh-huh, correct. Sorry.
Q. Have any payments been made to Taft by you personally after the filing of the bankruptcy?
A. No.
Q. Does Taft represent Jennifer in any capacity?
A. No.
Q. To your knowledge, has Taft ever represented Jennifer in any capacity?
A. No.
MS. VANDESTEEG: I'm going to pass you what we are going to mark as Exhibit 6.
(WHEREUPON, David Schupmann Deposition Exhibit No. 6 was marked for identification.)
BY MS. VANDESTEEG:

DRAFT COPY

Q. Exhibit 6 is an Old National Second Bank statement correct?
A. Yes.
Q. The statement is dated September 18, 2025, correct?
A. Yes.
Q. And it references a checking account that appears to have both your name and Jennifer's name on it, correct?
A. Yes.
Q. And it is account number ending in 2063 correct?
A. Why he.
Q. Is this the joint checking account you just referenced a couple questions ago?
A. Yes.
Q. I'd like to turn your attention to the last page of Exhibit 6 which contains copies of checks drawn on this account during that month, correct?
A. Yes.
Q. There's a check in the top right-hand corner here check Number type 8929 written out to Taft law correct?

DRAFT COPY

A. Yes.
Q. A that's a check in the amount of 10 thousand dollars correct?
A. Yes.
Q. And it -- in the for line, it appears to read 120538, correct?
A. Yes.
Q. And then there's a scratched out portion there that to me at least appears to say retainer but has been crossed out. Do you see that?
A. Yes.
Q. What was this check for?
A. This was a payment amount to Taft.
Q. What was Taft being paid for with this $10,000?
A. It just went to a general -- general invoice.
Q. So with retainer crossed out do you have any knowledge of Jennifer retaining Taft for some new separate other purpose?
A. No.
Q. Is it your understanding this ten thousand dollars was going to pay down the overall balance that you personally owed to Taft in connection with

DRAFT COPY

the Colorado action?
A. Yes.
Q. To your knowledge, is this the ten thousand dollars that you referenced earlier in this examination with respect to some sort of a payment plan with respect to the amounts owed to Taft?
A. Yes.
(WHEREUPON, David Schupmann Deposition Exhibit No. 7 was marked for identification.)
BY MS. VANDESTEEG:
Q. I have passed you what we have marked Exhibit 7.
Exhibit 7 is a proof of claim that has been filed by Taft against your bankruptcy estate. Have you seen this document before?
A. I recall that Taft filed one, yes.
Q. I'm going to turn your attention to the last page of this document. It's the second page of the exhibit and the final page of the document. It's labeled Exhibit A at the top. Do you see the page that I'm referencing?
A. Yes.

DRAFT COPY

Q. This page appears to lay out Taft's evidence on the amounts that it is owed and I see that there appears to have been an invoice -- the first invoice listed 6800943 on August 29, 2025, in the amount of $384,800.34.

Do you see that?

A. Yes.

Q. To your recollection was the first time that you received an invoice from Taft in or about August of 2029 -- August 29 of 2025?

A. I don't recall.

Q. To the best of your recollection do you recall whether the first invoice that you saw from Taft with respect to fees incurred in the Colorado action was in excess of 350 indeed nearly $400,000?

A. I don't recall.

Q. This document also sets forth that have from Taft's perspective the total receipts on the amounts that you owe to them total $17,000. Do you see that?

A. Yes.

Q. Do you believe that's accurate that you've paid Taft a total of about $17,000 with respect to fees incurred in the Colorado action?

DRAFT COPY

A. I don't recall if that's the total. I don't know. I don't recall if there were previous -- I don't know. I'll just say I don't know.
Q. Where could we look to determine whether there had been any previous payments to Taft on account of those fees incurred in connection with the Colorado action?
A. If there were, it would be in my bank statements.
Q. And with respect to those bank statements would you expect that we would see any payments to Taft coming out of that have joint account ending in 2063?
A. Yes.
Q. This document also reflects that as Taft's position that there have been no payments made on this outstanding balance since September of 2025. Is it your understanding that no payments have been made to Taft on account of the outstanding fees since September of 2025?
A. No, I don't think that's right. Yeah, I think there were monthly payments being made.
Q. An over what period of time do you believe

DRAFT COPY

those monthly period -- sorry -- those monthly payments were being made?
A. I don't -- I don't recall. I don't remember.
Q. Where should we go to look for those for evidence of those monthly payments being made?
A. They would be in the bank statements.
Q. And the bank statement again we should look for the joint checking account with Old Second account ending 2063?
A. Correct.
Q. In looking at this document, there's a column here that have says age. Do you see that one?
A. Yes.
Q. Do you know what that's referencing?
A. No.
Q. Do you have any understanding that that would be the aging balance the number of days that that invoice had been outstanding?
A. I don't know what it means.
Q. Would we have to ask Taft about that?
A. I don't know the answer.
Q. With this proof of claim, Taft is stating

DRAFT COPY

that you personally owe Taft 493, 908.39, correct?
A. On this invoice, yes.
Q. Do you disagree with that number in any way?
A. No.
Q. Have you reviewed each of those underlying invoices from Taft?
A. I've seen the invoices from Taft.
Q. Have you confirmed that the work and amounts set forth on those invoices was all work performed for you personally and is owed by you personally?
A. I don't think I went line item by line item to determine that.
Q. Is there a possibility that there could have been and there may be work described in those invoices that was work performed for other entities in connection with the Colorado action?
MR. PAULSEN: Objection, calls for speculation.
THE WITNESS: Yeah, I don't -- I don't know.
BY MS. VANDESTEEG:
Q. Do you have copies of those underlying invoices set forth on the Taft proof of claim?
A. I have invoices from Taft.

DRAFT COPY

Q. Going back to the first invoice listed on Exhibit 7, again going back to August of 2025, do you recall receiving invoices from Taft prior to that date? Either for the -- either for the Colorado action or for any other matter in which Taft was representing you or any other entity?
A. I don't recall specific invoice, no.
THE WITNESS: Are you done with this Exhibit 5 or.
MS. VANDESTEEG: Leave that one close.
(WHEREUPON, David Schupmann Deposition Exhibit No. 8 was marked for identification.)
BY MS. VANDESTEEG:
Q. Exhibit 8 is your application to employ Michael Jurasek and Taft as special counsel in your bankruptcy proceeding effective as of August 1, 2026, correct?
A. Yes.
Q. And that was filed at docket 85 on August 24, 2026, correct?
A. I don't know where it says it was filed. Is that this right here, date.
Q. Yeah?

DRAFT COPY

A. Yes.
Q. That's just a couple days ago, right?
A. Yes.
Q. Why do you want to bring Taft and Michael Jurasek in as special litigation counsel in your bankruptcy case?
A. Institutional knowledge to help save costs, as I understand there's a claim that needs to be responded to.
Q. Jurasek's not a litigator is he?
A. I don't know.
Q. If I told you that his bio online says that's equities corporate guy, would that surprise you?
A. No.
Q. To your knowledge has Michael Jurasek ever appeared in court on your behalf?
A. I don't believe so.
Q. To your knowledge, would Michael Jurasek be appearing in court in this bankruptcy proceeding on your behalf?
A. I don't know.
Q. There's a statement here on Page 6 of 18 down at the bottom, last paragraph down, Jurasek

DRAFT COPY

represented Schupmann in the prebankruptcy litigation with the former employer. Again that's on Page 6 of 18?

A. Sorry, on the bottom. Got it.

Q. No problem.

What was Jurasek's role a corporate guy in the prebankruptcy litigation with Fortis?

MR. PAULSEN: Objection, mischaracterizes the document.

You can answer.

THE WITNESS: Can you please repeat the question.

BY MS. VANDESTEEG:

Q. There's a statement in this document that says Jurasek represented Schupmann in the prebankruptcy litigation with the former employer. What was Jurasek's role?

MR. PAULSEN: Can we clarify, are you talking about Jurasek the defined term that says Michael Jurasek and Taft whatever name is or are you talking about Jurasek individually?

MS. VANDESTEEG: I'm asking the witness as to his understanding of that.

MR. PAULSEN: You're asking about his

DRAFT COPY

understanding of my work product?

MS. VANDESTEEG: Yes, to the extent that he has one.

MR. PAULSEN: And my defined term that's defined in the first paragraph.

MS. VANDESTEEG: Yes.

MR. PAULSEN: So you're asking about the collective Jurasek.

MS. VANDESTEEG: If that's how he reads it as well, yes.

MR. PAULSEN: Okay.

THE WITNESS: I'm sorry. What was the question then at the end.

BY MS. VANDESTEEG:

Q. What was Jurasek's role in the underlying prebankruptcy litigation with Fortis?

MR. PAULSEN: Objection, foundation.

You can answer.

THE WITNESS: What was his role in the prebankruptcy litigation with Fortis -- he was an attorney with Taft.

BY MS. VANDESTEEG:

Q. I'd like you to turn to Page 8 of 18?

A. Oh, I see what you're saying. I was

DRAFT COPY

reading this paragraph here. It says collectively, the collective. You're asking my interpretation of this as he's read it here -- wrote at no time here with the collective.
Q. Yes.
A. Okay. So your question is on specifically the Paragraph 3 on Jurasek being the collective and what the collectives -- what the collective's role was in the prebankruptcy litigation. I'm sorry it's confusing.
Q. Let's break it down because it is confusing.
To your knowledge, will Michael Jurasek individually be involved in any capacity as special litigation counsel as a litigator in connection with your bankruptcy proceeding?
A. I don't know. Before I go on to that are Michael Jurasek the individual or Michael it says Michael Jurasek the collective.
Q. I'm asking about the individual in this question?
A. And my answer is I don't know.
Q. Do you know who from Taft would be involved in the representation of you in your

DRAFT COPY

bankruptcy as special litigation counsel?
A. No.
Q. Have you met with any specific attorneys at Taft in connection with this proposed engagement as special litigation counsel in your bankruptcy proceeding?
A. Say that again because I got Ben sitting right here, too.
Q. Have you met with any specific attorneys at Taft?
A. Uh-huh.
Q. Who would be involved in representing you in your bankruptcy as special litigation counsel?
A. I don't know. I think that's a new document. I don't know the details of how that will work.
Q. Were you involved in the decision to draft and file this document?
A. Yes.
Q. Did you have discussions with your bankruptcy counsel with respect to this application to employ Michael Jurasek and Taft as special litigation counsel?
A. Yes.

DRAFT COPY

Q. Did you have discussions with anyone at Taft in connection with this application to employ Jurasek and Taft as special litigation counsel?
A. Yes.
Q. Who at Taft?
A. I believe I talked to Michael Jurasek about it.
Q. Anyone else at Taft other than Michael Jurasek that you spoke to about this application to employ Michael Jurasek and Taft as special counsel?
A. I don't -- I don't think so.
Q. When did you speak to your bankruptcy counsel about this application to employ?
A. I don't know a specific date.
Q. Approximately?
A. I don't know.
Q. Was it a couple days ago?
A. No.
Q. Was it a week ago?
A. I don't think so.
Q. Was it a couple weeks ago?
A. I don't know.
Q. Was it a month ago?
A. I don't know.

DRAFT COPY

Q. Was it at the beginning of the bankruptcy case?
A. No.
Q. So sometime between the beginning and we're not sure since, so sometime in the last five months you can't pin it down at all?
A. No.
Q. Whose idea was it to seek to bring envelope Michael Jurasek and Taft as special counsel in the bankruptcy proceeding?
MR. MORRELL: Objection foundation.
You can answer.
THE WITNESS: I don't -- I don't recall.
BY MS. VANDESTEEG:
Q. Did you raise this idea?
A. I don't know that I raised an idea. I asked maybe asked a question how it worked or how the proceeding worked. I don't -- I mean, I didn't even know if this is an option I probably would have asked the question.
Q. You just mentioned a proceeding. Which proceeding were you referencing until that answer?
A. The bankruptcy, like what happens in bankruptcy.

DRAFT COPY

CONFIDENTIAL
UNCERTIFIED ROUGH DRAFT



Q. Do you recall did your bankruptcy counsel suggest that you bring in Taft as special counsel?

MR. PAULSEN: Objection, calls for attorney-client privilege.

You can answer but not as to direct communications between the lawyer and you.

THE WITNESS: I don't recall the exact communication was.

BY MS. VANDESTEEG:

Q. Do you recall if Michael Jurasek suggested that he come into the bankruptcy as special litigation counsel?

A. I'm trying to figure out how to answer this and still -- and still not step on your objection.

MR. PAULSEN: You can answer that question.

THE WITNESS: I believe Jeff and I just talked about the case and moving forward and how we would approach that piece of it and we just talked about options for it.

BY MS. VANDESTEEG:

Q. What do you mean by that piece of it?

A. Defense of the claim in bankruptcy.

Q. Which claim?

DRAFT COPY

A. The proof of claim that was filed.
Q. Proof of claim filed by whom?
A. By Fortis. Thank you.
Q. Do you agree that you owe Taft nearly half a million dollars in outstanding legal fees?
A. Yes.
Q. And you believe that that is a valid and legitimate prepetition claim unsecured claim against you and your bankruptcy estate?
MR. PAULSEN: Objection, calls for legal conclusion.
You can answer.
THE WITNESS: I believe as I sit here, I owe Taft five hundred thousand dollars. Yes.
BY MS. VANDESTEEG:
Q. To your knowledge, is Taft planning to waive that claim in any way prior to acting as special litigation counsel in your bankruptcy?
A. Not that I -- not that I know.
Q. Has there been any discussion of a waiver of that claim?
A. No.
Q. Is there any commitment by any person or entity outside of bankruptcy to pay Taft in part or

DRAFT COPY

in whole on that claim?
MR. MORRELL: O, foundation.
You can answer.
THE WITNESS: Not that I'm aware of.
BY MS. VANDESTEEG:
Q. Are you seeking to pay Taft any sort of a retainer in connection with this proposed application for Taft to come in as special litigation counsel in your bankruptcy?
A. I'm not sure.
Q. Have you agreed to pay Taft of a retainer in connection with this new potential engagement?
A. No.
Q. I'd like to turn your attention to Page 8 of 186 this document. And I'll direct your attention specifically to the first sentence of the first full paragraph. In which there's a statement, Schupmann believes that Jurasek does not hold or represent an interest adverse to Schupmann or the estate with respect to the dispute with Schupmann's former employer?
How can you take the position that Taft does not have an adverse interest when they have a 500,000 dollar claim against your estate.

DRAFT COPY

MR. PAULSEN: Objection, calls for legal conclusion. Objection, foundation: Objection, argumentative.
You can answer.
THE WITNESS: Yeah, I don't know.
BY MS. VANDESTEEG:
Q. You would agree that a 500,000 dollar claim against an estate is an interest against the estate, right?
A. I'm saying I don't.
MR. PAULSEN: Hold on. Objection, foundation. Objection, argumentative. Objection, calls for a legal conclusion.
You can answer.
THE WITNESS: I'm just saying I don't know how to answer that question. I didn't -- I didn't write this.
BY MS. VANDESTEEG:
Q. Do you believe just asking you personally setting aside the document, that a half a million dollar claim is an interest against you?
MR. PAULSEN: Objection, foundation. Objection, argumentative. Objection, calls for legal conclusion.

DRAFT COPY

You can answer.
THE WITNESS: I don't know.
BY MS. VANDESTEEG:
Q. Let's go forward one page to Page 9. In the middle of the page, well, toward the top it states I'm looking at the last sentence of that second full paragraph under Jurasek's compensation. It states the hourly rates applicable to the attorneys and professionals expected to represent Schupmann are as follows, correct?
A. Yes.
Q. And then it has a little chart with two attorneys names, correct?
A. Yes.
Q. Michael Jurasek, partner, $1,030 an hour, right?
A. Yes.
Q. And Emily England associate $430 an hour, correct?
A. Yes.
Q. But I think we covered to your knowledge, Michael Jurasek himself is not a litigator correct?
A. I don't know.
Q. What about Emily England, do you know what

DRAFT COPY

type of law she typically practices?
A. I don't know.
Q. Have you worked with Emily England before?
A. Yes.
Q. In what he capacity?
A. I worked with her on the injunction litigation.
Q. In the Colorado action?
A. Correct.
Q. Is it your recollection that Emily England withdrew from representation in the Colorado action?
A. Yes.
Q. Do you know why she withdrew in the Colorado action?
A. Not specifically, no.
Q. What about generally?
A. I thought it had something to do in conjunction with the stay and so that their services weren't needed.
Q. Aside from Michael Jurasek or Emily England, are you aware of any other Taft attorneys who would be involved in representing you in the bankruptcy proceeding?

DRAFT COPY

A. I don't know the specific plan is for that.

Q. Do you have a general idea of what the plan would be?

A. I don't.

Q. Let us go back to Exhibit 5.

Okay. I would like you to turn -- pathologist. Please go back to Exhibit 8 for one second. And turn to Page 14 of 18 for me.

And I'll have you back up a couple pages -- sorry -- first to Page 12 of 18 and do you agree with me that Pages 12 through 14 of 18 to Exhibit 8 are an engagement letter sent to you by Michael Jurasek of Taft?

A. Yes.

Q. And this engagement is the one that is for them to act as special counsel to you in the bankruptcy, correct?

A. I believe so.

Q. I'm looking at Page 14 and I see it's signed by Michael Jurasek. It's not yet signed by you. Do you know if a signed copy of this exists?

A. It does not.

Q. Do you know why?

DRAFT COPY

A. It was my understanding that it had to be approved by.

THE WITNESS: It was my understanding it need $ to be approved by the court first.

BY MS. VANDESTEEG:

Q. Now let's go back to Exhibit 5, please.

Can you turn to Page 12 of 54. Page 12 of 54 makes reference in bold that this is schedule A/B, property, correct? Do you see where I am?

A. Yes.

Q. Okay. And on this page you list property at 0S440 Crego Place did I pronounce that correctly?

A. Yes.

Q. That's in Geneva Illinois correct?

A. Correct.

Q. What is that property?

A. It's Michael Jurasek residence.

Q. How is this property owned?

A. My wife and I own it.

Q. Do you own this property out right or is this in trust?

A. I think that's two questions, but we don't

DRAFT COPY

own it out right. I believe it is in trust.
Q. Is there a mortgage on this property?
A. Yes.
Q. You state here on Page 12 of 54 that the current value of the portion that you own is $624,000 which is also the full current value, correct?
A. Current value of the portion -- give me your question again, please.
Q. Seems like it might have been confusing. Hold on.
You list the current value of the property at $624,000 correct?
A. I believe that's right.
Q. How did you come to that value?
A. I believe while we were going through the bankruptcy they did a Zillow search or something like that to find the value of the property.
Q. Who is they?
A. The bankruptcy attorneys.
Q. Have you separately in the last 12 months gotten an appraisal of this property?
A. I don't believe so.
Q. You list the current value of the portion

DRAFT COPY

that you own as $624,000, correct?
A. Yes.
Q. Are you taking the position that you individually own one hundred percent of the value of that home yourself?
MR. PAULSEN: Objection, calls for a legal conclusion.
You can answer.
THE WITNESS: I don't -- I don't own a hundred percent of the house, no. Well, I guess tenancy we would joint each own it all, right. I don't know the answer to your question. Sorry.
BY MS. VANDESTEEG:
Q. Do you believe that the house is owned in tenancy by the entirety?
A. Yes.
Q. Can you turn to the Page 13 of 54. You list a Hilton timeshare at the top of this page, correct?
A. Yes.
Q. Does that --
A. Where does it say that I see the Orlando Florida.
Q. In that same box, but down where?

DRAFT COPY

A. Oh, yeah okay.
Q. By the description?
A. That's correct. Yeah.
Q. What is that?
A. I don't -- it's a timeshare on Hilton grand vacations club.
Q. You list that that -- that that property has zero value; is that accurate?
A. Unfortunately, I believe, yes.
Q. Can you sell that timeshare interest?
A. I don't believe so.
Q. Do you pay any additional annual month lie any other sort of payments toward maintaining that timeshare interest?
A. There is a maintenance fee, yes.
Q. How much is that?
A. I don't recall.
Q. Approximately?
A. I don't know.
Q. Is that maintenance fee charged to you annually?
A. I believe so, yes.
Q. Where would we find evidence of how much the annual maintenance fee is for the Hilton

DRAFT COPY

timeshare?
A. We would either have an invoice or I believe it would be in our checking account.
Q. Would that be the joint checking account ending in 2063?
A. Yes.
Q. Do you recall approximately what time of year you pay that he annual maintenance fee?
A. No. I believe it's early in the year, but I don't recall when.
Q. How long have you had that timeshare?
A. I don't know, a while.
Q. More than five years?
A. Yes:
Q. More than ten years?
A. Yes.
Q. More than 15 years?
A. I don't know, maybe.
Q. Is this timeshare something that is owned by you personally? How does that work?
A. I don't -- I don't know.
Q. Are there documents that would have lay out the nature of your interest in this timeshare and what rights you have in it?

DRAFT COPY

A. I don't know.
Q. Who would know?
A. Hilton grand vacation would know. I would guess.
Q. How much time do you get per year in connection with this timeshare?
A. I think it varies based on the location or the size room you get, but I think generally I think about two weeks.
Q. Going down to the Part 2 of 13 of 54, vehicles?
A. Uh-huh.
Q. You list two vehicles, correct?
A. Yes.
Q. And for the toilet a Tundra, you state debtor drives and for the LEXIS G X 460 you state debtors non-filing spouse drives, correct?
A. Yes.
Q. Do you personally own both of these vehicles?
A. I don't know the answer to that question.
Q. Is your name on the title of each of these vehicles?
A. I believe so, but I believe Jenny's is as

DRAFT COPY

well.
Q. Is it your understanding that Jen's name is on both of these vehicles or just one or the other?
A. I don't know.
Q. Let's go on to Page 14 of 54.
Turning your attention to category 9 equipment for sports and hobbies, do you see where I am?
A. Yes.
Q. You list the description as, quote, usual and ordinary sporting and hobby equipment including but not limited to sporting and hobby equipment and miscellaneous Milford Hills hunting membership and annual land access for hunting on Fox River.
Did I read that correctly?
A. Yes.
Q. And you list collectively a value for those assets of $2,000, correct?
A. Yes.
Q. That $2,000 -- is that fair allocated to the equipment the sporting and hunting equipment?
A. I believe so.
Q. What is Milford Hills?

DRAFT COPY

A. It's a hunting facility.
Q. Do you pay an annual membership there?
A. Yes.
Q. How much is that?
A. Depends on the membership amount, but I think somewhere around -- I think around one to two thousand dollars.
Q. And what about that annual land access for hunting on Fox River, is that something that you have to pay for separately as well?
A. Yes.
Q. And how much is that?
A. I think it's about $200.
Q. Are those -- strike that.
Going back to the Milford Hills membership, is that a transferable membership?
A. I don't know.
Q. How long have you been a member?
A. I don't know. I don't know.
Q. Less than five years?
A. On and off more than ten years.
Q. Let's go on to Number 10, firearms. You list five handguns, four shotguns, one rifle, two slug guns with a collective value of $3,150,

DRAFT COPY

correct?
A. Yes.
Q. How did you calculate that value?
A. I think I just worked with the bankruptcy attorneys for find general pricing on this as an estimate.
Q. Let's go to Page 15 of 54, please.
I'd like to go through the bank accounts next. You list three accounts here under Number 17, correct?
A. Yes.
Q. You list a joint checking at Old Second National, correct?
A. Yes.
Q. And that is the joint checking account between you and Jennifer, correct?
A. I believe so.
Q. Well, let's talk about the checking account we were talking about earlier ending in 2063, okay?
A. Okay.
Q. Are you aware of any other joint checking account between you and Jen?
A. No.

DRAFT COPY

Q. You also list a joint savings account at Old Second National Bank correct?
A. Yes.
Q. Who is that held jointly with?
A. That would be Jennifer.
Q. Are you -- is it your understanding that there is only one joint savings account between you and Jennifer at Old Second National?
A. Yes.
Q. And you list a brokerage account with Raymond James correct?
A. Yes.
Q. The brokerage account -- is that a single account or are there multiple accounts?
A. I'm not sure how it's set up.
Q. In terms of other accounts also held by you and/or related entities or individuals, are you aware that there is also an account at Old Second National for Kyle Schupmann, the ILUTMA account, savings account ending in the 7826?
A. I know Kyle has an account there.
Q. For that account, is Jennifer the custody?
A. I don't know.
Q. Do you know whether you were a custodian

DRAFT COPY

on that account?
A. I don't -- I don't recall.
Q. There's also an ILUTMA savings account ending in 7520 for Allison Schupmann. Are you aware of the existence of that account?
A. I'm aware she has an account there.
Q. Are you aware whether you are a custodian on that account?
A. I don't recall.
Q. Are you aware of a joint account between Kyle Schupmann and David Schupmann a checking account ending in 5388?
A. Not that I recall.
Q. Are you aware of the existence of a joint checking account between Allison Schupmann and Jennifer Schupmann account ending in 5822?
A. A joint checking account between Jennifer and Allison, not specifically.
Q. Are you familiar with a bank account at Old Second National for Trident solutions of Sugar Grove LLC account ending in 0939?
A. I believe Trident had an account there. I don't think it's active anymore.
Q. Were you a signatory on that account?

DRAFT COPY

A. I believe so.
Q. Do you know when it stopped being active?
A. No.
Q. Why did it stop being active?
A. There was no business transactions going through there and I believe the company was dissolved so.
Q. Was Schultz also a signatory on that account?
A. I believe so.
MS. VANDESTEEG: I'll hand you what has been marked Exhibit 9.
(WHEREUPON, David Schupmann Deposition Exhibit No. 9 was marked for identification.)
BY MS. VANDESTEEG:
Q. Exhibit 9 are a series of statements from Old Second National Bank with respect to Trident solutions of Sugar Grove LLC account, correct?
A. Yes.
Q. And it shows statements for statements dated January 30, 2026, February 20 -- February 27, 2026, March 31, 2026, and April 30, 2026, correct?
A. Yes.

DRAFT COPY

Q. And for the first three of those statements it shows that there was a balance sitting in that account of 142.38, correct?
A. Yes.
Q. And then if we turn to the last statement, the one -- the statement dated April 30, 2026, the balance goes from 142.38 to zero, correct?
A. Yes.
Q. And if we take a look on the second to last page of this exhibit where it shows the cancelled check clearing that bank, it shows a check written on March 30, 2026, correct?
A. Yes.
Q. Paid to the order of Charlie's Schultz, correct?
A. Yes. The.
Q. Clearing that bank account out, correct?
A. Yes.
Q. Is that your signature?
A. No.
Q. Do you know whose signature that is?
A. Not with certainty, no.
Q. What's your best guess?
MR. PAULSEN: Objection, calls for speculation.

DRAFT COPY

You can answer.

THE WITNESS: I would guess it's Charlie's.

BY MS. VANDESTEEG:

Q. Have you seen Charlie's signature before?

A. I'm sure I have. I couldn't place it.

Q. March 30, 2026, that was the day you filed your bankruptcy petition, correct?

A. Which date?

Q. March 30, 2026. Is that right? Is there that shows what that date it was?

A. I don't know off the top of my head that that was right.

Q. You could look at the top of your petition there?

A. That's what I was looking for.

Q. Which is Exhibit 5 and it'll tell you the date it was filed.

A. 6-24.

Q. The filing dates are up at the very top where it says filed.

A. Oh, okay. I didn't know if that was something for this case. Okay. Yep.

Q. So your bankruptcy case you agree with me was filed on March 30, 2026?

DRAFT COPY

A. If that's -- if this is in fact what that filing date means, yes.
Q. Are you aware that Jen Schupmann has a personal checking account at Old Second National Bank?
MR. PAULSEN: Objection foundation.
You can answer.
THE WITNESS: Yes:
BY MS. VANDESTEEG:
Q. Do you know when that account was opened?
A. I believe it was part of the bankruptcy in order to make a clean break between our finances, she opened up her own accounts.
Q. Does Top Pick Investment Group LLC also have an account at Old Second National Bank?
A. Yes.
Q. Are you a signatory on that account?
A. Yes.
Q. Is there simply -- is there a single account for Top Pick Investment Group, do you know?
A. I believe there's a single account. I think there's some subaccounts based on the different entities in the company, but I think it's just a -- I guess one account.

DRAFT COPY

Q. Are there any other signatories on that account?
A. I don't recall.
Q. You have united credit card through chase bank, correct?
A. Currently?
Q. Yes.
A. No.
Q. Prepetition?
A. Yes.
Q. When did you stop using that card?
A. As right around the bankruptcy.
Q. Do you have any other personal credit cards?
A. No. No.
Q. Question of fact' seen reference across various bank records to a discover card. Is that your card?
MR. PAULSEN: Objection, foundation.
You can answer.
THE WITNESS: I don't have any credit cards. Yeah.
BY MS. VANDESTEEG:
Q. We've seen over the bank statements

DRAFT COPY

monthly payments to Wells Fargo. What is that for?
MR. PAULSEN: Objection, foundation.
THE WITNESS: Yeah, I don't -- I don't know off the top of my head.
BY MS. VANDESTEEG:
Q. Are you aware of any Wells Fargo accounts that you have an interest in?
A. I need to -- know something more specific about it. I don't know.
Q. Just offhand?
A. I don't know.
Q. What about thrive it financial?
A. Yes.
Q. What is that?
A. It's a financial institution. We set up some accounts with them many years ago.
Q. What kind of accounts are those?
A. I think they're life insurance accounts.
Q. What about John Hancock?
A. Similar, I think that's a really old account. I think it's some kind of life insurance.
Q. As you sit here today, are you aware of any other bank accounts, brokerage accounts, financial accounts that you have an interest in

DRAFT COPY

other than the ones that we've gone through?
MR. PAULSEN: Objection, foundation.
You can answer.
THE WITNESS: No.
BY MS. VANDESTEEG:
Q. Since December of 2024 when your employment with Fortis was terminated, have you transferred any funds from any account in your name to any account in Jennifer's name?
MR. PAULSEN: Objection, foundation.
You can answer.
THE WITNESS: I don't -- I don't recall.
BY MS. VANDESTEEG:
Q. Since March of 2025 and more specifically since March 30 of 2025, have you transferred any funds from any account in your name to any account in Jennifer's name?
MR. PAULSEN: Objection, form.
You can answer.
THE WITNESS: I don't -- I don't recall.
BY MS. VANDESTEEG:
Q. Since March 30, 2026, the petition date, have you transferred any funds from any account in your name to one into Jennifer's name?

DRAFT COPY

MR. PAULSEN: Objection, form.
You can answer.
THE WITNESS: I don't recall. No.
BY MS. VANDESTEEG:
Q. For those questions, where would we find evidence of any such potential transfers?
A. Well, you could look at my Old Second bank account and see if anything transferred out of there.
Q. How historically have you and Jennifer divided financial responsibilities prepetition?
A. For the most part, we had joint checking, joint savings.
Q. So you shared everything, everything into one account, everything out of one account?
A. Yes.
Q. Shared income, shared expenses?
A. Yes.
Q. Was everything shared equally?
A. I mean, no. I mean, our income wasn't equal, so no.
Q. Let me ask a different way.
Did you ever specifically on the expense side allocate either specific expenses or portions

DRAFT COPY

of specific expenses to one of you individually?
A. No, for the most part, I took care of all of the essential needs and home, things like that, and Jenny's stuff was more of the discretionary.
Q. The shared checking account -- was that historically the account from which -- strike that.
The joint checking account that we have referenced a few times the Old Second National account ending in 2063, was that the primary account into which both of you would put your income into that account?
A. I believe so.
Q. And was that also the account from which all of the shared expenses were paid?
A. I believe so.
Q. Has the way you and Jennifer divided financial responsibilities changed since the Colorado action was first filed in January of 2025?
A. Have they changed at all since January 2025?
Q. Correct.
A. I think the structure of them has yes.
Q. How so?
A. Well, in the bankruptcy we've got separate

DRAFT COPY

accounts, paychecks go in separate accounts and expenses go out of separate accounts.

Q. Thank you for that clarification.

During the time period between January of 2025 and the filing of the bankruptcy, did anything change in terms of how you and Jennifer maintained your typical financial responsibilities prepetition?

A. I don't -- I don't believe so.

Q. The changes happened at the time of the bankruptcy filing, right?

A. Correct.

Q. Historically speaking, was the joint checking account the primary account that you and Jennifer used at Old Second National?

A. Yes.

Q. The savings account, the joint savings account that you had there, what was the purpose of that account?

A. It kind of, you know, equipment in the house that might go out, repairs, vacation, that sort of thing.

Q. Historically speaking, what kind of a balance would you keep in your joint savings

DRAFT COPY

account?
A. It wasn't -- it wasn't a lot. I mean, I mean, I guess that's relative. I don't know. I'll say I don't know.
Q. Less than 20 thousand dollars?
A. Yes.
Q. Less than 10 thousand dollars?
A. Yes.
Q. Was that the only joint savings account that you and Jennifer shared at any point in let's call it the last ten years?
A. I believe so.
Q. I'll represent to you that there is a gap in statements for that savings account. Do you recall any period of time inform which that account may have been closed or been inactive?
MR. PAULSEN: Objection, foundation.
You can answer.
THE WITNESS: The joint savings account, I don't know.
I could use the restroom if you're checking.
MS. VANDESTEEG: I am checking and I am checking because it may make sense to take a pause

DRAFT COPY

CONFIDENTIAL
UNCERTIFIED ROUGH DRAFT



here for lunch. We're at 12930 and this next set is going to take a while so the if this works for everyone.

VIDEOGRAPHER: The time is 12:27 p.m.
This is the end of media 2 we're off the record.

(WHEREUPON, a short recess was taken.)

VIDEOGRAPHER: The time is now 1:13 p.m.
This is the beginning of media 3. We're back on the record.

BY MS. VANDESTEEG:

Q. Mr. Schupmann you understand that you are still under oath as you were before we left for break, yes?

A. Yes.

Q. Let's go back to Exhibit 5 and we were on Page 15 of 54. I'm going to point you to Number 19. Where it asks you to list non-publicly traded stock and interest in incorporated and unincorporated businesses including an interest in LLC partnership and joint venture. You list Top Pick Investment Group LLC.
What is Top Pick Investment Group?

DRAFT COPY

A. It's a baseball trading facility.
Q. You listed 25 percent ownership interest?
A. Yes.
Q. Who has the remaining 75 percent ownership interest?
(Reporter clarification.)
THE WITNESS: There's a lady named Margaret Maloney, a guy named Chris Forbs, Steve Stroub and Keith Hobson.
BY MS. VANDESTEEG:
Q. Have you always had a 25 percent ownership in that company?
A. No.
Q. When did that change?
A. There were several different changes.
Q. When was the most recent change?
A. A few years -- it's been a few years.
Q. More than two years?
A. I don't recall.
Q. More than five years?
A. I don't recall.
Q. What was the change? Did your ownership interest go up or go down at that time?
A. Went up. There was a individual that

DRAFT COPY

we -- that we bought out sow collectively we all put in some money to buy him out in and our interest level went up.

Q. How much money did you put in to buy that other owner out?

A. I don't recall.

Q. Was it more than $5,000?

A. I don't believe so.

Q. You list an asset value of zero dollars in connection with that ownership interest. How did you come to value that ownership interest of Top Pick Investment Group LLC at zero dollars?

A. Well, it's about a break even company. Some years up a little bit, maybe a thousand or so, most years a little bit of a loss. So on like a valuation standpoint on paper it's not worth anything, yeah, so that's where I came up with the zero.

Q. Well, there was value a few years ago for you and the other partners to buy out one of the owners, correct?

A. We didn't really figure the value of the company. We just tried to help the guy out. He needed out. So we put in some money in to help him

DRAFT COPY

get out of his ownership.
Q. Have you spoken with the other owners of Top Pick Investment Group about potentially buying your interest you out?
A. No.
Q. Any reason why not?
A. No.
Q. Do you think they'd have any there?
A. I don't think so.
Q. Could you please turn the page to Page 16 of 54. I'm going to direct your attention to the very top of that page which is listing from the page before retirement or pension accounts.
And you list four different accounts -- a Roth conversion rollover IRA with Raymond James, an IRA rollover with Raymond James, a rollover IRA with Raymond James and a 401(k) Ascensus ready save, right?
A. Yes.
Q. Are each of those -- strike that.
For each of those are you the sole owner of each account?
A. I don't know.
Q. For each of those were you the only person

DRAFT COPY

who contributed funds into those accounts?
A. The Ascensus one -- individually.
Q. Yes?
A. Yes.
Q. Have you made any withdrawals from any of those accounts in the last six months?
A. I don't believe so.
Q. Have you made any withdrawals from those accounts in the last -- have you made any withdrawals from those accounts whatsoever post petition?
A. I don't believe so.
Q. Do you owe any loans against any of those accounts?
A. I don't believe so.
Q. Moving down to Number 25 on this Page 16 of 54, you list under trusts the David P Schupmann and Jennifer M Schupmann declaration of trust dated May 11, 2021, correct?
A. Yes.
Q. Was that the first trust that you and Jennifer created together?
A. I believe so.
Q. Have you created any other trusts

DRAFT COPY

together?
A. I don't think so.
Q. Why did you create this trust?
A. It was at the suggestion of our financial advisor through just kind of normal course of adult hood that it was a smart thing to do.
Q. Was there any specific reason why that trust was created at that time in May of 2021?
A. No.
Q. When did you first discuss creating that trust -- let me back up. Strike that.
The trust was prepared by John D. Gutzke of Rolewick and Gutzke in Wheaton Illinois, correct?
A. I believe so.
Q. Am I saying his name correctly?
A. I believe so.
Q. When did you first discuss creating they trust with Mr. Gutzke?
A. I don't -- I don't know.
Q. Was it shortly before the creation of the trust or was this something that you had been planning for some weeks or months or years?
VIDEOGRAPHER: David can you move that have mic

DRAFT COPY

up.
THE WITNESS: Sorry, crossing over.
VIDEOGRAPHER: Above the button thank you.
THE WITNESS: Sure.
I don't recall the timeline. It was a while ago.
BY MS. VANDESTEEG:
Q. Do you recall what was your stated and specific purpose for creation of the trust?
A. Like I said, it was it wasn't even something that Jenny and I were thinking about. It was something through kind of normal adult hood life our financial advisor said it was a good thing to do.
Q. Who was your financial advisor in that context?
A. Tim Reeder.
Q. Who's he with?
A. Raymond James.
Q. Did you discuss -- strike that.
At or around the time of this the creation of this trust in May of 2021, did you more broadly discuss asset protection options with Mr. Gutzke?
A. Please repeat that.

DRAFT COPY

MS. VANDESTEEG: Can you please read it back:
(WHEREUPON, the record was read as requested.)
THE WITNESS: I mean, we discussed the trust and -- I'd say normal course. I don't know if there's anything broadly behind that but just the normal course of the trust for our family.
BY MS. VANDESTEEG:
Q. Did you discuss other options with respect to creditor protection beyond the trust?
A. Not that I recall.
Q. Did you discuss other wealth protection or wealth preservation strategies beyond the creation of the trust?
A. I guess can you be more specific about that what are you asking.
Q. I think you're asking me to rephrase my question.
A. I think so.
Q. When you met with Mr. Gutzke to create the trust, were there other options or alternatives that he discussed with you that you could use for wealth or asset protection or preservation?
A. No, not that I recall.

DRAFT COPY

Q. This is an irrevocable trust correct?
A. Yes.
Q. And?
A. Well, I should say I don't know. I think so, but I don't know.

(WHEREUPON, David Schupmann Deposition Exhibit No. 10 was marked for identification.)

BY MS. VANDESTEEG:

Q. I've handed you what we've marked as Exhibit 10. This is a copy of the trust agreement for you and Jennifer that we've been discussing these last few questions, right?
A. It appears so.
Q. In reviewing, is there anything in this document in front of you in Exhibit 10 that appears to be not that document or incorrect?
A. I don't -- I don't remember the last time I looked at this document other than making copies of it for you guys.
Q. You and Jennifer are both co-trustees of this trust, correct?
A. I'd have to read it had to answer that specifically, but it says that in here.

DRAFT COPY

Co-trustees, yep.
Q. Has there been any change in that status with the both of you as co-trustees signs since the creation of this trust in 2021?
A. I don't -- I don't think so.
Q. Let me ask an even broader question.
Have there been any amendments or modifications to this declaration of trust since May 11, 2021?
A. I don't -- I don't believe so.
Q. Did you ever meet with Mr. Gutzke again after this trust document was created in May of 2021 to discuss modifications or amendments to this trust?
A. I don't think so.
Q. You and Jennifer are both beneficiaries of this trust, correct?
A. I have to find it in here to answer yes, but -- sorry I'm just looking for beneficiaries I'm sure it's in here. I see all the language about beneficiaries I just don't see where it names them.
Q. Is that at least your general understanding of the way the trust was fob --
A. I think so.

DRAFT COPY

Q. I want to direct your attention to different provision which is the last provision of the trust on Page 32 it says Section 8. This provision reads, the settlers expressly acknowledge and intend that all property transferred to this trust is marital property or is intentionally converted to marital property by act of transfer and that settlers are aware of the consequences of such property being classified as marital property. Marital property under this declaration of trust is marital property as defined in the Illinois marriage and dissolution act as amended from time to time.

Did I read that language correctly?

A. Yes.

Q. Do you recall discussing this provision specifically with Mr. Gutzke?

A. I don't recall.

Q. What was the purpose of this provision?

A.

MR. PAULSEN: Objection calls for legal conclusion.

You can answer.

THE WITNESS: I don't remember.

DRAFT COPY

BY MS. VANDESTEEG:
Q. Did Mr. Gutzke ever explain to you the creditor protection implications of converting separate property into marital property held in trust?
MR. PAULSEN: Objection foundation. Objection calls for legal conclusion.
You can answer.
THE WITNESS: Excuse me. I don't remember.
BY MS. VANDESTEEG:
Q. The residence at 0S440 Crego Place in Geneva was transferred to the trust via warranty deed, correct?
A. Excuse me. I'm losing my voice.
I don't know what that means. I don't know exactly how it was transferred.
Q. The trust currently holds the deed to the house, correct?
A. I think that's correct.
Q. Are you aware of any other assets or accounts that are owned by the trust?
A. I believe Tim was moving things into the trust as I sit here today, I don't know what's in the trust.

DRAFT COPY

Q. Who would know that?
A. I guess Tim would know.
Q. And Tim again is full name?
A. Tim Reeder.
Q. And Tim is with Raymond James?
A. Yes.
Q. Would Tim have the ability to move any accounts or assets into the trust beyond Raymond James accounts?
A. Not to my knowledge.
Q. When the trust was created in May of 2021 what was your role at Fortis at that time?
A. I don't -- I think I may have still been supervisor of sales and marketing. I think that was the right title at the time.
Q. In May of 2021, were you at that time engaged in any other business activities outside of your employment with Fortis?
A. I had Top Pick Athletics. May of 2021 -- for business interest, I think that was -- that was it.
Q. Top Pick Athletics -- what is Top Pick Athletics?
A. Top Pick Athletics is a baseball training

DRAFT COPY

facility.

Q. How is that different from Top Pick Investment Group LLC that we saw previously listed on your -- on Exhibit 5?

A. It's not different. It's just a DBA of Top Pick Athletics top or Top Pick Investments.

Q. When was it formed?

A. I believe either late 2016 or early 2017.

Q. Were you involved with its formation?

A. I was involved when it was formed, yeah.

Q. How were you involved?

A. There was an old entity. I don't remember the exact name of it, but it was Top Pick something. They were looking to buy new or build a new facility in Sugar Grove, Illinois. We were gonna be -- this invest -- an investor group Top Pick investments was going to be a small piece of that. When that building started being created, the original entity decided like it was gonna be too big of a -- too big of a project for them. So they wanted to get out.

I think the collective group had a small investment. I think it was like 60 thousand dollars to buy in to that. And then we ended up

DRAFT COPY

taking over the project and finishing out and then we converted old co into new co and then the doors opened on that I think January of 2017.

Q. Hovers the we that you referenced involved with the -- with that particular project?

A. I think that's I guess everybody involved I guess at the time. So that would have been the investment group, and then we -- yeah, the investment group that I talked before Top Pick Athletics or Top Pick Investments and then we worked with an attorney to create that operating agreement and the sub discrimination agreements appeared all that have good stuff for the organization.

Q. What attorney were you working with in connection with that Top Pick at that time -- hold on let's get this record clear?

A. Yeah.

Q. Between Top Pick Investment Group LLC and Top Pick Athletics which is the DBA?

A. Top Pick Athletics.

Q. So at all times that we're talking about relevant to your involvement and any ownership interest, the entity the legal entity is Top Pick

DRAFT COPY

Investment Group LLC correct?
A. That's correct.
Q. If I refer to that is T P I can we call that the entity that we're talking about? We'll reference it T P I?
A. Nobody calls it that, but okay.
Q. Call it Top Pick for purposes of this examination?
A. Sure.
Q. Okay. So you mentioned an Investment Group in connection with the initial your initial involvement in this project and then the finishing of the building and getting it going.
A. Yeah.
Q. That Investment Group -- was that the comprised of the names you mentioned earlier you and Margaret and Chris and Steve and Keith?
A. So the ownership has changed a since the start. I have to look and see what the ownership chart was initially. But there were more names, maybe I don't -- I don't recall how many maybe eight or nine names on the first Investment Group.
Q. What was your initial investment into Top Pick in terms of dollars?

DRAFT COPY

A. I don't recall.
Q. Was it more than $10,000?
A. I don't recall. I don't recall. It was -- there was cash. There was kind of sweat equity stuff. I don't think it was -- I'd have to look. I don't know what the amount of money was.
Q. Where would you go to look to go find that out?
A. I don't know. It's old. I don't recall. The original that original buyer group collectively was about 60 thousand dollars, so it was probably whatever the portion of that was, I don't know.
Q. You said that an attorney created the documents for that company. What attorney created the documents for Top Pick back number 2016, 2017?
A. I don't recall the attorney, but we worked with Taft to get that done.
Q. Was it Michael Jurasek at that time?
A. I think Michael was involved I don't know that he drew up the documents.
Q. Okay. Tell me more about the business of Top Pick. You said it's a baseball training facility?
A. Correct.

DRAFT COPY

Q. Can you explain that to me?

A. Sure. It's a baseball training facility. It's about 15,000 square feet. It's got batting cages and tunnels and gives instructions and things like that and then I forget how long ago, maybe so we rent it out to different organizations and then I forgot maybe five six years ago we started a travel program as well with it.

Q. What is your current role with Top Pick? Actually, let's not do current. Let's start back at the beginning and I'll have you take me through the timeline?

What was your role with Top Pick when it was indicated and how has it changed if it has over the last ten years.

A. My kind of title has always been managing partner. There was a group of us that was kind of managing partners. I mean, small business opened up from the ground up. It could be I was hanging banners and cleaning toilets to, you know o now I kind of sit in on a weekly meeting and there's a staff that runs things and you know, kind of help them out. I use a lot of my relationships to help recruit players and coaches and instructors and,

DRAFT COPY

you know, nurture some of our you know higher end talent that we have but yeah.
Q. Are you involved really in day-to-day operations?
A. No.
Q. Does Top Pick own the land or the building on which it operates?
A. No.
Q. It's currently at 769 Hartland drive in Sugar Grove correct?
A. Yes.
Q. Has that been the address from the outset?
A. Yes. Well, as long as we've had it, yes. The old company was in north Aurora, I think.
Q. Do you have any level of control or insight into Top Pick's finances?
A. Yes.
Q. At any time in which you had an ownership interest and have an ownership interest in Top Pick have you taken distributions from Top Pick?
A. No.
Q. Have you ever taken a salary from Top Pick?
A. No.

DRAFT COPY

Q. Has there been any flow of funds from Top Pick to you personally?
A. What do you mean by flow?
Q. Have there been any moneys that have gone from Top Pick to you personally?
A. I think early on there was some reimbursement stuff before we you know, even had a credit card or anything like that, we would do we would purchase things Jenny and I would purchase or I would purchase things for the company and do reimbursement.
Everything since then is kind of normal business expenditures done on our company card and we have a third party accountant that have gathers that data and produces reports through kind of normal business operations.
Q. Who's your third party accountant for Top Pick?
A. Called Trillium Wealth.
Q. Do any of the other owners in Top Pick take distributions out of Top Pick?
A. No.
Q. Do you expect to take any distributions from Top Pick in the next year?

DRAFT COPY

A. Not yet.
Q. Do you expect to take any distributions from Top Pick in the next five years?
A. Potentially.
Q. What type of distributions do you think you could potentially take from Top Pick in the next five years?
A. I don't know. It's gonna depend on our travel growth, our lease, equipment replacement, that sort of thing.
Q. Fair to say that any future distributions would be hypothetical or speculative at this moment in time?
A. Yes.
Q. Going back to the legal name of the entity Top Pick investments -- group LLC, does Top Pick actually have an investment arm of its business?
A. No. So if you remember, are it was just it was just an Investment Group into a company. We never intended to run it or own it or anything when we got into it.
(Reporter clarification.)
THE WITNESS: I'm trying.
MS. VANDESTEEG: Off the record for a moment.

DRAFT COPY

VIDEOGRAPHER: Time is 1:44. This is the end of media 3. We're off the record.

(WHEREUPON, a short recess was taken.)

VIDEOGRAPHER: The time is now 1:45 p.m. this is the beginning of media 4 we're back on the record.

BY MS. VANDESTEEG:

Q. Mr. Schupmann I'm going to direct your attention back to the timing around the trust agreement in May of 2021. At that point in time were you involved with Schultz in any business venture?

A. Not in any official capacity, no.

Q. What about in an unofficial capacity?

A. I mean, I think I stated that we were working on some referral business and it was there wasn't official company or any official program for it. But there was -- there was some referral business that we were doing together.

Q. What was the referral business that you were doing together with Schultz?

MR. PAULSEN: Can I interject right here. This is starting to get into the Fortis and Schupmann

DRAFT COPY

dispute which I think we agreed we weren't going to inquire into: If you have some limited questions, I just don't want to the.

MS. VANDESTEEG: Just need my top folder there. No no no the top red one.

BY MS. VANDESTEEG:

Q. I think what we had talked about was a specific agreement that we would avoid the first of the bullet points that I had set forth in my email was knowledge concerning the allegations asserted by Fortis against David in the Denver proceeding. The remainder of those bullet points stayed in play for purposes of this deposition. For purposes I should make clear, of this 2004 examination?

MR. PAULSEN: We're going to check like the emails and go off exact words of the emails or are we going to go on the spirit of the agreement which is we're not going to talk about the agreement of Fortis and Schupmann.

MS. VANDESTEEG: I think we were precise about what we were doing, because the specific agreement about what we talked about expressly does include for purposes of this deposition knowledge concerning diversion of business opportunities,

DRAFT COPY

customers, vendor relationships, contractor reports commissions rebates or other economic opportunities.

MR. PAULSEN: That's not my understanding. My understanding was everything under that heading was off limits and we have of a protect -- as you're holding in your hand is the motion for protective order which covers all those topics. So for that reason Mr. Schupmann I'm going to instruct you not to answer that question until we have an opportunity to the have the judge hear our protective order.

MS. VANDESTEEG: This is exactly the language that we put in the email the proposal we sent to you last Friday in terms of proceeding with this examination. Was we would have agree main bullet point top bullet point out of play everything else expressly included in this and we said you can awe we can -- you can reserve your right to object. All of this is in play. If there were others -- if there are other specific things that you think are carved out but that is certainly not my understanding of what we're here to cover today.

MR. PAULSEN: You're aware that we have after

DRAFT COPY

motion for protective order.

MS. VANDESTEEG: Correct.

MR. PAULSEN: Right. Motion for protective order covers all of the points under that last heading 523 and related conduct.

MS. VANDESTEEG: Which is why we had the separate email back and forth it in terms of a compromise of that leading to today.

MR. PAULSEN: This is covered by motion for protective order. So I ask that you withhold those questions until we have this addressed by the judge.

MS. VANDESTEEG: My question is still pending. If you would like to direct your client not to answer you're obviously welcome to do so.

MR. PAULSEN: I did do that.

MS. VANDESTEEG: Okay.

So just so I am clear, I would ask that you take a look then at our email and also your protective order, I would like clarity so that we don't waste any of our respective time here today. With respect to all of the other bullet points under my potential five 23 issues and related conduct which per the emails that we exchanged were

DRAFT COPY

specifically in play and I'll read them off, knowledge concerning any diversion of business opportunities, customers, vendor relationships, contact -- contractor relationships, compensation extremes, commissions, rebates or other economic opportunities. Next, knowledge concerning the creation, use, operation or funding of Trident or Top Pick during the period relevant to ever Fortis claims. Next, knowledge concerning transfers of money, assets, opportunities or income between David and Trident or Top Pick. Next point, communications regarding the purpose for establishing operating, funding or restructuring Trident or Top Pick. Next point, any actions taken to segregate, transfer, shield, protect, or relocate assets income extremes, business opportunities or property interests and last bullet point, any facts relating to David's intent, knowledge, financial condition or conduct relevant to Fortis's claims and any issues affecting dischargeability.

Is it your position that we are not permitted to ask any questions with respect to any of those topics.

DRAFT COPY

MR. PAULSEN: Our protective order covers the entire subject of the entire set of topics under that heading. We are presenting that to the court next Tuesday. At that point we can have a decision on the motion for protective order, and if we need to come back for an additional examination we can do so.

MS. VANDESTEEG: Do you intend to direct your client not to answer questions on any of those topics.

MR. PAULSEN: We are going to instruct our client not to have answer topics underneath our protective order under our motion for motion for protect order covers that entire list of topics.

MS. VANDESTEEG: It is my position that there are still numerous questions that I intend to ask and will ask that perhaps you think you think might be encompassed by those, so I'm going to continue with my examination and allow you to direct your witness to answer that will.

MR. PAULSEN: Off the record please.

VIDEOGRAPHER: Counsel.

MS. VANDESTEEG: Yes.

VIDEOGRAPHER: The time is of 1528 this is the

DRAFT COPY

end of media 4 off the record.
(WHEREUPON, a short recess was taken.)
VIDEOGRAPHER: Off at 152 p.m.
(WHEREUPON, a short recess was taken.)
VIDEOGRAPHER: The time is now 203 p.m. this is the beginning of media five we're back on the record.
BY MS. VANDESTEEG:
Q. Mr. Schupmann you understand that you're still under oath?
A. Yes.
Q. Five minutes after the trust was created with Jen was created in 2021 you were promoted to COO of Fortis correct?
A. If that -- I don't recall the date, but I was promoted to COO there yeah.
Q. Did you know in May when the trust was created that you were going to be promoted into that COO role?
A. No.
Q. Trident was formed in about September of 2022, correct?

DRAFT COPY

A. I know it was the end of 2022 I don't recall when, but.
Q. Had you already considered or thought about starting Trident at the time that the trust was created in May of 2021?
A. I don't believe so. They weren't related.
Q. Do you recall when you first started discussing the creation of Trident with Schultz?
A. No.
MR. PAULSEN: For what it's worth objection, foundation.
BY MS. VANDESTEEG:
Q. To your knowledge, since March 30, 2025, have you transferred any additional assets into the trust?
A. I don't know.
Q. Who would know?
A. I guess Tim would:
Q. To your knowledge, since March 30, 2025, have you removed any assets from the trust?
A. I don't believe so.
Q. Let's go back to Exhibit 5. Okay. Please turn to Page 17 of 54 of Exhibit 5. I'm going to direct your attention to Number 33 about a third of

DRAFT COPY

the way down that page which is request to list claims against third parties whether or not you have filed a lawsuit or made a demand for payment. Do you see where I am?

A. In 33.

Q. Yes?

A. Yes.

Q. And you list I'll quote, claims against FW-CO, Inc. DBA Fortis and Richard M. Lewis for earned but unpaid wages, parens, 60,000, end paren, accrued but unused vacation time parens, as 20,000, end parens, due and owing commissions, parens, 250,000, end parens, severance pay, parens, as 800,000, end parens, and related claims including travel damages pending in the district court of Colorado as Case Number 25-CV-00254.

Did I read that correctly?

A. Yes.

Q. And you have that claim the value of that claim list willed as 3 million 390 thousand dollars correct?

A. I see that there: Yes.

Q. How did you come to calculate that number?

A. I don't know what the exact calculation

DRAFT COPY

was. I think there was some calculation of adding these up and whatever these travel damages were over that period of time compounded to that number.

Q. Is it your understanding that each one of those separated parts that makes up the total claim is subject to travel damages in Colorado?

MR. PAULSEN: Objection calls for legal conclusion but you can answer.

THE WITNESS: Yeah, I don't know.

BY MS. VANDESTEEG:

Q. Breaking that down, do you believe that your claim exists both against the company and also against Mr. Lewis personally?

A. That's what was explained to me, yes.

Q. And do you understand that that claim and the potential damages related to it would need to be broken down between Mr. Lewis personally and/or the company?

MR. PAULSEN: Objection, calls for a legal conclusion.

You can answer.

THE WITNESS: Yeah, I don't -- I don't know.

BY MS. VANDESTEEG:

Q. Can you turn to Page 21 of 54, please.

DRAFT COPY

And this is part of schedule C, the property you claim as exempt and if I go to the last claim that you list as exempt on this Page 21 of 54 which is again that same claim against FW-CO, Inc. DBA Fortis and Richard M Lewis again listed at 3 million 390 thousand dollars, under amount of exemption you claim you list 85 percent.

Why did you list 85 percent there?

MR. PAULSEN: Objection, calls for legal conclusion.

You can answer.

THE WITNESS: I don't know.

BY MS. VANDESTEEG:

Q. Do you know why it's not a hundred percent.

A. I don't know.

Q. Please turn to Page 22 of 54 which lists schedule D creditors who have claims secured by property. I'll direct your attention to 2.1 which lists Old Second National Bank do you see where I am?

A. Yes.

Q. It lists an amount of claim at 228,575.50, correct?

DRAFT COPY

A. Yes.
Q. What gives rise to that claim?
A. I assume that that was the amount due on the loan.
Q. Which loan?
A. The home loan.
Q. Home mortgage?
A. Yes.
Q. How much is your monthly mortgage payment?
A. I think it's about 3 thousand dollars.
Q. Do you know exactly how much it is?
A. I think it's $3,000. I don't know exactly.
MS. VANDESTEEG: I'll hand you what we'll mark as Exhibit 11.
(WHEREUPON, David Schupmann Deposition Exhibit No. 11 was marked for identification.)
BY MS. VANDESTEEG:
Q. Exhibit 11 -- this is the note for your -- the mortgage on your house, right?
A. I believe so.
Q. And it calls out about halfway down this first page the amount of monthly payments correct?

DRAFT COPY

A. Yes.
Q. It states that the monthly payments is in the amount of 2, 973.82, correct?
A. Yes.
Q. Do you know how much you currently pay every month on your mortgage?
A. I think 3 thousand dollars.
MS. VANDESTEEG: I'll hand you what has been marked Exhibit 12.
(WHEREUPON, David Schupmann Deposition Exhibit No. 12 was marked for identification.)
BY MS. VANDESTEEG:
Q. Do you know what this document is?
A. It looks like -- I don't want to speculate you can tell me.
Q. Let's look at the top of the document it references Dovenmuehle mortgage Inc.
Are you familiar with Dovenmuehle mortgage Inc.?
A. I'm familiar with the name related to the mortgage yeah.
Q. Is that the name related to the mortgage?
A. Yes.

DRAFT COPY

Q. He'll represent to you this is a statement of payments on your mortgage over the years, okay?
A. Okay.
MR. PAULSEN: Objection, foundation. Carry on.
BY MS. VANDESTEEG:
Q. So if you look through the payment history, you see for every month there is a payment, yes, for the mortgage payment of 2,973.82, correct?
MR. PAULSEN: Objection, foundation.
You can answer.
THE WITNESS: I can see there's a payment for that, yes.
BY MS. VANDESTEEG:
Q. There's also an additional payment each month of 26.18?
MR. PAULSEN: Objection, foundation.
You can answer.
THE WITNESS: I see the 26.18.
BY MS. VANDESTEEG:
Q. If we add 26.18 and 2973.82, it's 3,000, correct?
A. I believe so.
Q. And it was your understanding your

DRAFT COPY

recollection that you've been paying 3 thousand dollars a month on your mortgage, correct?
A. Yes.
Q. So with every mortgage payment you make you also make an additional payment of 26.18 on the principal correct?
MR. PAULSEN: Objection foundation you can answer.
THE WITNESS: Yes.
BY MS. VANDESTEEG:
Q. You and Jennifer co-obligors on the mortgage, correct?
A. Yes.
Q. What is I your plan for treatment of this claim in your bankruptcy proceeding?
A. I don't know.
Q. If you were unable to pay the monthly mortgage payment, would Jennifer be able to pay it herself?
A. I don't know.
Q. This home is currently in the trust, correct?
A. I believe that's correct.
Q. So every time there's a 3 thousand dollar

DRAFT COPY

payment it pays an extra 26.18 into the trust?
MR. PAULSEN: Objection, foundation.
Objection, mischaracterizes prior testimony.
You can answer.
THE WITNESS: I don't know.
BY MS. VANDESTEEG:
Q. Let me ask a different way.
To the extent that every month you are slightly over paying your mortgage, the benefit of that over payment goes toward increasing of equity in the home in the trust, correct?
MR. PAULSEN: Objection, calls for legal conclusion.
You can answer.
THE WITNESS: The 26.18 increases equity value. Yes.
BY MS. VANDESTEEG:
Q. With every payment, correct?
A. Yes.
Q. Turning to Page 23 of 54, and then carrying on?
A. Exhibit 5.
Q. Yes, still inform Exhibit 5 thank you for clarifying?

DRAFT COPY

A. Sure. 23 you said.
Q. Correct. Let's look at 23. We are now looking at schedule E/F creditors who have unsecured creditors. You list capital one. Why is capital one an unsecured creditor for you -- of you?
MR. PAULSEN: Objection calls for a legal conclusion.
You can answer.
THE WITNESS: I don't know.
BY MS. VANDESTEEG:
Q. Do you have a capital one credit card?
A. I don't know. I don't think so. I think it's tied to like a Coles or something like that, but I don't -- I don't know that I have -- I don't have any credit cards, but.
BY MS. VANDESTEEG:
Q. Why did you list it on your schedules?
A. I think my name at the time was listed on here.
Q. So let me make sure I understand.
In March -- on March 30, 2026, your name was listed on a capital one card potentially a Coles card, correct?

DRAFT COPY

A. Yeah, I'm gonna say I don't know. It would have been a reason, but I don't know what it was.
Q. You didn't know when you signed this or you don't know now?
A. I don't know now.
Q. You believe the capital one card is a Coles card?
A. I don't know.
Q. Are you currently carrying a Coles card?
A. I am not.
Q. Does Jen carry a Coles card?
A. I don't know.
Q. In any event, your schedule shows that there was nothing owed on that card at the time that you filed correct?
A. That's what it shows.
Q. Let's turn the page to Page 24 of 54: You list a chase card member services as an unsecured claimant. As of March 30, 2026, did you have a chase card?
A. As of March -- excuse me.
Q. 30, 2026?
A. I don't -- I don't -- I don't know. I'm

DRAFT COPY

not sure of the date.
Q. Do you know why this card is listed, why this claimant is listed as an unsecured creditor?
A. As I sit here, I do not.
Q. Do you currently have a chase card?
A. I do not.
Q. Does Jennifer have a chase card?
A. I don't know.
Q. In any event, the value is listed as zero on this schedule correct?
A. Yes.
Q. Next down the line 4.3 is discover, do you know why discover is listed on this schedule?
A. No.
Q. Do you have a discover card?
A. I do not.
Q. Does Jennifer have a discover card?
A. I don't know.
Q. Mr. Schupmann do you have any credit cards in your wallet?
A. I have -- I have one but it's I'm named on it, but I mean, it's not my card.
Q. What kind of a card is it?
A. I don't know. You want me to look.

DRAFT COPY

Q. Yeah, I do.
A. Whatever this is.
Q. Okay. So that card has your name on it?
A. Yes.
Q. But and that looks like it's a united chase card united visa card?
A. Right.
Q. Okay. Is that fair listed somewhere, is that the chase card member services card listed here?
A. No.
Q. Who's responsible for payment of that card that you just showed me?
A. I'm named as a user on Jenny's account.
Q. Are you responsible for payment of that?
A. I don't think so.
Q. Did you sign up for that in any way?
A. I did not.
Q. What do you charge to that account -- to that card?
A. Hardly anything.
Q. About what types of things?
A. Oh, if I -- nothing routinely, but you know, if I travel for something maybe for my son or

DRAFT COPY

for my daughter maybe something that's not essential household type thing I'll put it on there.

Q. So that type of expense would not show up otherwise on what you believe your expenses to be here in your bankruptcy schedules?

A. I don't think we -- I'd have to go back and check. I don't know.

Q. Is there any agreement let's start -- is there any written agreement between you and Jennifer in terms of your ability to use that card and her requirement and obligation to pay for any charges you put on that card?

A. I don't -- there's not a written -- I just ask if I can use it.

Q. Do ask every time you charge something?

A. I don't use it that often. I don't -- I don't -- I don't know.

Q. When was the last time you can you can remember swiping that card?

A. I don't remember.

Q. Was it in the last day?

A. I don't think so, no.

Q. What about in the last week?

DRAFT COPY

A. I don't think so.
Q. The last month?
A. I don't know.
Q. Is there any unwritten agreement between you and Jennifer in terms of your ability to charge things to this card, the card that you just showed us, the united visa and her obligation to pay for them?
A. Please ask me again.
MS. VANDESTEEG: Please read it again.
(WHEREUPON, the record was read as requested.)
THE WITNESS: I don't think so, no.
BY MS. VANDESTEEG:
Q. Do you have the discretion to use and charge things to that card whenever you want?
A. I don't.
Q. Has Jennifer placed specific restrictions around what you are permitted to put on that card either in terms of specific items or in terms of dollar amount?
A. I don't think so.
Q. I think that one's a yes or no?
A. Okay. I don't know.

DRAFT COPY

Q. Do you recall any conversations with Jennifer about your use of that card?

A. Other than just kind of more discretionary spending stuff we would have put it on there or I would put it on there.

Q. What do you mean by more discretionary spending stuff?

A. Like for instance, a travel to see one of my son's baseball games or maybe to go see one of her volleyball games, something that's a not kind of, you know, like a mortgage or something like that.

Q. Is there a clear list that you and Jennifer came up with respect to what if constitutes discretionary spending items versus expense items?

A. No.

Q. So again is that in your discretion?

A. It follows -- it's meant to follow the same plan that we have put forth in the bankruptcy schedule.

Q. What do you mean by that?

A. So I guess things that we would spend money on that -- I mean, they may be essential to

DRAFT COPY

the house but don't fit the schedule maybe needs a new like I said travel or something like that. I'm not doing a good job of answering your question. And maybe because I don't understand it. So you're asking me is there a written documentation about how I'm to use the card. The answer is no to that.

Q. And then I asked if there are specific guidelines around what you are permitted to put on that card either in terms of items or dollar amount.

A. I'd say not specifically.

Q. For the category of discretionary items that you put on the card, are those items or amounts otherwise reflected in your monthly operating reports?

A. No.

Q. Are those items or amounts otherwise reflected in your petition and schedule of expenses?

A. So moneys that I that are on the card are they reflected in there -- I think under there was a in the schedule under Jenny's expenditures, so it would have been there, but not under mine.

Q. So just so I'm clear to make sure that

DRAFT COPY

we're putting all of this together, is it your contention that items that you spend on the chase visa card are not items within the purview of your expenses for bankruptcy purposes?

A. I don't know that to be the case, no. They're just items that if there were an issue that Jenny would cover or would be happy to cover.

Q. In terms of Jenny covering them in terms of the payment for those things, that is at her discretion and there's no specific obligation for her to pay those, correct?

A. I don't know that. If it's her card she would have an obligation to pay for it.

Q. Is there any other written obligation whereby Jenny has committed to a certain fixed level of financial support to you?

A. I don't think so.

Q. It's at her discretion again in terms of additional sums that she may want to pay toward discretionary spending?

A. There's -- you're asking if there's something written about that?

Q. Yes.

A. I don't believe so.

DRAFT COPY

Q. Going back to Pages 23 through 25 of Exhibit 5, after we get past the three credit card claims each of which are listed a as at zero, there only two unsecured creditor claims listed, correct?
A. Yes.
Q. And that again is one for FW-CO Inc., correct?
A. Yes.
Q. And the other is for Taft, correct?
A. Yes.
Q. I had e like you to turn to Page 27 of 54, please. This page references schedule H your co-debtors. Do you see where I am?
A. Yes.
Q. Do you know what a co-debtor is?
A. I'll take your explanation.
Q. No, I'm asking you?
A. Oh.
Q. Do you know what a co-debtor is?
A. Nothing I'd be sure of, no. I cover read this description right here.
Q. You list Jennifer Schupmann as a co-debtor on several different claims, correct?
A. Yes.

DRAFT COPY

Q. You list her as a co-debtor on 2.1. Do you know what that references, schedule D 2.1 and I can point you back to Page 22 of 54 for that.
A. Okay got it.
Q. So that list it's the mortgage?
A. Yeah.
Q. Do you agree Jennifer is a co-debtor on that mortgage?
A. Yes.
Q. Jennifer's also listed as a co-debtor on schedule E/F line 4.1 and 4.2?
A. Yes.
Q. And we were just looking at those. Those were capital one and chase. Do you know why you were listed as co-debtors on those credit cards?
A. Must have been -- I don't -- I don't recall.
Q. I see that she's not listed as a co-debtor on the discover card. Do you know why that is?
A. No.
Q. Do you believe that Trident should be listed as a co-debtor on the Taft claim?
A. I don't know.
Q. To your knowledge, does Trident have any

DRAFT COPY

payment obligation together with you on the Taft claim?

A. I don't know.

Q. Same question with respect to Roofing USA, do you think Roofing USA should be a co-debtor on the Taft claim?

A. On my -- on my claim? I don't know. I don't think so.

Q. What about Schultz, do you think Schultz should be listed as a co-debtor on the Taft claim?

A. I don't think so.

Q. Let's turn to Page 28 of 54 which is schedule I your income?

A. Uh-huh.

Q. Your employer is Roofing USA LLC, correct?

A. Yes.

Q. What is your current title at roofing LLC -- I'm sorry -- Roofing USA?

A. Vice president of sales.

Q. When did you first have any business relationship with Roofing USA?

A. Me personally.

Q. Uh-huh, yes.

A. Personally, not until January of '25.

DRAFT COPY

Q. How else could you have had' business relationship with Roofing USA other than personally prior to January of 2025?
A. There was a consulting agreement that Roofing USA had with Trident that Charlie was running.
Q. Charlie's Schultz?
A. Yes.
Q. When did Roofing USA and Trident enter into that consulting agreement?
A. I don't know if there was anything formal H I think it was like July, August of '24. It was right around when Charlie was terminated.
Q. To your knowledge, was there a written consulting agreement between Trident and Roofing USA in that July, August 2024 time period?
A. I don't recall.
Q. Have you ever seen a written consulting agreement between Trident and Roofing USA?
A. I don't recall.
Q. Did you have any participation in drafting a consulting agreement between Trident and Roofing USA?
A. I don't recall that there was one at that

DRAFT COPY

time.
Q. Was there one at any time?
A. We had put together one the end of '24, I think was end of '24 for Charlie to continue services with them and it was rejected.
Q. Who is we in that sentence?
A. Charlie Schultz.
Q. You and Charlie?
A. Yes.
Q. Who rejected that contract?
A. Roofing USA.
Q. When did they reject the contract?
A. I don't recall exactly when.
Q. Why did they reject the contract?
MR. MORRELL: Objection, foundation.
You can answer.
THE WITNESS: I don't recall. I think they wanted to hire someone full time.
BY MS. VANDESTEEG:
Q. Hire someone full time for what?
A. In their office, I'm not sure what their role would have been.
Q. Let's go back to the July August time period before you're aware there was at least a

DRAFT COPY

draft of it -- a consulting agreement?
What was the nature of the agreement for consulting purposes? What services or consulting or otherwise were being provided.
A. Assistance with sales hiring, assistance with kind of sales structure, I think assistance with like sales accountability.
Q. During that time period, let's say July of 204, did you have any involvement in those consulting services provided to Roofing USA?
A. I did some things -- I sat in on some phone calls and I probably consulted after hours with Charlie on them. I'm sure I had some calls with Brian in there as well.
Q. And what were the nature of the calls with Brian?
A. Just check ins see how things were going, see the effectiveness, make suggestions kind of business consulting type stuff.
Q. When did you begin these business consulting services for Roofing USA?
A. What do you mean?
Q. I'd like for you to give me a little bit of a clear timeline over that course of 2024. You

DRAFT COPY

mentioned, and this is where I need clarification from you?

A. Sure.

Q. Originally it was just Charlie who was providing some consulting services?

A. Yeah.

Q. But then there was a consulting agreement that was proposed at end of 2024. You mentioned that there was some phone calls that you sat in on and you talked to Charlie:

I had alike to understand with more clarity what the nature of your involvement was personally at those different periods of time, what were you doing?

A. I'm pretty sure I outlined all of this to damn Kimball when I was working at Fortis when he asked me about this activity and there was November issue with this, by the way.

By Roofing USA approached me through some kind of headhunter. They actually interviewed me to come work there. You know, didn't think it was a good fit wasn't something I wanted to do. I let them know immediately I had a noncompete. They weren't interested in anything I was doing in my

DRAFT COPY

current role.
Charlie, I think, was terminated at the time: I have to check the dates on these, but the way I recall it was somewhere around there Charlie was terminated. He was looking for something to do. I paired him up with Roofing USA through Trident. So I sat on some calls to help get him up to speed and then Charlie kind of took the calls after that. And it was -- it was just like I said, kind of sales hiring, on boarding, sales structure and was all specific to that market and roofing contracting services, not in competition with Fortis.
Q. When did Roofing USA first approach you through that he headhunter?
A. I don't recall. Sometime, I believe, mid '24, I believe. I think that's right: And I was taking other calls at the time. I had interviewed with a couple of other roofing contractors to which Fortis also knew about and was fine with specifically Flynn companies. So it was fairly knowledgeable that I had taken some interviews during that time.
Q. You said that when Roofing USA first

DRAFT COPY

approached you and you talked about through the headhunter that they weren't interested in you, is that --

A. No, I wasn't interested in the opportunity.

Q. What changed? Between when that headhunter approached you and when you did go to work with Roofing USA in terms of your interest in it?

A. Well, I was terminated and looking for employment.

Q. Was there anything else that had changed in terms of the nature of the services that you would be providing and the work that you would be doing?

A. From what?

Q. Between the position that was offered to you by the headhunter and the position you took when you went to go work fore Roofing USA?

A. I don't think we talked about particulars of the actual position when I talked initially. It was just more about the company and the size and capabilities and that sort of thing.

Q. Was Roofing USA prior to you go going to

DRAFT COPY

work there a contractor that performed work for or with Fortis?

A. It was not. In fact, I had three offers at the time. One was for Blue Thread Services a national company that was private equity held out of Denver. One was a solar company out of Washington, D.C. and the other was Roofing USA. I specifically chose Roofing USA because it was a small roofing contractor that had nothing to do with the warranty industry, it was out of their market and should have been the least -- the least problematic company for me to go to.

Q. Did you receive any compensation for consulting services from Roofing USA before you left your employment with Fortis?

A. I would have received -- not directly, no.

Q. What about indirectly?

A. I would have received money through Trident.

Q. Do you recall how much money Trident was receiving from roofing services for these consulting services?

A. From Roofing USA?

Q. Yes.

DRAFT COPY

A. I think the agreement was about $5,000 a month.
Q. Did that go up to ten thousand dollars a month?
A. Not that I recall.
Q. Do you recall when Roofing USA started paying Trident the consulting fees?
A. I thought it was mid -- mid to late -- maybe third quarter 2024, otherwise I don't -- I don't know.
MS. VANDESTEEG: I'm going to hand you what we will mark Exhibit 13.
(WHEREUPON, David Schupmann Deposition Exhibit No. 13 was marked for identification.)
BY MS. VANDESTEEG:
Q. Do you recognize what I've handed you marked Exhibit 13?
A. I don't think I've seen I know Charlie put out these invoices but could have been.
Q. Do you agree with me they appears to be a invoice issued by Trident to Roofing USA for August 2024 consultation?
A. Yes.

DRAFT COPY

Q. So?

A. Well, yes. I don't know what this amount was for. I see what was outlined here. I don't know if it was for a single month I didn't create this.

MR. PAULSEN: Do we have much more to go on this: I've let you talk a lot about Trident and their relationship with Roofing USA, but this feels like it's getting more into things that don't have anything to do with Dave and have more to do with Charlie Schultz and Fortis and that dispute with Charlie.

MS. VANDESTEEG: He may have just solved it therefore on his on.

BY MS. VANDESTEEG:

Q. Do you have any personal knowledge with respect to these invoices that were issued by Trident to Roofing USA?

A. I didn't issue these invoices.

Q. That's not quite my question?

A. Okay.

Q. Do you have any personal knowledge with respect to these invoices?

A. I know Trident invoices Roofing USA, does

DRAFT COPY

that answer your question?
Q. Do you know overall how much Trident?
A. Oh.
Q. Invoiced Roofing USA?
A. Not as I sit here today, no.
Q. Of but with respect to these specific invoices you are ear not the person to testify to these?
A. I don't believe so.
Q. And who would be?
A. I believe this was put together by Charlie Schultz.
Q. Did Trident have any other employees?
A. No.
Q. It was just you and Charlie?
A. Yes.
Q. And it wasn't you who prepared or issued these invoices?
A. I didn't issue these or prepare them, no.
Q. Did you at any time provide Roofing USA with any Fortis information customer lists pricing anything of that nature?
MR. PAULSEN: Objection, this is squarely within the protective order. The motion for

DRAFT COPY

protective order so I instruct you not to answer that pending resolution of our motion for protective order.

BY MS. VANDESTEEG:

Q. Did you steer any Fortis business toward Roofing USA at any point in time?

MR. PAULSEN: Objection, this is within the protective order. Instruct you not to answer that have until our protect order is resolved.

BY MS. VANDESTEEG:

Q. Did you at any time give Roofing USA any competitive advantage based upon your inside knowledge of Fortis?

MR. PAULSEN: Same objection. Instruct not to answer until motion for protective order is resolved.

BY MS. VANDESTEEG:

Q. Who hired you at Roofing USA?

A. Brian Tice.

Q. Did you disclose to anyone at Fortis that you were being recruited by Roofing USA?

A. I may have as part of my discussion can with Dan Kimball about Trident, yes.

Q. Anyone else at Fortis that you may have

DRAFT COPY

disclosed this to?
A. I don't recall.
Q. I believe you testified that you started employment with Roofing USA in January of 2025; is that correct?
A. I believe that's correct.
Q. Was there a written offer letter?
A. Yes.
Q. Do you know when that written offer letter was signed?
A. I believe early or mid January 2025.
Q. What is your current annual salary at Roofing USA?
A. It's a base of 300,000.
Q. Is that guaranteed?
A. Yes.
Q. Do you receive bonuses?
A. I haven't yet.
Q. Are you eligible to receive bonuses?
A. If we ever have something to get bonused -- I don't know. I don't recall in my offer letter anything specific about bonuses.
Q. Do you know how any bonus would be calculated?

DRAFT COPY

A. No.
Q. And there's no certainty you will receive a bonus for this year for example?
A. That's correct.
Q. Is there any certainty you would receive a bonus next year?
A. No.
Q. Is there any certainty you would receive a bonus in the next five years?
A. No.
Q. With respect to your base salary is that base salary indefinitely or does it include any sort of an annual step-up?
A. Nothing's promised beyond the initial base salary.
Q. Is there any language in your in the letter in which you are entitled to any sort of annual discussion as to a base salary adjustment?
A. I don't recall.
Q. To your knowledge, is any salary adjustment entirely discretionary on the part of Roofing USA?
A. Per the letter?
Q. Let's start with per the letter?

DRAFT COPY

A. I don't I don't -- I think the letter's silent on it. I don't I don't -- I don't know anything specific.

Q. Do you have an employment agreement with Roofing USA?

A. I have a I think maybe a one page document with them. I don't know if that constitute that as employment agreement.

Q. What is that one page document contain?

A. Salary information, probably job title. I'd be speculating on the rest.

Q. Has there been any adjustment in that one-page document with salary and job description since you started at Roofing USA in January of 2025?

A. No.

Q. Do you receive commissions?

A. No.

Q. Are you entitled to receive commissions?

A. No.

Q. Is it would it be accurate to say that it is possible that your future earnings with Roofing USA could increase?

A. Potentially.

DRAFT COPY

Q. Would it be accurate to say that have it is possible that your future earnings with Roofing USA might decrease?
A. It's possible.
Q. Do you have any equity or ownership interest inform Roofing USA?
A. No.
Q. Does Roofing USA provide you with any other form of benefits or compensation that would have of a dollar value in the form of a car allowance, expense account, other benefits?
A. I get a thousand dollars a month for general stipend for car, phone, internet, et cetera.
Q. Anything else?
A. No.
Q. Are you entitled to reimbursements for business expenses from Roofing USA?
A. Yes.
Q. Is there a limit on what you can you can expense to be reimbursed through Roofing USA?
A. We set a budget, so there's a target for it, but I don't know if there's a limit.
Q. What is what is the current target?

DRAFT COPY

A. I think it's $36,000 annually.
Q. Does the one page document that you have contain any sort of a noncompete or non-solicit provision?
A. I don't believe so.
Q. Has Roofing USA in any way agreed to help pay for the cost of the pending litigation with Fortis?
A. For my personal debts?
Q. Yes.
A. No.
Q. Do you have a company vehicle?
A. No.
Q. Does Roofing USA otherwise in any way indemnify you with respect to the pending litigation with Fortis?
A. No.
Q. What do you believe your earning capacity today is?
A. I don't know.
Q. Given your prior experience as an executive at a national company, do you believe that you could earn more than you currently do at Roofing USA?

DRAFT COPY

A. Potentially.
Q. Have you looked for employment?
A. Not actively.
Q. When was the last time you did look for other employment?
A. If someone calls, I'll listen.
Q. Is it your position as you sit here today, that Roofing USA is not a competitor of Fortis?
A. It is not.
Q. Is it your position as you sit here today that there is no overlap of services provided to customers by Roofing USA and Fortis?
A. Correct. Correct. Excuse me. Correct.
Q. Does Roofing USA currently employ any sort of a warranty roofing warranty service to its customers?
A. Similar to Fortis?
Q. To start with just more broadly?
A. So in the commercial roofing industry in of many states it is required and in very, very common practice to offer a contractor guarantee that has to go to the workmanship when a roofer is replaced. It's usually limited to somewhere between one to two, one to three years and is

DRAFT COPY

direct leave associated with the installation of that. Almost every contractor has that.

Q. Does Roofing USA have any sort of program whereby it refurbishes roofs without replacement and provides any sort of warranty program?

A. No. And if we did, we wouldn't even be the only one in the market that had that.

Q. Do you have any other sources of income presently outside of Roofing USA?

A. No.

Q. Does Top Pick generate any income for you these days?

A. No.

Q. Does Trident generate any income these days?

A. No.

Q. How much income did you get from Trident during the time period of 2023 through 2025?

A. I think that we stated in our documents it generated between three and four hundred thousand dollars over, I don't know, three or four year period.

Q. How much income did you derive from Trident during the time period of 2023 through

DRAFT COPY

2025?
A. I got half of whatever came in minus taxes.
Q. If I wanted to find an accurate number as to what income you derived from Trident, would your tax returns be the right place to look?
A. Yes.
Q. Are there any other documents that you would recommend that we go to determine how much income you derived from Trident?
A. We disclosed everything. We'd third party accountant that have managed it and produced our taxes.
Q. Let's go back to Exhibit 5. Please turn to Page 29 of 54. 29 of 54 provides the calculation with respect to the combined monthly income for you and Jennifer your non-filing spouse, correct?
A. Yes.
Q. And there's a note down at the bottom Number 13, that asks do you expect an increase or decrease within the year after you file this form, correct?
A. Yes.

DRAFT COPY

Q. And you checked the box yes and you stated and I quote, both employers railroad not withholding a sufficient amount of tax withholdings and that will need to increase which will result in a reduction to net.

Did I read that correctly?

A. Yes.

Q. So it's your position that the net combined monthly income will actually decrease once there are more tax withholdings factored in, correct?

A. Correct.

Q. How much do you believe that it's going to decrease as a result of that increased tax withholding?

A. I don't recall the answer to that.

Q. Do you have a ballpark?

A. I don't remember.

Q. Will it decrease for both you and Jen?

A. Yes.

Q. Will it decrease by more than a thousand dollars?

A. Yes.

Q. For both of you?

DRAFT COPY

A. I don't know.
Q. Will it decrease -- I'm sorry. Will it decrease by more than a collective $2,000?
A. A collective 2,000 yes.
Q. Will it decrease by more than a collective $5,000?
A. I don't recall.
Q. Who prepared the calculation for you in determining how much more additional tax withholdings will be necessary?
A. Our tax accountant.
Q. Who is your tax accountant?
A. Trillium.
Q. Is there a specific individual?
A. It's Lora. I can't remember her last name -- Willis.
Q. W-L-L-I-S?
A. W I L L I S, I believe.
Q. Okay. Did Lora tell you when you should expect to see this decrease as a result of additional tax withholdings?
A. I think it was just an adjustment to the withholdings on a monthly basis.
Q. Has that already taken effect?

DRAFT COPY

CONFIDENTIAL
UNCERTIFIED ROUGH DRAFT



A. I believe so.
Q. Let's turn the page to 30 of 54 schedule J your expenses. Part 1 asks if this is a joint case and you state no, correct?
A. Correct.
Q. Part 2 goes on to ask you to estimate your ongoing month lie expenses, correct?
A. Yes.
Q. Will you estimate these ongoing expenses, are these just your expenses or are these joint expenses?
A. I believe they're -- some of them refer joint expenses.
Q. How am I supposed to know which of these are joint expenses and which are your expenses?
A. I don't know.
Q. You see under Part 2, right, before you begin the listing the column of the listing of expenses it does state your expenses, correct?
A. Yes.
Q. And you understand that this calculation of expenses is critical to determine your monthly net income at 23C, correct?
MR. PAULSEN: Objection, calls for legal

DRAFT COPY

conclusion. Objection, argumentative.
You can answer.
THE WITNESS: Yeah, I don't know.
BY MS. VANDESTEEG:
Q. Well, let's go through them. Line 4, rental or home ownership expenses for your residence listed at 2974, is that your mortgage payment?
A. Yes.
Q. But you pay 3,000 a month on that, correct?
A. I have been, yes.
Q. Is that -- have you individually been paying 3,000?
A. I write a check for 3 thousand dollars for the mortgage.
Q. Do you consider that to be an individual personal expense?
A. That's a household expense.
Q. So is that a joint expense?
A. It's a household expense.
Q. I need to understand again which of these expenses you take the position are your expenses for purposes of -- for purposes of determining what

DRAFT COPY

your?
A. Yeah.
Q. Disposable income is so I need to understand is this?
A. I believe.
Q. Hold on hold on?
A. All right. I'm sorry.
Q. Can he got to keep a clean record so I need to drill down into is it your view that this is a David debtor expense or is this a joint expense?
A. Yeah, this is David debtor expense.
Q. And you believe that have this is a David debtor expense that must be paid 3 thousand dollars on a monthly basis?
A. Yes.
Q. Notwithstanding the fact that he you and Jen are jointly responsible on that mortgage, correct?
A. Yes.
Q. Let's go down to 4 A, real estate taxes. You have listed under your expenses real estate taxes on a monthly basis at 1, 120 dollars. What how did you come to that number?

DRAFT COPY

A. I believe that's the estimate of our monthly real estate taxes.
Q. So is that the monthly estimate for the total real estate taxes that are due on that joint home on Crego Street?
A. Place.
Q. Place, thank you?
A. Yes.
Q. So I am clear you are taking the position that the full amount of real estate taxes due on the joint home is a David debtor specific expense?
MR. PAULSEN: Objection, it calls for a legal conclusion.
You can answer.
THE WITNESS: Yes.
BY MS. VANDESTEEG:
Q. Again, notwithstanding the fact that that property is owned in tenancy by the entirety correct?
MR. PAULSEN: Objection argument. Objection calls for a legal conclusion.
THE WITNESS: Yeah, I don't know.
BY MS. VANDESTEEG:
Q. But you take the position again here on

DRAFT COPY

schedule J that the total e of the real estate taxes are a David debtor expense?

MR. PAULSEN: Objection.

MS. VANDESTEEG: Correct.

MR. PAULSEN: Sorry objection calls for a legal conclusion.

THE WITNESS: I don't know.

BY MS. VANDESTEEG:

Q. 1120 is listed here on 4A correct, we can at least agree on that 1120?

A. Yes.

Q. 4A property homeowners or renters insurance is listed as 263 how did you come to that calculation?

A. I believe we just took the homeowners insurance bill and divided it by 12.

Q. Again that's the total homeowners insurance bill broken down on a monthly basis and you are taking the position that homeowners insurance is a David debtor expense is that correct?

MR. PAULSEN: Objection. Sorry. O, calls for a legal conclusion.

You can answer?

DRAFT COPY

THE WITNESS: I don't know.
MS. VANDESTEEG:
MR. PAULSEN: Can I we've been back for about an hour since our little break. I know you're in the middle of schedule J but they have might be after good time for a break unless you're going to power through this quickly.
MS. VANDESTEEG: Let's at least power through Page 30 and then we'll take a break at the bottom of Page 308.
BY MS. VANDESTEEG:
Q. Let's move on to 4C.
4C lists home maintenance repair and upkeep expenses. And you have a thousand dollars a month scheduled as a debtor expense.
What goes within home maintenance repair and upkeep expenses for a thousand dollars a month?
A. Could be anything, could be landscaping, could be filters, it could be things that break, could be a variety of things.
Q. Was it your -- when you put together that $1,000 a month expense, was that calculated upon your expectation of the sum total of home maintenance expenses that come up on any given

DRAFT COPY

month?
A. No, I don't -- I think that is that's a portion of it.
Q. How much would the total be for all home maintenance repair and upkeep expenses?
A. I don't know.
Q. Is it your position that Jen was responsible for some portion of home maintenance and you as debtor are responsible for some other portion of home maintenance?
A. I don't know.
Q. Moving to have utilities, 6A, electricity heat natural gas listed at 675. Much how did you come to that number?
A. I think I just looked at some past bills for these and added them up.
Q. Are these one 12th of an annualized estimate of all electricity, heat and natural gas expenses for the house?
A. I don't -- I don't recall.
Q. Can you tell by looking at this 675 whether that is debtor expense for the entirety of electricity heat and natural gas or if some portion of those electricity heat and natural gas expenses

DRAFT COPY

are being covered by nondebtor?
A. I don't know.
Q. How would I find out?
A. Probably look on my bank statements as to what I'm paying for these.
Q. Let me ask it a different way.
Did you put together this calculation for 675?
A. In conjunction with my bankruptcy attorney yes.
Q. Okay. So when you put this together, what did you do? Did you look at maybe a handful of monthly bills from the last year in terms of utilities?
A. I don't recall what the process was, but we looked historically at spending there. Yes.
Q. And did you figure out what an annual spend would be?
A. I don't recall the exact process we went through.
Q. Do you remember in connection with that process if you allocated any portion of any of these utility expenses to Jen Schupmann or any other nondebtor entity?

DRAFT COPY

A. I don't recall.
Q. What about with respect to 6C, telephone, cell phone, internet satellite cable services, do you see how that's a listed at 660?
A. Yes.
Q. What falls within that bucket?
A. I don't recall exactly how that was figured.
Q. Does that include Jen's cell phone?
A. I don't recall.
Q. Do you pay for your kids' cell phones?
A. We do. I do.
Q. Does the 660 include your kids' cell phones?
A. I don't recall. I believe so.
Q. Do you believe it also includes Jen's?
A. I believe so.
Q. Do you have a single cell phone provider with the whole family bill?
A. Yes.
Q. It's your understanding that entire cell phone bill would be included within this 660?
A. I don't recall.
Q. Let's go ahead and take a pause right

DRAFT COPY

there individual I had the time is now 313 p.m. this is the end of media five we're off the record.

(WHEREUPON, a short recess was taken.)

VIDEOGRAPHER: The time is now 328 p.m. this is the beginning of media six we're back on the record.

BY MS. VANDESTEEG:

Q. Mr. Schupmann you understand that you are still under oath?

A. Yes.

Q. Going back to the items we were going through on schedule J of expenses, what is Kurt's Turf?

A. It's a landscaping company.

Q. Do you have any personal relationships with the owners or principals of Kurt's Turf?

A. I mean, he's I consider a friend, sure.

Q. What's Kurt's Turf do exactly for landscaping purposes?

A. Typical landscaping.

Q. Would Kurt's Turf expenses for example fall within your category of home maintenance repair and upkeep or would that be separate?

DRAFT COPY

A. I'm trying to remember what I list them at on the MOR report I'm going to say I don't know right now.

Q. Let's take a look continuing on to Page 31 of 54. Line 7, food and housekeeping supplies, what is included within this line expense?

A. Food and housekeeping supplies.

Q. What do you include within housekeeping supplies?

A. I don't know specifically put into that, but I would think typical housekeeping supplies and food.

Q. You list that at $2,000 a month as an expense, correct?

A. Yes.

Q. Is that the total for all food and housekeeping supplies for your entire household on a monthly basis?

A. I don't recall how we got to that estimate.

Q. When you say we in that sentence, who are you referring to?

A. My bankruptcy attorney and I.

Q. But it is your position that you David

DRAFT COPY

debtor are responsible for $2,000 a month in food and housekeeping supplies?

MR. PAULSEN: Objection, calls for legal conclusion.

You can answer.

THE WITNESS: When I at the time I put this together, yes.

BY MS. VANDESTEEG:

Q. Do you have a different position now?

A. I don't think I do.

Q. I think that one's a yes or no question sir?

A. Oh, no.

Q. Let's look at Line 8, childcare and children's education costs. You have that listed as a monthly expense as 1901.22 correct?

A. Yes.

Q. What goes into that monthly expense?

A. I believe that's my daughter's monthly tuition bill.

Q. Your daughter is at private school?

A. Yes.

Q. Is this her total monthly tuition bill or is this a portion of that monthly tuition bill?

DRAFT COPY

A. I don't recall exactly what's into this.
Q. I'm sorry. I did not hear the last part of that sentence?
A. I don't recall what will that number -- that total number represents.
Q. Do you have a current estimation much how much your daughter's monthly tuition is?
A. Yes, I don't recall off the top of my head what it is.
Q. Well, we see that he reflected in bank statements?
A. Yes.
BY MS. VANDESTEEG:
Q. Is that tuition paid on a monthly basis?
A. Yes.
Q. Let's look at Line 12 transportation include gas maintenance bus or train fare do not include car payments you list your monthly transportation expenses at $2,100 what goes into that he number?
A. Gas, maintenance upkeep of our vehicles.
Q. Is that gas maintenance and upkeep for all of your vehicles?
A. I don't recall exactly how that was

DRAFT COPY

calculated.
Q. Do you have a general recollection of how that was calculated?
A. Yes. I believe I had to substantiate that too in the 341 review and that was accurate as well, so I don't -- I don't recall the exact pieces to it, though.
Q. You drive the Toyota Tundra correct?
A. Yes.
Q. Do you believe that you spend $2100 a month on gas and maintenance of the Toyota Tundra alone?
A. No.
Q. There in addition Jennifer drives a LEXIS and is there one more vehicle that you are responsible for?
A. Yes. It's my son's car listed somewhere on here.
Q. Do you pay for gas and maintenance for your son's car?
A. Yes.
Q. And do you pay for gas and maintenance for Jennifer's car?
A. Yes.

DRAFT COPY

Q. Do you think as you sit here today, that it is more likely than not that the 21 hundred dollars per month includes gas and maintenance for all three of those vehicles?
A. Some portion of it. Yes.
Q. What do you mean by some portion of it?
A. I don't know what the total of that have includes.
Q. Does your son pay for any gas or car maintenance on his car?
A. I don't know.
Q. Line 13, entertainment, clubs, recreation newspapers magazines and books. You list at $1,000 per month. What is included in that $1,000?
A. Newspapers subscription, dinners with the family, I don't recall all the components that were in that when we calculated this.
Q. Dinners with family are included in Line 13 and not in Line 7 food and housekeeping supplies?
A. I believe that's correct. Dinner out is, yeah, I think we classified that more entertainment. Food up top was more groceries.
Q. What clubs are you a member of that would

DRAFT COPY

go into a 1,000 dollar per month expense here?
A. I have -- if we renew, I have the hunting club. I don't -- I don't recall other clubs.
Q. Are you a member of a fitness club?
A. No.
Q. Is Jennifer a member of a fitness club?
A. I don't believe so. But like she has a Peloton, so that would maybe be a subscription in here.
Q. That would be counted somewhere within these expenses listed here in schedule J?
A. I don't recall. I don't recall the piece -- the exact pieces calculated out.
Q. Did you otherwise have a work book or some other list of documents that you were using to put together this schedule J?
A. I used information that we had -- that I had to assist the bankruptcy attorney put the schedule together, yes.
Q. Let's go back up to transportation for a second.
We saw in your bank statements that in October of 2025 you wrote a check to maple ton Toyota for 19, 500. Was that for the Tundra that's

DRAFT COPY

listed on your schedules?
MR. PAULSEN: Objection, foundation.
BY MS. VANDESTEEG:
Q. You can answer.
A. Say the date again, please.
Q. October '25, October of 2025?
A. That I wrote a check?
Q. Yes, there's a check written out of Account 2063?
MR. PAULSEN: Objection, there's no question there, but objection, foundation.
BY MS. VANDESTEEG:
Q. Do you recall writing a 19, 5 hundred dollars check to maim ton Toyota toward the end of 2025?
A. I didn't -- I don't recall write -- I don't recall writing the check.
BY MS. VANDESTEEG:
Q. Did anyone in your family purchase a car or a truck at maim ton Toyota in October of 2025 for 19, 500 dollars?
A. So I don't remember the timing of it. My son purchased a car because he was involved in an accident where his car got totaled out and received

DRAFT COPY

some insurance money for that, and that money went towards the purchase of his new car. So I don't -- I don't know how that money -- I don't know how that came out of that account.

Q. Line item 14, charitable contributions and religious donations. You have scheduled at $1800 a month. What makes up charitable contributions at $1800 a month?

A. I don't recall the components that go into that number.

Q. Do you generally recall what makes up contributions charitable contributions of $1800 a month?

A. There's weekly giving to our church, special donations, some other charitable donations that I'll provide.

Q. You make regular donations to resurrection Lutheran church and resurrection Lutheran school correct?

A. Yes.

Q. What is resurrection Lutheran church?

A. It's our it's our weekly church home our church home.

Q. How long have you been a member?

DRAFT COPY

A. Since I was ten years old.
Q. The pastor there is Phillip M Schupmann, right?
A. It is not.
Q. I found information online that it was. Was it at some point Phillip Schupmann?
A. At some point it was.
Q. How long?
A. But it is not now.
Q. Okay. Let's break that down. Who is Phillip Schupmann to you?
A. Phillip Schupmann is my father.
Q. How long was your father the pastor of resurrection Lutheran church?
A. I don't know, maybe -- maybe 30 years.
Q. He is no longer the pastor?
A. No.
Q. And when did he stop being the pastor?
A. He retired, I don't know, three or four years ago.
Q. Do you have an idea annually approximately how much you provide in charitable contributions to Resurrection Lutheran church?
A. I think we get an annual statement

DRAFT COPY

somewhere around 10 to 12 thousand dollars I think.
Q. If I represented to you that your tax returns indicate that for the last four years it's in the range of 18 to 20 thousand dollars a year, would that surprise you?
A. No.
Q. Does that sound more accurate as I say that number?
A. I don't.
MR. PAULSEN: Objection argumentative. You can answer.
THE WITNESS: I don't know I'd have to look.
BY MS. VANDESTEEG:
Q. Do you ever receive any donations or goods for in changes for your donations?
A. No.
Q. These are voluntary charitable contributions, right?
A. Yes.
Q. You are not legally obligated to make them, correct?
A. Correct.
Q. For that one in particular, I'll come back to some of these others -- why is it that you

DRAFT COPY

believe those contributions should get paid ahead of creditors?

MR. PAULSEN: Objection, argumentative. Objection calls for a legal conclusion. Objection, foundation.

You can answer.

THE WITNESS: I don't know.

BY MS. VANDESTEEG:

Q. Let's move to have 15, 15A in particular, life insurance. Shows a monthly expense of 1,666 dollars correct?

A. Yes.

Q. What policy or policies make up that life insurance expense item?

A. I don't recall exact lie what made that up.

Q. Do you have a general understanding of what goes into making up that monthly expense?

A. I believe it was or it is the Raymond James policies but I'd have to check I don't know with certainty.

Q. What about the John Hancock policies?

A. Same thing, inside of there.

Q. What are the John Hancock policies?

DRAFT COPY

A. I don't know specifically.
Q. Do you have a policy a life insurance policy with John Hancock?
A. I'd have -- I'd have to check. I don't know.
Q. Does Jennifer have a life insurance policy with John Hancock?
A. I don't know.
Q. Where would you check?
A. I would probably go look at the policy that I have. I haven't looked at it in a while.
Q. Did you look at it before you put together schedule J?
A. I looked at what I pay for these.
Q. Do you have any knowledge as you sit here today as to whether that life insurance monthly expense covers life insurance for both you and Jen or just for you personally?
A. I don't know.
Q. 15 C vehicle insurance, $300 a month. Do you know how that monthly expense was calculated?
A. I believe it was the monthly fee from our or from my -- from our policy. We have the home and auto policy.

DRAFT COPY

Q. So would that home and auto policy cover all of your all three vehicles?
A. I believe so.
Q. So does this 3 hundred dollars a month expense reflect insurance for all three of it -- all three vehicles?
A. I believe it's a household policy.
Q. That didn't answer my question it's listed for vehicle insurance. Does this cover insurance for all three vehicles?
A. I don't -- I don't recall.
Q. Moving on to disability insurance, 15 D, 185 dollars a month, do you know what that disability insurance policy -- who is that for?
A. I'm uncertain whatever exactly it is. I believe it's my policy through Raymond James.
Q. Are you aware of any other disability insurance policies?
A. No.
Q. To your knowledge, does Jennifer have a disability insurance policies?
A. Not that I'm -- not that I recall.
Q. Next line for 15 D, umbrella insurance policy, 75 dollars a month, what does that confer

DRAFT COPY

cover?
A. I believe that's a rider on our home insurance for that insurance policy.
Q. So is that for the benefit of the home and all members of the household?
A. Yes, the household.
Q. Let's move down to 21, you specify rent for son 941.50. Is that your son's total monthly rent payment?
A. I believe so.
Q. And that is listed strictly as an expense on the debtor's schedule here?
MR. PAULSEN: Objection, calls for legal conclusion.
You can answer.
THE WITNESS: Yeah, I'm not -- you keep calling this the debtor schedule.
BY MS. VANDESTEEG:
Q. They're your schedules, you are the debtor yes?
A. It totals up and asks for both of our incomes and gives an ends and there's a non-filing spouse piece on here, so, I mean, I think this is schedule of household expenses. Sore, yes, that's

DRAFT COPY

Kyle's rent payment and he is at school.

Q. Going to 21 for pet care, 650 dollars monthly expense?

A. Yes.

Q. How is that calculated?

A. Same thing, I believe I looked at past invoices from the vet, food, that sort of thing and calculated that.

Q. So it's an annualized total pet care divided on a monthly basis?

A. I believe so.

Q. The next line is non-filing spouse credit card payments, $5,000 a month. What is that?

A. Those are expenses that my wife pays out for different things on her credit cards that are on the schedule or on the -- yeah, that five thousand dollar a month those are like her whatever she spends money on, Netflix account, hair care, whatever.

Q. So those are Jen's personal expenses?

A. I don't think they're personal, I think they're household but whatever she spends it on.

Q. Household expenses are listed up above underline items?

DRAFT COPY

A. A portion of them are. I'm not sure what's included in hers down here.
Q. How would we break that down?
A. I don't know.
Q. Family travel, hotel, airfare rental car miscellaneous, 35 hundred dollars a month, what typically goes into making that 35 hundred dollars a month?
A. That's a lot of the travel for running around to see our kids play different travel sports.
Q. Anything else?
A. I don't really take vacation, but if we do he can, maybe that's in there.
Q. Anything else?
A. Not that I recall.
Q. Going down to Number 24?
A. Uh-huh.
Q. Another question about do you expect an increase or decrease in your expenses within the year after you file this form and you checked the box yes on this?
A. Yes.
Q. And you go on to explain next month

DRAFT COPY

daughter will be added to vehicle insurance and expense will increase by $125 also non-filing spouse needs a new vehicle. Plan is to allow daughter to use current vehicle and non-filing spouse to purchase new vehicle.

Did I read that correctly?

A. Yes.

Q. Has the vehicle insurance expense cost gone up since March 30, 2026, by that $125?

A. I have to verify the amount.

I don't recall.

Q. Has it gone up though?

A. Yes.

Q. What about with respect to a new vehicle, has Jen purchased a new vehicle?

A. She did.

Q. And what did she purchase?

A. Same vehicle that she had for the last 12 years.

Q. Which is what?

A. The LEXIS G X.

Q. So is that a new vehicle that is not presently listed on these schedules?

A. Yeah, she purchased it herself.

DRAFT COPY

Q. When did she purchase it?
A. I think about approximate a month ago.
Q. When you said she purchased it herself from what source of funds did she purchase that LEXIS?
A. I don't what she did for the finances.
Q. Do you know if she purchased it out right or if it's financed?
A. It's financed.
Q. Let's go back to the insurance policies for a second. Life insurance is listed again monthly at 1666 dollars. So I did the math, multiplied by 12, I'll represent to you that that's $17,760 a year in life insurance premiums.
Do you know the underlying policies here, are they term or whole life policies?
A. I'd have to look at the policies I don't recall.
Q. You don't know offhand?
A. I don't.
Q. Do you know if any of those policies have a current cash surrender value?
A. Not as I sit here, no.
Q. Do you know if there are any outstanding

DRAFT COPY

loans against any of those policies?
A. I don't believe so.
Q. Do you know who the beneficiaries are on any of those policies?
A. Not as I sit here right now, no.
Q. Have you looked into whether those premiums could be in any way reduced?
A. I haven't.
Q. Do you expect to have to make any major appliance or equipment purchases in the next year?
A. Yes.
Q. What do you need to buy?
A. We need a new furnace.
Q. Do you have any estimate as to approximately how much a new furnace is going to cost?
A. Not right now, no.
Q. Are there any other major appliance or equipment purchases that you foresee in the next 12 months?
A. Not that I'm aware of.
Q. What about in the next 24 months?
A. I don't know.
Q. What about in the next five years?

DRAFT COPY

A. I don't know.

MS. VANDESTEEG: 14.

(WHEREUPON, David Schupmann Deposition Exhibit No. 14 was marked for identification.)

MS. VANDESTEEG: And 15.

(WHEREUPON, David Schupmann Deposition Exhibit No. 15 was marked for identification.)

MR. PAULSEN: I think I mixed them up.

MS. VANDESTEEG: The thicker one the joint is 14. The thinner one joint is 15.

MR. PAULSEN: Thank you.

BY MS. VANDESTEEG:

Q. Mr. Schupmann I've handed you two exhibits. They're both group exhibits. Exhibit 14 is all of the Old Second National Bank statements for the joint checking account ending in 2063 for the year of 2026. So we have -- we have statement dated January 2026, February 2026, March 2026, April 2026, May 2026, June 2026, and July of 2026, okay?

A. Okay.

Q. Exhibit 15 is Jennifer Schupmann's

DRAFT COPY

individual checking account, account ending in 2277 again another group exhibit for statement dates April 2026, May 2026, June 2026, and July 2026, okay?

A. Yeah. The full grouping isn't a joint checking account though for packet 14, right?

Q. Packet 146 is the joint checking and it should be each of those statements for each of those months.

A. As of April it's just a single account.

Q. Thank you for that clarification. And I will make a flag of that.

For the months of January, February and March 2026 it was a joint account between David and Jennifer, correct?

A. Correct.

Q. Thank you for that clarification.

Okay. Looking first at Exhibit 14 and focusing on the first three months when it was the joint account, this is the account that we were talking about earlier when we talked about how income and expenses were shared prepetition between you and Jennifer, correct?

A. Yes.

DRAFT COPY

Q. So all of your collective income would come into 246 joint checking account correct?
A. Correct.
Q. And all shared expenses were paid out of this joint account correct?
A. Correct.
Q. So as we take a look starting in January for some of the historic prepetition, I want to ask some questions about some specific recurring things that I see when it was a joint account.
Specifically, let's start on first page, there are several payments out to Sallie Mae bank smarty pig of varying amounts ranging from $1,000, 2 hundred dollars, 185.37, 150, 150. What are the payments that are going out of this joint account to the Sallie Mae bank smarty pig?
A. I think that's Jenny's savings account.
Q. Do you have access to that account?
A. No.
Q. Do you have a signatory on that account?
A. I don't believe so.
Q. Can you withdraw any funds from that account?

DRAFT COPY

A. No.
Q. I see for example, on 12-23 a bill payment to AT&T, is AT&T one of the expenses that we were looking at on schedule J under utilities for example?
A. Yes. I think I list that in my monthly MOR report as well.
Q. Would that the fall under 6C telephone cell phone internet satellite cable services?
A. Yes.
Q. Turning the page again 2063, 12-24, there's a line that he says AC Roofing USA reimburse for 2350.17 coming into the account. What does that notation reflect?
A. It would have been -- I think it was probably an expense report.
Q. From your employer?
A. Correct.
Q. Underneath that is a AC Wells Fargo auto draft $1,000. What is that auto draft to Wells Fargo going to?
A. I don't know by looking at this. I don't know.
Q. As you sit here today, are you aware of

DRAFT COPY

any regular recurring auto draft that have would go to Wells Fargo in any form?
A. I don't know what that is.
Q. The next expense down AC chase credit card E pay 21,077.58 -- what credit card would that be referring to?
A. January '26, that was I believe that was the chase card that was listed in the report.
Q. Is that card still active?
A. No.
Q. That's different than the chase VISA that we talked about earlier today?
A. Yes.
Q. Would this card have been a joint card?
A. Yes.
Q. The next line down AC discover e-payment, what is that card?
A. I don't know what that is by looking at this.
Q. What about the next one down, AC principle CCPLN PRIN FINAN, are you aware of any payments to principal? Is that an insurance? Is that something else? Are you aware of what that is as you sit here today?

DRAFT COPY

A. I am not.
Q. What about the next one for Com Ed payment coming out of this joint account 12-30 369.29?
A. I would guess that's the electric bill.
Q. Is that one we would expect to see that's a type of overall expense that we would see listed in schedule J under six, utilities?
A. Yes.
Q. 12-31, incoming from AC -- that's coming in. That one's coming in from roofing are you payroll 8,964.80, what is that?
A. Bimonthly payroll payment from Roofing USA is what it looks like to me.
Q. So that's your inbound payroll?
A. Yes.
Q. Next we see plaza home mortgage payroll 262.86 on 12-31. What is that?
A. I don't know what that is.
Q. Are you familiar with plaza home mortgage?
A. That's my wife's employer.
Q. So if it's showing payroll coming in is it reasonable to at least assume that that's going to be inbound payroll for Jennifer?
A. Could be.

DRAFT COPY

Q. Going down a few lines, one January 2, payment going out to Taft law $1,000, you previously told us that you believed that you were paying Taft on a more regular basis. Is this one of the payments you were thinking of when you said that you were making monthly payments to them?

A. I believe so.

Q. And did you understand that this $1,000 was going to be applied to the total outstanding balance that you owed to Taft in connection with the Colorado action?

A. Yes.

Q. Going down a few lines, discover e-payment 4,933.52 do you see that one?

A. Yes.

Q. Do you know what card that might be related to?

A. I don't know the details of that, no.

Q. Do you know if that card is different than the payment that was made to discover that we saw a few lines up on December 26?

A. I don't know.

Q. Did there was there previously a discover card that was a joint card between you and

DRAFT COPY

Jennifer?

A. I don't know.

Q. Turning the page, one page to January 7 I see a line about a quarter of the way down bill paid Dovenmuehle mortgage 3 thousand dollars. Is that one of the monthly mortgage payments?

A. Yes.

Q. And that's a month expense that is the one that is reflected also on schedule J at Line 4, but in the amount of 3,000 as opposed to 2974, correct.

A. Yes.

Q. A couple lines down -- let's see, no, next line down target card service payment 406.55. Are you familiar with this target card and are you on that target card number?

A. I don't know.

Q. Do you carry a target card with you?

A. I do not.

Q. On 1-8 there's the bill pay to Nicor gas in the amount of 268.41 do you see that?

A. Yes.

Q. Is that one that would have gone into the overall expenses that you list under schedule J Number 6 utilities?

DRAFT COPY

A. As part of the household utilities, yes.
Q. One eight another payment to discover 1,345.44 do you have any idea what discover card that might relate to?
A. I do not.
Q. A few lines down there's a charge to Barclay card U S credit card 463.75. Do you know what card that relates to?
A. I do not.
Q. Let's turn another page, please. We're on Page 4 of the January 16, 2026 statement. On January 13 there's a Zelle credit with respect to Steven Stroub. Who's Steven Stroub?
A. He's a friend of ours from church. He is involved at Top Pick.
Q. Why would Steven have been sending you 958 dollars on January 13?
A. I believe he bought a portion of bears tickets that I have so he was sending me money for those.
Q. Unrelated to Top Pick?
A. What do you mean in.
Q. Is that inbound payment from Steven unrelated to Top Pick?

DRAFT COPY

A. It would have been I believe it was for payment for bears tickets.
Q. Going down a few lines, we see another payment in deposit in from plaza home mortgage payroll would that be Jennifer's payroll?
A. I guess so. I don't know exactly.
Q. The two next line items with respect to roofing you payroll is that your payroll coming in?
A. I don't know from looking at this. I would guess that.
Q. Can you think of another in bound payment into your joint checking account that would be coming in from roofing U?
A. Other than general expense reimbursement.
Q. Well, look one line down where it says reimbursement?
A. Right right right that's what I'm saying. Other than general reimbursement, a payroll, then no.
Q. One more line down B tuition management B B tuition for 1, 347.50 what is that?
A. I think that's my daughter's tuition payment.
Q. If we compare that tuition payment to

DRAFT COPY

schedule J, that lists childcare and education costs at 1901.22 per month, do you know what would make up the difference between 1347 and 1902 the extra 550 dollars education costs?

A. Well, it's a boarding school, so I probably allocated some additional costs into that for that.

Q. What school is that?

A. Lutheran prep in water town Wisconsin.

Q. Let's turn another page, please to where we see the cancelled checks. There's a check paid to resurrection Lutheran on 12-23 for $4,000. Was there -- is four thousand dollars an unusual amount for you to provide in terms of a donation at any given time?

A. I don't have my glasses. What does it say on the bottom left there? Does that missions? I don't know.

Q. It's possible would missions mean something to you?

A. It's possible that she made a missions payment.

Q. What is a missions payment?

A. So our church has various congregations

DRAFT COPY

that are getting started in different parts of the country that sort of thing so there's a separate mission offering that you would help donate to the get those off the ground.

Q. In looking at cancelled checks we also see fairly regular checks in cash in the amount of 120 dollars. Does that mean anything to you?

A. Yeah, you'll see that my more as well twice a month that's just for a house cleaning.

Q. Let's move on to the first page of the February 2026 statement. The first withdrawal that we see on this one, not withdrawal but debit out is Raymond James brokerage 15 hundred dollars. Do you know what that was for?

A. Not -- not specifically, no.

Q. Prepetition, did you historically make regular contributions into your one or more of your Raymond James accounts?

A. I don't think -- I don't know if these are contributions or just payments for everything. So I don't know what that exactly is.

Q. Do you know if you have made any contributions into any of your Raymond James account post petition?

DRAFT COPY

A. I don't know.
Q. Moving down on January 2020 -- sorry -- January 21, two payments to John Hancock one 750 one 730. Do you know what those are for?
A. Not -- not looking at this, no.
Q. Do you believe that it's possible that those are your life insurance premium payments?
A. Possible, yes.
Q. If there are two payments here, would that indicate to you that you have a premium and Jennifer has a premium and they're both being paid?
A. I don't know. I don't know. We put a lot of this stuff in place a long time ago, so I don't -- it's not stuff I've looked at.
Q. Moving through still in February, let's look at -- I mean, I'm sorry, February statement in January 1-26 -- on January 26 -- go ahead and turn the page -- 14,128 to chase, that's the prior joint card which has now been cancelled is that?
A. I believe so.
Q. Right underneath it Wells Fargo auto draft $1,000?
A. Yeah. I don't know what that is.

DRAFT COPY

Q. Let's go toward the end of this month, the last few payments, on 2-17 there's another one of those tuition payments 1347.50. Does that have indicate to you that is the monthly tuition payment?

A. I'm not certain, but it looks like it could be.

Q. And two more payments on February 18 to John Hancock another one for 750 and a second one for 730. Do you see those as well?

A. Yes.

Q. But as you sit here today, you can't tell me what those are for?

A. Not specifically.

Q. Let's flip ahead to the March statement for the joint account. I want to point you to a transfer on March 5 where there's a statement that says transfer from money connection to checking. Do you know what money connection references?

A. March 5.

Q. Yes.

A. Oh, there it is. No. I don't know what that is.

Q. Do you have any account that you're aware

DRAFT COPY

of that is named or called a money connection account?

A. I don't know what that is.

Q. Look up at the top of the page for February 24, another Wells Fargo auto draft for a thousand, still not aware of what that is as you sit here today?

A. No.

Q. And the last two payments of the month on this statement on March 18, 750 and 730 to John Hancock as you sit here today, still no recollection of what those are?

A. Not specifically.

Q. Okay. Now, I note that this joint checking account as you flagged earlier, this it joint checking account, this statement ends March 18 and then if we turn to the next statement dated 4-17-26, it starts on 3-19 and as you pointed out you out now it says Davis Schupmann POD on it.

A. Yes.

Q. What does POD mean?

A. I don't know.

Q. This statement again, the new David Schupmann POD, the first entry shows transfer from

DRAFT COPY

money connection to checking, 5, 596.60, do you know where that money came in from, what account that money connection account was?
A. Not without checking into it.
Q. Where would you need to check?
A. I don't know. I probably ask the bank pour more information on what that means.
Q. Why did you change ownership of this account from a joint checking account to an individual account?
A. This was in line with the bankruptcy to separate accounts and draw a line for the bankruptcy.
Q. On 3-249 top of the next page, 3, 24, there's a note, transfer from CONVEN, 001 to 02 check 009, $20,000. Do you know what that refers to?
A. I don't know.
Q. 3-24 another auto draft to Wells Fargo, do you know what that one would be in this account?
A. I don't.
Q. 3-30, there are two different transfers from 02 check to CONVEN each for $1,000.
Do you see that?

DRAFT COPY

CONFIDENTIAL
UNCERTIFIED ROUGH DRAFT



A. Yes.
Q. Do you know what those are?
A. Transfer from 02 check transfer to those two.
Q. Yeah.
A. I have an idea, but I don't know exactly.
Q. What's your idea?
A. These might have just been transfers into my account from Jenny's account to help pay bills. I don't know that for certain.
Q. Do you know what green owner purchase is?
A. That is the owner of Kyle's the landlord at his apartment or whatever.
Q. So the 941.50 -- that's Kyle's rent?
A. Yes.
Q. And that lines up with what we saw on schedule J correct?
A. Yes.
Q. Petition date again if we're looking at Exhibit 5 was March 30, 2026, correct?
A. Yes.
Q. So going down to April 7, there's a target card payment of 56.75. Do you know what that target card payment is?

DRAFT COPY

A. No.
Q. Do you know area it's come out of your account?
A. I don't.
Q. That's not your card, correct?
A. I don't -- I don't I don't -- I don't think so.
Q. If we turn the page to April 8, AT&T payment, 416.84, so that would be an AT&T payment that would correspond with the telephone cell phone internet satellite we looked at under 6C schedule J?
A. I believe so.
Q. That's coming again out of the what is now David individual account, correct?
A. Yes.
Q. We also start to see Zelle credits coming in from Jennifer prior to the separation of these -- prior to the separation of the joint checking account into two separate accounts, had Jennifer ever Zelled you money on a regular basis previously?
A. No, because it was a joint account.
Q. So what was the purpose of these Zelle

DRAFT COPY

payments that start to come in from Jennifer into the David account?

A. Because I don't have enough money to pay the bills, so she was contributing to them.

Q. We see on April 9, Nicor gas 140.87, correct? That was a payment out?

A. 140, yes.

Q. And Nicor gas again would be one of the utilities listed in part 6 of schedule J, yes?

A. Yes.

Q. And again we see a corresponding credit come in from general to help cover that, correct?

A. Yes.

Q. On April 10, there's a note for Old Second bank P2P payment 25 hundred. Do you know what that is?

A. I don't. I believe April was part of the month I was doing my more reports so I would have had list what that was specifically, so it should be on there.

Q. There's another notation on 4-15 same thing, AC Old Second bank P 26 P payment as you sit here, do you know what that was for?

A. No.

DRAFT COPY

Q. Right underneath that on 4, 15, IRS USA tax payment 8702 dollars do you see that?
A. Yes.
Q. What was that for?
A. To pay our taxes.
Q. Do you and Jennifer file jointly?
A. Yes.
Q. So is that a tax payment for the both of you?
A. Yes.
Q. 415 on the next page, tuition 1, 347.50 that's your daughter's tuition again, right?
A. I believe so.
Q. And what about underneath for I L department of revenue E D I payments?
A. Probably looks like the state tax payment.
Q. And again you and Jennifer file jointly?
A. Yes.
Q. So that would be both of your tax payments?
A. Yes.
Q. Let's go to the next statement, this is a statement for David Schupmann account dated May 18, 2026. I'd like to point you down toward the bottom

DRAFT COPY

of this first page and top of the second page John Hancock payments, one for 750, one for 730. As you sit here today, do you know what those payments are?
A. Payments to it John Hancock for some a policy.
Q. One policy or two of policies?
A. I have no idea.
Q. Continuing down on 4-21, payment to thrive it financial withdrawal, do you know what that is?
A. I don't know.
Q. Turning the page, May 1, payment out to Com Ed 241.62. That's another one that would be in utilities under schedule J, correct?
A. Yes.
Q. And 5-4, Dovenmuehle mortgage $3,000?
A. Yes.
Q. That's your mortgage payment?
A. Yes.
Q. 5-5 there's a payment to State Farm. Do you know what that is?
A. Either homeowners or our car insurance policy.
Q. And that would be listed on your expenses

DRAFT COPY

under in schedule J either under --
A. 15 C.
Q. Four 15, yeah, 15. What about the one directly underneath, Massachusetts M U M M pay?
A. I'm not sure what that is.
Q. AT&T 385.64?
A. I think that's the monthly phone bill.
Q. Turn to the next page. Down toward the bottom of the page another tuition payment on May 15, again that's your daughter's monthly tuition?
A. I believe so.
Q. Turning the page, again on 5-18 two payments out to John Hancock 750, 730, correct?
A. Oh, I'm sorry. Yes.
Q. Thank you.

A. I was thinking that we would have submitted those as part of the bankruptcy documentation is what I was caught on there, so.
Q. Can you set 146 Rae side and let's take a look at 15, please. Exhibit 15 is Jennifer's individual checking account, correct?
A. Yes.

DRAFT COPY

Q. And it was opened on March 19, correct?
A. If that's what this first activity is. I don't know exactly when it was opened.
Q. We don't see any activity on the statement before March 19, correct?
A. I get that, so I'm going to assume that's sort of correct.
Q. On March 24 there's an influx of 20 thousand dollars transfer from CONVEN, 001 to 02 check do you know what that is?
A. No.
Q. March 27, AC Roofing USA reimbursement $1,000?
A. Yes.
Q. Do we believe that was a reimbursement for you for business expenses?
A. It was. And then it was inadvertently put to this account I think that's why there was one of those thousand dollar transfers back to me and you should see that should be hitting my account now.
Q. 38-30, $1,000 to Taft. Is it your understanding that that is also part of the $1,000 a month that was being paid to Taft?
A. Yes.

DRAFT COPY

Q. Again that was to pay down the outstanding balance owed to Taft in connection with the Colorado action?

A. Yes.

Q. 331 your petition date was March 30, on March 31, there is a roofing view U payroll 7, 975.70 that is coming into Jennifer's account, correct?

A. I guess. I don't know why that is.

Q.

MS. VANDESTEEG: Take a pause real quick.

VIDEOGRAPHER: Time is 4:30 p.m. We're off the record.

(WHEREUPON, a short recess was taken.)

VIDEOGRAPHER: The time is now 4633 p.m. this is the beginning of media 7 we're back on the record.

BY MS. VANDESTEEG:

Q. Thank you Mr. Schupmann you understand that you are still under oath?

A. Yes.

Q. So we were just taking a look on the Jennifer Schupmann account ending 2277 where there

DRAFT COPY

was an in bound payment to Jennifer's account from roofing U payroll 7,975.70. Do you know why your payroll was deposited into her account on March 31?

A. I don't. And I see it was corrected again the next payroll, so I'm not sure why that occurred.

Q. Let's go into the next statement for Jennifer's individual account. And I'm looking at 4 -- April 9 and there's an entry bill paid David Schupmann conf Number 2, $2500 do you know what that is?

A. No.

Q. The next entry under that is for AC Roofing USA reimbursement on April 10 in the amount of 5954.07. Do you know why Roofing USA was paying expense reimbursement for you into Jen's account?

A. I don't know other than when we were trying to make this line like during this couple week period, maybe we just didn't get some stuff right. I think we got it right and I believe it was corrected in the MOR report but no, I don't know.

Q. Turning the page, April 14, Line item bill paid David Schupmann conf $2,900 do you know what

DRAFT COPY

that is?
A. I don't know.
Q. Going down to May 1, Roofing USA car $1,000 being deposited into Jen's personal account. Do you know why are that was being deposited into Jen's account?
A. No, other than like I said, maybe we got something wrong when we did the initial change over because I've been seeing it show up in my account now which is correct. And then those were some of the transfers over from Jen into my account I think to correct for that.
Q. Where do you see the in bound into your account from Jen's account for any of those Roofing USA payments that were made post petition into Jen's account?
A. I think there's these five hundred dollars and one thousand dollar transfer ins.
Q. Well, those dollar amounts don't line up, do they?
A. I believe they -- I believe they do. I have -- I check my more, too, because I thought that I got the incomes on those correct. I haven't seen them show up correctly hopefully, yeah.

DRAFT COPY

MS. VANDESTEEG: I am handing you what we are marking Exhibit 16.

(WHEREUPON, David Schupmann
Deposition Exhibit No. 16 was
marked for identification.)

BY MS. VANDESTEEG:

Q. Okay. Exhibit 16 is your monthly operating report operating report for the month of April 2026. These monthly operating reports, is this what you had been referencing when you have used the term more?

A. Yes.

Q. When I refer to these I typically refer to them as MOR I think we're talking about the same thing?

A. Okay.

Q. That's what I mean same thing when you say MOR?

A. Yeah.

Q. So we're looking at this April MOR and I would like you to turn to Page 6 of 19 and I'm referencing that document number up at the top Page 6 of 19.

Okay. So Exhibit -- this is Exhibit C

DRAFT COPY

receipts, so these are amounts of in bound funds that your account and you received for the month of April, correct?

A. Yes.

Q. And in terms of your in bound income, there are a couple of small electronic payment deposits for bank interest. You've got two payroll cycles, correct?

A. Yes.

Q. There's a refund for 215 dollars. What gives rise to a flex spending refund?

A. I don't recall the details around that. It was shown I thought it showed as a credit on the account, so I tracked it down to that.

Q. Is that a regularly recurring receipt?

A. I haven't seen one since.

Q. And then we have a number of transfers in bound spouse transfer for shared costs, correct?

A. Yes.

Q. Account balance short fall correct?

A. Yes.

Q. Was the intent behind that for Jen to cover and assist with any short fall that couldn't otherwise be paid out of your employment income?

DRAFT COPY

A. Well, at a minimum, yes.

Q. Let's take a look at the expenses that we see and by category that we see. So here going out of your personal David debtor account, we do see payments out for car maintenance, correct?

A. Yes.

Q. And there's a credit card payment for spouse credit card. What -- what was on that spouse credit card that credit card payment paid for?

A. I don't recall the details of that one.

Q. Would we have to look to the underlying credit card statement to see that?

A. I'm not sure.

Q. Do you know if the amounts that were paid for in that credit card payment are otherwise allocated or accounted for under schedule J of expenses?

A. Ask that again, please.

(WHEREUPON, the record was read as requested.)

MR. PAULSEN: Objection, foundation.

You can answer.

THE WITNESS: I don't I don't -- I don't recall

DRAFT COPY

the details of it. It was during the transfer over and I don't -- I don't recall seeing these types of payments going forward. I think this was right after the bankruptcy.

BY MS. VANDESTEEG:

Q. Let's move on. We see a number of payments to groceries over the course of April of 2026, correct?

A. Yes.

Q. Is this the line item of groceries that you would anticipate would be that that is comprised by the grocery by the food and housekeeping supplies expense line on schedule J?

MR. PAULSEN: Objection, foundation:

THE WITNESS: It boob a portion of that.

BY MS. VANDESTEEG:

Q. What would be the other portion?

A. I'm not sure.

Q. Did you and Jen at or after the time of the petition date discuss how household expenses, shared expenses, would be allocated or paid between your individual account and her individual account?

A. We worked with bankruptcy attorneys to get guidelines on it, and then we tried to put those

DRAFT COPY

into play. So that was the thinking behind separation of accounts and what was being paid from each account.
Q. So what was intended to be paid from the David Schupmann individual account?
A. I'm trying to describe how to say it. I essential household items, household, things that weren't -- that didn't seem discretionary I guess.
Q. So for example, was the intent that groceries generally speaking for the household would be paid out of the David Schupmann account?
A. For the most part, yes.
Q. Was the intent generally speaking, that home maintenance expenses which we see on here, too, would generally speaking be intended to be paid out of the David Schupmann account?
A. Generally, yes.
Q. Likewise for insurance payments, was it the general plan that insurance payments for the entire household be paid out of the David Schupmann account?
A. Generally, yes.
Q. And within the insurance category, shall there is a State Farm insurance, a claim balance

DRAFT COPY

insurance, and then four separate insurance payments that are listed as life insurance slash investment. Do you know what those life insurance slash investment payments are for?

A. These recurring policies we were talking about that I don't have the details on.

Q. As you sit here today you don't know if those have a investment component to them?

A. I don't.

Q. As you sit here today you can't tell me approximate if those policies cover both David and Jennifer?

A. I don't know the details of this.

Q. But you do recall at the very least that insurance was generally tend intended to be paid out of the David Schupmann account for the house household?

A. Yes.

Q. Moving down to the kids invest category, what is that?

A. The kids have investment accounts that I'm the custodian of. So we make a quarterly contribution to it.

Q. And it was?

DRAFT COPY

A. I make the quarterly contribution.
Q. Pathologist for interrupting.
It was the intention that the kids investments payments generally be made out of the David Schupmann individual account?
A. Yes.
Q. There's also then a number of expenses that go out to meals. Do you see those?
A. Yes.
Q. And was it the general intention and is it the general intention that meals generally speaking for the household be paid out of the David Schupmann individual account?
A. Not all of them. Some:
Q. How do you make the determination which get paid out of the David Schupmann account and which get paid out of the Jennifer Schupmann account?
A. I don't think there's hard and fast rules to if it, but I think if she's traveling with my daughter I think they pay for them, but I don't know if there is he any consistency to that.
Q. The mortgage payment, that's listed here on your MOR is it the general intent that the

DRAFT COPY

mortgage payment be paid in full out of the David Schupmann account on a monthly basis?

A. Yes.

Q. There's also son college rent and utilities listed. Is it the general intent that your son's monthly rent and utilities be paid out of the David Schupmann account?

A. I have to check. I think that was moved out. So the answer to your question is no. Or I'm not -- I'm gonna say I'm not sure.

Q. At present do you believe that you are still on a month over month basis paying the 3 thousand dollar mortgage payment on the David Schupmann debtor account.

A. Yes.

Q. Do you intend to continue paying the 3,000 dollar a month out of the David Schupmann account?

A. Yes.

Q. With respect to your son's rent because that's where I think I just mixed it up is it your intent on a going forward basis to continue paying your sons college rent and utilities out of the David Schupmann account?

A. I'm sure gonna pull out the MOR but I

DRAFT COPY

think it was changed, so I think I'm gonna say I don't know, but I think it was changed.

Q. Taxes -- the federal taxes and state court taxes that were paid here, is it the intent that taxes generally speaking for the household will be paid out of the David Schupmann account?

A. Yes.

Q. Tuition for your daughter, is it the intent and should we expect to see that he month over month your daughters tuition will be paid out of David Schupmann account?

A. Yes.

Q. Utilities, various utilities paid on a monthly basis, is it the intent that utilities for the household be paid out of the David Schupmann account?

A. Yes.

MS. VANDESTEEG: Here is Exhibit 17.

(WHEREUPON, David Schupmann Deposition Exhibit No. 17 was marked for identification.)

BY MS. VANDESTEEG:

Q. Exhibit 17 is your May MOR, correct?

A. Yes.

DRAFT COPY

Q. Looking into May and looking at your projections under Section 7, Number 7 for May, your projections?

A. Would have been for June, right?

Q. It's comparing we'll read it compare your actual cash receipts and disbursements to what you projected in the previous month. So we compare and we come up with the difference.

A. You're asking about 36? It's for next month, right?

Q. I'm sorry I think we're speaking past each other?

A. Okay.

Q. Give me a moment. I will reset. I'd like to go back to not back to, let's go forward to Page 6 of 16 receipts you know what Mr. Schupmann, do me a favor, pull Exhibit 16 back up again first, the April MOR. The total expenses if we take a look at the total expenses that the David Schupmann account paid for in connection with this April MOR, the total is 21,270.16, correct?

MR. PAULSEN: Counsel you're referring to a particular spot.

MS. VANDESTEEG: Pardon.

DRAFT COPY

MR. PAULSEN: Are you referring to a particular page.

MS. VANDESTEEG: Page 2 of -- sorry -- let me use my bankruptcy numbers. Look at the bottom of Page 8 of 19.

MR. PAULSEN: Thank you.

BY MS. VANDESTEEG:

Q. Where we sum up the expenses?

A. On Exhibit 16?

Q. Correct.

A. Okay.

Q. So the total expenses paid for out of the David Schupmann account was 21, 270.16, correct?

A. Yes.

Q. And the total receipts if you go back up to Page 6 of 19, was 24, 776.09, correct?

A. Yes.

Q. But that included 9 thousand dollars of spouse transfer for shared costs, correct?

A. Roughly, yes.

Q. And so without that have 9 thousand dollars of spouse transfer for shared costs, your individual receipts would not have been sufficient to cover the expenses paid out of your account,

DRAFT COPY

correct?
A. For these household expenses, yes.
Q. Let's take a look now at Exhibit 17, the May MOR, looking first at Page 6 of 16, for receipts money into your account two payroll deposits correct?
A. Yes.
Q. And then a couple thousand in spouse transfer for shared costs, correct?
A. Yes.
Q. 2200 to be precise?
A. Yes.
Q. And we see also over the course of the expenses that go out of the David Schupmann account for May of 2026, the Schupmann account is paying for car maintenance, correct?
A. Yes.
Q. And charitable giving, correct?
A. Yes.
Q. Fuel, groceries, all being paid out of the David Schupmann account, correct?
A. Yes.
Q. Household maintenance expenses are coming out of the Schupmann account correct?

DRAFT COPY

A. Yes. I don't know if these are all inclusive but yes there's home maintenance groceries and all these other things coming out of the account yes.

Q. Same thing again we see insurance and life insurance and investments being paid out of the David Schupmann account correct?

A. Yes.

Q. Mortgage payment coming out of the David Schupmann account, correct?

A. Yes.

Q. At the 3 thousand dollar level, correct?

A. Yes.

Q. Now, I do see here you messaged that you thought you weren't paying your sons college rent my more. There's still' line item son college rent 3118?

A. Looks like a utility payment.

Q. Is it your plan and expectation that your son's utility payments will still continue to be paid out of the David Schupmann account going forward?

A. I'm not sure.

Q. Why did you decide not to pay his rent,

DRAFT COPY

your son's rent out of the David Schupmann account for the month of May?

A. I think that was a payment that we went over with our bankruptcy attorneys that might not be -- might not qualify, so we left we took it out of my payment and put it in Jen's payment.

Q. What do you mean by qualify?

A. As an essential household payment maybe.

Q. Is it your understanding that you as a debtor can be responsible for all household payments?

A. That I can be, I'm not sure.

Q. There is an expense on May 15 for $724 household lighting repair, artistic outdoor lighting, what is that?

A. I don't think -- I hadn't done maintenance on exterior lights in a while, and so they came out and that was their bill for going through everything and replacing broken fixtures.

Q.

MR. PAULSEN: Is this a.

VIDEOGRAPHER: We're off the record.

(WHEREUPON, a short recess was taken.)

DRAFT COPY

(WHEREUPON, David Schupmann
Deposition Exhibit No. 18 was
marked for identification.)

VIDEOGRAPHER: The time is now 5:08 p.m. this is the beginning of media 8. We're back on the record.

BY MS. VANDESTEEG:

Q. Mr. Schupmann you are aware that you're back under oath still under oath?

A. Yes.

Q. Thank you.

We're looking now at what we have marked Exhibit 18 this is your June MOR, correct?

A. Yes.

Q. Let's go once again to Page 6 of 25, receipts. Under your receipts we again see two payroll from Roofing USA, correct?

A. Yes.

Q. And one thousand dollar reimbursement from Roofing USA, correct?

A. Yes.

Q. Is that an expense reimbursement at one thousand or is that the monthly?

A. It's like a stipend.

DRAFT COPY

Q. Stipend, okay.
And there are also a number of entries for spouse transfer for shared costs, correct?
A. Yes.
Q. And by my count those add up to about 23 hundred dollars; is that correct?
A. Yes.
VIDEOGRAPHER: Where is your phone.
THE WITNESS: In my pocket.
VIDEOGRAPHER: It's really close to the microphone cord and causing interference.
THE WITNESS: How's that.
VIDEOGRAPHER: Until it makes a noise, I don't know.
(WHEREUPON, the record was read as requested.)
BY MS. VANDESTEEG:
Q. Let's take a look now at Pages 7 and 8 of 25. I should say 7, 8 and 9. That comprises your listing of expenses paid out of the David Schupmann account during the month of June, correct?
A. Yes.
Q. There's a payment on June 8, 2026, 512.84 hotel do you know what that was for?

DRAFT COPY

A. Not specifically.
Q. There's another hotel payment on 6-23, 606.36 do you know what that is for?
A. Not specifically.
Q. Going to the end of these expenses on Page 9, there are five different entries under charitable giving to R L S church. Do you see those?
A. I'm sorry which page?
Q. Nine of 25?
A. Nine of 25, oh, okay. Yes.
Q. And R L S church that is the resurrection church we referenced earlier?
A. Yes.
Q. So whenever we see a note for R L S note is that a charitable contribution to the same church?
A. Yes.
Q. Looking on Page 9 of 25, the total expenses paid out of the David Schupmann account for the month of June total 21,497.91 correct?
A. Yes.
Q. And the total receipts by that account the total funds into that account if you look at Page 6

DRAFT COPY

was 18, 872.56, correct?
A. Yes.
Q. Of which 2300 was comprised of spouse transfers, correct?
A. Yes.
Q. So even with those spouse transfers for the month of June, there was still a short fall between expenses paid out and sums that came in, correct?
A. Yes.
(WHEREUPON, David Schupmann Deposition Exhibit No. 19 was marked for identification.) Use
BY MS. VANDESTEEG:
Q. I'm handing you what we've marked as Exhibit 19. And this is your July MOR, correct?
A. Yes.
Q. Please turn to Page 6 of 22. Receipts into your David Schupmann personal account reimbursements and two payrolls and a few sons cents of bank interest correct?
A. Yes.
Q. For the month of July there were no spouse contributions, correct?

DRAFT COPY

A. Correct.

Q. Any particular reason why?

A. Not that I recall.

Q. Let's take a look at your expenses on Pages 7 through 9 of 22. I want to point to check 3025 for home maintenance. If you take a look at the cancelled checks which you could find on Page 16 of 22, it's a 3,025 dollar payment to Kurt's Turf. What was Kurt's Turf providing for 3,025 dollars?

A. I believe that's the annual yard clean up mulching, trimming all that kind of stuff.

Q. And that is an expense that was allocated to the David Schupmann expense payments out of your individual account?

A. Yes.

Q. Is that an expense that would fall under the home maintenance category 4C on schedule J?

A. 4C, I believe so.

Q. Do you know roughly how much you have contributed in charitable giving since the petition date out of the David Schupmann individual account?

A. I don't know.

Q. If I were to represent to you that I added

DRAFT COPY

CONFIDENTIAL
UNCERTIFIED ROUGH DRAFT



up the charitable giving out of the David Schupmann account over the course of those four months, it was 132 dollars for April, 1, 0606.20 May, 2,035.20 June 2,275 for July, for a total of 5,502.04. Would that sound about right to you?

A. I mean, it could be. I'd have to add them up to be sure, but it could be.

Q. Can you tell me yes charitable contributions are an expense that are being paid out of the David Schupmann individual account rather than the Jennifer Schupmann account?

A. It's a household account and, yeah, household account.

Q. What do you mean by it's a household account?

A. I'm sorry. Much it's a household expense.

Q. Are you aware of whether Jen is also making additional contributions to resurrection Lutheran church out of her individual account?

A. I don't know.

Q. If I represented to you that she has made an additional 26 hundred dollars in contributions to the resurrection church post petition, would that surprise you?

DRAFT COPY

A. It would not surprise me.
Q. Turning back to Page 9 of 22 of Exhibit 19, total expenses paid out of the David Schupmann individual account during the month of July totaled 20,678.86, correct?
A. Yes.
Q. And the total funds that went into the David Schupmann account for the month of July were 16,341.49, correct?
A. 16351.49 yes.
Q. We have a short fall again of expenses paid out versus funds coming into the account of about $4,000, correct, little over $4,000?
A. Yes.
Q. So on your own with the payroll for the month of July you would be unable to cover all the expenses that are being paid out of your account, correct?
A. Correct.
Q. As of today you have not filed a chapter 11 plan, correct?
A. Correct.
Q. You move to extend the time for you to file a plan to September 29, 2026, correct?

DRAFT COPY

A. I believe that's correct.
Q. Have you formulated a plan in the meantime?
A. I don't believe so.
Q. Have you discussed any proposed source of funding for a plan?
A. No.
Q. Do you have any idea how much disposable income you have each month that could be committed to paying creditor claims?
MR. PAULSEN: Objection, calls for a legal conclusion.
You can answer.
THE WITNESS: I don't know.
BY MS. VANDESTEEG:
Q. Do you have any idea how much unsecured creditors specifically Fortis, could expect to be paid under any plan you might propose?
MR. PAULSEN: Objection, foundation.
You can answer.
THE WITNESS: I don't know.
BY MS. VANDESTEEG:
Q. Do you have any idea what percentage on each claimed dollar against your estate might be

DRAFT COPY

paid under a plan?
A. I don't know.
Q. Fortis's proof of claim is for approximately five million four hundred thousand dollars.
Do you have any idea as you sit here today, what the maximum amount you could pay toward that claim could be over the life of any plan?
MR. PAULSEN: Objection, foundation. Objection, calls for speculation. Objection, excuse me. Facts not in evidence.
You can answer.
THE WITNESS: I don't know.
BY MS. VANDESTEEG:
Q. Has anyone -- has any nondebtor commit today contributing funds to a plan?
A. No.
Q. Has Jennifer committed to any funds being paid into a plan?
A. No.
Q. Have any other family members committed any funds?
A. No.
Q. Has any other third party committed any

DRAFT COPY

funds?

A. No.

Q. Have you asked any nondebtor entity or Peter to commit funds to a plan?

A. No.

Q. Are any of of the contributions that Jennifer has made to date into your David Schupmann individual account required for her to make?

A. Required how?

Q. Is she legally obligated to transfer funds into your debtor account to allow you to pay your expenses?

A. So much as we've got obligations on things to get them paid, no.

Q. Is there any written documents between you and Jennifer whereby she has agreed to commit a certain amount of funding into your individual David Schupmann account?

A. No.

Q. Your income alone over the course of the MORs would be insufficient to pay the expenses you've been paying out of your individual account, correct?

A. Correct.

DRAFT COPY

Q. And your income alone would be insuffer to fund a plan for any recovery for creditors, correct?
MR. PAULSEN: Objection, foundation. Objection, calls for speculation:
You can answer.
THE WITNESS: Correct.
BY MS. VANDESTEEG:
Q. Does your ability to formulate a plan depend on the outcome of the Colorado action?
MR. PAULSEN: Objection, calls for speculation. Objection, foundation. Objection -- I'll leave it at that. Oh, objection, calls for legal conclusion.
THE WITNESS: I don't know.
BY MS. VANDESTEEG:
Q. Does your ability to formulate a plan depend upon resolution of the claims and counterclaims pending between Fortis and you and the other defendants?
MR. PAULSEN: Same objections.
THE WITNESS: I don't know.
BY MS. VANDESTEEG:
Q. What do you mean I don't know in the

DRAFT COPY

context of that response?
A. I just don't have all the facts. I don't have all the information that would get to a conclusion.
Q. What additional facts and information would you need?
A. Specifically for what?
Q. In order for you to be able to be in a position to formulate a plan to resolve this bankruptcy proceeding.
A. Assuming there's a claim or no claim.
Q. Well, why don't you you walk me through both of those because it sounds to my like you at least knees resolution of whether there is a claim in order to formulate a plan; is that fair?
A. I think the -- I think the plan is vastly different depending on the outcome.
Q. So you need an outcome first before you can develop a plan?
MR. PAULSEN: Objection, argumentative. Objection, calls for legal conclusion.
THE WITNESS: I believe so.
BY MS. VANDESTEEG:
Q. Let's say Fortis prevails on its full

DRAFT COPY

claim of 5.4 million dollars, can you pay that?
MR. PAULSEN: Objection, calls for speculation. Objection, foundation:
THE WITNESS: No.
BY MS. VANDESTEEG:
Q. Let's say that the claim is deemed to be nondischargeable, what would your plan pathway look like then?
A. I don't know.
Q. The motion to extend time to file the plan stated that the relationship between Fortis and Schupmann remains uncertain. Do you believe that is still true?
A. Yes.
Q. How would the parties get to certainty on that issue?
MR. PAULSEN: Objection, calls for a legal conclusion:
THE WITNESS: On -- go ahead.
MR. PAULSEN: Objection, calls for speculation.
THE WITNESS: On which issue?
BY MS. VANDESTEEG:
Q. The relationship between Schupmann and Fortis?

DRAFT COPY

A. How do we make it uncertain.
Q. How do you make it certain?
A. Get to some type of resolution I guess.
Q. How are you going to get to some type of resolution?
MR. PAULSEN: Asked and answered, objection.
THE WITNESS: I don't know.
BY MS. VANDESTEEG:
Q. Your motion to extend states that you intend to object to Fortis's claim. On what grounds do you intend to object to Fortis's claim?
MR. PAULSEN: Objection, calls for legal conclusion.
You can answer.
THE WITNESS: I don't know.
BY MS. VANDESTEEG:
Q. Do you know any bases upon which an objection would be raised?
MR. PAULSEN: Objection, calls for a legal conclusion.
THE WITNESS: As I sit here, I don't have an answer to that.
BY MS. VANDESTEEG:
Q. Do you agree with me that you need to it

DRAFT COPY

resolve the Colorado action before you can formulate a plan?

MR. PAULSEN: Objection, calls for a legal conclusion.

THE WITNESS: I don't believe so.

BY MS. VANDESTEEG:

Q. So how else can you formulate a plan?

A. Because as I understand it, the claim is now brought to the bankruptcy court so so it can be resolved in the bankruptcy court.

Q. You believe Fortis's claim can be resolved on its own in the bankruptcy court without further action in the Colorado action?

A. I don't know.

Q. Let's talk about Top Pick again for a minute.

Thank you. Are you familiar with the company by the name of smart roof commercial LLC?

A. Yes.

Q. What does smart roof do?

A. Currently, I'm not sure.

Q. What did smart roof do in 2022?

A. They were a residential and commercial roofing contractor.

DRAFT COPY

Q. Are you aware that Top Pick was issuing invoices to smart roof?

MR. PAULSEN: Objection.

BY MS. VANDESTEEG:

Q. In 2022?

MR. PAULSEN: Sorry, Counsel. Objection, this falls within the motion for protective order that we have pending which will be heard next Tuesday. So I instruct you not to answer until we have the motion resolved.

BY MS. VANDESTEEG:

Q. Do you know if any other roofing contractors sent -- were getting invoices from or sending money to Top Pick at any point in time between 2022 and 2025?

MR. PAULSEN: Objection, this relates to the subject to the motion for protective order that's pending in the presented next Tuesday, instruct the witness not to answer pending resolution of that motion.

BY MS. VANDESTEEG:

Q. What is the relationship if any, between Top Pick and Trident?

MR. PAULSEN: Objection, this falls within the

DRAFT COPY

copy scope of the motion for protective order, instruct the witness not to answer.

BY MS. VANDESTEEG:

Q. At any time are you aware of money flowing between Top Pick and Trident?

MR. PAULSEN: Objection, this again subject to the protective order or motion for a protective order.

MS. VANDESTEEG: Instruct the witness not to answer.

BY MS. VANDESTEEG:

Q. Let's talk generally about Trident.

Specifically I'm talking about Trident solutions of Sugar Grove. What is Trident?

MR. PAULSEN: Observation, this falls within the scope of the motion for protective order instruct the witness not to answer pending resolution of that motion.

MS. VANDESTEEG: Just so I'm clear you're instructing him not to answer even a question as to what the entity is.

MR. PAULSEN: Yes.

BY MS. VANDESTEEG:

Q. And just so I'm clear again you're

DRAFT COPY

instructing him not to answer questions with respect to an entity from of which he has admittedly received income in the years leading up to the bankruptcy?

MR. PAULSEN: Yes.

BY MS. VANDESTEEG:

Q. Why was Trident created?

MR. PAULSEN: Same objection, subject to the motion for protective order. Instruct you not to answer pending resolution of the motion.

BY MS. VANDESTEEG:

Q. Whose idea was it to form Trident?

MR. PAULSEN: Same objection, instruct the witness not to answer subject to resolution of the motion.

MS. VANDESTEEG: Or Ford ever protective order.

BY MS. VANDESTEEG:

Q. At the time Trident was formed were you employed by Fortis?

MR. PAULSEN: Objection, same objections, same instruction not to answer.

BY MS. VANDESTEEG:

Q. What role did you personally play in Trident?

DRAFT COPY

MR. PAULSEN: Same objections, same instruction.

BY MS. VANDESTEEG:

Q. Were you involved in any of the day-to-day decision-making at Trident?

MR. PAULSEN: Same objection, same -- same instruction.

BY MS. VANDESTEEG:

Q. Did you see any conflict between what Trident was doing and your obligations to Fortis?

MR. PAULSEN: Same objection, same instruction.

BY MS. VANDESTEEG:

Q. Why was Trident dissolved?

MR. PAULSEN: Same -- same objection same instruction.

BY MS. VANDESTEEG:

Q. Decision papers for Trident were filed in February of 2026. But a month before your bankruptcy petition was the timing of that have dissolution related to the bankruptcy filing?

MR. PAULSEN: Objection foundation, also objection related to the protective order and instruct you not to answer pending resolution.

BY MS. VANDESTEEG:

DRAFT COPY

Q. Trident continued to receive commercial deposits at least through February of 2025 even though it had lost its good standing in December of 2024. Do you know why money was still flowing into Trident even after it was inactive?

MR. PAULSEN: Objection, foundation. Objection, based on the protective order and instruct him not to answer pending resolution of the motion.

BY MS. VANDESTEEG:

Q. I'd like to understand the business relationships between Top Pick and Trident and various different contractors like installation services, Top Key, Roofing USA and smart roof. Are you familiar with all of those entities?

MR. PAULSEN: Objection, same -- same objection regarding the protective order. Same objection -- sorry. Same instruction not to answer pending resolution.

BY MS. VANDESTEEG:

Q. If I were to ask any additional questions of your client counselor, on any of those entities installation services Top Key Roofing USA and smart roof and their interactions with Trident and/or Top

DRAFT COPY

Pick would your why answer and direction not to respond -- would your your objection and direction to your client not to answer be the same for each of those questions?

MR. PAULSEN: Most likely, yes. Yes.

MS. VANDESTEEG: Is it a yes or is it a most likely yes.

MR. PAULSEN: Well, of course I don't know what your questions are, but if they're along the lines of ones you've already asked, then yes.

BY MS. VANDESTEEG:

Q. Are you familiar with an entity by the name of south point, a project by the name of south point?

A. Can you be more specific?

Q. Are you familiar with a project by the name of quarrel hills?

MR. PAULSEN: I'm going to object. I believe this is related to the motion for pending order -- for the protective order. If it is, I instruct the client not to answer on that have basis, if it's related to something else, let me know, you can continue your inquiry.

BY MS. VANDESTEEG:

DRAFT COPY

Q. Quarrel hills involves a project for which there were invoicing and payments to Trident?

MR. PAULSEN: Yeah.

BY MS. VANDESTEEG:

Q. Are you familiar with a quarrel hills project?

MR. PAULSEN: Same objection, regarding the protective order, same instruction not to answer.

BY MS. VANDESTEEG:

Q. After your termination from of Fortis you retained approximately 850 pages of Fortis materials, corrects?

MR. PAULSEN: Objection, same objection regarding the protective order and instruct the client not to answer pending resolution.

MS. VANDESTEEG: Counselor if I were to ask your client any additional questions with respect to his retention of Fortis documents after his termination from Fortis, would your objection remain the same and would your you direct your client not to answer those questions.

MR. PAULSEN: Yes.

MS. VANDESTEEG: I would like to take a five-minute break. And come back.

DRAFT COPY

MR. PAULSEN: Okay.

VIDEOGRAPHER: Time is 537 p.m. This is the end of media 8 we're off the record.

(WHEREUPON, a short recess was taken.)

VIDEOGRAPHER: The time is now 551 p.m. this is the beginning of media 9 we are a back on the record.

BY MS. VANDESTEEG:

Q. Mr. Schupmann you do understand that you're still under oath?

A. Yes.

MS. VANDESTEEG: Before we go off the record and conclude for today, the parties had some housekeeping matters to put onto the record.

As a result of the pending motion by the debtor seeking a protective order as to certain of the topics and categories of questioning for today and as a result of our disagreement of what the bounds of that should be and as a result of the pending intermediary deadline for Fortis to file a 523 action which is currently slated for Monday, the the parties have stipulated and agreed that the deadline for Fortis to file it's 523 adversary

DRAFT COPY

proceeding as to dischargeability will be extended until September 15. The parties agree that they will together execute an agreed stipulation to that effect and will also work together with all due haste to tomorrow getting an agreed motion on file to approve that stipulated order extending the deadline and set that matter for hearing on shortened notice on Tuesday, September 1 at the same time at which the motion for protective order is set to be heard.

Counsel, have I misstated the agreement between the parties?

MR. PAULSEN: No, I agree with that.

MS. VANDESTEEG: Excellent. Then with that housekeeping and with a further reservation of rights on behalf of Fortis to recall Mr. Schupmann for continued 2004 examination pending the outcome of the hearing on the protective order and also subject to Fortis's reservation of rights to proceed with additional discovery and depositions in any future adversary proceeding or contested matter Fortis rests and concludes its questioning for today.

MR. PAULSEN: Thank you.

DRAFT COPY

MR. PAULSEN: I have no questions.

VIDEOGRAPHER: The time is now 5:54 p.m.

This concludes this deposition. We're off the record

DRAFT COPY

REALTIME ROUGH DRAFT AND UNCERTIFIED TRANSCRIPT.

****

The following file is not an official transcript. It is intended only to aid in case preparation. The final transcript will be different, both in form and substance, from this rough draft translation. You may see errors and omissions during the realtime translation. This is not an unusual process, and these errors and omissions will be corrected on the final transcript. Please do not try to bring these discrepancies to the attention of the reporter during the course of the deposition.

UNOFFICIAL DRAFT TRANSCRIPT

THIS IS AN UNOFFICIAL DRAFT TRANSCRIPT

This transcript has not been checked, proofread or corrected. It is a draft transcript, NOT a certified transcript. As such, it may contain computer-generated mistranslations of stenotype code, resulting in inaccurate or nonsensical word combinations or untranslated stenotype symbols which cannot be deciphered by

DRAFT COPY

non-stenotypists. Corrections will be made in the preparation of the certified transcript, resulting in differences in page and line numbers, punctuation and formatting.

THIS DRAFT TRANSCRIPT IS SUPPLIED TO YOU ON THE CONDITION THAT UPON RECEIPT OF THE CERTIFIED TRANSCRIPT, THIS DRAFT AND ANY COPIES THEREOF (IN CONDENSED FORMAT OR OTHERWISE) WILL BE DESTROYED. THE CERTIFIED TRANSCRIPT IS THE ONLY OFFICIAL TRANSCRIPT WHICH MAY BE RELIED UPON FOR PURPOSES OF VERBATIM CITATION OF TESTIMONY.

****

DRAFT COPY